IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellant

v.

WILLIAM F. GALVIN, in the official capacity as Secretary of the Commonwealth of Massachusetts; MASSACHUSETTS ALLIANCE FOR RETIRED AMERICANS; COMMON CAUSE; JANE DOE INC.; JUAN PABLO JARAMILLO; NEW ENGLAND STATE AREA CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,
Defendants-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**APPENDIX**

HARMEET K. DHILLON
  Assistant Attorney General
JESUS A. OSETE
  Principal Deputy Assistant Attorney
  General
ANDREW G. BRANIFF
DAVID N. GOLDMAN
CHRISTOPHER C. WANG
JOSHUA R. ZUCKERMAN
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (771) 333-0027

# TABLE OF CONTENTS

**PAGE**

District Court Docket ..............................................................................1

Complaint,
    filed December 11, 2025
    (Doc. 1) ......................................................................................17

Motion to Compel the Production of Records,
    filed December 12, 2025
    (Doc. 6) ......................................................................................26

Declaration of Eric Neff,
    filed December 12, 2025
    (Doc. 6-1) ...................................................................................30

Memorandum of Law in Support of Motion to Compel
    the Production of Records,
    filed December 12, 2025
    (Doc. 6-2) ...................................................................................33

Letter and Email from the DOJ to Secretary Galvin,
    dated July 22, 2025
    (Doc. 6-3) ...................................................................................46

Letter and Email from First Deputy Secretary to the DOJ,
    dated August 7, 2025
    (Doc. 6-4) ...................................................................................50

Letter and Email from the DOJ to Secretary Galvin,
    dated August 14, 2025
    (Doc. 6-5) ...................................................................................52

Letter and Email from the DOJ to Secretary Galvin,
    dated August 28, 2025
    (Doc. 6-6) ...................................................................................56

**TABLE OF CONTENTS (continued):**                                              **PAGE**

Declaration of Hema Sarang-Sieminksi,
    filed December 22, 2025
    (Doc. 15-2, Exh. B)......................................................................57

Declaration of Juan Pablo Jaramillo,
    filed December 22, 2025
    (Doc. 15-3, Exh. C)......................................................................61

Confidential Memorandum of Understanding Between
    the DOJ and Colorado,
    filed February 6, 2026
    (Doc. 51-1, Exh. A)......................................................................64

Confidential Memorandum of Understanding Between
    the DOJ and Texas,
    filed February 6, 2026
    (Doc. 51-2, Exh. B)......................................................................74

Transcript of Hearing Re: Motion to Dismiss in *United States v.*
    *Weber*, No. 2:25-cv-9149 (C.D. Cal. Dec. 4, 2025)
    filed February 6, 2026
    (Doc. 51-3, Exh. C)......................................................................84

Letter from Attorney General Pamela Bondi to
    Minnesota Governor Tim Walz,
    dated January 25, 2026
    (Doc. 51-4, Exh. D)....................................................................118

Massachusetts Voter Registration Form,
    filed March 13, 2026
    (Doc. 74-1, Exh. A)....................................................................122

Transcript of Hearing Re: Motion Hearing in *United States v.*
    *Simon*, No. 25-cv-3761 (D. Minn. Mar. 3, 2026)
    filed March 13, 2026
    (Doc. 74-2, Exh. B)....................................................................125

**TABLE OF CONTENTS (continued):** **PAGE**

Protective Order, Schedule A, entered in *United States v.*
*Scanlan*, No. 1:24-cv-312 (D.N.H.)
filed March 13, 2026
(Doc. 74-4, Exh. D)......................................................................182

Notice of Appeal,
filed June 1, 2026
(Doc. 95) ....................................................................................186

APPEAL

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:25-cv-13816-LTS

United States of America v. Galvin
Assigned to: District Judge Leo T. Sorokin
Case in other court: USCA - First Circuit, 26-01657
Cause: 42:1981 Civil Rights

Date Filed: 12/11/2025
Date Terminated: 04/09/2026
Jury Demand: None
Nature of Suit: 441 Civil Rights: Voting
Jurisdiction: U.S. Government Plaintiff

**Plaintiff**

**United States of America**                    represented by    **David D. Vandenberg**
DOJ-Crt
150 M Street, NE
Washington, DC 20002
202-307-2767
Email: david.vandenberg@usdoj.gov
*TERMINATED: 06/02/2026*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher J Gardner**
DOJ-Crt
150 M St NE
Washington, DC 20002
202-812-2631
Email: christopher.gardner@usdoj.gov
*ATTORNEY TO BE NOTICED*

**John Casali**
DOJ-Crt
150 M Street NE
Washington DC, DC 20003
202-316-8087
Email: john.casali@usdoj.gov
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**William Francis Galvin**                    represented by    **Anne L. Sterman**
*in his official capacity as Secretary of the*                Office of the Attorney General
*Commonwealth of Massachusetts*                One Ashburton Place
18th Floor
Boston, MA 02108
617-727-2200
Email: Anne.Sterman@mass.gov
*ATTORNEY TO BE NOTICED*

App. 1

**Phoebe Fischer-Groban**
Massachusetts Attorney General's Office
McCormack Building
One Ashburton Place
Boston, MA 02108
617-963-2589
Email: phoebe.fischer-groban@mass.gov
*ATTORNEY TO BE NOTICED*

**Vanessa Azniv Arslanian**
Office of Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
617-963-2107
Email: vanessa.arslanian@mass.gov
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Common Cause**                    represented by   **Ari J. Savitzky**
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
401-529-3982
Email: asavitzky@aclu.org
*ATTORNEY TO BE NOTICED*

**Jessie J. Rossman**
ACLU of Massachusetts
Massachusetts
One Center Plaza
Suite 850
Boston, MA 02108
617-482-3170
Fax: 617-451-0009
Email: jrossman@aclum.org
*ATTORNEY TO BE NOTICED*

**Megan Christine Keenan**
American Civil Liberties Union Foundation
Voting Rights Project
915 15th St. NW
Washington, DC 20005
740-632-0671
Email: mkeenan@aclu.org
*TERMINATED: 01/29/2026*
*ATTORNEY TO BE NOTICED*

**Sophia Lin Lakin**
American Civil Liberties Union Foundation
Voting Rights Project
125 Broad Street
Ste 18th Floor
New York, NY 10004
212-519-7836

App. 2

Email: slakin@aclu.org
*ATTORNEY TO BE NOTICED*

**Suzanne Schlossberg**
ACLU of Massachusetts
One Center Plaza
Ste 850
Boston, MA 02108
617-482-3170
Email: sschlossberg@aclum.org
*ATTORNEY TO BE NOTICED*

**Theresa J. Lee**
American Civil Liberties Union Foundation
125 Broad Street
18th Floor
New York, NY 10004
212-549-2500
Email: tlee@aclu.org
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Jane Doe Inc.**                       represented by   **Ari J. Savitzky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jessie J. Rossman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan Christine Keenan**
(See above for address)
*TERMINATED: 01/29/2026*
*ATTORNEY TO BE NOTICED*

**Sophia Lin Lakin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Suzanne Schlossberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Theresa J. Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Juan Pablo Jaramillo**                represented by   **Ari J. Savitzky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jessie J. Rossman**
(See above for address)

App. 3

*ATTORNEY TO BE NOTICED*

**Megan Christine Keenan**
(See above for address)
*TERMINATED: 01/29/2026*
*ATTORNEY TO BE NOTICED*

**Sophia Lin Lakin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Suzanne Schlossberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Theresa J. Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Democratic National Committee**          represented by   **Daniel J. Freeman**
                                                            Democratic National Committee
                                                            430 South Capitol St SE #3
                                                            Washington, DC 20003
                                                            202-923-6429
                                                            Email: freemand@dnc.org
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Thomas R. Kiley**
                                                            CEK Boston, P.C.
                                                            One International Place
                                                            Ste 1820
                                                            Boston, MA 02110
                                                            617-439-7775
                                                            Fax: 617-330-8774
                                                            Email: tkiley@ceklaw.net
                                                            *ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Former Employees of the U.S.**          represented by   **Megan K. Smith**
**Department of Justice**                                   Willkie Farr & Gallagher LLP
                                                            2029 Century Park East - Suite 2900
                                                            Los Angeles, CA 90067-2905
                                                            301-728-8344
                                                            Email: msmith@willkie.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**The Bipartisan American Election**          represented by   **Andrew George Pappas**
**Project**                                                    Osborn Maledon, P.A.
                                                               2929 N. Central Avenue
                                                               Suite 2000

App. 4

Phoenix, AZ 85012
602-640-9398
Fax: 602-640-9050
Email: apappas@omlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kimberly I. Friday**
Osborn Maledon, P.A.
2929 N. Central Avenue
Suite 2000
Phoenix, AZ 85012-2793
602-640-9000
Email: kfriday@omlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mary Ruth O'Grady**
Osborn Maledon PA
2929 N Central Ave
Ste 2100
Phoenix, AZ 85012
602-640-9000
Fax: 602-640-9050
Email: mogrady@omlaw.com
*ATTORNEY TO BE NOTICED*

V.

**<u>Intervenor</u>**

**New England State Area Conference of the National Association for the Advancement of Colored People**  represented by  **David Robert Fox**
Elias Law Group LLP
250 Massachusetts Ave NW
Suite 400
Washington, DC 20001
202-968-4546
Email: dfox@elias.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin Ronald Kowalewski**
Elias Law Group LLP
250 Massachusetts Avenue NW
Suite 400
Washington DC, DC 20001
202-985-3535
Email: kkowalewski@elias.law
*ATTORNEY TO BE NOTICED*

**Tori Shaw**
Elias Law Group LLP
Litigation
250 Massachusetts Ave NW

App. 5

Suite 400
Washington, DC 20001
202-987-4663
Email: tshaw@elias.law
*ATTORNEY TO BE NOTICED*

**Intervenor**

| | | |
|---|---|---|
| **Massachusetts Alliance for Retired Americans** | represented by | **David Robert Fox**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Kevin Ronald Kowalewski**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Tori Shaw**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 12/11/2025 | 1 | COMPLAINT against William Francis Galvin (Fee Status: US Government), filed by United States of America. (Attachments: # 1 Civil Cover Sheet, # 2 Civil Cover Sheet Attachment)(Vandenberg, David)<br>Modified on 12/12/2025: to edit docket text (EZG). (Entered: 12/11/2025) |
| 12/12/2025 | 2 | **ELECTRONIC NOTICE TO COUNSEL:**<br>Counsel shall complete and file in PDF format a **Local Category Form**. The form can be found on the court's website under Resources/Forms. Counsel will use the event under Other Documents- Civil Cover Sheet & Category Sheet. (EZG) (Entered: 12/12/2025) |
| 12/12/2025 | 3 | ELECTRONIC NOTICE of Case Assignment. District Judge Leo T. Sorokin assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Jessica D. Hedges. (NMC) (Entered: 12/12/2025) |
| 12/12/2025 | 4 | Summons Issued as to William Francis Galvin. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (SP) (Entered: 12/12/2025) |
| 12/12/2025 | 5 | Civil Cover Sheet & Category Sheet re 1 Complaint, by United States of America. (Attachments: # 1 Category Form)(Vandenberg, David) (Entered: 12/12/2025) |
| 12/12/2025 | 6 | MOTION to Compel *Production* by United States of America. (Vandenberg, David) (Additional attachment(s) added on 12/15/2025: # 1 Declaration of Eric Neff, # 2 Text of Proposed Order) (FGD). **Modified on 12/15/2025: Memo is support and exhibits were removed and properly refiled as a separate entry. Please see entry 7 .** (FGD). (Entered: 12/12/2025) |
| 12/12/2025 | 7 | MEMORANDUM in Support re 6 MOTION to Compel *Production* filed by United States of America. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4) (FGD) (Entered: 12/15/2025) |

App. 6

| | | |
|---|---|---|
| 12/15/2025 | 8 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered re: 6 MOTION to Compel *Production*.<br><br>The deadline for responding to this Motion, filed before proof of service appears on the docket, is 21 days after the later of (1) the date of service or (2) the filing on the docket of this motion. Plaintiff shall provide a copy of this e order to defendant and its counsel when serving the complaint.<br><br>(FGD) (Entered: 12/15/2025) |
| 12/21/2025 | 9 | MOTION to Intervene by New England State Area Conference of the National Association for the Advancement of Colored People, Massachusetts Alliance for Retired Americans. (Attachments: # 1 Proposed Answer)(Fox, David) (Entered: 12/21/2025) |
| 12/21/2025 | 10 | MEMORANDUM in Support re 9 MOTION to Intervene filed by Massachusetts Alliance for Retired Americans, New England State Area Conference of the National Association for the Advancement of Colored People. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Fox, David) (Entered: 12/21/2025) |
| 12/21/2025 | 11 | CORPORATE DISCLOSURE STATEMENT by New England State Area Conference of the National Association for the Advancement of Colored People. (Fox, David) (Entered: 12/21/2025) |
| 12/21/2025 | 12 | CORPORATE DISCLOSURE STATEMENT by Massachusetts Alliance for Retired Americans. (Fox, David) (Entered: 12/21/2025) |
| 12/22/2025 | 13 | MOTION to Intervene by Common Cause, Jane Doe Inc., Juan Pablo Jaramillo. (Attachments: # 1 Proposed Order, # 2 Motion to Dismiss)(Schlossberg, Suzanne) (Entered: 12/22/2025) |
| 12/22/2025 | 14 | MEMORANDUM in Support re 13 MOTION to Intervene filed by Common Cause, Jane Doe Inc., Juan Pablo Jaramillo. (Schlossberg, Suzanne) (Entered: 12/22/2025) |
| 12/22/2025 | 15 | AFFIDAVIT in Support re 13 MOTION to Intervene filed by Common Cause, Jane Doe Inc., Juan Pablo Jaramillo. (Attachments: # 1 Ex. A - Declaration of G. Foster, # 2 Ex. B - Declaration of H. Sarang-Sieminski, # 3 Ex. C - Declaration of J.P. Jaramillo)(Schlossberg, Suzanne) (Entered: 12/22/2025) |
| 12/22/2025 | 16 | CORPORATE DISCLOSURE STATEMENT by Common Cause, Jane Doe Inc.. (Schlossberg, Suzanne) (Entered: 12/22/2025) |
| 12/26/2025 | 17 | MOTION for Leave to Appear Pro Hac Vice for admission of Tori Shaw Filing fee: $ 125, receipt number AMADC-11440867 by Massachusetts Alliance for Retired Americans, New England State Area Conference of the National Association for the Advancement of Colored People. (Attachments: # 1 Certification)(Fox, David) Modified docket text on 12/29/2025 (FGD). (Entered: 12/26/2025) |
| 12/29/2025 | 18 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 17 Motion for Leave to Appear Pro Hac Vice Added Tori Shaw.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. |

App. 7

| | | A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(FGD) (Entered: 12/29/2025) |
|---|---|---|
| 12/29/2025 | 19 | MOTION for Leave to Appear Pro Hac Vice for admission of Ari J. Savitzsky Filing fee: $ 125, receipt number AMADC-11444148 by Common Cause, Juan Pablo Jaramillo, Jane Doe Inc. . (Attachments: # 1 Exhibit A)(Schlossberg, Suzanne) **Modified on 12/30/2025: Updated filer names.** (FGD) (Entered: 12/29/2025) |
| 12/30/2025 | 20 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 19 Motion for Leave to Appear Pro Hac Vice Added Ari J. Savitzky.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(FGD) (Entered: 12/30/2025) |
| 12/30/2025 | 21 | MOTION for Leave to Appear Pro Hac Vice for admission of Kevin Kowalewski Filing fee: $ 125, receipt number AMADC-11445761 by Massachusetts Alliance for Retired Americans, New England State Area Conference of the National Association for the Advancement of Colored People. (Attachments: # 1 Affidavit of Kevin Kowalewski)(Fox, David) (Entered: 12/30/2025) |
| 12/31/2025 | 22 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 21 Motion for Leave to Appear Pro Hac Vice Added Kevin Kowalewski.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(FGD) (Entered: 12/31/2025) |
| 01/02/2026 | 23 | NOTICE of Appearance by Tori Shaw on behalf of Massachusetts Alliance for Retired Americans, New England State Area Conference of the National Association for the Advancement of Colored People (Shaw, Tori) (Entered: 01/02/2026) |
| 01/05/2026 | 24 | MOTION for Leave to Appear Pro Hac Vice for admission of MEGAN C. KEENAN Filing fee: $ 125, receipt number AMADC-11452339 by Common Cause, Jane Doe Inc., Juan Pablo Jaramillo. (Attachments: # 1 Exhibit A)(Schlossberg, Suzanne) (Entered: 01/05/2026) |

App. 8

| | | |
|---|---|---|
| 01/05/2026 | 25 | MOTION for Leave to Appear Pro Hac Vice for admission of Sophia Lin Lakin Filing fee: $ 125, receipt number AMADC-11452476 by Common Cause, Jane Doe Inc., Juan Pablo Jaramillo. (Attachments: # 1 Exhibit A)(Schlossberg, Suzanne) (Entered: 01/05/2026) |
| 01/05/2026 | 26 | MOTION for Leave to Appear Pro Hac Vice for admission of Theresa J. Lee Filing fee: $ 125, receipt number AMADC-11452487 by Common Cause, Jane Doe Inc., Juan Pablo Jaramillo. (Attachments: # 1 Exhibit A)(Schlossberg, Suzanne) (Entered: 01/05/2026) |
| 01/05/2026 | 27 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 24 Motion for Leave to Appear Pro Hac Vice Added Megan C. Keenan.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(FGD) (Entered: 01/05/2026) |
| 01/05/2026 | 28 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 25 Motion for Leave to Appear Pro Hac Vice Added Sophia Lin Lakin.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(FGD) (Entered: 01/05/2026) |
| 01/05/2026 | 29 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 26 Motion for Leave to Appear Pro Hac Vice Added Theresa J. Lee.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(FGD) (Entered: 01/05/2026) |

App. 9

| 01/06/2026 | 30 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered.<br><br>Pending before the Court are two timely motions to intervene as defendants, either as of right under Rule 24(a) or with permission under Rule 24(b). Doc. Nos. 9, 13. Proposed intervenors are four organizations with Massachusetts-voter members—the New England State Area Conference of the NAACP (Doc. No. 10-1), the Massachusetts Alliance for Retired Americans (Doc. No. 10-2), Common Cause (Doc. No. 15-1), and Jane Doe Inc. (Doc. No. 15-2)—as well as an individual Massachusetts voter, Juan Pablo Jaramillo (Doc. No. 15-3). The existing parties (plaintiff United States and defendant Secretary Galvin) do not oppose the motions to intervene. Doc. No. 9 at 2; Doc. No. 13 at 2. The motions to intervene (Doc. Nos. 9, 13) are therefore ALLOWED as unopposed.<br><br>Proof of service on defendant Galvin does not yet appear on the docket, and he has not yet responded to the complaint or motion to compel. The Court previously ordered that Galvin's deadline for responding to the United States' motion to compel is "21 days after the later of (1) the date of service or (2) the filing on the docket of [the motion to compel]." Doc. No. 8. The intervenor-defendants have indicated their intent to move to dismiss, Doc. No. 9 at 1 n.1; Doc. No. 13-2, and to respond to the motion to compel, Doc. No. 13 at 2. (Some intervenors did not reference the motion to compel but, of course, they may respond as they are now defendants in this case.)<br><br>The Court intends to adopt a unified briefing schedule. By January 9, 2026, the parties shall file a joint status report that proposes a briefing schedule for (a) the defendants' responses to the complaint (including any Rule 12 motions), (b) the defendants' responses to the motion to compel, and (c) the United States' responses/replies thereto. Any pending responsive pleading deadlines, including those specified in Doc. No. 8, are stayed pending the Court's adoption of a briefing schedule. To the extent the United States has not yet served defendant Galvin, the report shall discuss when that might occur, and counsel shall confer with the Office of the Attorney General for the Commonwealth of Massachusetts, as anticipated counsel for Galvin, to discern its position on the matters for the status report.<br><br>(FGD) (Entered: 01/06/2026) |
| 01/06/2026 | 31 | ~~SUMMONS Returned Executed William Francis Galvin served on 12/18/2025, answer due 1/8/2026.~~ (Vandenberg, David) **Modified on 1/7/2026: Document refiled under correct docketing event. Please see entries 34 , 35 .** (FGD) (Entered: 01/06/2026) |
| 01/06/2026 | 32 | NOTICE of Appearance by Ari J. Savitzky on behalf of Common Cause, Jane Doe Inc., Juan Pablo Jaramillo (Savitzky, Ari) (Entered: 01/06/2026) |
| 01/07/2026 | 33 | NOTICE of Appearance by Sophia Lin Lakin on behalf of Common Cause, Jane Doe Inc., Juan Pablo Jaramillo (Lakin, Sophia) (Entered: 01/07/2026) |
| 01/07/2026 | 34 | US Marshal Process Receipt and Return for Summons and Complaint. William Francis Galvin served Delivered on 1/18/2025. (FGD) (Entered: 01/07/2026) |
| 01/07/2026 | 35 | US Marshal Process Receipt and Return for Summons and Complaint. Andrea Joy Campbell, Attorney General served Delivered on 12/18/2025. (FGD) (Entered: 01/07/2026) |
| 01/07/2026 | 36 | NOTICE of Appearance by Theresa J. Lee on behalf of Common Cause, Jane Doe Inc., Juan Pablo Jaramillo (Lee, Theresa) (Entered: 01/07/2026) |
| 01/07/2026 | 37 | NOTICE of Appearance by Megan Christine Keenan on behalf of Common Cause, Jane Doe Inc., Juan Pablo Jaramillo (Keenan, Megan) (Entered: 01/07/2026) |

App. 10

| | | |
|---|---|---|
| 01/07/2026 | 38 | NOTICE of Appearance by Jessie J. Rossman on behalf of Common Cause, Jane Doe Inc., Juan Pablo Jaramillo (Rossman, Jessie) (Entered: 01/07/2026) |
| 01/09/2026 | 39 | STATUS REPORT *of the Parties* by United States of America. (Vandenberg, David) (Entered: 01/09/2026) |
| 01/09/2026 | 40 | NOTICE of Appearance by Anne L. Sterman on behalf of William Francis Galvin (Sterman, Anne) (Entered: 01/09/2026) |
| 01/09/2026 | 41 | NOTICE of Appearance by Phoebe Fischer-Groban on behalf of William Francis Galvin (Fischer-Groban, Phoebe) (Entered: 01/09/2026) |
| 01/09/2026 | 42 | NOTICE of Appearance by Vanessa Azniv Arslanian on behalf of William Francis Galvin (Arslanian, Vanessa) (Entered: 01/09/2026) |
| 01/12/2026 | 43 | District Judge Leo T. Sorokin: ELECTRONIC ORDER enteredre: 39 STATUS REPORT *of the Parties.*<br><br>The Court construes the status report as a joint motion of the parties to adopt the briefing schedule proposed. The Court allows that request and adopts the proposed schedule. (FGD) (Entered: 01/12/2026) |
| 01/23/2026 | 44 | US Marshal Process Receipt and Return for Summons and Complaint. William Francis Galvin served Delivered on 12/18/2025. (FGD) (Entered: 01/27/2026) |
| 01/23/2026 | 45 | US Treasury Process Receipt and Return for Summons and Complaint. Andrea Joy Campbell, Attorney General served Delivered on 12/18/2025. (FGD) (Entered: 01/27/2026) |
| 01/28/2026 | 46 | MOTION to Withdraw as Attorney by Common Cause, Jane Doe Inc., Juan Pablo Jaramillo.(Keenan, Megan) (Entered: 01/28/2026) |
| 01/29/2026 | 47 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered re: 46 Motion to Withdraw as Attorney.<br><br>ALLOWED. Attorney Megan Christine Keenan terminated. (FGD) (Entered: 01/29/2026) |
| 02/06/2026 | 48 | NOTICE of Appearance by Kevin Ronald Kowalewski on behalf of Massachusetts Alliance for Retired Americans, New England State Area Conference of the National Association for the Advancement of Colored People (Kowalewski, Kevin) (Entered: 02/06/2026) |
| 02/06/2026 | 49 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Common Cause, Jane Doe Inc., Juan Pablo Jaramillo.(Savitzky, Ari) (Entered: 02/06/2026) |
| 02/06/2026 | 50 | MEMORANDUM in Support re 49 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Common Cause, Jane Doe Inc., Juan Pablo Jaramillo. (Savitzky, Ari) (Entered: 02/06/2026) |
| 02/06/2026 | 51 | AFFIDAVIT in Support re 49 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Common Cause, Jane Doe Inc., Juan Pablo Jaramillo. (Attachments: # 1 Exhibit A - Colorado MOU, # 2 Exhibit B - Texas MOU, # 3 Exhibit C - Weber Partial Transcript, # 4 Exhibit D - Bondi Letter)(Savitzky, Ari) (Entered: 02/06/2026) |
| 02/06/2026 | 52 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Massachusetts Alliance for Retired Americans, New England State Area Conference of the National Association for the Advancement of Colored People.(Fox, David) (Entered: 02/06/2026) |

App. 11

| | | |
|---|---|---|
| 02/06/2026 | 53 | Opposition re 6 MOTION to Compel *Production* filed by Common Cause, Jane Doe Inc., Juan Pablo Jaramillo. (Savitzky, Ari) (Entered: 02/06/2026) |
| 02/06/2026 | 54 | MEMORANDUM in Support re 52 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Massachusetts Alliance for Retired Americans, New England State Area Conference of the National Association for the Advancement of Colored People. (Fox, David) (Entered: 02/06/2026) |
| 02/06/2026 | 55 | MEMORANDUM in Opposition re 6 MOTION to Compel *Production* filed by Massachusetts Alliance for Retired Americans, New England State Area Conference of the National Association for the Advancement of Colored People. (Fox, David) (Entered: 02/06/2026) |
| 02/06/2026 | 56 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by William Francis Galvin. (Fischer-Groban, Phoebe) (Entered: 02/06/2026) |
| 02/06/2026 | 57 | MEMORANDUM in Support re 56 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by William Francis Galvin. (Fischer-Groban, Phoebe) (Entered: 02/06/2026) |
| 02/09/2026 | 58 | MOTION for Leave to Appear Pro Hac Vice for admission of Daniel Freeman Filing fee: $ 125, receipt number AMADC-11535699 by Democratic National Committee.(Kiley, Thomas) (Additional attachment(s) added on 2/9/2026: # 1 Certification) (FGD). **Modified on 2/9/2026: Main Document 58 replaced on 2/9/2026, detached from supporting document. Filing party's name corrected.** (FGD) (Entered: 02/09/2026) |
| 02/09/2026 | 59 | MOTION for Leave to File *Amicus Brief* by Democratic National Committee.(Kiley, Thomas) (Entered: 02/09/2026) |
| 02/09/2026 | 60 | MEMORANDUM in Support re 59 MOTION for Leave to File *Amicus Brief* filed by Democratic National Committee. (Kiley, Thomas) (Entered: 02/09/2026) |
| 02/09/2026 | 61 | AMICUS BRIEF filed by Democratic National Committee . (Kiley, Thomas) (Entered: 02/09/2026) |
| 02/09/2026 | 62 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 58 Motion for Leave to Appear Pro Hac Vice Added Daniel J. Freeman. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. (FGD) (Entered: 02/09/2026) |
| 02/10/2026 | 63 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered re: 59 MOTION for Leave to File Amicus Brief. ALLOWED. Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (FGD) (Entered: 02/10/2026) |

App. 12

| 02/10/2026 | 64 | RESPONSE TO COURT ORDER by Democratic National Committee . (Kiley, Thomas) (Entered: 02/10/2026) |
|---|---|---|
| 02/10/2026 | 65 | NOTICE of Appearance by Daniel J. Freeman on behalf of Democratic National Committee (Freeman, Daniel) (Entered: 02/10/2026) |
| 02/13/2026 | 66 | MOTION for Leave to File *Amicus Brief* by Former Employees of the U.S. Department of Justice.(Smith, Megan) (Entered: 02/13/2026) |
| 02/13/2026 | 67 | MEMORANDUM in Support re 66 MOTION for Leave to File *Amicus Brief* filed by Former Employees of the U.S. Department of Justice. (Smith, Megan) (Entered: 02/13/2026) |
| 02/13/2026 | 68 | AMICUS BRIEF filed by Former Employees of the U.S. Department of Justice . (Smith, Megan) (Entered: 02/13/2026) |
| 02/17/2026 | 69 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered re: 66 MOTION for Leave to File Amicus Brief.<br><br>ALLOWED. Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document.<br><br>(FGD) (Entered: 02/17/2026) |
| 02/27/2026 | 70 | MOTION for Leave to File *Response with Additional Pages* by United States of America. (Attachments: # 1 Exhibit Proposed Opposition, # 2 Affidavit Declaration of Eric Neff, # 3 Exhibit Exhibit 1 Georgia Complaint, # 4 Exhibit Exhibit 2 Georgia Consent Decree, # 5 Exhibit Texas MOU, # 6 Exhibit North Carolina Consent Decree, # 7 Exhibit North Carolina 2nd Status Report, # 8 Exhibit Ford Carter Report, # 9 Exhibit Benson Notice of Appeal, # 10 Exhibit Oregon Notice of Appeal, # 11 Exhibit Weber Notice of Appeal) (Gardner, Christopher) (Entered: 02/27/2026) |
| 03/02/2026 | 71 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered re: 70 MOTION for Leave to File Response with Additional Pages.<br><br>ALLOWED. Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (FGD) (Entered: 03/02/2026) |
| 03/02/2026 | 72 | MEMORANDUM in Opposition re 52 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 49 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 56 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by United States of America. (Attachments: # 1 Exhibit 2nd Neff Declaration, # 2 Exhibit Georgia Complaint, # 3 Exhibit Georgia Consent Decree, # 4 Exhibit Texas MOU, # 5 Exhibit North Carolina Consent Decree, # 6 Exhibit North Carolina Second Status Report, # 7 Exhibit Ford Carter Report, # 8 Exhibit Benson Notice of Appeal, # 9 Exhibit Oregon Notice of Appeal, # 10 Exhibit Weber Notice of Appeal)(Gardner, Christopher) (Entered: 03/02/2026) |
| 03/13/2026 | 73 | REPLY to Response to 49 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Common Cause, Jane Doe Inc., Juan Pablo Jaramillo. (Savitzky, Ari) (Entered: 03/13/2026) |
| 03/13/2026 | 74 | AFFIDAVIT in Support re 49 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Common Cause, Jane Doe Inc., Juan Pablo Jaramillo. (Attachments: # 1 |

App. 13

| | | |
|---|---|---|
| | | Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Savitzky, Ari) (Entered: 03/13/2026) |
| 03/13/2026 | 75 | REPLY to Response to 56 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by William Francis Galvin. (Fischer-Groban, Phoebe) (Entered: 03/13/2026) |
| 03/13/2026 | 76 | REPLY to Response to 52 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Massachusetts Alliance for Retired Americans, New England State Area Conference of the National Association for the Advancement of Colored People. (Fox, David) (Entered: 03/13/2026) |
| 03/18/2026 | 77 | NOTICE of Appearance by Kimberly I. Friday on behalf of The Bipartisan American Election Project (Friday, Kimberly) (Entered: 03/18/2026) |
| 03/18/2026 | 78 | MOTION for Leave to Appear Pro Hac Vice for admission of Mary R. O'Grady Filing fee: $ 125, receipt number AMADC-11619854 by The Bipartisan American Election Project. (Attachments: # 1 Affidavit)(Friday, Kimberly) (Entered: 03/18/2026) |
| 03/18/2026 | 79 | MOTION for Leave to Appear Pro Hac Vice for admission of Andrew G. Pappas Filing fee: $ 125, receipt number AMADC-11620026 by The Bipartisan American Election Project. (Attachments: # 1 Affidavit)(Friday, Kimberly) (Entered: 03/18/2026) |
| 03/18/2026 | 80 | MOTION for Leave to Appear Pro Hac Vice for admission of John Bullock Filing fee: $ 125, receipt number AMADC-11620036 by The Bipartisan American Election Project. (Attachments: # 1 Affidavit)(Friday, Kimberly) (Entered: 03/18/2026) |
| 03/19/2026 | 81 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 78 Motion for Leave to Appear Pro Hac Vice Added Mary R. O'Grady. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. (FGD) (Entered: 03/19/2026) |
| 03/19/2026 | 82 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 79 Motion for Leave to Appear Pro Hac Vice Added Andrew G. Pappas. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. (FGD) (Entered: 03/19/2026) |

App. 14

| 03/19/2026 | 83 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 80 Motion for Leave to Appear Pro Hac Vice Added John Bullock.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(FGD) (Entered: 03/19/2026) |
| --- | --- | --- |
| 03/23/2026 | 84 | NOTICE of Appearance by Andrew George Pappas on behalf of The Bipartisan American Election Project (Pappas, Andrew) (Entered: 03/23/2026) |
| 03/23/2026 | 85 | NOTICE of Appearance by Mary Ruth O'Grady on behalf of The Bipartisan American Election Project (O'Grady, Mary) (Entered: 03/23/2026) |
| 03/23/2026 | 86 | MOTION for Leave to File *Brief of Amicus Curiae* by The Bipartisan American Election Project.(Pappas, Andrew) (Entered: 03/23/2026) |
| 03/23/2026 | 87 | MEMORANDUM in Support re 86 MOTION for Leave to File *Brief of Amicus Curiae* filed by The Bipartisan American Election Project. (Pappas, Andrew) (Entered: 03/23/2026) |
| 03/23/2026 | 88 | AMICUS BRIEF filed by The Bipartisan American Election Project . (Pappas, Andrew) (Entered: 03/23/2026) |
| 03/24/2026 | 89 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered re: 86 MOTION for Leave to File Brief of Amicus Curiae.<br><br>ALLOWED. Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (FGD) (Entered: 03/24/2026) |
| 03/24/2026 | 90 | AMICUS BRIEF filed by The Bipartisan American Election Project . (Pappas, Andrew) (Entered: 03/24/2026) |
| 03/26/2026 | 91 | NOTICE of Appearance by John Casali on behalf of United States of America (Casali, John) (Entered: 03/26/2026) |
| 04/09/2026 | 92 | District Judge Leo T. Sorokin: ORDER entered. ORDER ON MOTION TO COMPEL (DOC. NO. 6 ) AND MOTIONS TO DISMISS (DOC. NOS. 49 , 52 , 56 ). (FGD) (Entered: 04/09/2026) |
| 04/09/2026 | 93 | District Judge Leo T. Sorokin: ORDER entered. ORDER DISMISSING CASE. (FGD) (Entered: 04/09/2026) |
| 06/01/2026 | 94 | NOTICE of Withdrawal of Appearance by Christopher J Gardner *on Behalf of David Vandenburg* (Gardner, Christopher) (Entered: 06/01/2026) |
| 06/01/2026 | 95 | NOTICE OF APPEAL as to 92 Order, Terminate Motions, 93 Order Dismissing Case by United States of America. Fee Status: US Government. |

App. 15

|  |  | NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US District Court Clerk to deliver official record to Court of Appeals by 6/22/2026. (Gardner, Christopher) (Entered: 06/01/2026) |
|---|---|---|
| 06/02/2026 | 96 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 95 Notice of Appeal. (FGD) (Entered: 06/02/2026) |
| 06/02/2026 | 97 | USCA Case Number 26-1657 for 95 Notice of Appeal, filed by United States of America. (FGD) (Entered: 06/02/2026) |
| 06/03/2026 | 98 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered: re 94 Notice of Withdrawal of Appearance. ALLOWED. (FGD) (Entered: 06/03/2026) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/15/2026 12:03:03 | | |
| **PACER Login:** joshzuckerman | **Client Code:** | |
| **Description:** Docket Report | **Search Criteria:** | 1:25-cv-13816-LTS |
| **Billable Pages:** 14 | **Cost:** | 1.40 |

App. 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

WILLIAM FRANCIS GALVIN, in his official
capacity as Secretary of the Commonwealth of
Massachusetts,

        Defendant.

Civil No.

## COMPLAINT

Plaintiff United States of America brings this action against William Galvin, in his official capacity as Secretary of the Commonwealth of Massachusetts, and alleges:

## INTRODUCTION

1.      Title III of the Civil Rights Act of 1960 ("CRA") imposes a "sweeping" obligation on election officials, *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962), to "retain and preserve… *all* records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…" 52 U.S.C. § 20701 (emphasis added).

2.      Title III likewise grants the Attorney General of the United States the sweeping power to obtain these records: "Any record or paper required by section 301 to be retained and preserved shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for

App. 17

inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative….” 52 U.S.C. § 20703. The written demand “shall contain a statement of the basis and the purpose therefor.” *Id.*

3.	If the custodian to whom the written demand refuses to comply, the CRA requires “a special statutory proceeding in which the courts play a limited, albeit vital, role” in assisting the Attorney General’s investigative powers. *Lynd*, 306 F.2d at 225. The Attorney General or her representative may request a federal court to issue an order directing the officer of election to produce the demanded records, akin to “a traditional order to show cause, or to produce in aid of an order of an administrative agency.” *Id.*

4.	In this “summary” proceeding, *In re Gordon*, 218 F. Supp. 826, 826-27 (S.D. Miss. 1963), the Attorney General need only show that she made a “written demand” for records covered by Section 301 of the CRA and that “the person against whom an order for production is sought… has failed or refused to make such papers ‘available for inspection, reproduction, and copying,’” *Lynd*, 306 F.2d at 226 (quoting 42 U.S.C. § 1974b, transferred to 52 U.S.C. § 20703). The court does not adjudicate “the factual foundation for, or the sufficiency of, the Attorney General’s ‘statement of the basis and the purpose’ contained in the written demand” or “the scope of the order to produce.” *Id.*

## JURISDICTION AND VENUE

5.	This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, and 2201(a); and 52 U.S.C. § 20705.

6.	Venue for this action is proper in the United States District Court for the District of Massachusetts, because all actions giving rise to the suit occurred within this district, the Defendant is a resident of the Commonwealth of Massachusetts, and the records that are demanded

2

App. 18

are located in this district. 28 U.S.C. § 1391(b); *see also* 28 U.S.C. § 101 (the Commonwealth of Massachusetts constitutes a single federal district court).

## PARTIES

7.      Plaintiff is the United States of America. The United States, through the Attorney General, has authority to enforce various federal election statutes, including the CRA, *see* 52 U.S.C. § 20703; the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20510(a); and Title III of the Help America Vote Act ("HAVA"), 52 U.S.C. § 21111.

8.      Defendant William Francis Galvin ("Secretary Galvin") is the Secretary of the Commonwealth of Massachusetts and is sued in his official capacity as an "officer of election" as defined by Section 306 of the CRA. *See* 52 U.S.C. § 20706. Secretary Galvin is the chief election official responsible for coordinating Massachusetts's responsibilities under the NVRA. *See* 52 U.S.C. § 20509.  As the chief election official, Secretary Galvin is required to retain and preserve election records, including the federal election records identified in Section 301 of the CRA. *See* 52 U.S.C. § 20701.  Secretary Galvin is sued in his official capacity only.

## BACKGROUND

9.      This proceeding arises from the Attorney General's investigation into Massachusetts's compliance with federal election laws, particularly the NVRA and HAVA.

10.     Both the NVRA and HAVA require states to maintain accurate voter registration lists. The NVRA requires states to preserve certain records and papers that fall within the scope of Section 301 of Title III of the CRA.

11.     The NVRA requires each state to "designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities" under the NVRA.

3

App. 19

52 U.S.C. § 20509. Secretary Galvin is the chief election official of the Commonwealth of Massachusetts.

12. The NVRA requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" the death of the registrant, or "a change in the residence of the registrant, in accordance with subsections (b), (c), and (d)[.]" 52 U.S.C. § 20507(a)(4)(A)-(B).

13. The NVRA also requires states to maintain, with exceptions not relevant here, "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…." 52 U.S.C. § 20507(i)(1).

14. HAVA requires all states to maintain and administer "a single, uniform, official, centralized, interactive computerized statewide voter registration list" that contains "the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State…." 52 U.S.C. § 21083(a)(1)(A).

15. HAVA further establishes "[m]inimum standard[s] for accuracy of State voter registration records," 52 U.S.C. § 21083(a)(4), and prohibits states from processing voter-registration applications without obtaining and verifying certain identifying information from the applicants, namely a driver's license number for those who possess a valid one,  the last four digits of a Social Security number for those who do not have a driver's license number, or a unique HAVA identifier if the registrant does not have either one. 52 U.S.C. § 21083(a)(5)(A).

## FACTUAL ALLEGATIONS

16. The United States Election Assistance Commission ("EAC") – "an independent, bipartisan commission whose mission is to help election officials improve the administration of elections and help Americans participate in the election process" – conducts a biennial Election

App. 20

Administration and Voting Survey ("EAVS"). EAC, *About the EAC*, http://eac.gov/about (last visited Dec. 8, 2025).

17.    For the EAC's most recent report, "Election Administration and Voting Survey 2024 Comprehensive Report: A Report from the U.S. Election Assistance Commission to the 119th Congress" ("2024 EAVS Report"), States "reported data on their efforts to keep voter registration lists current and accurate, known as list maintenance." EAC, 2024 EAVS Report at iv.[1]

18.    Based on a review of the 2024 EAVS Report, the Attorney General, acting through her representative, the Assistant Attorney General for Civil Rights, sent a letter to Secretary Galvin on July 22, 2025, seeking information regarding Massachusetts's compliance with federal election law. Ex. 1 to Decl. of Eric Neff ("Neff Decl."), Ltr. from the Asst. Att'y Gen. to Sec'y Galvin July 22, 2025) ("July 22 Letter").

19.    The July 22 Letter requested – pursuant to Section 8(i) of the NVRA – that the Secretary provide a current electronic copy of its computerized statewide voter registration list ("SVRL"), required under Section 303 of HAVA. *Id.* In addition, the July 22 Letter requested information regarding Massachusetts's answers to specific questions in the 2024 EAVS Report. *Id.*

20.     On August 7, 2025, Massachusetts requested sixty additional days in which to provide a response. Ex. 2 to Decl. of Eric Neff ("Neff Decl."), Ltr. from Sec'y Galvin to Maureen Riordan August 7, 2025) ("August 7 Letter"). *Id.*

---

[1] https://www.eac.gov/sites/default/files/2025-07/2024_EAVS_Report_508.pdf (last visited Dec. 8, 2025).

App. 21

21.    The Attorney General, acting through her representative, the Assistant Attorney General for Civil Rights, sent a second letter to Secretary Galvin on August 14, 2025. Ex. 3 to Decl. of Eric Neff ("Neff Decl."), Ltr. from the Asst. Att'y Gen. to Sec'y Galvin August 14, 2025) ("August 14 Letter").

22.    The August 14 Letter contained a written demand made pursuant to Section 301 of the CRA, 52 U.S.C. § 20703, demanding "an electronic copy of Massachusetts's complete and current VRL" and advised that "[t]he purpose of the request is to ascertain Massachusetts's compliance with the list maintenance requirements of the NVRA and HAVA." *See* Ex. 3 to Neff Decl. at 2 (describing the scope of records and papers demanded). The letter directed that the SVRL should contain all fields, which include the registrant's full name, date of birth, residential address, his or her driver's license number, or the last four digits of the registrant's social security number as required by HAVA to register individuals for federal elections. *Id.* at 1-2.

23.    The August 14 Letter explained that "HAVA specifies that the 'last 4 digits of a social security number… shall not be considered to be a social security number for purposes of section 7 of the Privacy Act of 1974.'" *Id.* at 2 (citing 5 U.S.C. § 552a note; 52 U.S.C. § 21083(c)). In addition, it explained that any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Attorney General is now doing.  *See id.*

6

App. 22

24.　　Finally, the August 14 Letter also made clear that the requested records will be maintained consistently with Privacy Act protections as explained on the Department's website.[2] *See id.*

25.　　On August 28, 2025, the Voting Section followed up with an email asking for a response to the August 14 Letter.　Ex. 4 to Decl. of Eric Neff ("Neff Decl."), E-Mail from Michael Gates to Sec'y Galvin August 128, 2025) ("August 28 E-Mail").

26.　　The Department received no further written correspondence from Secretary Galvin.

27.　　On or about December 4, 2025, the Department contacted First Deputy Secretary Tassinari by telephone, who advised that Massachusetts would not provide its SVRL.

**COUNT ONE**
**VIOLATION OF THE CIVIL RIGHTS ACT OF 1960, 52 U.S.C. § 20703**

28.　　On August 14, 2025, the Attorney General, acting through her representative the Assistant Attorney General for Civil Rights, sent a written demand to Secretary Galvin to produce specific election records, as authorized by Section 303 of the CRA, 52 U.S.C. § 20703.

29.　　The written demand "contain[ed] a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.

30.　　Secretary Galvin has refused to provide the records requested.

Wherefore, the United States respectfully requests this Court:

A. Declare that Secretary Galvin's refusal to provide the federal election records upon a demand by the Attorney General violates Section 303 of the Civil Rights Act, 52 U.S.C. § 20703;

---

[2] https://civilrights.justice.gov/privacy-policy#:~:text=Our%20Statutes-
,Privacy%20Act%20Statement,the%20scope%20of%20our%20jurisdiction.

App. 23

B.  Order Secretary Galvin to provide to the Attorney General's representative, the Assistant Attorney General for Civil Rights, an electronic copy of Massachusetts's statewide Voter Registration List with all fields, including each registrant's name, date of birth, residential address, and as required by HAVA, their driver's license/state identification number, the last four digits of their Social Security number, or the unique HAVA identifier, *see* 52 U.S.C. § 21083 within five (5) days of a Court order; and

C.  Award such additional relief as the interests of justice may require.

Dated: December 11, 2025                              Respectfully submitted:


HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

*/s/David D. Vandenberg*
ERIC NEFF
Acting Chief, Voting Section

TIMOTHY F. MELLETT
DAVID D. VANDENBERG
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE
Washington, D.C. 20530
Telephone: (771) 333-0028
Eric.Neff@usdoj.gov
Timothy.F.Mellett@usdoj.gov
David.Vandenberg@usdoj.gov
*Attorneys for the United States*

8

App. 24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 11, 2025, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

<div align="right">

*/s/ David D. Vandenberg*
David D. Vandenberg

</div>

App. 25

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> *Plaintiff,* <br><br> *v.* <br><br><br> WILLIAM FRANCIS GALVIN, in his official capacity as Secretary of the Commonwealth of Massachusetts, <br><br><br><br> *Defendant.* | CASE NO:  1:25-cv-13816 <br><br><br><br> MOTION TO COMPEL PRODUCTION OF RECORDS, PURSUANT TO 52 U.S.C. § 20701, et seq. |

**MOTION TO COMPEL PRODUCTION OF RECORDS DEMANDED PURSUANT TO THE CIVIL RIGHTS ACT OF 1960**

Plaintiff, UNITED STATES OF AMERICA, by and through the Attorney General, pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), 52 U.S.C. § 20701, et seq., hereby moves this Honorable Court for an Order Compelling Defendant, WILLIAM FRANCIS GALVIN, Secretary of the Commonwealth, to show why he should not be compelled to produce the documents requested by Plaintiff. The United States offers the attached Memorandum of Law, and Declaration of Eric Neff, in Support of its Motion to Compel Production.

**Introduction**

The Attorney General has been tasked by Congress with enforcement authority for both the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA"). *See* 52 U.S.C. § 20510(a) and 52 U.S.C. § 21111. Both statutes require Defendant to conduct specified maintenance of Massachusetts's voter registration list. These requirements are an integral measure to ensure that Massachusetts's statewide voter registration lists ("SVRL") are accurate. Ensuring the accuracy of the list of eligible voters preserves the integrity of Massachusetts's federal election procedures.

Pursuant to Section 301 of the CRA, 52 U.S.C. § 20701, "every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or

App. 26

primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, all records and papers which come into his possession relating to any *application, registration*, payment of poll tax, or other act requisite to voting in such election[.]" (emphasis added).

Further, Section 303 of the CRA provides, "Any record or paper required by section 301 to be retained and preserved shall, *upon demand in writing by the Attorney General* or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative. This demand shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703 (emphasis added).

The United States has properly demanded records from Defendant, pursuant to these federal statutes, and Defendant has failed to comply as detailed in the Memorandum of Law in Support of this Motion, and exhibits filed contemporaneously herein. The United States brings this action and files this Motion to Compel Defendant to produce the requested records forthwith.

Section 305 of the CRA, 52 U.S.C. § 20705, provides that "[t]he United States District Court for the district in which a demand is made pursuant to Section 303, or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper."

### Prayer for Relief

For the foregoing reasons, Plaintiff requests that this Court enter an Order Compelling Defendant to produce the records demanded. Plaintiff further requests this Court:

A. Order Defendant to produce an electronic copy of the Massachusetts statewide Voter Registration List with all fields, including each registrant's name, date of birth, address, and as required by HAVA, the last four digits of the registrant's social security number, driver's license/state identification number, or the unique HAVA identifier;

App. 27

B.  Order Defendant to submit all demanded documents electronically to the Attorney General, within five (5) days of this order; and

C.  Award such additional relief as the interests of justice may require.

DATED: December 12, 2025

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division


*/s/ David D. Vandenberg*
ERIC NEFF
Acting Chief, Voting Section

TIMOTHY F. MELLETT
DAVID VANDENBERG
Trial Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street, NE, Room 8.143
Washington, D.C. 20002
Telephone: (202) 307-2767
Eric.Neff@usdoj.gov
Timothy.F.Mellett@usdoj.gov
David.Vandenberg@usdoj.gov
*Attorneys for the United States*

App. 28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 12, 2025, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/David D.Vandenberg*
David D. Vandenberg

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                 *Plaintiff,*<br><br>        v.<br><br>WILLIAM FRANCIS GALVIN, in his<br>official capacity as Secretary of the<br>Commonwealth of Massachusetts,<br><br>                 *Defendant.* | CASE NO: 1:25-cv-13816<br><br>DECLARATION OF ERIC NEFF IN<br>SUPPORT OF THE REQUEST FOR<br>ORDER TO COMPEL PRODUCTION OF<br>RECORDS PURSUANT TO 52 U.S.C. §<br>20701, *et seq.* |

## DECLARATION

I, Eric Neff, declare, pursuant to 28 U.S.C. § 1746, that:

1.      I am currently the Acting Voting Section Chief to the Assistant Attorney General for the Civil Rights Division of the United States Department of Justice. I am fully and personally familiar with the facts stated herein. I make this declaration in support of the United States's motion for an Order to Compel production of election registration records, pursuant to the Civil Rights Act codified at 52 U.S.C. § 20701, *et seq.*

2.      The National Voter Registration Act, 52 U.S.C. § 20501, *et seq.*, and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901, *et seq.*, require each state to perform voter-list maintenance to ensure that only eligible voters remain on the statewide voter registration list. Under Section 11 of the NVRA and Section 401 of HAVA, the Attorney General is charged with the responsibility for enforcement of the list maintenance requirements of both statutes. *See* 52 U.S.C. § 20510(a) and 52 U.S.C. § 21111. This enforcement responsibility has been delegated to the Civil Rights Division by Congress.

App. 30

3.      One of the Justice Department's responsibilities is monitoring states' compliance with the requirements of the NVRA and HAVA, including the filing of enforcement actions for noncompliance.

4.      On July 22, 2025, the Attorney General sent by letter a demand, – pursuant to Section 8(i) of the NVRA – that the Secretary provide a current electronic copy of its computerized statewide voter registration list ("SVRL"), required under Section 303 of HAVA. *Id.* In addition, the July 22 Letter requested information regarding Massachusetts's answers to specific questions in the 2024 EAVS. Ex. 1 (Ltr. from the Asst. Att'y Gen. to Sec'y Galvin July 22, 2025) ("July 22 Letter").

5.      On August 7, 2025, Massachusetts responded by requesting sixty additional days in which to provide a response. Ex. 2 (Ltr. from Sec'y Galvin to Maureen Riordan August 7, 2025) ("August 7 Letter").

6.      The Attorney General, acting through her representative, the Assistant Attorney General for Civil Rights, sent a second letter to Secretary Galvin on August 14, 2025, Ex. 3 (Ltr. from the Asst. Att'y Gen. to Sec'y Galvin August 14, 2025) ("August 14 Letter"), containing a written demand made pursuant to Section 301 of the CRA, 52 U.S.C. § 20703. *Id.* The August 14 Letter requested "an electronic copy of Massachuetts's complete and current VRL" and advised that "[t]he purpose of the request is to ascertain Massachusetts's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* at 2 (describing the scope of records and papers demanded). The August 14 Letter directed that the SVRL should contain all fields, which include the registrant's full name, date of birth, residential address, his or her driver's license number, or the last four digits of the registrant's social security number as required by HAVA to register individuals for federal elections. *Id.* at 1-2.

7.      The August 14 Letter also made clear that the requested records will be maintained consistently with Privacy Act protections as explained on the Department's website.[1] *See id.*

---

[1] https://civilrights.justice.gov/privacy-policy#:~:text=Our%20Statutes-,Privacy%20Act%20Statement,the%20scope%20of%20our%20jurisdiction.

App. 31

8.      On August 28, 2025, the Voting Section followed up with an e-mail asking for a response to the August 14 Letter. Ex. 4 (E-mail from Michael Gates to Sec'y Galvin August 28, 2025) ("August 28 E-Mail"). The Department received no further written correspondence from Secretary Galvin.

9.      On or about December 4, 2025, the Department contacted First Deputy Secretary Tassinari, who advised that Massachusetts would not provide its SVRL.

10.      True and correct copies of the Attorney General's letters dated July 22 (Ex. 1) and August 14 (Ex. 3), 2025, the response letter from the Secretary dated August 7, 2025 (Ex. 2), and the Department's e-mail of August 28, 2025 (Ex. 4), are attached as Exhibits hereto.

I declare under the penalty of perjury that the above statements are true and correct.


Executed: December 12, 2025, at Washington, D.C.


Eric Neff


App. 32

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>*v.*<br><br>WILLIAM FRANCIS GALVIN, in his official capacity as Secretary of State of the Commonwealth of Massachusetts,<br><br>*Defendant.* | CASE NO:  1:25-cv-13816<br><br><br>MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO COMPEL PRODUCTION OF RECORDS PURSUANT TO 52 U.S.C. § 20701, *et seq.* |

**MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES' MOTION TO COMPEL PRODUCTION OF RECORDS PURSUANT TO 52 U.S.C. § 20701, *et seq.***

1

App. 33

## TABLE OF CONTENTS

**INTRODUCTION**...................................................................................................4

**BACKGROUND** ...................................................................................................5

A.      Title III of the Civil Rights Act of 1960 ....................................................5

B.      The Attorney General Is Making a Demand for Federal Election Records under the CRA to Assess Massachusetts's NVRA and HAVA Compliance…....7

**ARGUMENT**…………….………………………..……………….………..8

A.  Title III of the Civil Rights Act of 1960…………………………….…..8
B.  The Attorney General Is Entitled to Relief under the CRA's Summary Proceedings for Obtaining Federal Election Records………..….………..10

**CONCLUSION**…………………………………………………..……...…..11

2

App. 34

## TABLE OF AUTHORITIES

**Cases**

*Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963)……………………………………………4, 6, 10

*Dinkens v. Attorney General*, 285 F.2d 430 (5th Cir. 1961)…………………………………..5

*In re Gordon*, 218 F. Supp. 826 (S.D. Miss. 1963)…………………………………………..6, 11

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962)…………………………………………………6

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962)………………………………………………passim

*Smith v. City of Jackson*, 544 U.S. 228 (2005)…………………………………….…………10

*State of Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960)…….................4

**Statutes**

52 U.S.C § 20510(a) ................................................................................................ 10

52 U.S.C. § 20501(b)(3) .......................................................................................... 7

52 U.S.C. § 20507 .................................................................................................... 10

52 U.S.C. § 20507(a)(4)........................................................................................... 7, 9

52 U.S.C. § 20507(i)(1) ........................................................................................... 7

52 U.S.C. § 20701.................................................................................................... 4, 5, 9

52 U.S.C. § 20703.................................................................................................... 4, 5, 8, 9

52 U.S.C. § 20706.................................................................................................... 8

52 U.S.C. § 21083(a)(1)(A) .................................................................................... 7

52 U.S.C. § 21083(a)(2)(B)(iii) .............................................................................. 9

52 U.S.C. § 21083(a)(5)........................................................................................... 7

52 U.S.C. § 21083(a)(5)(A)(i-ii)............................................................................. 9

App. 35

## I.    INTRODUCTION

Section 301 of Title III of the Civil Rights Act of 1960 ("CRA") imposes a "sweeping" obligation on election officials. *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962).[1] It provides, "Every officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] *all* records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…" 52 U.S.C. § 20701 (transferred from 42 U.S.C. § 1974) (emphasis added).

Section 303 provides the Attorney General of the United States a correspondingly sweeping power to obtain Federal election records: "Any record or paper required by [52 U.S.C. § 20701] to be retained and preserved shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying … by the Attorney General or [her] representative…." 52 U.S.C. § 20703. The written demand need only "contain a statement of the basis and the purpose therefor." *Id.*; *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam).

On August 14, 2025, the Attorney General, through her representative, made a written demand to Secretary William Francis Galvin ("Secretary Galvin") to produce certain Federal election records covered by the CRA. Dec'l. of Eric Neff, Ex. 3 (Ltr. from Harmeet Dhillon to Sec'y Galvin August 14, 2025) ("August 14 Letter"). That written demand explained that the purpose was for enforcement of the list maintenance requirements of the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA"). *Id.* Secretary Galvin has refused to produce the requested federal election records.

Pursuant to Section 305 of the CRA, the United States moves for an order to compel Secretary Galvin to produce the federal election records identified in the written demand. *See State of Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 855-56 (M.D. Ala. 1960), *aff'd and*

---

[1] Caselaw addressing the CRA in any depth is confined to courts within the Fifth Circuit in the early years following the CRA's enactment. Since then, courts have not had occasion to revisit the issue. The United States is unaware of any courts disagreeing with the Fifth Circuit's approach to the CRA.

App. 36

*adopted in full sub nom. Dinkens v. Attorney General*, 285 F.2d 430 (5th Cir. 1961) (per curiam). The CRA displaces the Federal Rules of Civil Procedure by creating a "special statutory proceeding." *Lynd*, 306 F.2d at 225. "All that is required is a simple statement by the Attorney General" after making a written demand for federal election records and papers covered by the statute, explaining that the person against whom an order is sought has failed or refused to make the requested records "'available for inspection, reproduction, and copying.'" *Id.* at 226 (quoting 52 U.S.C. § 20703). The United States has satisfied those requirements. Accordingly, the United States respectfully requests that the Court issue an order, compelling Secretary Galvin to produce the Federal election records described in its written demand.

## II.    BACKGROUND

### A.    Title III of the Civil Rights Act of 1960.

Under Section 301 of the CRA, every "officer of election" must "retain and preserve … all records and papers which come into his possession relating to any … act requisite to voting in [a Federal] election" for a period of twenty-two months from that election, 52 U.S.C. § 20701. Section 303 of the CRA provides:

> Any record or paper required by section 301 to be retained and preserved shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative….

52 U.S.C. § 20703.

The written demand "shall contain a statement of the basis and the purpose therefor." *Id.*

If an officer of election refuses to comply with the CRA's command, the Act requires "a special statutory proceeding in which the courts play a limited, albeit vital, role" in assisting the Attorney General's investigative powers. *Lynd*, 306 F.2d at 225. The Attorney General or her representative may request a federal court to issue an order directing the officer of election to produce the demanded records, akin to "a traditional order to show cause, or to produce in aid of an order of an administrative agency." *Id.*

5

App. 37

The special proceeding is "summary" in "nature" and neither "plenary [n]or adversary." *In re Gordon*, 218 F. Supp. 826, 826-27 (S.D. Miss. 1963); *see Kennedy v. Bruce*, 298 F.2d 860, 863 (5th Cir. 1962) (noting that this procedure "does not amount to the filing of a suit of any kind"). "All that is required is a simple statement by the Attorney General that after a … written demand" for federal election records covered by Section 301 of the CRA (52 U.S.C. § 20701), "the person against whom an order for production is sought … has failed or refused to make such papers 'available for inspection, reproduction, and copying ….'" *Lynd*, 306 F.2d at 226 (quoting 52 U.S.C. § 20703). The court does not entertain "any other procedural device or maneuver— either before or during any hearing of the application—to ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Id.* (quoting 52 U.S.C. § 20703). Rather, "[t]he Court, with expedition, should grant the relief sought or, if the respondent-custodian opposes the grant of such relief, the matter should be set down without delay for suitable hearing on the matters open for determination." *Id.*

Those matters, though, are "severely limited." *Id.* The court may adjudicate only: (1) "whether the written demand has been made"; and (2) "whether the custodians against whom orders are sought have been given reasonable notice of the pendency of the proceeding." *Id.* Neither "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand," nor "the scope of the order to produce" is open for review. *Id.*; *see Coleman*, 313 F.2d at 868. As the Fifth Circuit has explained, "No showing even of a prima facie case of a violation of Federal law need be made." *Id.* (citation omitted). Instead, "[i]f, after issuance of an order to produce, a genuine dispute subsequently arises as to whether or not any specified particular paper or record comes within [52 U.S.C. § 20701's] broad statutory classification," that issue may be decided by the court. *Lynd*, 306 F.2d at 226.

App. 38

**B.**     **The Attorney General is making a demand for federal election records under the CRA to assess Massachusetts's NVRA and HAVA compliance.**

On July 22, 2025, the Attorney General, acting through her representatives at the Department of Justice ("Department"), sent a letter to Secretary Galvin, an officer of election, regarding Massachusetts's compliance with federal list maintenance requirements. *See* Dec'l. of Eric Neff, Ex. 1 ("July 22 Letter"). The NVRA has list maintenance requirements "to protect the integrity of the electoral process." 52 U.S.C. § 20501(b)(3). The Department requested information to ascertain Massachusetts's compliance with the NVRA.

On August 7, 2025, Secretary Galvin responded to the Department's July 22 Letter by requesting sixty additional days to prepare a response. *See* Dec'l. of Eric Neff, Ex. 2 (Ltr. from Sec'y Galvin to Maureen Riordan dated August 7, 2025) ("August 7 Letter").

On August 14, 2025, the Department sent a second letter, requesting documents, pursuant to the statewide voter registration list maintenance provisions of the NVRA, HAVA, and the CRA, for a current electronic copy of Massachusetts's computerized statewide voter registration list ("SVRL") including the driver's license number or last four digits of the social security number which is required by HAVA. *See* Dec'l. of Eric Neff, Ex. 3, August 14 Letter. Both the NVRA and HAVA impose certain recordkeeping duties and require reasonable efforts to maintain lists of eligible voters for federal elections. *See* 52 U.S.C. §§ 20507(a)(4), 20507(i)(1), 21083(a)(1)(A). HAVA requires verification of voter registrations for federal elections. 52 U.S.C. § 21083(a)(5).

On August 28, 2025, the Department sent a follow-up e-mail to Secretary Galvin, requesting a response. *See* Dec'l. of Eric Neff, Ex. 4 (E-Mail from Michael Gates to Sec'y Galvin August 28, 2025) ("August 28 E-Mail").

The Department received no further written correspondence from Secretary Galvin, so on or about December 4, 2025, the Department contacted First Deputy Secretary Tassinari, who advised that Massachusetts would not provide its SVRL.

App. 39

## III.    ARGUMENT

**A.    The United States is entitled to an order compelling production under the CRA.**

An order to show cause for production of documents under the CRA is appropriate when the United States files a "simple statement" describing its written demand for inspection, reproduction, and copying, and explaining that the officer of election to whom it was directed has "failed or refused to make such papers 'available for inspection, reproduction, and copying.'" *Lynd*, 306 F.2d at 226 (citation omitted). The written demand must include "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.

The Department's August 14 Letter satisfies these requirements by: (1) making a written demand for inspection, reproduction, and copying of federal election records, including the SVRL and records of voter registration application within twenty-two months of a federal election; (2) directing that demand to Secretary Galvin, officer of election as defined by Section 306 of the CRA;[2] (3) explaining the basis of the demand as Massachusetts' possible lack of compliance with the voter registration list requirements enumerated in the Department's July 22 Letter, Dec'l. of Eric Neff, Ex. 1; and (4) stating that the purpose of the demand is to assist in the Department's determination of whether Massachusetts's list maintenance program complies with the NVRA and HAVA. Dec'l. of Eric Neff, Ex. 3 ("August 14 Letter").

---

[2] Section 306 provides:

> As used in this chapter, the term "officer of election" means any person who, under color of any Federal, State, Commonwealth, or local law, statute, ordinance, regulation, authority, custom, or usage, performs or is authorized to perform any function, duty, or task in connection with any application, registration, payment of poll tax, or other act requisite to voting in any general, special, or primary election at which votes are cast for candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico.

52 U.S.C. § 20706.

App. 40

Secretary Galvin's refusal to produce anything is plainly insufficient to meet the CRA's requirements. Officers of election have no discretion to limit the federal election records or papers or the content of those records made available to the Attorney General. *See* 52 U.S.C. § 20703; *see also* 52 U.S.C. § 20701 (referring to "all records and papers").  Massachusetts's election officers certainly have no authority to deny the Attorney General's request altogether.

The Attorney General cannot assess compliance with HAVA and the NVRA absent full, unredacted SVRL and other requested federal election records, pertaining to Massachusetts's list maintenance efforts.  HAVA prohibits a state from processing a voter registration application without the applicant's driver's license number, where an applicant has a current and valid driver's license, or, for other applicants, the last four digits of the applicant's social security number.  For those lacking both identification numbers, the state must assign a unique HAVA identifier.  *See* 52 U.S.C. § 21083(a)(5)(A)(i-ii).  Without the unredacted data, including these identification numbers, the Attorney General cannot evaluate Massachusetts's compliance with HAVA.

Similarly, HAVA requires list maintenance to "be conducted in a manner that ensures" the elimination of duplicate names from the statewide list. 52 U.S.C. § 21083(a)(2)(B)(iii). Unredacted voter files, including the three identification numbers described above, are needed to determine if the commonwealth has a reasonable program of identifying and removing duplicate voter registrations. Massachusetts, twenty-four other states, and the District of Columbia provide the unredacted voter file to the Electronic Registration Information Center ("ERIC") for the purpose of list maintenance.[3]

The United States needs the same unredacted federal election records to assess Massachusetts's compliance with the NVRA. Section 8(a)(4) of the NVRA requires each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters…". 52 U.S.C. § 20507(a)(4). For example, use of

---

[3] *See* ERIC, ERIC Overview, *available at* https://ericstates.org/ (last visited Dec. 9, 2025).

App. 41

unredacted voter data ensures that matches to identify deceased voters are more accurate and complete.

Secretary Galvin has rejected the Attorney General's written demand pursuant to the CRA to produce Massachusetts's statewide VRL and other federal election records. Consequently, the United States respectfully requests that this Court issue an Order compelling Secretary Galvin and the Commonwealth of Massachusetts to immediately produce those records through a secure method. *See Lynd*, 306 F.2d at 226; *Coleman*, 313 F.2d at 868.

**B.     The Attorney General is entitled to relief under the CRA's summary proceedings for obtaining federal election records.**

The CRA displaces the Federal Rules of Civil Procedure and creates a "special statutory proceeding" under which Secretary Galvin, as an officer of election for Massachusetts, must produce the voter-registration lists and other federal election records demanded by the Attorney General.[4] *Lynd*, 306 F.2d at 225. The court in *Lynd* reasoned that a special proceeding was necessary to obtain federal election records, because no other procedural device or maneuver was available:

> There is no place for a motion for a bill of particulars or for a more definite statement under F.R.Civ.P. 12(e), 28 U.S.C.A. There is no place for any other procedural device or maneuver— either before or during any hearing of the application— to ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand. [52 U.S.C. § 20703]. Thus with respect to the reasons why the Attorney General considers the records essential, there is no place, either as a part of pleadings, discovery, or trial, for interrogatories under F.R.Civ.P. 33, oral depositions of a party under F.R.Civ.P. 26(a), 30, production of documents under F.R.Civ.P. 34, or request for admissions as to facts or genuineness of documents or other things under F.R.Civ.P. 36, 37.

*Id.* at 226.

---

[4] Although this Motion to Compel Production is made under the CRA, the United States notes that the NVRA includes a similar requirement for production of federal election records. *See* 52 U.S.C. §§ 20507, 20510(a). "[W]hen Congress uses the same language in two statutes having similar purposes … it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) (plurality opinion).

The "special statutory proceeding" of these statutes is "a summary proceeding." *Id.* at 225–26. To institute this proceeding, the United States need only file a "simple statement," describing its written demand for the federal election records and explaining that Secretary Galvin, acting as an officer of election for Massachusetts, "failed or refused to make such papers 'available for inspection, reproduction, and copying.'" *Id.* at 226 (citation omitted). Accordingly, the Court "should grant the relief sought or, if the respondent-custodian opposes the grant of such relief, the matter should be set down without delay for suitable hearing on the matters open for determination." *Id.* The Attorney General's right to reproduction and copying of federal election records is not dependent upon any other showing. *Id.* Therefore, the United States respectfully requests that this Court issue an order directing Secretary Galvin and the Commonwealth of Massachusetts to produce the federal election records described in the Attorney General's written demand.

## IV.    CONCLUSION

For the foregoing reasons, the United States requests that this Court enter an Order compelling Secretary Galvin to comply with the Attorney General's request for all federal election records described in the Department's August 14 Letter. Those records should be provided electronically to the United States within five days, or within such time as this Court deems reasonable. *See Gordon*, 218 F. Supp. at 827 (deeming "fifteen days [a]s a reasonable time"). For the Court's convenience, a proposed form of order is provided as Ex. 1.

App. 43

Dated: December 12, 2025

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

*David D. Vandenberg*
ERIC NEFF
Acting Chief, Voting Section
Civil Rights Division

TIMOTHY F. MELLETT
DAVID D. VANDENBERG
Trial Attorneys, Voting Section
Civil Rights Division
4 Constitution Square
150 M Street, NE, Room 8.143
Washington, D.C. 20002
Eric.Neff@usdoj.gov
Timothy.Mellett@usdoj.gov
David.Vandenberg@usdoj.gov
Tel. (202) 307-2767
*Attorneys for the United States*

12

App. 44

13

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 12, 2025, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

<div align="right">

*/s/ David D. Vandenberg*
David Vandenberg

</div>

App. 45

| | |
|---|---|
| **From:** | Voting Section (CRT) |
| **To:** | william.galvin@sec.state.ma.us |
| **Cc:** | Tassinari, Michelle (SEC) |
| **Subject:** | Please see the attached correspondence |
| **Date:** | Tuesday, July 22, 2025 5:03:00 PM |
| **Attachments:** | Commonwealth of Massachussetts.pdf |

Dear Secretary Galvin,

Please see the attached correspondence. If you would like to send responsive materials via the Department's secure file-sharing platform, Justice Enterprise File Sharing (JEFS), please let us know and we will send you instructions. Thank you.

**Voting Section**
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave NW- 4CON
Washington, D.C. 20530
1(800)253-3931

**U.S. Department of Justice**

Civil Rights Division

_Voting Section_
_950 Pennsylvania Ave, NW – 4CON_
_Washington, DC  20530_

July 22, 2025

<u>Via Mail and Email</u>

The Honorable William Francis Galvin
Secretary of the Commonwealth
1 Ashburton Place
Boston, MA 02108
william.galvin@sec.state.ma.us

Dear Secretary Galvin:

We write to you as the chief election official for the Commonwealth of Massachusetts to request information regarding the Commonwealth's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 _et seq_.

Please provide a list of the election officials who are responsible for implementing Massachusetts' general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken, and when those steps were taken, to ensure that the Commonwealth's list maintenance program has been properly carried out in full compliance with the NVRA. Please include both the actions taken by Massachusetts officials as well as county officials.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions. _See_ 52 U.S.C. § 20510.

Pursuant to Section 20507(i) of the NVRA, the Attorney General requests that you produce for inspection the following records:

1. The current electronic copy of Massachusetts' computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format.  Please specify what delimiter is used, if applicable, or provide a file layout along with a database user manual, coding list, or other materials that define or explain how a voter record is coded into the statewide voter

App. 47

registration list and reported in the electronic copy of the statewide voter registration list.

Additionally, please provide the following information in electronic form. The time period for these requests is close of registration for the November 2022 general election through the close of registration for the November 2024 general election, the same time period as the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS").  If you are unable to provide the data, please explain why the data is not available.

1.  In the EAVS data for Question A10a, Massachusetts sent 580,433 confirmation notices, and 100% of the "Result of Confirmation Notice" is under "Not Categorized." The EAVS data for Questions A10b-A10f reflect that neither the Commonwealth nor the localities in the Commonwealth provided a response to these questions regarding voters' responses to confirmation notices. Please explain how the "Result of Confirmation Notice" is determined for the 580,433 confirmation notices that Massachusetts sent. Please provide that data to the extent possible.

2.  Similarly, the Commonwealth and localities do not provide data for the reasons for sending confirmation notices in A11a-k. The locality responses indicate that the data cannot be provided and the data is not available. Please explain why the data cannot be provided and how it is determined whether and when confirmation notices should be sent.

3.  In EAVS Question A12b, Massachusetts indicates that it removed 441,784 voters for moved out of jurisdiction. In EAVS Question A12e, Massachusetts indicates that it removed 120,203 voters for failure to respond to a sent confirmation notice and not voting in the two most recent federal elections. Please explain how the Commonwealth uses the confirmation notice process to remove voters from the voter lists in the A12b and A12e categories.

Please provide a description of the steps that Massachusetts has taken, and when those steps were taken, to identify registered voters who are ineligible to vote as well as the procedures Massachusetts used to remove those ineligible voters from the registration list. Please identify the number of registered voters identified as ineligible to vote for the time period of the close of registration for the November 2022 general election through present for each of the following reasons:

1.  Non-citizen

2.  Adjudicated incompetent

3.  Felony conviction

For each of those voters identified in categories 1-3 above, provide their registration information on the statewide voter registration list, including their vote history.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

App. 48

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

cc:     Michelle Tassinari
        First Deputy Secretary of the Commonwealth
        Director & Legal Counsel, Elections Division
        1 Ashburton Place, Room 1705
        Boston, MA 02108
        michelle.tassinari@sec.state.ma.us

3

App. 49

| | |
|---|---|
| **From:** | Tassinari, Michelle (SEC) |
| **To:** | Voting Section (CRT)  Riordan, Maureen (CRT) |
| **Cc:** | Murray, Re ecca (SEC) |
| **Subject:** | E TER    RE: Please see the attached correspondence |
| **Date:** | Thursday,  ugust , 2025  :05:3  M |
| **Attachments:** | M  S  C    J Reply  . .2025.pdf |

Good Morning-

Attached please find a reply to your letter.

Michelle K. Tassinari

First Deputy Secretary

Director and Legal Counsel, Elections Division

Office of the Secretary of the Commonwealth

One Ashburton Place, Room 1705

Boston, MA 02108

617-727-2828

Michelle.Tassinari@sec.state.ma.us


Voting Section (CRT) <Voting.Section@usdoj.gov>
Tuesday, July 22, 2025 5:03 PM
Galvin, William Francis (SEC) <William.Galvin@sec.state.ma.us>
Tassinari, Michelle (SEC) <Michelle.Tassinari@sec.state.ma.us>
Please see the attached correspondence

Dear Secretary Galvin,

Please see the attached correspondence. If you would like to send responsive materials via the Department's secure file-sharing platform, Justice Enterprise File Sharing (JEFS), please let us know and we will send you instructions. Thank you.


Civil Rights Division

U.S. Department of Justice

950 Pennsylvania Ave NW- 4CON

Washington, D.C. 20530

1(800)253-3931

App. 50



# The Commonwealth of Massachusetts
William Francis Galvin, Secretary of the Commonwealth
Elections Division

August 7, 2025

Maureen Riordan, Acting Chief
Michael E. Gates, Deputy Assistant Attorney General
U.S. Department of Justice
Civil Rights Division, Voting Section
950 Pennsylvania Ave, NW
Washington, DC 20530

***Via Email Only***

Dear Acting Chief Riordan and Deputy Assistant Attorney General Gates:

I am writing on behalf of Secretary of the Commonwealth William Francis Galvin in regards to your letter dated July 22, 2025, in which you request certain information as well as inquire about data reported by this Office as part of the Election Administration and Voting Survey report published by the Election Assistance Commission.

We are preparing a response but require additional time. We expect to provide the Department with a response within 60 days.  Please let me know if you have any questions.

Very truly yours,

Michelle K. Tassinari
First Deputy Secretary
Director and Legal Counsel, Elections Division

One Ashburton Place, Room 1705, Boston, Massachusetts 02108 • (617) 727-2828
sec.state.ma.us/ele • elections@sec.state.ma.us

App. 51

| | |
|---|---|
| **From:** | ates, Michael (CRT) |
| **To:** | william.galvin@sec.state.ma.us |
| **Cc:** | michelle.tassinari@sec.state.ma.us  Riordan, Maureen (CRT)  Mellett, Timothy   (CRT) |
| **Subject:** | Complete Voter Registration  ist with  ll  ields |
| **Date:** | Thursday,  ugust   , 2025  :0 :33 PM |
| **Attachments:** | State of Massachusetts  inal.pdf |

Secretary Galvin, please find attached the Justice Department's letter re uesting your state's complete electronic  oter Registration  ist, with applica le legal authorities for this re uest.  Please note the August 21, 2025, deadline.  Thank you.

**ic  e    te**

Deputy Assistant Attorney General

Civil Rights Division, U.S. Department of Justice

Cell  (202)   9-  891

App. 52



**U.S. Department of Justice**

Civil Rights Division

_____

*Office of the Assistant Attorney General*                 *Washington, D.C. 20530*

August 14, 2025

<u>Via Mail and Email</u>

The Honorable William Francis Galvin
Secretary of the Commonwealth
1 Ashburton Place
Boston, MA 02108
william.galvin@sec.state.ma.us

Re:     **Massachusetts's Voter Registration List Needs All Fields and Response to July 22 Letter**

Secretary Galvin:

This letter responds to correspondence from the Secretary's office dated August 7, 2025, in response to our letter of July 22, 2025, in which we made a request to the Commonwealth of Massachusetts for information regarding the Commonwealth's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501, *et seq.* Your August 7, 2025, letter states that it will not be possible to provide the requested records for sixty days.

As the Attorney General requested, the electronic copy of the statewide Voter Registration List ("VRL") must contain *all fields*, including the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA")[1] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

We have requested Massachusetts's VRL to assess your compliance with the list maintenance provisions of the NVRA, 52 U.S.C. § 20501, *et seq.* Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20501(a).

---

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that Justice Department be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

App. 53

HAVA, 52 U.S.C. § 20501, *et seq.*, also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's computerized statewide Voter Registration List requirements. *See* 52 U.S.C. § 21111; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding there is no private right of action to enforce those requirements in HAVA).

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq.*  Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of 22 months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…" 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of Massachusetts's complete and current VRL. The purpose of the request is to ascertain Massachusetts's compliance with the list maintenance requirements of the NVRA and HAVA.

To the extent there are privacy concerns, the voter registration list is subject to federal privacy protections. Section 304 of the CRA provides:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

Moreover, HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 552a note); 52 U.S.C. § 21083(c).  In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing. That said, all data received from you will be kept securely and treated consistently with the Privacy Act.

To that end, please provide the requested electronic VRL with all fields to the Justice Department no later than August 21, 2025.  We recognize, however, that other responses to our July 22 letter may take more time.  As such, we are prepared to give the Secretary of the Commonwealth until Monday, September 15th, to respond to the other requests.

App. 54

The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

cc:    Michelle Tassinari
       First Deputy Secretary of the Commonwealth
       Director & Legal Counsel, Elections Division
       1 Ashburton Place, Room 1705
       Boston, MA 02108
       michelle.tassinari@sec.state.ma.us

App. 55

| | |
|---|---|
| **From:** | Voting Section (CRT) |
| **To:** | william.galvin@sec.state.ma.us |
| **Cc:** | Michelle.Tassinari@sec.state.ma.us |
| **Subject:** | VR  Compliance follow up |
| **Date:** | Thursday,  ugust 2 , 2025   : 2:00  M |

Good morning,

We are writing to follow up on our letter dated August 1 , 2025. We re uested Massachusetts  statewide voter registration list by August 21. To date, we have not received a response from you. Please let us  now if you have any  uestions or concerns.

Than  you,

**Voting Section**

Civil Rights Division

U.S. Department of Justice

950 Pennsylvania Ave NW- 4CON

Washington, D.C. 20530

1(800)253-3931

App. 56

# EXHIBIT B

## DECLARATION OF Hema Sarang-Sieminski

Pursuant to 28 U.S.C. § 1746, I, Hema Sarang-Sieminski, declare the following:

1. My name is Hema Sarang-Sieminski. I am registered to vote in Massachusetts. I submit this declaration in support of Jane Doe Inc.'s (JDI) motion to intervene in this matter.

2. I am the Executive Director of JDI, the Massachusetts statewide coalition against sexual assault and domestic violence. In this capacity, I oversee JDI's policy, systems advocacy, training, and coalition coordination work and regularly engage with survivor-serving programs, state agencies, and other stakeholders across the Commonwealth.

3. JDI's mission is to mobilize collective power and resources to realize a safer, healthier, and freer Massachusetts beyond abuse and violence. JDI advances this mission through statewide policy and systems advocacy, training and technical assistance, coalition-building, and coordination among community-based sexual assault and domestic violence programs. JDI's work is grounded in survivor safety, confidentiality, and the lived experiences of the programs and advocates who serve survivors directly.

4. JDI is a membership organization comprised of sixty-five community-based sexual assault and domestic violence programs throughout Massachusetts. Member programs provide direct services, prevention education, advocacy, and support to survivors and their families. JDI's role as a coalition is to elevate member-identified needs, challenges, and emerging trends into statewide advocacy and systems-change efforts, and to support consistent, survivor-centered practices across programs and systems.

5. The Address Confidentiality Program (ACP) is a state-administered program designed to protect the location information of survivors of domestic violence, sexual assault, stalking, and human trafficking. The program allows eligible participants to use a designated substitute address in place of their actual residential address for interactions with government agencies and public records, including voter registration, court filings, school enrollment, and other official documentation. For survivors facing ongoing risk of harm, the disclosure of a home address through public systems can pose a serious and immediate safety concern. ACP is therefore a critical safety intervention.

6. In addition to the supportive role we provide to member programs regarding ACP procedures and any administrative barriers, JDI has a formal role in ACP administration. Massachusetts regulations governing the Address Confidentiality Program provide that survivors may appeal decisions by the ACP. Pursuant to 950 CMR 130.10, the Secretary of the Commonwealth is required to designate an appeal committee to review decisions related to the Address Confidentiality Program, and that committee includes a representative from Jane Doe Inc., the Massachusetts Office for Victims Assistance, and additional members designated by the Secretary.

7. ACP is of significant importance to JDI and its member programs because confidentiality is a foundational component of survivor safety and effective advocacy. JDI has engaged in

1

App. 58

sustained efforts to support the enactment, implementation, and effective use of ACP in Massachusetts. This work has included policy advocacy related to ACP, collaboration with state agencies responsible for program administration, and the provision of training and technical assistance to member programs regarding eligibility, enrollment, and appropriate use of ACP across systems.

8. Through its engagement with member programs, JDI has identified recurring barriers to ACP access and implementation, including inconsistent awareness among public agencies, administrative complexity, and challenges integrating ACP into court, housing, education, and public benefits systems. JDI has elevated these issues through formal advocacy and cross-system collaboration in order to improve program accessibility and ensure that ACP functions as intended to protect survivor safety.

9. Participants who engage in the ACP program are among those survivors at highest risk of lethality related to sexual assault or domestic violence. These are survivors who have made the very difficult but necessary decision to choose anonymity and invisibility because their lives are at risk. This means never receiving a holiday card to your home or having the pleasure of opening a spontaneous care package.

10. In Massachusetts, these protections now also extend to providers administering sensitive medical services such as reproductive health care or gender affirming care, services of utmost importance to many survivors of sexual assault and domestic violence.

11. Based on my experience and the information provided by JDI's member programs, ACP is an essential tool for protecting survivors and supporting their ability to access services, housing, education, and civic participation without compromising their safety. JDI's work related to ACP reflects its broader role as a statewide coalition in translating the experiences of survivor-serving programs into policy, practice, and systems-level improvements.

12. As part of our commitment to survivor-driven public policy, we invite Massachusetts residents to take part in civic engagement opportunities. We have participated in Survivors Vote campaigns amplifying the importance of voter registration for survivors and ways all eligible survivors can vote without the fear of compromising their safety or privacy. We reassure survivors that voter files are held with great care and security. The prospect of a policy shift that would risk the misuse of personal information directly undermines survivor safety, damages public trust, and risks chilling survivor-voter participation.

13. Disclosure of the entire, unredacted Massachusetts voter file would undermine Jane Doe Inc.'s commitment to survivor privacy. We know in this field the importance of creating strong safeguards to prevent the sharing of personally identifiable information. Federal law, namely provisions of the Violence Against Women Act, the Family Violence Prevention and Services Act, and the Victims of Crime Act each recognize the importance of survivor privacy in ensuring survivor safety and have strict prohibitions for grantees and service providers on whether, when, and how any personally identifiable information may be shared.

14. Based on my experience, efforts by the DOJ to access the PII of Massachusetts voters undermine survivor safety and the important objectives of ACP.

2

App. 59

15. If survivors fear their personal information, like their residential address, or a partial Social Security number or driver's license number, could be misused or exposed, they may avoid registering to vote, decline to update their current voter registration record, or withdraw from civic engagement activities altogether. Additionally, it puts survivor safety at risk by creating additional avenues for misuse of personal information. For survivors and other marginalized communities impacted by this practice, knowing their information could be weaponized to question their eligibility to vote would chill engagement with the democratic process and potentially have dire consequences. This is especially true for voters in marginalized communities who already face systemic barriers and distrust government surveillance.

16. If Massachusetts discloses the unredacted voter file, this will undermine decades of work to enshrine survivor safety into our polices and practices. It would normalize federal overreach into state-run elections, and open the door to future demands for even more intrusive data. It poses a grave threat to survivor safety, privacy and public confidence.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 22, 2025
Sharon MA

Hema Sarang-Sieminski

3

App. 60

# EXHIBIT C

App. 61

**DECLARATION OF JUAN PABLO JARAMILLO**

Pursuant to 28 U.S.C. § 1746, I, Juan Pablo Jaramillo, declare as follows:

1.  I am over 18 years old and am otherwise competent to testify. I have personal knowledge of the matters in this declaration, and I would testify thereto if I were called as a witness in Court.

2.  I live in Revere, Massachusetts, with my wife and child and am employed as a union organizer.

3.  I am an eligible registered voter.

4.  I am originally from Colombia. I came to the United States in 2000 when I was 7 years old. I became a naturalized citizen of the United States while I was still a minor.

5.  While my decision to become a citizen was made by my parents since I was a minor, my naturalization has allowed me to fully partake and contribute to American society and in the renewal of the living American Dream which makes our country great. Certainly, an important part of becoming a citizen was gaining the right to vote. I believe in the democratic process and the importance of civic engagement. Healthy republics demand a comprehensive and diverse participatory democratic system and one of the best ways to secure the health of those republics is by protecting the right to vote of its citizens.

6.  I remember voting in my first election in 2011. I was excited and proud to be able to cast my vote and engage in the community in this important way. It was a municipal election here in Revere, where I grew up. Seeing my local councilor's name both on the ballot debunked for me the mysticism that the government, even for young immigrant kids like me, was inaccessible.

7.  In 2023 I decided to run for local office and was elected in a nonpartisan election to be a Councilor-at-Large for Revere, MA and got the opportunity to serve alongside the very same councilor I voted for in 2011. I made history as the first immigrant to be elected to local office in Revere, the city that raised me. I ran for office out of a sense of duty to the community in which I live, committed to promoting policies that create a more equitable, sustainable, and thriving community.

8.  During the 2025 election cycle, I fell short of re-election in what can only be qualified as a statistical tie, 13 votes. I stand firmly by the results of this election in particular because they confirm the importance of every citizen having the chance to vote, and of every

1

App. 62

voter feeling empowered, rather than fearful, to utilize this core civic right and affirms that every vote matters in a healthy democracy.

9. I am concerned that the current Presidential administration will try to suppress votes. I understand that they have publicly floated the idea of de-naturalizing citizens. I want to exercise my rights as a citizen, but I am worried that some in power do not share my views on the rights of naturalized citizens.

10. When I learned that the Department of Justice requested voter records from Massachusetts, including sensitive data, I became concerned about how they might use these lists. I believe that naturalized citizens like me may be more vulnerable than other groups of voters to false allegations about illegal voting.

11. I care about the privacy of my personal data and about the integrity of the electoral system. I believe that we should make the electoral process more welcoming to every eligible voter and make sure that voters are not intimidated from exercising their rights. I also believe that eligible voters should not be removed from registration lists.

12. I feel strongly that the U.S. is built on the American Dream which is rooted in the immigrant story. Immigrants deserve to feel like a part of their country. Naturalized citizens are people who have chosen to live here and people for whom the right to cast a ballot here is particularly important. They typically have at least, if not more faith in the democratic process than many American-born citizens. They deserve a chance to participate in civic life through voting.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 22, 2025
Revere, Massachusetts

Juan Pablo Jaramillo

2

App. 63

# Exhibit A

App. 64



**U.S. Department of Justice**

Civil Rights Division

---

## <u>CONFIDENTIAL MEMORANDUM OF UNDERSTANDING</u>

### I.    PARTIES & POINTS OF CONTACT.

<u>Requester</u>
Federal Agency Name:  Civil Rights Division, U.S. Department of Justice
VRL/Data User:
Title:
Address:
Phone:

<u>VRL/Data Provider</u>
State Agency Name:
Custodian:
Title:
Address:
Phone:

The parties to this Memorandum of Understanding ("MOU" or "Agreement") are the Department of Justice, Civil Rights Division ("Justice Department" or "Department"), and the State of Colorado ("You" or "your state").

### II.    AUTHORITY.

By this Agreement, the State of Colorado ("You" or "your state") has agreed to, and will, provide an electronic copy of your state's complete statewide Voter Registration List ("VRL" or "VRL/Data") to the Civil Rights Division of the U.S. Department of Justice (at times referred to as the "Department").  The VRL/Data must include, among other fields of data, the voter registrant's full name, date of birth, residential address, his or her state driver's license number or

1

App. 65

the last four digits of the registrant's social security number as required under the HAVA to register

individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A).

The authorities by which this information is requested by the Department of Justice are:

- National Voter Registration Act of 1993, 52 U.S.C. § 20501, *et seq*.

- Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. See 52 U.S.C. § 20501(a).

- Help America Vote Act of 2002, 52 U.S.C. § 20901, *et seq.*

- Attorney General's authority to enforce the Help America Vote Act under 53 U.S.C. § 21111.

- Attorney General authority to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq.*

- The Privacy Act of 1974, 5 U.S.C. § 552a, as amended.

### III.    PURPOSE.

A VRL is a Voter Registration List pursuant to the NVRA and HAVA, commonly referred

to as "voter roll," compiled by a state – often from information submitted by counties – containing

a list of all the state's *eligible* voters.  Regardless of the basis for ineligibility, ineligible voters do

not appear on a state's VRL when proper list maintenance is performed by states.  The Justice

Department is requesting your state's VRL to test, analyze, and assess states' VRLs for proper list

maintenance and compliance with federal law.  In the event the Justice Department's analysis of a

VRL results in list maintenance issues, insufficiency, inadequacy, anomalies, or concerns, the

Justice Department will notify your state's point of contact   of the issues to assist your state with

curing.

App. 66

The purpose of this MOU is to establish the parties' understanding as to the security protections for data transfer and data access by the Department of Justice of the electronic copy of the statewide voter registration list, including all fields requested by the Department of Justice.

## IV.    TIMING OF AGREEMENT – TIME IS OF ESSENCE.

Although the Justice Department is under no such obligation as a matter of law, because this Agreement is proposed, made, and to be entered into at your state's request as part of your state's transmission of its VRL to the Justice Department, this Agreement is to be fully executed within seven (7) days of the Justice Department presenting this Agreement to you.  Both parties agree that no part of this Agreement or execution is intended to, or will, cause delay of the transmission of your state's VRL to the Justice Department for analysis.

## V.    TIMING OF VRL/DATA TRANSFER.

You agree to transfer an electronic copy of your state's complete statewide VRL/Data to the Civil Rights Division of the U.S. Department of Justice as described in Section III of this Agreement no later than five (5) business days from the execution of this Agreement, which is counted from the last day of the last signatory.

## VI.    METHOD OF VRL/DATA ACCESS OR TRANSFER.

The VRL will be submitted by your state via the Department of Justice's secure file-sharing system, i.e., Justice Enterprise File Sharing (JEFS").  A separate application to use JEFS must be completed and submitted by your state through the Civil Rights Help Desk.  JEFS implements strict access controls to ensure that each user can only access their own files.  All files and folders are tied to a specific user, and each user has defined permissions that govern how they may interact with those files (e.g., read, write, or read-only).

App. 67

Whenever a user attempts to access a file or folder, JEFS validates the request against the assigned permissions to confirm that the user is explicitly authorized.  This process guarantees that users can only access files and folders only where they have permission.  Users are also limited to the authorized type of interaction with each file or folder.  Within the Department of Justice, access to JEFS is restricted to specific roles: Litigation Support, IT staff, and Civil Rights Division staff.

**VII.    LOCATION OF DATA AND CUSTODIAL RESPONSIBILITY.**

The parties mutually agree that the Civil Rights Division (also "Department") will be designated as "Custodian" of the file(s) and will be responsible for the observance of all conditions for use and for establishment and maintenance of security agreements as specified in this agreement to prevent unauthorized use.  The information that the Department is collecting will be maintained consistent with the Privacy Act of 1974, 5 U.S.C. § 552a.  The full list of routine uses for this collection of information can be found in the Systems of Record Notice ("SORN") titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (August 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017).  It should be noted that the statutes cited for routine use include NVRA, HAVA, and the Civil Rights Act of 1960, and the Justice Department is making our request pursuant to those statutes.  The records in the system of records are kept under the authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

VRL/Data storage is similar to the restricted access provided on JEFS and complies with the SORN: Information in computer form is safeguarded and protected in accordance with applicable Department security regulations for systems of records.  Only a limited number of staff members who are assigned a specific identification code will be able to use the computer to access

App. 68

the stored information.  However, a section may decide to allow its employees access to the system in order to perform their official duties.

All systems storing the VRL data will comply with all security requirements applicable to Justice Department systems, including but not limited to all Executive Branch system security requirements (e.g., requirements imposed by the Office of Management and Budget [OMB] and National Institute of Standards and Technology [NIST]), Department of Justice IT Security Standards, and Department of Justice Order 2640.2F.

**VIII.    NVRA/HAVA COMPLIANT VOTER REGISTRATION LIST.**

After analysis and assessment of your state's VRL, the Justice Department will securely notify you or your state of any voter list maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, the Justice Department found when testing, assessing, and analyzing your state's VRL for NVRA and HAVA compliance, i.e., that your state's VRL only includes eligible voters.

You agree therefore that within forty-five (45) days of receiving that notice from the Justice Department of any issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, your state will clean its VRL/Data by removing ineligible voters and resubmit the updated VRL/Data to the Civil Rights Division of the Justice Department to verify proper list maintenance has occurred by your state pursuant to the NVRA and HAVA.

**IX.    CONFIDENTIALITY & DEPARTMENT SAFEGUARDS.**

Any member of the Justice Department in possession of a VRL/Data will employ reasonable administrative, technical, and physical safeguards designed to protect the security and confidentiality of such data.  Compliance with these safeguards will include secure user authentication protocols deploying either: (i) Two-Factor Authentication ("2FA"), which requires users to go through two layers of security before access is granted to the system; or (ii) the

5

App. 69

assignment of unique user identifications to each person with computer access plus unique complex passwords, which are not vendor supplied default passwords.

The Department will activate audit logging for the records, files, and data containing the state's VRL/Data in order to identify abnormal use, as well as to track access control, on computers, servers and/or Devices containing the VRL/Data.

For all devices storing records, files, and data containing the VRL/Data: there is (i) up-to-date versions of system security agent software that includes endpoint protection and malware protection and reasonably up-to-date patches and virus definitions, or a version of such software that can still be supported with up-to-date patches and virus definitions, and is set to receive the most current security updates on a regular basis; and (ii) up-to-date operating system security patches designed to maintain the integrity of the personal information.

For all devices storing records, files, and data containing the VRL/Data: there is (i) controlled and locked physical access for the Device; and (ii) the prohibition of the connection of the Device to public or insecure home networks.

There will be no copying of records, files, or data containing the VRL/Data to unencrypted USB drives, CDs, or external storage. In addition, the use of devices outside of moving the records, files, or data to the final stored device location shall be limited.

Any notes, lists, memoranda, indices, compilations prepared or based on an examination of VRL/Data or any other form of information (including electronic forms), that quote from, paraphrase, copy, or disclose the VRL/Data with such specificity that the VRL/Data can be identified, or by reasonable logical extension can be identified will not be shared by the Department. Any summary results, however, may be shared by the Department.

In addition to the Department's enforcement efforts, the Justice Department may use the information you provide for certain routine, or pre-litigation or litigation purposes including:

App. 70

present VRL/Data to a court, magistrate, or administrative tribunal; a contractor with the Department of Justice who needs access to the VRL/Data information in order to perform duties related to the Department's list maintenance verification procedures.  Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. § 552a(m).

## X.    LOSS OR BREACH OF DATA.

If a receiving party discovers any loss of VRL/Data, or a breach of security, including any actual or suspected unauthorized access, relating to VRL/Data, the receiving party shall, at its own expense immediately provide written notice to the producing party of such breach; investigate and make reasonable and timely efforts to remediate the effects of the breach, and provide the producing party with assurances reasonably satisfactory to the producing party that such breach shall not recur; and provide sufficient information about the breach that the producing party can reasonably ascertain the size and scope of the breach. The receiving party agrees to cooperate with the producing party or law enforcement in investigating any such security incident. In any event, the receiving party shall promptly take all necessary and appropriate corrective action to terminate unauthorized access.

## XI.    DESTRUCTION OF DATA.

The Department will destroy all VRL/Data associated with actual records as soon as the purposes of the list maintenance project have been accomplished and the time required for records retention pursuant to applicable law has passed.  When the project is complete and such retention requirements by law expires, the Justice Department will:

1. Destroy all hard copies containing confidential data (e.g., shredding);

2. Archive and store electronic data containing confidential information offline in a secure location; and

App. 71

3.  All other data will be erased or maintained in a secured area.

## XII.    OTHER PROVISIONS.

A.  Conflicts. This MOU constitutes the full MOU on this subject between the Department and your state. Any inconsistency or conflict between or among the provisions of this MOU, will be resolved in the following order of precedence: (1) this MOU and (2) other documents incorporated by reference in this MOU (e.g., transaction charges).

B.  Severability. Nothing in this MOU is intended to conflict with current law or regulation or the directives of Department, or the your state. If a term of this MOU is inconsistent with such authority, then that term shall be invalid but, to the extent allowable, the remaining terms and conditions of this MOU shall remain in full force and effect.

C.  Assignment. Your state may not assign this MOU, nor may it assign any of its rights or obligations under this MOU.  To the extent allowable by law, this MOU shall inure to the benefit of, and be binding upon, any successors to the Justice Department and your state without restriction.

D.  Waiver. No waiver by either party of any breach of any provision of this MOU shall constitute a waiver of any other breach. Failure of either party to enforce at any time, or from time to time, any provision of this MOU shall not be construed to be a waiver thereof.

E.  Compliance with Other Laws. Nothing in this MOU is intended or should be construed to limit or affect the duties, responsibilities, and rights of the User Agency under the National Voter Registration Act, 52 U.S.C. § 20501 *et seq*., as amended; the Help America Vote Act, 52 U.S.C. § 20901 *et seq*., as amended; the Voting Rights Act, 52 U.S.C. § *10301 et seq.*, as amended; and the Civil Rights Act, 52 U.S.C. § 10101 et seq., as amended.

F.  Confidentiality of MOU.  To the extent allowed by applicable law, this MOU, its contents, and the drafts and communications leading up to the execution of this MOU are deemed

App. 72

by the parties as "confidential."  Any disclosures therefore could be made, if at all, pursuant to applicable laws or court orders requiring such disclosures.

**SIGNATURES**

VRL/Data Provider
State Agency Name:
Signature: _____ Date of Execution:_____

Authorized Signatory Name Printed:_____

Title: _____

Requester
Federal Agency Name:  Civil Rights Division, U.S. Department of Justice

Signature: _____ Date of Execution:_____

Authorized Signatory Name Printed:_____

Title: _____

App. 73

# Exhibit B



**U.S. Department of Justice**

Civil Rights Division

## CONFIDENTIAL MEMORANDUM OF UNDERSTANDING

### I.    PARTIES & POINTS OF CONTACT.

Requester

Federal Agency Name:  Civil Rights Division, U.S. Department of Justice
VRL/Data User: Eric Neff
Title: Acting Chief, Voting Section
Address: 150 M St. NE, Ste. 8-139, Washington DC 20002
Phone: (202) 704-5430

VRL/Data Provider

State Agency Name: Office of the Texas Secretary of State
Custodian: Adam Bitter
Title: General Counsel
Address: P.O. Box 12697, Austin, Texas 78711-2697
Phone: (512) 475-2813

The parties to this Memorandum of Understanding ("MOU" or "Agreement") are the

Department of Justice, Civil Rights Division ("Justice Department" or "Department"), and the State of

Texas ("Texas").

### II.    AUTHORITY.

By this Agreement, Texas has agreed to, and will, provide an electronic copy of your state's

complete statewide Voter Registration List ("VRL" or "VRL/Data") to the Civil Rights Division

of the U.S. Department of Justice (at times referred to as the "Department").  The VRL/Data must

include, among other fields of data, the voter registrant's full name, date of birth, residential

address, his or her state driver's license number or the last four digits of the registrant's social

1

App. 75

security number as required under the HAVA to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A).

The authorities by which this information is requested by the Department of Justice are:

- National Voter Registration Act of 1993, 52 U.S.C. § 20501, *et seq.*

- Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. See 52 U.S.C. § 20501(a).

- Help America Vote Act of 2002, 52 U.S.C. § 20901, *et seq.*

- Attorney General's authority to enforce the Help America Vote Act under 53 U.S.C. § 21111.

- Attorney General authority to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq.*

- The Privacy Act of 1974, 5 U.S.C. § 552a, as amended.

## III.    PURPOSE.

A VRL is a Voter Registration List pursuant to the NVRA and HAVA, commonly referred to as "voter roll," compiled by a state – often from information submitted by counties – containing a list of all the state's *eligible* voters.  Regardless of the basis for ineligibility, ineligible voters do not appear on a state's VRL when proper list maintenance is performed by states.  The Justice Department is requesting your state's VRL to test, analyze, and assess states' VRLs for proper list maintenance and compliance with federal law.  In the event the Justice Department's analysis of a VRL results in list maintenance issues, insufficiency, inadequacy, anomalies, or concerns, the Justice Department will notify your state's point of contact   of the issues to assist your state with curing.

App. 76

The purpose of this MOU is to establish the parties' understanding as to the security protections for data transfer and data access by the Department of Justice of the electronic copy of the statewide voter registration list, including all fields requested by the Department of Justice.

## IV.    TIMING OF AGREEMENT – TIME IS OF ESSENCE.

Although the Justice Department is under no such obligation as a matter of law, because this Agreement is proposed, made, and to be entered into at your state's request as part of your state's transmission of its VRL to the Justice Department, this Agreement is to be fully executed within seven (7) days of the Justice Department presenting this Agreement to you.  Both parties agree that no part of this Agreement or execution is intended to, or will, cause delay of the transmission of your state's VRL to the Justice Department for analysis.

## V.    TIMING OF VRL/DATA TRANSFER.

You agree to transfer an electronic copy of your state's complete statewide VRL/Data to the Civil Rights Division of the U.S. Department of Justice as described in Section III of this Agreement no later than five (5) business days from the execution of this Agreement, which is counted from the last day of the last signatory.

## VI.    METHOD OF VRL/DATA ACCESS OR TRANSFER.

The VRL will be submitted by your state via the Department of Justice's secure file-sharing system, i.e., Justice Enterprise File Sharing (JEFS"").  A separate application to use JEFS must be completed and submitted by your state through the Civil Rights Help Desk.  JEFS implements strict access controls to ensure that each user can only access their own files.  All files and folders are tied to a specific user, and each user has defined permissions that govern how they may interact with those files (e.g., read, write, or read-only).

3

App. 77

Whenever a user attempts to access a file or folder, JEFS validates the request against the assigned permissions to confirm that the user is explicitly authorized. This process guarantees that users can only access files and folders only where they have permission. Users are also limited to the authorized type of interaction with each file or folder. Within the Department of Justice, access to JEFS is restricted to specific roles: Litigation Support, IT staff, and Civil Rights Division staff.

## VII.    LOCATION OF DATA AND CUSTODIAL RESPONSIBILITY.

The parties mutually agree that the Civil Rights Division (also "Department") will be designated as "Custodian" of the file(s) and will be responsible for the observance of all conditions for use and for establishment and maintenance of security agreements as specified in this agreement to prevent unauthorized use. The information that the Department is collecting will be maintained consistent with the Privacy Act of 1974, 5 U.S.C. § 552a. The full list of routine uses for this collection of information can be found in the Systems of Record Notice ("SORN") titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (August 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017). It should be noted that the statutes cited for routine use include NVRA, HAVA, and the Civil Rights Act of 1960, and the Justice Department is making our request pursuant to those statutes. The records in the system of records are kept under the authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

VRL/Data storage is similar to the restricted access provided on JEFS and complies with the SORN: Information in computer form is safeguarded and protected in accordance with applicable Department security regulations for systems of records. Only a limited number of staff members who are assigned a specific identification code will be able to use the computer to access

the stored information. However, a section may decide to allow its employees access to the system in order to perform their official duties.

All systems storing the VRL data will comply with all security requirements applicable to Justice Department systems, including but not limited to all Executive Branch system security requirements (e.g., requirements imposed by the Office of Management and Budget [OMB] and National Institute of Standards and Technology [NIST]), Department of Justice IT Security Standards, and Department of Justice Order 2640.2F.

## VIII.    NVRA/HAVA COMPLIANT VOTER REGISTRATION LIST.

After analysis and assessment of your state's VRL, the Justice Department will securely notify you or your state of any voter list maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, the Justice Department found when testing, assessing, and analyzing your state's VRL for NVRA and HAVA compliance, i.e., that your state's VRL only includes eligible voters.

You agree therefore that within forty-five (45) days of receiving that notice from the Justice Department of any issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, your state will clean its VRL/Data by removing ineligible voters and resubmit the updated VRL/Data to the Civil Rights Division of the Justice Department to verify proper list maintenance has occurred by your state pursuant to the NVRA and HAVA.

## IX.    CONFIDENTIALITY & DEPARTMENT SAFEGUARDS.

Any member of the Justice Department in possession of a VRL/Data will employ reasonable administrative, technical, and physical safeguards designed to protect the security and confidentiality of such data. Compliance with these safeguards will include secure user authentication protocols deploying either: (i) Two-Factor Authentication ("2FA"), which requires users to go through two layers of security before access is granted to the system; or (ii) the

App. 79

assignment of unique user identifications to each person with computer access plus unique complex passwords, which are not vendor supplied default passwords.

The Department will activate audit logging for the records, files, and data containing the state's VRL/Data in order to identify abnormal use, as well as to track access control, on computers, servers and/or Devices containing the VRL/Data.

For all devices storing records, files, and data containing the VRL/Data: there is (i) up-to-date versions of system security agent software that includes endpoint protection and malware protection and reasonably up-to-date patches and virus definitions, or a version of such software that can still be supported with up-to-date patches and virus definitions, and is set to receive the most current security updates on a regular basis; and (ii) up-to-date operating system security patches designed to maintain the integrity of the personal information.

For all devices storing records, files, and data containing the VRL/Data: there is (i) controlled and locked physical access for the Device; and (ii) the prohibition of the connection of the Device to public or insecure home networks.

There will be no copying of records, files, or data containing the VRL/Data to unencrypted USB drives, CDs, or external storage.  In addition, the use of devices outside of moving the records, files, or data to the final stored device location shall be limited.

Any notes, lists, memoranda, indices, compilations prepared or based on an examination of VRL/Data or any other form of information (including electronic forms), that quote from, paraphrase, copy, or disclose the VRL/Data with such specificity that the VRL/Data can be identified, or by reasonable logical extension can be identified will not be shared by the Department. Any summary results, however, may be shared by the Department.

In addition to the Department's enforcement efforts, the Justice Department may use the information you provide for certain routine, or pre-litigation or litigation purposes including:

6

App. 80

present VRL/Data to a court, magistrate, or administrative tribunal; a contractor with the Department of Justice who needs access to the VRL/Data information in order to perform duties related to the Department's list maintenance verification procedures. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. § 552a(m).

## X. LOSS OR BREACH OF DATA.

If a receiving party discovers any loss of VRL/Data, or a breach of security, including any actual or suspected unauthorized access, relating to VRL/Data, the receiving party shall, at its own expense immediately provide written notice to the producing party of such breach; investigate and make reasonable and timely efforts to remediate the effects of the breach, and provide the producing party with assurances reasonably satisfactory to the producing party that such breach shall not recur; and provide sufficient information about the breach that the producing party can reasonably ascertain the size and scope of the breach. The receiving party agrees to cooperate with the producing party or law enforcement in investigating any such security incident. In any event, the receiving party shall promptly take all necessary and appropriate corrective action to terminate unauthorized access.

## XI. DESTRUCTION OF DATA.

The Department will destroy all VRL/Data associated with actual records as soon as the purposes of the list maintenance project have been accomplished and the time required for records retention pursuant to applicable law has passed. When the project is complete and such retention requirements by law expires, the Justice Department will:

1. Destroy all hard copies containing confidential data (e.g., shredding);

2. Archive and store electronic data containing confidential information offline in a secure location; and

App. 81

3. All other data will be erased or maintained in a secured area.

**XII.    OTHER PROVISIONS.**

A. Conflicts. This MOU constitutes the full MOU on this subject between the Department and your state. Any inconsistency or conflict between or among the provisions of this MOU, will be resolved in the following order of precedence: (1) this MOU and (2) other documents incorporated by reference in this MOU (e.g., transaction charges).

B. Severability. Nothing in this MOU is intended to conflict with current law or regulation or the directives of Department, or the your state. If a term of this MOU is inconsistent with such authority, then that term shall be invalid but, to the extent allowable, the remaining terms and conditions of this MOU shall remain in full force and effect.

C. Assignment. Your state may not assign this MOU, nor may it assign any of its rights or obligations under this MOU. To the extent allowable by law, this MOU shall inure to the benefit of, and be binding upon, any successors to the Justice Department and your state without restriction.

D. Waiver. No waiver by either party of any breach of any provision of this MOU shall constitute a waiver of any other breach. Failure of either party to enforce at any time, or from time to time, any provision of this MOU shall not be construed to be a waiver thereof.

E. Compliance with Other Laws. Nothing in this MOU is intended or should be construed to limit or affect the duties, responsibilities, and rights of the User Agency under the National Voter Registration Act, 52 U.S.C. § 20501 *et seq.*, as amended; the Help America Vote Act, 52 U.S.C. § 20901 *et seq.*, as amended; the Voting Rights Act, 52 U.S.C. § *10301 et seq.*, as amended; and the Civil Rights Act, 52 U.S.C. § 10101 et seq., as amended.

F. Confidentiality of MOU. To the extent allowed by applicable law, this MOU, its contents, and the drafts and communications leading up to the execution of this MOU are deemed

8

App. 82

by the parties as "confidential." Any disclosures therefore could be made, if at all, pursuant to applicable laws or court orders requiring such disclosures.

**SIGNATURES**

VRL/Data Provider
State Agency Name: Office of the Texas Secretary of State
Signature: _____ Date of Execution: 12/5/25

Authorized Signatory Name Printed: Adam Bitter_____

Title: General Counsel_____

Requester
Federal Agency Name: Civil Rights Division, U.S. Department of Justice

Signature: _____ Date of Execution: 12/9/2025

Authorized Signatory Name Printed: Eric Neff_____

Title: Acting Chief, Voting Section, Civil Rights Division

9

App. 83

# Exhibit C

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 2:25-cv-09149-DOC-ADSx |
| | ) | |
| Plaintiff, | ) | CIVIL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| SHIRLEY WEBER, ET AL, | ) | Thursday, December 4, 2025 |
| | ) | ( 7:38 a.m. to  9:09 a.m.) |
| Defendants. | ) | (12:01 p.m. to 12:58 p.m.) |
| | | ( 2:00 p.m. to  2:31 p.m.) |
| | | ( 2:31 p.m. to  2:33 p.m.) |


HEARING RE:

MOTION TO DISMISS [DKT.NO.67];

PLAINTIFF'S REQUEST FOR ORDER TO PRODUCE RECORDS
(52 USC 20701)
[DKT.NOS.87,88,89]


BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE


**APPEARANCES:**                 SEE PAGE 2


Court Reporter:          Recorded; CourtSmart


Courtroom Deputy:        Karlen Dubon


Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

App. 85

2

**APPEARANCES:**

For Plaintiff:              ERIC V. NEFF, ESQ.
                            U.S. Department of Justice
                            150 M St. NE, Suite 8-139
                            Washington, DC 20002
                            202-532-3628

For Intervenors:            GRAYCE S.P. ZELPHIN, ESQ.
                            American Civil Liberties
                            Union of Northern California
                            39 Drumm Street
                            San Francisco, CA 94111
                            530-515-8978

                            CHRISTOPHER D. DODGE, ESQ.
                            Elias Law Group
                            250 Massachusetts Ave. NW
                            Suite 400
                            Washington, DC 20001
                            202-987-4928

For Robert Page:            SUZANNE E. SHOAI, ESQ.
                            Orange County Counsel
                            P.O. Box 1379
                            Santa Ana, CA 92702
                            714-834-3300

For Defendants:             MALCOLM A. BRUDIGAM, ESQ.
                            Office of the Attorney General
                            1300 I Street
                            Suite 125
                            Sacramento, CA 95814
                            916-210-7873

                            ROBERT W. SETRAKIAN, ESQ.
                            California Department of Justice
                            300 S. Spring Street
                            Suite 1702
                            Los Angeles, CA 90013
                            213-269-6668

App. 86

3

**Los Angeles, California; Thursday, December 4, 2025; 7:38 a.m.**

**(Call to Order)**

THE COURT:  -- Shirley Weber.

**(Pause)**

THE COURT:  And, counsel, as you're seated, let me take one more matter.  Just remain seated for a moment.

**(Pause)**

THE COURT:  All right.  Thank you then.  I think that resolves the rest of the morning calendar.  So first of all, good morning.

MR. NEFF:  Good morning, Your Honor.

THE COURT:  This is the matter of United States v. Shirley Weber.  It's case number 25-09149.  And, counsel, you can just remain seated.  You can pretend it's state court if you want to, but make your appearances.

MR. NEFF:  Eric Neff on behalf of the United States. Good morning, Your Honor.

THE COURT:  Thank you.

MR. BRUDIGAM:  Deputy Attorney General Malcolm Brudigam on behalf of defendants Secretary of State Shirley Weber and the State of California.

THE COURT:  Okay, thank you very much.

MR. SETRAKIAN:  Deputy Attorney General Will Setrakian on behalf of defendants State of California and California Secretary of State Shirley Weber.

4

**THE COURT:**  Thank you very much.  I appreciate it.

**MR. DODGE:**  Chris Dodge on behalf of Intervenors NAACP and Siren.

**MS. ZELPHIN:**  Grace Zelphin on behalf of Intervenors League of Women Voters of California.

**THE COURT:**  Is anybody here representing what I call the County case?

**MS. SHOAI:**  Good morning, Your Honor.

**THE COURT:**  Come on up.  What we're doing here may be of interest to you.  So we want your appearance.

**MS. SHOAI:**  Thank you, Your Honor.  Deputy County Counsel --

**THE COURT:**  No, no, wait, wait till we get a good recording of you.

**MS. SHOAI:**  Good morning, Your Honor.  Deputy County Counsel Suzanne Schoai on behalf of --

**THE COURT:**  I see.  Why don't you have a seat?  Do you have any other colleague with you today?

**MS. SHOAI:**  No, Your Honor.

**THE COURT:**  All right.  So first, I'd like to address plaintiff's motion for order to produce records pursuant to 52 U.S.C. 20701 that was filed on Monday, set for hearing today.  I appreciate the speed, but not at the expense of due process.  And although I've encouraged us to move forward as quickly as possible concerning the substantive issues, this is

5

not the due process because there needs to be at least 28 days' notice before a date for hearing under CD California Rule 6-1.

The plaintiff is seeking to reach the ultimate question in this case regarding the production of records and thousands of voters' lives will be impacted by this case.  And the Court will not be setting the matter on any legal -- I don't want to say gamesmanship, but therefore, the motion for order to produce records pursuant to 52 U.S.C. 20701 is denied.

Now, you can once again follow the process and procedure in terms of due process.  We'll have time potentially, but this doesn't supply the due process needed.

Second, I'd like to hear arguments if there are any on two motions regarding amicus briefs.  First, there was a motion for leave to file an amicus brief brought by 16 states. Those states are Arizona, Colorado, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington.

The second request was to file an amicus brief and it was filed by the former secretaries of state and the proposed amicus briefs are allegedly from a bipartisan group of state secretaries for the states of Colorado, Connecticut, Minnesota, Nebraska, Oregon, Pennsylvania, and Washington.

Does any party have a statement to make regarding these amici briefs and any wisdom on your part that if I allow

these amici briefs, whether I should then extend for some period of time the opportunity for additional briefs from interested parties, because these are the parties that have directly contacted the Court, but there may be other parties that piecemeal choose to come in, and then I'm deciding that on an almost ex-parte basis, case by case as they come to me, unless you're flying out here for every single hearing for every requested amici brief.

So I was thinking if I was going to allow these, that I should throw this open for 7 days or 14 days for the amici briefs to come in during the period of argument and try to sort through whatever the Court's opinion would be and give you that courtesy and simply extend it.  But I'm looking for your wisdom on that because you can anticipate if I'm getting these amici requests now, I promise you, as soon as you leave the courtroom, there's going to be another request.  And I don't want to do that ex parte without your wisdom on both parties' parts.

So let's start with the first group.  This motion for leave to file an amici brief by 16 states, and one of my concerns was whether this would become a bipartisan effort, for instance, of Democrats and Republicans using the Court in a sense, in a political sense, not necessarily a substantive sense.  But I noticed there are what I consider some swing states, New Mexico certainly was during the last election,

71

those records to make sure we are doing our duty as the federal government to make sure that these federal elections remain free and fair.

And counsel simply has to rely on both misrepresentations of the law and our position, stating our -- for example, that our whole case relies on Lynd.  No.  This action relies on the Civil Rights Act of 1960 and its very clear text, which is the one thing they don't want to talk about because it's very clear.

Privacy concerns are first not a proper concern for this motion to dismiss but even if they were, they're unfounded.  Privacy -- the United States is going to comply with all federal laws.  That includes the Federal Privacy Act. The DOJ Civil Rights Division itself has a stated policy available on a website as to how we will comply with the Federal Privacy Act and have before.

THE COURT:  Explain that to me.

MR. NEFF:  Yes, sure.

So we publish a series of regulations.  They're called the SORNs that show how we tend to the data and make sure everything is properly protected under, not just Federal Privacy Act, but other obvious concerns when you're dealing with large databases.

THE COURT:  Is that part of my record?

MR. NEFF:  Yes.

72

THE COURT:  And what would I look at that?  What exhibit?

MR. NEFF:  At our -- in our response to our motion to dismiss and the supporting data for that, the attachments for that.

However, I would state, that to any extent, especially the state privacy-type acts would contradict the Civil Rights Act, that the Civil Rights Act would rule.

The United States does this on a regular basis.  We have multiple states that don't even see this as a dispute, that simply just -- in fact, on their own do this on a regular basis, share the information with the federal government so that we can run crosschecks to make sure that people are properly on voter rolls.

THE COURT:  What states are those that have shared either their DMV registrations or the social security numbers of voters?

MR. NEFF:  Offhand, right now, off of memory I believe the states are Kansas, Indiana -- there are four.

THE COURT:  That's okay.

MR. NEFF:  I'll also state the biggest one is -- so we also have an MOU that we produce at the state request.  Some states request it, some don't.  Some say, yes, you're entitled to this data, here you go.  And we have a whole data-sharing setup ready.  It's essentially the Box program, plus some

73

federal proprietary encryption technology to make sure that this is as secure as it needs to be.  And we -- so Texas just told us today they're going to enter in the MOU and share us the data in the next few days.  We believe many more states are going to follow just in the next few days but so we have four states that have already sent us the data.  No questions asked. Probably another dozen or so states in the next week or so that are just going to sign the MOU and share with us.  This really shouldn't be controversial.  It's clearly stated as part of our duty under HAVA and the Civil Rights Act is clear that this is the mechanism in which we do it.

**THE COURT:**  Do you think that those states with attorney generals complying with your request would be interested in filing an amicus just as other states who may be opposed to your request are filing amicus?  In other words, what I want to do is make certain if we have states coming late to the table but in compliance that we're looking at the reasoning by all of the atty generals in the respective states.

And what I was worried about before, frankly, is if I had red and blue states lining up when I started to look at the amicus, I was particularly interested in the states bringing that to me.

Now, I don't know how you define what I call -- well those states that have voted for different -- in different elections in different ways.  Arizona, New Mexico, Michigan,

74

Minnesota, seem to be what I call those states that traditionally doesn't go Democrat or Republican.

And then I looked down at the state secretaries for the states and if you notice, there are three states out of there on the amicus. Connecticut is in for the first time. They are not part of the amicus for the 16 states that we initially named but these are the state secretaries for the states of and Connecticut is an addition, Nebraska is an addition, Pennsylvania -- which has certainly been a swing state.

So I was a little worried and that's why I sought your wisdom about whether you all were going to stipulate to me accepting this because I didn't know the weight if I was just dealing with a party disagreement. And I'm not saying that these swing states necessarily carry greater or less weight but I want to be alert that if this is a partisan effort. And certainly the country is divided so ...

**MR. NEFF:** I would be --

**THE COURT:** ... so I've got a stipulation that I'm accepting all of these amicus briefs. I just want to pay you the courtesy if other states are coming onboard, like Texas, et cetera, that we give them a chance for those attorney generals to get this to us but by the same token, I'm going to be writing over the next couple weeks.

Is two weeks enough time for you?

75

MR. NEFF:  We can inform the states that --

THE COURT:  Okay.

MR. NEFF:  -- a judge has invited them to file amicus but --

THE COURT:  Will you do so?  In other words, for both parties.  Get it out to all the states that you can and I'll docket this, et cetera.  And there may even be disagreements between different courts examining this matter and different circuits.

MR. NEFF:  I think the bigger picture is that the states that are complying are likely not going to see this as something that they need to delve issue.

THE COURT:  But I just want to pay you the courtesy in terms of due process.  Okay.

MR. NEFF:  Yes.  And I would say that's because this really shouldn't be a political issue.  One side can make it a political issue if they want to just simply in a single position declare it that but it doesn't change the fact that the Civil Rights Act of 1960, the text is quite clear and that no one is in favor of faulty voter rolls.

THE COURT:  We've also had for both parties we've had a series of state rights issues in the federal court for years. And different states have taken a perspective on what the states' rights issues are.  Some are much more state-right oriented, others aren't.  That's why I was interested in the

division. But since you've all stipulated, I'm accepting this amicus at the present time. I just want to make sure you've got the courtesy on both sides of any other parties coming onboard so if we need an extra week we can take it, okay?

Okay. Won't you continue. I'm sorry.

**MR. NEFF:** Thank you, Your Honor.

The -- would emphasize that this data is necessary for the United States to conduct its HAVA operation -- its HAVA enforcement compliance and that is why that data is specifically cited in the statute. It simply couldn't be clearer that it needs to be the last four digits of a social security number or the driver's license; otherwise, we are not able to make a verified finding as to the various voter roll registrations that might have problems. In fact, we sometimes even have to follow up after that data is run. It's rare but there's a reason that was put in the statute because it's something like we can verify it from what I've talked to our database analysts something like 99.999 percent of the time. That's enough for us to be able to know if it's an actual person that lives in that location and is who the voter registration role says it is.

**(Pause)**

Again, with the caveat that we do not need to ever -- that we do not need to get to this. This is essentially an OSC where we only need to state our purpose and then we are

entitled to the records. Also under a prompt order, according to caselaw, a prompt order that this is essentially an OSC hearing.

The facts of California itself are particularly worrisome. Maybe the most worrisome state in the union.

The state is required to provide various data to the Election Assistance Commission which is a nonpartisan commission. The state -- the agency created by HAVA in order to try and keep this as neutral as possible and California doesn't provide the complete data. Their data doesn't have Los Angeles County in it. It's one-fourth the state's population. That on its own should cause concern countrywide that they've not submitted that data. It would be irresponsible of the United States to not come in at this point and say we need to see your data to ensure fair and free elections.

All of the harms that opposing counsel have pointed to are based on speculation, logical leaps and there is no concrete evidence they can point to.

That being said, with the overarching point that this is before the Court right now as essentially an order for an order to show cause, dressed up as a complaint, and that you have a dismissal that is essentially fighting that order to show cause, dressed up as a motion to dismiss, I believe the Court should act within what would be its lawful authority to issue a prompt order that California needs to turn those

78

records over to us that we are entitled to.

THE COURT:  How do you deal with the state provisions concerning the DMV?  In other words, the state is arguing to the Court that that has a -- for want of a better word -- a special category that is not subject to the Voting Rights Act of 1960 or HAVA, and that they have a privacy interest in a sense as well.  What does the Court do with that?

MR. NEFF:  Any state privacy interest would be trumped by federal law.  It would be trumped by both the Federal Privacy Act, which we're complying with.  It would be trumped by HAVA, which is a -- I repeat -- a federal minimum standards law for state compliance that specifically mentions driver's license number or last four digits of social.

The state is required to produce and provide this data under the statute.  If they have some issue with the driver's license; hypothetically, if a state just said we have some real concerns about our driver's license, they comply with the statute if they provide the last four of the social security number.

Does the Court have other questions or concerns?

THE COURT:  Just one moment.  Let me look at a note that I made.

(Pause)

The state represents that they have offered -- and I think both in the Orange County case with the registrar -- and

App. 98

79

it's represented today in the statewide case -- the names and addresses.  Has that offer in fact been made?

**MR. NEFF:**  Has that offer --

**THE COURT:**  Yes.  To you.

**MR. NEFF:**  Oh --

**THE COURT:**  Not to you but to the government, the DOJ.

**MR. NEFF:**  California has taken the unique in the nation position that they are -- that they -- we are permitted to come and inspect it in their offices, that data; which, (a), is not sufficient; (b), we argue is not an appropriate way of providing it in today's day and age where it's actually more secure to share this data electronically through our shared file-sharing --

**THE COURT:**  Kind of slow-walking you.  Kind of slow walking.

**MR. NEFF:**  I think --

**THE COURT:**  For want of a better term.

**MR. NEFF:**  That is the United States' interpretation of it but --

**THE COURT:**  How about the voter participation and the registration methods?  Have those been offered to you?  In other words, that's been argued to me but behind the scenes I don't have that record right now.  Has that been offered to you?

80

MR. NEFF:  It is in the back-and-forth is in the letters attached as exhibits in the filings, Your Honor; however, the United States' position is that the responses have been woefully inadequate.

THE COURT:  Okay.  So we've never gotten down to really how that information would be exchanged.  It's flowing back and forth in terms of representations but as a practical matter there's a big difference between a representation and conveying the information to you.

MR. NEFF:  Well actually in our letters we did lay out to opposing counsel our file-sharing program, how it works, that it is secure and we invite them to -- assuming they have a change of heart, to use it.

THE COURT:  About the registration status and the contact information, has that been offered to you?

MR. NEFF:  That, I'm not sure about.  I'm not sure what the scope of their offer is.

THE COURT:  Okay.

MR. NEFF:  I just know that it does not include the -- for sure, does not include the driver's license number or the last four of the social as required by the HAVA statute.  And in other states as well, that has always been the crux of the dispute.

THE COURT:  In their opening arguments they'd argued that in the Benson case out of the Sixth Circuit, Bellows out

App. 100

81

of the First and <u>Long</u> case out of the Fourth, that there's an inconsistent and uniformed position taken by the government. How do you respond to that?

**MR. NEFF:**  That the -- there is no inconsistency in position.

**THE COURT:**  Explain that to me.

**MR. NEFF:**  What there is is difference in posture of those cases.  It is a true statement to say that the United States, as an agency, has yet to go to states to enforce the minimum standards of the HAVA statute.  One can argue whether that was a wise or unwise decision but here we are 23 years later and the federal government has yet to do it.  It is still, for certain, good law.  The United States believes it is a law that should be enforced and complied with.  Therefore, because of that history where this hasn't been done before, all of those cases relate to private parties trying to in some way get in.

The DOJ's position is that private parties do not have a right of action under HAVA and therefore they should not be allowed to go to states and say, I would like your driver's license or social security number.  However, there are states around the country, including ones that are fighting us, that interestingly, have been willing to turn over that data to a private organization without the same protections as the United States.  That's been cited in our briefing, the ERIC

82

Organization.

So what I would say is all those cases are inapplicable.  It often requires selectively quoting them to make it sound like in some way the United States government is not entitled to it.  No, the United States government is uniquely mentioned in both the CRA and HAVA.  And therefore just because this is the first time the United States is coming in and doing it, doesn't mean that it's not clearly what the statute states.

THE COURT:  For both parties, you mentioned that California is one of the main outliers, for want of a better word, from the DOJ and the executive branch's position.  Is it the position of the executive branch that there need not be any stated purpose that there's an absolute right to obtain this information per statute?

MR. NEFF:  Statute requires we state a purpose.  A purpose.

THE COURT:  And what is the purpose here?

MR. NEFF:  The purpose is for, as stated in our letters to them, for voter roll maintenance enforcement and compliance.

THE COURT:  And we stated in Orange County with a limited county case involving Page.  There, there were -- and I keep 13 or 17 but 17, I believe, allegations.  The most notorious became the dog that voted twice.

83

Is that, out of 1.2 million voters, what's the basis, for instance, of that kind of request because of course we're always going to have error, including people who legitimately die.  So what's the threshold that this stated purpose has? How should I interpret that?

MR. NEFF:  Under the CRA there is no threshold.

THE COURT:  Okay.  Now, do you need to -- and thank you.  Do you need to make any calls?  You're all by yourself, you're doing -- there's nobody to consult with but do you need to make any calls?  Are you satisfied with your argument?

MR. NEFF:  I appreciate the offer, Your Honor, but no, we're satisfied.

THE COURT:  Okay.  There'll be a second round.

MR. NEFF:  Yes.

THE COURT:  So counsel, however you'd like to proceed then.  One of you has another obligation, I don't care which order.  You can take the intervenors first or the parties.

**(Pause)**

MR. BRUDIGAM:  So there was a lot going on there, Your Honor, and so I'm going to try to be thorough in making sure I cover all of those points.

So I think the first thing I want to talk about is this notion that the complaint is just an order to show cause. And essentially what the federal government wants to do is take the Court and sideline them in this dispute and say that the

App. 103

84

Court has no room for any judicial review here.  And that's just not supported by the text of the statute.

There's nothing in the Civil Rights Act that creates a special statutory procedure.  The words "order to show cause" are not in the statute at all and I'll just read you the text right here.

It says that:

"The appropriate district court shall have jurisdiction by appropriate process to compel the production of such record or paper."

That's what it says, "By appropriate process."  And so that's up to the Court to decide what the appropriate process is here.

And I'd also just point Your Honor to the fact that the Federal Rules of Civil Procedure contemplate what rules apply when you have a government investigative demand.  I mean Federal Rule of Civil Procedure 81(a)(5) specifically says:

"The Federal Rules of Civil Procedure apply to proceedings governing demands for records by the U.S. government."

And so this idea that some other procedure applies, it's not supported by the text, it's not supported by the Federal Rules of Civil Procedure.  The only thing that supports this purported procedure are these early 1960s' cases and like we've said, the federal government, they pin their hopes on

App. 104

85

this one <u>Kennedy v. Lynd</u>, Fifth Circuit case from 1962.  That's the one they're referring to which says that the Court shouldn't have any role here.

But that case is obviously nonbinding on Your Honor and it's really been overruled.  I would point you to the <u>United States v. Powell</u> case.

**THE COURT:**  I'm sorry, what -- just a moment.

**MR. BRUDIGAM:**  Sure.

**THE COURT:**  All right.  Please continue.  I've got my note.

**MR. BRUDIGAM:**  So the Supreme Court in United States v. Powell found that the Federal Rules of Civil Procedure, they apply to a proceeding like this.  And in that case it involved an IRS document request statute which used the very same language that we have here which is that the Court shall, by appropriate process, compel relief under that statute.  So even if Your Honor found Kennedy v. Lynd persuasive, it's obviously unbinding, that's been overruled.  So just to be clear, the Federal Rules of Civil Procedure govern this action.

**THE COURT:**  Well, you've cited on both parties' parts, different enactments by council, statutory provisions. I think we can all agree that we want qualified voters to vote without any chilling effect.

**MR. BRUDIGAM:**  I agree.

**THE COURT:**  Is there -- well I think we can all

86

stipulate to that.

**MR. BRUDIGAM:**  We can.

**THE COURT:**  And I'll use the word "qualified voters".

Is there a chilling effect in the request by the government and if so, what is that chilling effect?  How would there allegedly be persons who may believe that the government has no business in the sense of getting more information.

**MR. BRUDIGAM:**  Sure I mean I think --

**THE COURT:**  And behind this the concern of this court eventually, besides the statutory following the law, is going to be the impact of what we write and do.  And this case will probably be the first case that comes out that other circuits look at.  So with that noble goal in mind of having voter participation, is there a chilling effect or not?

**MR. BRUDIGAM:**  I think there's absolutely a chilling effect here because --

**THE COURT:**  And I need you to define that for me.

**MR. BRUDIGAM:**  Sure.

**THE COURT:**  And it may not be relevant to the opinion but behind all of this, we need voters who are qualified to be able to vote.

**MR. BRUDIGAM:**  Right.

**THE COURT:**  Now the ease of that could be differences between different administrations and whether you have different methodologies.  And I know there's a huge controversy

87

about mail-in ballots and voter registration and drive-in, et cetera, but when we're finally done with this, we want qualified voters to vote.  And if there's a chilling effect, or this privacy right that we've somewhat skipped over, I want to hear how you define that.

**MR. BRUDIGAM:**  Sure.  Your Honor, I think this action should make the stomach of every American turn, knowing that this executive branch is going in, state by state, collecting and vacuuming up everybody's voter registration information.  It is on a scale that we have never seen before.  Okay.

And what this is going to do --

**THE COURT:**  It is their disparity argument.  In other words, remember when I started this conversation early on, and I discussed the amicus briefs, I was particularly interested if I was getting just red and blue states.  That's why I was looking to see if there were these swing states.

**MR. BRUDIGAM:**  I mean I point Your Honor to --

**THE COURT:**  Or is this a argument also that a particular group of states are being examined versus other states?  Because here, the government has represented while California from their perception might be an outlier, they've also made inquiries of the let's say more, from their standpoint, compliant states like Kansas and -- I forget which one -- just a moment -- Indiana, and that Texas was coming onboard.

88

MR. BRUDIGAM:  Yeah.  Well, what I would say is I mean those aren't states that are complying, they're voluntarily giving that information to the federal government.

THE COURT:  But regardless, the government has made an inquiry so if there's an argument that the government is reaching out and being selective, if the state is voluntarily complying that doesn't seem to me to be singling out progressive states.  And if you think that, then I need to hear that and hear your reasoning behind that.

MR. BRUDIGAM:  I'm not saying they're singling out states.

THE COURT:  Okay.  Then we can pass that.

MR. BRUDIGAM:  They're going after every state and California is by no means --

THE COURT:  So I'm not going to have a disparity argument.

MR. BRUDIGAM:  Right, right.  I just mean in terms of the position the secretary has taken, I mean the reason they had to sue 14 different states is because nobody wants to turn this data over.  The representations that Counsel just gave today, that's the first that I've heard of any state turning over that information.  So we are by no means an outlier in taking this position.

THE COURT:  Wait just a moment.  For the government or DOJ, how do we validate Kansas and Indiana?  What validation

89

do I have about that?

MR. NEFF:  I was actually looking that up right now, Your Honor, because --

THE COURT:  Well go ahead and look it up.  You've got lots of time.

MR. NEFF:  And I --

THE COURT:  By the way, I'm not holding you to it.  I know it's in good faith but I'd like to hear what states that we have validation for turning this document over.  And there may be numerous states.

MR. NEFF:  It's a good-faith representation here.  I am kind of a point --

THE COURT:  Okay.  Well now take away the good faith. I accept that.  Okay, I'm asking for proof now.

MR. NEFF:  Okay.  Wyoming, Kansas, Indiana and Arkansas all complied voluntarily.

THE COURT:  Okay.  Just a moment.

MR. NEFF:  Texas --

THE COURT:  Kansas, Indiana, Wyoming and Arkansas ...

MR. NEFF:  ... have already complied ...

THE COURT:  ... voluntarily.

MR. NEFF:  ... voluntarily.

THE COURT:  Okay.  Texas?

MR. NEFF:  Texas, Virginia, Utah, Tennessee, South Dakota --

90

THE COURT:  Just a moment.

MR. NEFF:  Oh it's gonna go long, yeah.  South Carolina, Nebraska, Montana, Mississippi, Missouri and Alabama, all fall into the list of they have expressed with us a willingness to comply based on the represented MOU that we have sent them.  And so we expect full --

THE COURT:  Now apparently Nebraska can't make up its mind because of the proposed amici briefed to the Court, they have the former state secretaries of state for Colorado, Connecticut, Minnesota and guess what?  Nebraska.

MR. NEFF:  Well those are former.  And furthermore, just because some states are representing certain things in court, there are still discussions going on now that this MOU we have is fully blessed.  There are the -- I don't think it's safe at this point to go beyond those states but --

THE COURT:  Then that's fine.

MR. NEFF:  -- that's a fair representation of the state of discussions as of today.

THE COURT:  And Counsel, back to you.

MR. BRUDIGAM:  Sure.  And yeah, so all I heard there was we've heard a willingness.  It doesn't sound like those states have actually turned over any data, just to be clear.

So I want to talk a little bit about --

THE COURT:  No, I think he said that four states have actually.  Kansas --

91

MR. BRUDIGAM:  Four states have actually turned over but the broader list --

THE COURT:  -- Indiana, Wyoming and Arkansas.

MR. BRUDIGAM:  Right.

THE COURT:  The others were a purported willingness.

MR. BRUDIGAM:  Right.

So Your Honor, the federal government is really leaning hard into the text of these statutes and they say that we don't want to talk about the text but that's just absolutely not true.  And I want to just start with the Civil Rights Act of 1960.

There is a very clear statutory limitation in that provision and it's in Section 20703.  And it says that the attorney general's demand shall contain a statement of the basis and the purpose therefore.  DOJ has not satisfied this requirement and so their demand is invalid plainly under the statutory text.

THE COURT:  So the plain representation by the government is too broad; and that is, they want to stop voter fraud.

MR. BRUDIGAM:  Well, so they've mentioned a couple of things.  It keeps changing so I want to unpack this a little bit.

So they said that the purpose is free and fair elections, clean voter rolls.  Then he said up here that it's

App. 111

92

for enforcing HAVA.  So these are multiple different bases.  And also it's different than the -- or than the purpose that was originally articulated in the letters to the secretary.

The original request said that it was -- they were seeking it for NVRA voter list -- list maintenance compliance.  So the reason and rationale keeps shifting and changing.  And that's a problem, not just because it's suspicious, it's a problem because, again, the text says, "The demand shall contain a statement of the basis and the purpose therefore.  The text use of the article."  'The,' twice, in front of the basis and the purpose indicates that there is only one basis and one purpose.

And the federal government has explicitly rejected this plain text reading.  They said it up here that they just need to give you any old basis and then the demand is good.

**THE COURT:**  That's my question also to both of you; and that is, does the executive branch need to state a purpose?  Your argument is that they do.

**MR. BRUDIGAM:**  They do.

**THE COURT:**  Counsel for DOJ puts that in broad terms.

**MR. BRUDIGAM:**  Right.  Well but again, it's not just a purpose, it's -- or not just the purpose, it's also the basis.

**THE COURT:**  Okay.

**MR. BRUDIGAM:**  And they have not alleged any basis

anywhere in their action.

Now, I also want to talk about -- and just -- you know this -- I'm sorry. I want to talk a little bit more about HAVA, which is the law that apparently now that's the main method of enforcement we're now learning today, that that's what they want to enforce and they specifically reference the requirement under HAVA that states collect social security numbers and driver's license numbers. Well let's look to the text of HAVA. What does it say?

"The state shall determine whether the information provided by an individual is sufficient to meet the requirements of this subparagraph in accordance with state law."

And that is -- when it says "this subparagraph," it's referring directly to the requirement that states collect that information when processing voter registration applications. So there is nothing for the federal government to enforce here. This is solely the state's domain.

And as I said in my original motion, another provision of HAVA explicitly delegates discretion of implementation of HAVA to the states. So again, we're not afraid of the text in this case, we think it strongly supports our position. And so I also want to talk about what this data could be used for.

So we've heard a lot of different reasons. I just

94

explained why it's not relevant for HAVA.  I want to also talk about why it's not relevant for List Maintenance under the NVRA.

So the legal standard under the NVRA requires states to conduct a general program that makes a reasonable effort.  So the Sixth Circuit held this year in that Benson case that this just means a serious attempt, a rational, sensible approach.  It need not be perfect or optimal.  And so under this standard, getting line-by-line voter information of their social security numbers and driver's license numbers, that's entirely unrelated to whether a general program exists or whether the state is making a reasonable effort.  And so, again, at every turn, the supposed reason why they need this information, it just doesn't add up.

And then finally, I want to talk about they claimed, as they did in their brief, that California has, quote, "the most worrisome voter registration data in the nation."  That's just absolutely wrong, okay?  That's an assertion in a brief without any support.

And they also incorrectly say that in submitting data to the Election Administration Commission in response to the EACs survey, this is an election administration survey, they said the LA County didn't submit any data.  That's not true.  That's simply not true.  You can go to the survey and look at the data that LA submitted and you can look at our explanation

to DOJ in our letters in advance (inaudible) litigation explaining the questions they had about that survey.  So to the extent that they want to rely on EACs as some after-the-fact rationalization for this demand, it just doesn't make sense.  It doesn't add up.

So those are the main --

THE COURT:  Were there inconsistent or consistent offers if you're aware of the Page case, as well as this case.  In other words, when this started in Orange County, originally counsel was here, there's a representation about the registrar there making the same or similar representations about what they were willing to share with DOJ but I've never compared the two.  And I don't know what the state's position is because DOJ's argument might be, we're getting inconsistent data.  In other words, even when we're sharing, with the different entities promising that they'll share some amount of this data, the different counties are supplying this in different ways.

MR. BRUDIGAM:  Sure.  So I won't speak too much about that case but I would say that case is different and there isn't a problem of inconsistent data sharing because in the state case, they're saying, give us the whole list.  We want every voter.

In Orange County, they said, we want a list of just the individuals that have been removed from your list because of non-citizenship, people who renounced or for whatever

96

reason.

THE COURT: So this is much broader from your perspective in terms of protection, privacy, HAVA.

MR. BRUDIGAM: Yeah. It's not an issue of can they be reconciled.

So I do want to just back up again and just zoom out on the big picture here in this case.

You know, as we talked about -- my colleague talked about, in his motion, that the states really have the primary role in administering elections and the voter registration process. The Constitution makes that quite clear in the elections clause. And it makes sense to prioritize the state in this process because they're the ones that are closer to the voters, more accountable to the voters. And so this is an arrangement that it depends on the principle of subsidiarity where a decision should be made at the local level. And here, we don't -- there's no place for the federal government to come in and start demanding these records under that constitutional framework.

And not only are the states the default entity running elections but it's only Congress that can make or alter those rules. Here, we have the executive branch in court trying to get this information. The Constitution says nothing about the executive branch having any role in federal elections.

97

And I would just say that this is not a unique position by this administration.  The president has been meddling in state election law since he came into office.  And I would point Your Honor to a case in the District of Massachusetts, <u>California v. Trump</u>, where the executive was doing something sort of similar where they were going in under the guise of federal law and trying the change the way states administer and conduct elections and that was pursuant to an executive order the president issued.  And so here, we're having another situation where the federal government is coming in under the guise of inapplicable federal laws and trying to interfere with the state's role in elections.  And so I'd just say against that backdrop, it's important to keep that in mind; but even if, you know, considering all that, if you'd just go back to the text of these statutes, the federal government is not entitled to this information under those laws.

And so at this point I want to turn it over to my colleague, Will Setrakian, to just provide some rebuttal on the federal privacy laws issue.

**THE COURT:**  Thank you.  And once again, would you state your name because we're on CourtSmart.

**MR. SETRAKIAN:**  Good afternoon, Your Honor.  Will Setrakian for defendants, The State of California and California Secretary of State Shirley Weber.  Just four quick points on the federal privacy statute.

# Exhibit D



**Office of the Attorney General**
**Washington, D. C. 20530**

January 24, 2026

Tim Walz
Governor of Minnesota
130 State Capitol
75 Rev Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

Governor Walz,

The State of Minnesota has refused to enforce the law, and the consequences are heartbreaking. Americans are watching politicians ignore federal immigration law, criminals attack federal law enforcement, and rioters storm church services. I write to urge a change.

In December 2025, the Department of Homeland Security (DHS) launched Operation Metro Surge to protect Americans from the dangers presented by unchecked illegal immigration, including violent crime and drug trafficking. Since the beginning of this operation, law enforcement has put themselves in harm's way to arrest dangerous criminals, including members of notorious, violent gangs.[1] Criminal illegal aliens convicted of homicide, drug trafficking, sexual assault against a child, rape with a weapon, and other horrific crimes are now off the streets because of Operation Metro Surge.[2]

Unfortunately, you and other Minnesota officials have refused to support the men and women risking their lives to protect Americans and uphold the rule of law. Because Minnesota, Minneapolis, and St. Paul have chosen to ignore federal immigration law by enacting sanctuary laws and policies, the federal agents led by U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) have operated alone. And politicians in your state are not just refusing to help these agents, they are putting federal agents in danger. Minneapolis Mayor Jacob Frey said, "ICE: Get the f*** out of Minneapolis. We do not want you

---

[1] Under President Trump's leadership, ICE has arrested members of some of the world's most dangerous gangs in Sanctuary Minnesota (Jan. 14, 2026), https://www.ice.gov/news/releases/under-president-trumps-leadership-ice-has-arrested-members-some-worlds-most-dangerous

[2] *Id.*; ICE arrests dozens of criminal illegal aliens convicted of murder, child rape and more in sanctuary state Minnesota (Jan. 10, 2026), https://www.ice.gov/news/releases/ice-arrests-dozens-criminal-illegal-aliens-convicted-murder-child-rape-and-more

App. 119

here."[3] You referred to our law enforcement as "Trump's modern-day Gestapo."[4] Minneapolis City Council Member Aisha Chughtai stated that the city "must be ready to act as the last line of defense for targeted communities."[5] Minnesota Attorney General Keith Ellison has previously compared ICE enforcement to being "under attack by the Nazis."[6]

The results of your state's policies and politicians' anti-law enforcement rhetoric are a national tragedy. Violence against ICE officers and agents has increased approximately 1,300 percent.[7] Vehicular attacks against ICE officers have increased 3,200%.[8] Perhaps most disappointing, the lawlessness caused by these policies has bled into sacred spaces of worship. Parishioners were met by an anti-ICE mob last weekend, as several dozen individuals stormed Cities Church in Minneapolis to interrupt worship services and scream in the faces of frightened Christians and their families. [9] The violence against our officers and the violations of religious liberties cannot be allowed to continue.

The lawlessness in the streets is matched by the unprecedented financial fraud occurring on your watch.[10] And the out of control fraud in your state also implicates election security.[11] It is a tragedy that Americans have lost faith in Minnesota's ability to keep its taxpayers' funds secure and its citizens' safe.

You and your office must restore the rule of law, support ICE officers, and bring an end to the chaos in Minnesota. Fortunately, there are common sense solutions to these problems that I hope we can accomplish together.

First, share all of Minnesota's records on Medicaid and Food and Nutrition Service programs, including the Supplemental Nutrition Assistance Program data, with the federal government. Allowing the federal government to efficiently investigate fraud will save Minnesota taxpayers' money and ensure that Minnesota's welfare funds are being used to help those in need, not enrich fraudsters.

---

[3] Mayor Frey to ICE: 'Get the f--- out of our city', YouTube (Jan. 7, 2026), 0:25-0:30, https://www.youtube.com/watch?v=8M3GtZ_sqYI

[4] Gov. Walz refers to ICE as 'Trump's modern-day Gestapo', YouTube (May 20, 2025), 0:01-0:03, https://www.youtube.com/shorts/PgY_koUpCRM

[5] https://x.com/aishaforward10/status/1873733878894199226

[6] https://x.com/RapidResponse47/status/2012187329692365264

[7] Radical Rhetoric by Sanctuary Politicians Leads to an Unprecedented 1,300% Increase in Assaults Against ICE Officers and a 3,200% Increase in Vehicular Attacks (Jan. 8, 2026), https://www.dhs.gov/news/2026/01/08/radical-rhetoric-sanctuary-politicians-leads-unprecedented-1300-increase-assaults

[8] *Id.*

[9] Anti-Ice agitators disrupt Minnesota church, shout down worshippers during Sunday service (Jan. 19, 2026), https://www.foxnews.com/us/anti-ice-agitators-disrupt-minnesota-church-shout-worshippers-sunday-service

[10] Congress opens 'industrial-scale fraud' probe in Minnesota, warns Walz demands are 'just the beginning' (Jan. 20, 2026), https://www.foxnews.com/politics/congress-opens-industrial-scale-fraud-probe-minnesota-warns-walz-demands-just-beginning

[11] Two Nevada Residents Charged for Conspiring to Engage in Voter Registration Fraud in Minnesota (June 13, 2025), https://www.justice.gov/usao-mn/pr/two-nevada-residents-charged-conspiring-engage-voter-registration-fraud-minnesota

App. 120

Second, repeal the sanctuary policies that have led to so much crime and violence in your state. Removing criminal illegal aliens from Minnesota neighborhoods will save lives, and state and local officials should support this goal. All detention facilities in your state should cooperate fully with ICE, honor immigration detainers, and permit ICE to interview detainees in custody to determine immigration status. I urge you to reach an agreement with ICE that allows them to remove illegal aliens in custody of Minnesota's prisons and jails and avoids pushing these interactions into your streets.

Third, allow the Civil Rights Division of the Department of Justice to access voter rolls to confirm that Minnesota's voter registration practices comply with federal law as authorized by the Civil Rights Act of 1960. Fulfilling this common sense request will better guarantee free and fair elections and boost confidence in the rule of law.

I am confident that these simple steps will help bring back law and order to Minnesota and improve the lives of Americans.

The time has come for state and local officials in your state to change course. As the chief law enforcement officer of the United States, I am committed to enforcing federal immigration laws and keeping every American safe. Minnesota can and should be a partner with this administration. Do not obstruct federal immigration enforcement; do not allow rioters to take over the streets and houses of worship; do not hinder federal officials from investigating financial fraud and violations of election laws. Whether state and local politicians stand in the way or not, we will work every day to protect Americans and make Minnesota Safe Again. I request that you join us in that effort.

Sincerely,

Pamela Bondi
Attorney General

App. 121

# EXHIBIT A

App. 122

# Massachusetts Official Mail-In
# Voter Registration Form

William Francis Galvin
Secretary of the Commonwealth

## Instructions

- Confirm your citizenship at the top of the form below.

- Provide your name, full residential address, and date of birth. You may not use a P.O. Box for your residential address.

- If you have a non-traditional residential address, use the map to draw the location of your residence.

- Provide your Massachusetts driver's license number in the Identification section. If you do not have one, provide the last 4 digits of your Social Security Number. If you have neither, write "NONE."

- Make a party selection. If you do not wish to enroll in a party, check "No Party (Unenrolled)." To enroll in a political designation, check "Political Designation" and write the name of the designation.

- If you cannot sign this form due to disability or inability to read the form, the person assisting you may sign your name, in your presence. That person must also provide their own information.

- Sign and date this form and submit it to your local election office at your city/town hall.

- This form must be postmarked or hand-delivered at least **10 days before the election** or town meeting in which you wish to vote.

## Eligibility

You may use this form to:

- Register to vote or pre-register to vote

- Update your address, name, or party

To use this form, you must be:

- A citizen of the United States
- At least 16 years old (you must be 18 to vote)
- A Massachusetts resident
- Not incarcerated for a felony conviction
- Not disqualified from voting by a court order

## Identification Requirements

The ID number you provide in on this form will be verified through the Registry of Motor Vehicles or Social Security Administration. If this number cannot be verified, you will be asked to present ID that shows your name and address on or before Election Day.

## Penalties for Illegal Registration

The penalty for illegal registration is a fine of not more than $10,000 or imprisonment for not more than 5 years, or both. M.G.L. c. 56 § 8

| north | Using landmarks, draw the location of the place where you live if you cannot describe that location as a number and street. |
| west    east | |
| south | |

---

**Citizenship:** Are you a Citizen of the United States of America? ☐ Yes ☐ No
**NOTE: If "No," do not complete this form**.

Name _____
        last              first              middle      suffix

Former Name *(if applicable)* _____
                    last              first              middle    suffix

Residential Address _____

Mailing Address *(if different)* _____

Date of Birth *mm/dd/yyyy* _____

Identification # _____

Telephone # *(optional)* _____ ☐ Unlisted

Party Enrollment   ☐ Democratic   ☐ Republican   ☐ No Party (unenrolled)
                   ☐ Political Designation (write name): _____

Address of Previous Registration *(if any)* _____

Assisting Person *(if applicable)* _____
                        name              address      telephone number (optional)

**Oath**: **I hereby swear (affirm)** that I am the person named above, that the above information is true, that **I AM A CITIZEN OF THE UNITED STATES**, that I am at least 16 years old, that I am not a person under a guardianship which prohibits my registering to vote, that I am not disqualified by law from voting because of corrupt practices, that I am not currently incarcerated for a felony conviction, and that I consider this residence to be my home. Signed under the penalty of perjury.

Signature _____ Date *mm/dd/yyyy* _____

App. 123

Rev. 6/2/25

Return Address

Place Stamp Here

OFFICIAL ELECTION MAIL™
Authorized by the U.S. Postal Service

**Board of Registrars or Election Commission**

**City or Town Hall**

**MA**

*YOUR CITY OR TOWN* *ZIP CODE FOR CITY OR TOWN HALL*

*Fold here*

*Place tape here*

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------

United States of America,          )   File No. 25-cv-3761
                                   )            (KMM/EMB)
         Plaintiff,                )
                                   )
vs.                                )   Minneapolis, Minnesota
                                   )   March 3, 2026
Steve Simon, in his official       )   9:27 a.m.
capacity as Secretary of State     )
for the State of Minnesota,        )
and the State of Minnesota,        )
                                   )
         Defendants.               )
------------------------------------------------------------

BEFORE THE HONORABLE KATHERINE M. MENENDEZ
UNITED STATES DISTRICT COURT JUDGE
**(MOTION HEARING)**

Proceedings reported by certified stenographer; transcript produced with computer.

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | U.S. Department of Justice |
| | JAMES T. TUCKER, ESQ. |
| | BRITTANY E. BENNETT, ESQ. |
| | 950 Pennsylvania Avenue NW |
| | Washington, DC 20530 |
| | |
| For the Defendants: | Minnesota Attorney General's |
| | Office |
| | ANGELA BEHRENS, ESQ. |
| | ALLEN BARR, ESQ. |
| | LINDSEY E. MIDDLECAMP, ESQ |
| | 445 Minnesota Street |
| | Suite 600 |
| | St. Paul, MN 55101 |
| | |
| For Intervenor | Greene Espel PLLP |
| Defendants Minnesota | KATHERINE M. SWENSON, ESQ. |
| Alliance for Retired | KSHITHIJ SHRINATH, ESQ. |
| Americans Educational | 222 South Ninth Street |
| Fund and Misael | Suite 200 |
| Hernandez: | Minneapolis, MN 55402 |
| | |
| | Elias Law Group LLP |
| | ROBERT GOLAN-VILELLA, ESQ. |
| | UZOMA N. NKWONTA, ESQ. |
| | 250 Massachusetts Avenue NW |
| | Suite 400 |
| | Washington, DC 20001 |
| | |
| For Intervenor | Stoel Rives LLP |
| Defendants Common | ANDREW J. PIEPER, ESQ. |
| Cause, League of Women | HEATHER CHANG, ESQ. |
| Voters of Minnesota, | MARIAN SRODULSKI, ESQ. |
| Valerie Mangskau and | 33 South Sixth Street |
| Jennifer Compeau: | Suite 4200 |
| | Minneapolis, MN 55402 |
| | |
| | ACLU of Minnesota |
| | DAVID P. McKINNEY, ESQ. |
| | 2828 University Avenue SE |
| | Suite 160 |
| | Minneapolis, MN 55414 |
| | |
| | ACLU of Minnesota |
| | TERESA J. NELSON, ESQ. |
| | P.O. BOX 14720 |
| | Minneapolis, MN 55414 |

PAULA K. RICHTER, RMR-CRR-CRC
(612) 664-5162                    App. 127

**APPEARANCES (Continued):**

| | |
|---|---|
| For Amicus Defendant Former Employees of the U.S. Department of Justice: | Goetz & Eckland PA ANDREW H. MOHRING, ESQ. 615 First Avenue NE Suite 425 Minneapolis, MN 55413 |
| For Proposed Intervenors NAACP and Cynthia Wilson: | Lathrop GPM LLP PIERCE ROSE, ESQ. AMY E. ERICKSON, ESQ. GABRIELLE JACKSON, ESQ. 80 South Eighth Street Suite 3100 Minneapolis, MN 55402 |
| Court Reporter: | PAULA K. RICHTER, RMR-CRR-CRC 300 South Fourth Street Box 1005 Minneapolis, Minnesota 55415 |

**P R O C E E D I N G S**

**IN OPEN COURT**

THE COURT: All right. Good morning, everyone. We are here for oral argument in United States versus Simon.

Let's get counsel's names on the record, first on behalf of the United States.

MR. TUCKER: Good morning, Your Honor. James Tucker and Brittany Bennett on behalf of the United States.

THE COURT: Welcome to both of you. And which of you are going to be presenting argument today?

MR. TUCKER: I will be, Your Honor.

THE COURT: Okay, very good.

Hang on just one second. You can be seated, sir, sorry. I just realized I left part of my notes on the printer. Can you grab them? Thanks, Brian.

And on behalf of the State of Minnesota and Mr. Simon?

MS. BEHRENS: Good morning, Your Honor. Angela Behrens, and with me are Allen Barr and Lindsey Middlecamp.

THE COURT: Okay. Welcome to all of you. And, Ms. Behrens, my notes suggest you're going to be presenting argument?

MS. BEHRENS: Yes.

THE COURT: Okay, very good.

And on behalf of the Intervenors Minnesota

Alliance for Retired Americans Educational Fund.

MS. SWENSON:  Good morning, Your Honor.  Katherine Swenson from Greene Espel law firm.  With me today is my colleague, Kshithij Shrinat, and then from the Mark Elias law firm, Uzoma Nkwonta and Robert Golan-Vilella.

THE COURT:  Okay, great.  Welcome to all of you.

And, Ms. Swenson, I'm not certain there's going to be a lot of opportunity for argument for intervenors, but we will see.  I tend to handle argument with questions, as you probably know, and then if there are questions that remain after my discussion with the primary defendants, I'll give you an opportunity to chime in.

MS. SWENSON:  Thank you, Your Honor.

THE COURT:  And Intervenors Common Cause, League of Women Voters, and two individuals.

MR. PIEPER:  Good morning, Your Honor.  Andy Pieper with the Stoel Rives firm.  With me from my firm today are Heather Chang and Marian Srodulski, and also with us today is my co-counsel from the ACLU of Minnesota, David McKinney and Teri Nelson.

THE COURT: Okay, great.  Welcome to all of you.

And same goes for you, Mr. Pieper.  We'll see what we need.

MR. PIEPER:  Thank you.

THE COURT:  Thank you.

Anybody else need to make an appearance today?

MR. MOHRING:  Good morning, Your Honor.  Andrew Mohring.  There is a pending motion for leave to file an amicus brief.  I'm here as well on behalf of a collection of former employees.

THE COURT:  Okay.  Thank you very much, Mr. Mohring.  I think that motion was granted, actually.

MR. MOHRING:  It was.  There was an opposition. There was a reply.

THE COURT:  I know all about that.  Thank you.

Yes.

MR. ROSE:  Good morning, Your Honor.  Pierce Rose and my colleagues, Amy Erickson and Gabrielle Jackson on behalf of proposed intervenors, the NAACP and Ms. Cynthia Wilson.

THE COURT:  Okay, great.  Thank you.  Thank you, all.

Let's go ahead and get started.  I think I will begin with Ms. Behrens.  Do you want to come up to the podium?

Okay.  Have there been any decisions other than *U.S. v. Oregon*, *U.S. v. Weber*, and *U.S. v. Benson*?

MS. BEHRENS:  Not that I'm aware of.  I checked this morning and did not see anything new that came out.

THE COURT:  Which other cases are furthest along?

MS. BEHRENS:  My understanding is that there are four that are pending decision, so --

THE COURT:  Sorry to interject right after you're answering a question that I asked you, but the four that are pending decision, are those similarly postured in terms of pending decisions on motions to dismiss?

MS. BEHRENS:  Yes.  And those are all cases where it's been fully briefed, and my understanding is the courts will not be holding oral argument, and those states are New York, New Mexico, Nevada, and Pennsylvania.

And then my understanding is there will be about five hearings on motions to dismiss within the next month or so, and those are Connecticut, Maine, Rhode Island, Hawaii, and Nebraska.

THE COURT:  Okay.  Thank you.

A couple of procedural thoughts before we get started in some substantive questions that I have.  First, with respect to the point that Mr. Mohring just made about the amicus, I had granted the motion for amicus, understanding that the United States and the parties did not object.  Then there was a change of -- response from the United States expressing an opposition to amicus following the completion of briefing.

I'm going -- I'm not going to strike or deny the amicus, but I am going to give the United States the

opportunity to file a letter brief in response to anything it wishes to address related to the amicus that's been filed.  You can have up to ten pages, and you can have two weeks to do so.  If you have any points you'd like to make, they can be made then.

MR. TUCKER:  Thank you, Your Honor.

THE COURT:  Okay, great.

MS. MORRISON:  There's no objection, Your Honor, obviously.

THE COURT:  Okay.  Thank you.  I assumed so.

The second matter is that in *United States vs. Benson*, the district judge engaged with an argument related to the scope of records covered by the Civil Rights Act.  It is, I believe, raised somewhat in a briefing from the League of Women Voters, but I would like additional briefing on that matter in the wake of the Michigan decision.

We'll include details in a brief text-only order or in the minutes from today's hearing.  We'll give everyone plenty of time.  It will be simultaneous briefing from both sides.  I'd like one brief from the defendants, so you all put your heads together about who takes the lead on that and what that looks like, and one brief from the United States.

So I'm not going to discuss that argument today.  My questions aren't going to focus on that argument today.  I want to dive a little more deeply into that issue once I

receive the briefing, unlikely to set a second argument, although I guess it's always possible if there's a lot of questions that come to mind.

But I just thought I'd put those two procedural issues out there right away. Anything you want to address about either of those on behalf of the State defendants?

MS. BEHRENS: No, Your Honor.

THE COURT: Okay. How about on behalf of the United States, before we get back to substance?

MR. TUCKER: Your Honor, so just to clarify, those would be due simultaneously and you'll specify the date that they are due in the order?

THE COURT: Precisely.

MR. TUCKER: Okay. Thank you, Your Honor.

THE COURT: And they don't have to be simultaneously like to the hour, but just on the same day. They're not going to be back and forth motion practice. Okay. Very good. Sorry to have interrupted myself.

So let's get started with some of the substance related to the Civil Rights Act. You appear to raise a few arguments about the Department of Justice's request with respect to the Civil Rights Act.

First, you suggest that under the CRA, it just doesn't work like this and you don't get to use the Civil Rights Act to seek information regarding compliance with

HAVA.  Can you articulate this argument for me as best you can?

MS. BEHRENS:  Certainly.  So that goes to the requirement that there be a statement of the purpose.  And first, it's within the Civil Rights Act, so the need to state a purpose -- the purpose indicates there is a substantive limit and it is the purpose therefore, which means the data can only be used for that reason.

And this is within the Civil Rights Act.  The obvious reading of that is that it needs to have a connection to the Civil Rights Act -- to a civil rights investigation.

Certainly there could be cases where evidence that data gathered because of HAVA is relevant to a civil rights investigation, but it's not about HAVA itself.  And the legislative history particularly shows that the Civil Rights Act records provision was targeted to rampant racial discrimination and registration practices at the time and that's historically how it's been used.  And the Fifth Circuit cases around the time the most contemporaneous case law shows that very specific use of targeted investigations towards specific jurisdictions where the Attorney General was indicating he had evidence of some racial discrimination and registration practices and was gathering information relevant to that purpose.

THE COURT:  Has there been a case where that provision was used where the articulation is something related to the purposes of the Civil Rights Act but no proffer has been made about specific concerns related to the information?  For example, maybe a kind of rote articulation:  This information is being sought pursuant to the Civil Rights Act for the purposes of enforcing its provisions but without saying, We believe that X jurisdiction or Y state has done something that runs afoul of those protections.  Were there any cases at any point, either shortly after the passage or more recently, that did that?

MS. BEHRENS:  Not that I'm aware of.  And some of the examples cited from the -- in the United States' brief and from the amicus brief from the former DOJ employees, a lot of these appear to have been settled, so we don't necessarily have litigation expanding on what the correspondence was with the jurisdiction.  But the examples in the amicus brief are particularly enlightening because it shows even if they were suggest -- gathering data that was collected under HAVA, it was still to investigate discriminatory practices related to denial of the right to vote.

THE COURT:  Are you aware of any instance in which this information-gathering provision of the Civil Rights Act

has been used for an articulated basis or purpose outside of the Civil Rights Act?

MS. BEHRENS:  I am not.

THE COURT:  One could suggest that part of the Civil Rights Act is about voting, not just about civil rights and discrimination but also about election integrity. Do you think that that allows the Civil Rights Act to be used more broadly in an election setting somewhat untethered from the racial discrimination history of the act?

MS. BEHRENS:  I wouldn't say it necessarily has to be racial discrimination, but it does need a civil rights hook.  And certainly there could be hypothetical cases. We're not saying there could never be an avenue for potentially gathering data collected under HAVA.

But in terms of just general HAVA compliance, there's a mismatch.  HAVA just sets minimal election standards for election administration.  It directs states to have a centralized list, so in Minnesota we don't have 87 counties doing their own thing in terms of registration processes.  And then it directs routine list maintenance processes.

If Congress had intended the United States to be able to just generally collect all voting data collected under HAVA, essentially conducting an audit, it presumably would have said so.  But everything about HAVA, it has those

general guidelines about centralized lists and list maintenance, but it really takes a hands-off approach and keeps states in the driver's seat.

It's states and local officials that define and maintain and administer it.  It's states and local officials that perform list maintenance, states and local officials that decide whether information is sufficient to register, and states that generally have control over the methods of implementation.  And when HAVA talks about sharing information or access, it's still referring to states sharing with state agencies or local officials.

THE COURT:  Okay.  Do you think that the CRA contemplates a role for me in tailoring the information requested to the purpose of the request?

MS. BEHRENS:  Yes.

THE COURT:  And what's your best authority for that idea?

MS. BEHRENS:  Well, *Powell* and some of the other cases, *Becker*, essentially the case law that's developed since those Fifth Circuit cases establish that when the government comes to court trying to enforce a demand for documents or information, judicial review can look at the facial validity, so whether the government complied with the statute, and the substantive legitimacy, so ensuring that the federal government is not abusing its authority.  And

that can go to whether there's a good faith, legitimate purpose or a pretextual basis, and relevance and overbreadth and compliance with other laws.

THE COURT:  It feels like we've got this flurry of law from shortly after the passage of the act culminating with *Powell* and the note that you cite, and then not a lot of law illuminating the scope of my role in the decades since then.  Am I right about that or am I missing something?

MS. BEHRENS:  As to this specific provision, that is correct, but I think the general principles about government demands for data equally apply here.

THE COURT:  Okay.  You also suggest that I shouldn't credit the Department of Justice's statement that it wants the unredacted lists for HAVA-related reasons.  In other words, you and the intervenors suggest that there are other sort of more nefarious or certainly more outside the purposes of either the CRA or HAVA objectives for trying to get these lists.

Are you making that argument, and if so, how am I supposed to assess that?  Point me to something that gives me the authority to try to divine the true motivation of the executive.

MS. BEHRENS:  We are making that argument, that even if the demand is facially valid, there are substantive

problems.  And again, *Powell* provides that a party can challenge on any appropriate ground.

And the record here -- and I want to say, the State does not make these arguments lightly.  We certainly appreciate a state government, the importance of agencies being able to investigate, but we also know that investigation has to be done within the scope of an agency's authority and in good faith and for a legitimate purpose.

And here, what starts as just the fundamental mismatch between the claimed purpose and the request.  The claimed purpose is for HAVA compliance, HAVA simply requires maintenance processes be in place and that states routinely update their list.  But here, that's about process, but they want data.

Second, they repeatedly ask for the statewide voter registration list, but then also say, Include active and inactive.  Well, by definition, inactive voters will not be on the voter registration list because they are not registered voters.

And then second, the public events and the reporting and public documents that the Court can take judicial notice of, they're difficult to ignore.  If you watch the trajectory from about a year ago, in early 2025, through last month, what starts as perhaps rumors or whispers really crescendoes into a roar.  We have the

executive orders from last March talking about the federal government gathering voter data.  Then in the summer we have a dragnet approach of asking every single state to turn over its voter data.  That indicates there is no individualized suspicion, so that, again, goes to the lack of -- not only did the government not state a basis, it's clear there's not a basis for believing there's a violation here.  So there is no good faith.

THE COURT:  A violation of the Civil Rights Act, a violation of HAVA, or either?

MS. BEHRENS:  Either.

And then through the late summer and the fall, public reporting about voter data potentially going to the Department of Homeland Security, running through the SAVE Act and perhaps running national list maintenance or a national voter role.

By the end of December, the head of the civil rights division, in an interview that we cited, is saying the Attorney General doesn't have to show her homework on what she's going to do with it, which is also contrary to the Civil Rights Act because even if it is a legitimate purpose, you have to be cabined to that purpose.

And then in January --

THE COURT:  What's your best -- let me interrupt you there.  What's your best authority for the idea that the

purpose cabins the use of the information, and sort of second-tier question, that I have some role in enforcing the cabining of the use of the information to the stated purpose?

MS. BEHRENS:  The plain text of the Civil Rights Act, it refers to "the basis" and "the purpose," so those are two distinct concepts.  That's underscored by the repetition of the definite article, so this wasn't -- basis and purpose isn't sort of a single phrase.  They're distinct concepts.

And then the use of "the."  It's a definite article.  It has to be "the."  And then the phrase is "the purpose therefor," and it's the therefor without the E at the end, which is the definition is, "For that reason."  So the statute itself cabins the use of the data.

THE COURT:  So then point me to my authority to administer the cabining of the data.

MS. BEHRENS:  Well, I think on its face, some of these events, they're enough to dismiss for failure to state a claim.  *Powell* and, again, the authorities on just government demands in general give the Court that opening.  Certainly if this were a worst-case scenario and the Court were ordering production of data, it would be through a robust protective order and use of that, but the data itself.  And that is the role of courts.  That's why

Congress also built in judicial review into the Civil Rights Act, that there is a role for the courts to determine what the law is and how far the department can go in -- the Department of Justice can go in making demands under the Civil Rights Act.

THE COURT:  One of the things that I have been considering is the suggestion in the briefing that a demonstration of compliance with HAVA doesn't require the personal identifiers or the -- you know, the Social Security information, the very specific individual voter-level information.

Do you think that there is some basis that I could order the disclosure of the information with those things redacted?  And I understand perhaps this information has already been offered.  But do you think that that is within my power, those sorts of limitations?  And if so, what is the strongest thing you can point me to for that authority?  Is it the same idea that it's part of my general power in cabining government data requests?  Is it *Powell*?  What would be the hook there?

MS. BEHRENS:  Yes, it would be the *Powell* line of cases.  And I think the hook for that, too, is just relevance and overbreadth, that this information is not relevant.  And as you noted, the information has been offered, so if that information is not relevant, that would

support outright dismissal.

THE COURT:  So what do you make of the decision in *Benson* not adopting your sort of statutory reading that creates this limit on the use of the Civil Rights Act?

MS. BEHRENS:  I think that decision is an outlier, and we'll certainly provide the supplemental briefing you noted at the outset, and those arguments hadn't been here. I think that provides a more unduly narrow read of record, and what is instructive are the cases under the National Voting Rights Act, which uses similar language about all records where the First Circuit and the Fourth Circuit and numerous district courts have recognized that states can redact sensitive private data.  And those cases have been out there for a while, and Congress certainly has not amended the law or spoken otherwise and said that the information cannot be redacted, so that analogy I think provides strong authority.

THE COURT:  All right.  Let me get back to my list.  Hang on one second.

So let's have a hypothetical here.  Let's imagine that under the Civil Rights Act the Department of Justice informed Minnesota that it had reason to suspect that Minnesota -- the election systems in place were discriminating against people on the basis of race, so kind of a classic objective of the Civil Rights Act, and that it

wanted the full voter registration list to assess those concerns. Is it still appropriate for a court, if the articulation is right in the wheelhouse of the purpose of the act, to assess the stated purpose and whether it is valid?

MS. BEHRENS: Assuming, with the hypothetical, and assuming there were no concerns of good faith or pretext or any of that, then we agree that the -- it is an investigative tool. It's not about trying the case within the case. But if there is -- a party is able to come forward with evidence, that is one of the central reasons for judicial review. If there is a lack of good faith or a pretext, then it is open for judicial scrutiny.

THE COURT: So in your reading, it's not sort of a magic word invocation. It would have to be a magic word invocation unburdened by a suggestion of a contrary motivation.

MS. BEHRENS: Correct. And that's what those cases from the Fifth Circuit, what you saw were just outright stall tactics and the counties trying to obstruct the investigation. In *Lynd,* the county was demanding the names of every witness the United States had. In *Bruce*, where the county tried to shortcut the investigation and just submit an affidavit and say, Well, no black people have tried to register; you can't ask any questions. That's not

what we have here.  With the list of events, we just -- I rattled off there in terms of other public statements, there's enough here to raise suspicion.

And there are -- it's worth emphasizing, again, this is sensitive data on millions of Minnesotans, people who have given that information to vote, not for the State to hand it over to the federal government indiscriminately.

THE COURT:  The Department of Justice indicates that it will safeguard the information that it is seeking and has identified some intention and plan to do so.  Why isn't that sufficient to alleviate your concern about privacy?

MS. BEHRENS:  Well, one, the Department of Justice seems to concede that the Privacy Act applies to it, but it has not identified any system of record notice that would apply.

And then second, going back to the same sort of events I listed, there's just -- there's not a lot of confidence there.  And I think the Oregon decision talked about that, why there's not a presumption of regularity anymore on this issue.

And a couple of other more recent events I did not list before was in January, the Social Security Administration made a court filing where it admitted DOGE employees had entered some type of agreement with an

election integrity group and given Social Security data.

And then we have, very close to home in Minnesota, the Attorney General writing to Minnesota's governor and tying giving the voter role to immigration enforcement.

So there's certainly a record at a minimum that would open the door to discovery on good faith and a legitimate purpose on this record.

THE COURT:  Okay.  So you're suggesting that if I do not grant the motion to dismiss and I do not grant the motion to compel, that the next step would be proceeding to discovery, the purpose of which would be to explore the basis and the purpose?

MS. BEHRENS:  Correct.

THE COURT:  Okay.  And do you have any cases where a Civil Rights Act request led to discovery like that?

MS. BEHRENS:  Not that I'm aware of.  Again, I think we're all sort of reading the same four or five cases from the 1960s where -- and there was no evidence that those counties made those arguments, so it just hasn't been reached.  But I think the general principles from all the other cases about abuse of process and government demands for information would apply here.

THE COURT:  Why did all this litigation come to a screeching halt in the early '60s?  Do you think it's because of *Powell,* or do you think it's -- I mean, it's

certainly not that civil rights problems were fixed.

MS. BEHRENS:  I don't know.  I know some of the intervenors expand a little bit on the history of Voting Rights Act and some of the other stronger tools, that this may not be the needed go-to tool anymore, or it could be that they're just not getting litigated because there's compliance and consent decrees.

THE COURT:  Okay.  What do you think about the *Benson* court's analogy of these requests to an administrative subpoena?

MS. BEHRENS:  They're similar in that it is the government asking for documents, but Congress did not use those words.  We know Congress knows how to use the language of subpoena within various statutes.  It's notable that HAVA did not give the DOJ any investigative authority.  But at the end of the day, I think it gets us back to the same place and that if this were the equivalent of a subpoena and there had been an attempt for judicial enforcement, we would be back here making the exact same arguments.

THE COURT:  Okay.  I think those are my questions for you.  What else do you think you'd like to point out or highlight?

MS. BEHRENS:  I think we've covered most of the points I'd intended to make.  I would just add, I realize the phrase "fishing expedition" gets thrown out a lot in

litigation, but it really fits the bill here.  We have a sweeping and unprecedented demand for state voter data where there's no hint of an underlying violation, and the demand is hitched to statutes that are far removed from this type of use.

THE COURT:  Okay.  Thank you.

MS. BEHRENS:  Thank you.

THE COURT:  All right.  Ms. Swenson or Mr. Pieper, do either of you want to jump in on anything that I haven't already sufficiently hinted at with co-counsel?

MS. SWENSON:  Yes, my co-counsel will be addressing that, Your Honor.

THE COURT:  Okay, great.  Come on up.  And if you could remind me of your name.

MR. GOLAN-VILELLA:  Sure.  Good morning, Your Honor.  Robert Golan-Vilella on behalf of the Alliance intervenors.

THE COURT:  Great.

MR. GOLAN-VILELLA:  I'd like to focus -- most of the discussion up to this point has been in the area of the Civil Rights Act purpose demand, but I'd like to focus the Court's attention briefly on what we think are the other two simplest and most straightforward grounds on which this case can and should be resolved.  And those are, first, the simple failure to provide not just a basis but anything that

could be considered a basis in DOJ's demand letter.  And second, the failure to provide any allegations of a HAVA violation for the other claim, which we haven't discussed so far.

THE COURT:  My perception of the -- I don't really want to talk about the HAVA claim right now.

MR. GOLAN-VILELLA:  Understood.

THE COURT:  After I speak with opposing counsel, if they are relying on it in ways that I don't believe they are right now, we'll pivot back to you, but let's go ahead with your first point about no basis being articulated in the demand letter.

MR. GOLAN-VILELLA:  Certainly, Your Honor.  So as the California and Oregon courts have well articulated, we believe that basis must mean a factual basis.  And you can see this in a few different ways.

If you were to take DOJ's interpretation, which is that the basis is the Civil Rights Act itself in its Civil Rights Act demand, the phrase would simply become meaningless because it would be automatically satisfied in any case in which a demand was made under the CRA at all, and there is --

THE COURT:  Well, isn't that kind of the federal government's argument here, that I have no role in grappling with the veracity, persuasiveness, or foundation of the

basis?  It is -- I mean, the closest analogy I've been able to come up with in my head is the Stored Communications Act, where the government can seek certain communications by articulating of sort of rote standard.  We have reason to believe this might be relevant for an investigation or something similar to that.  And if they say those magic words, that my duty when I was a magistrate judge was to make sure they said those magic words and then sign.  What is your support for the idea that something more robust is permitted to me and, therefore, required of the showing?

MR. GOLAN-VILELLA:  Several points on this, Your Honor.

First, even in DOJ's own cases, you know, some of them have provided the statements of basis and purpose that were used at the time.  *Kennedy v. Lynd* is one example of them.  Even there, the government provided separate statements of basis and purpose so must have understood them to be two separate and independent requirements.

We'd also point to the general principle that, you know, Congress is generally not presumed to enact meaningless statutes.  This ought to have some meaning.

And we'd point to *Powell* and the more modern line of cases that the State discussed which suggest that the review has to have some meaning.

In addition to the criteria that the State pointed

to, you know, that the purpose is legitimate, that the inquiry is relevant to that purpose, that the Court's process not be abused, and that the underlying statute be satisfied, I'd like to point Your Honor to one case that is cited in our briefing which is a case called *CFPB v. ACICS,* and the cite for that is 854 F.3d 683. So that's a case involving a civil investigative demand. And the Court in that case not only denied it because the statement that the government made was too perfunctory to allow it to be addressed, but it actually said that the review of the demand or the request that is made cannot be so lax as to drain the underlying statute that authorizes the request of its meaning.

We think that principle has direct application here. Basis and purpose have to mean something. In this particular instance, basis, because the government has provided no basis at all. And an interpretation of the law that allows the Court to be totally hands-off and not review it at all drains the underlying statute of its meaning.

THE COURT: What circuit was *CFPB*?

MR. GOLAN-VILELLA: That's a D.C. Circuit case, Your Honor.

THE COURT: Thank you. Okay. Anything else?

MR. GOLAN-VILELLA: No, Your Honor.

THE COURT: Okay. Thank you. Very helpful.

MR. GOLAN-VILELLA:  Thank you.

THE COURT:  And, Mr. Pieper.

MR. PIEPER:  I'll ruin the microphone setup for everybody.

Good morning, Your Honor.

THE COURT:  There's a button on the --

MR. PIEPER:  That's okay.  I'll be fairly brief. I think that we bring a unique perspective on behalf of the intervenors that I represent with the ACLU of Minnesota, and I want to just briefly introduce them.

So obviously we represent Intervenors League of Women Voters, which is a nonpartisan nonprofit, that has been around for more than a hundred years protecting voting rights through voter education engagement activities, particularly through voter registration efforts.  And the Minnesota executive director, Amy Perna, is in the courtroom today.

Common Cause is another intervenor that we represent which has likewise been engaged for many years in election protection work.

And we also represent, importantly, individual intervenors, Minnesotans themselves, Valerie Mangskau and Jennifer Compeau, and they're in the courtroom as well.  And I want to highlight them because they're both Minnesotans who value their right to vote so much so that though they

were formally disenfranchised on account of past felony convictions, their voting rights were recently restored, both through litigation advocacy and policy advocacy in part due to their extensive efforts to secure the right to vote for former formally convicted felons on behalf of the entire class of Minnesotans who fall within that.

And so while we in our briefing echo all of the same types of legal issues that you were just discussing with counsel, Your Honor, I think there is one overarching concern that applies here specific to these intervenors, and that is that the basis and the purpose, or the stated basis and purpose, is effectively pretext for the federal government to collect and compile politically sensitive private voter information, specifically information that's descriptive of voters' conduct protected under the First Amendment into presumably some type of federal national voter database, which is prohibited by the Privacy Act.

And I know you talked briefly about the Privacy Act with counsel for the State, but I would like to just simply highlight that issue which we've raised in our brief, that disclosure of the State's unredacted voter database would inevitably lead to Privacy Act violations.

All of this, the failure to state a justifiable -- or any basis, as counsel for the other intervenors just articulated, and a justifiable purpose for this demand, the

pretextual nature of the basis and purpose and the fact that HAVA itself does not provide --

THE COURT:  What -- whoa, whoa.  What do I use -- so this isn't the first recent case involving the federal government where I've been asked to consider motivations.  What do I use -- what framework do I apply, what lens do I look through, to determine the true motivation of a multifaceted executive branch?

MR. PIEPER:  Yeah.  And I appreciate that question, Your Honor, and I completely understand the position that you're in to ferret all of this out both in this case and the other cases that are on your docket.

THE COURT:  You're going to have to slow down about half.

MR. PIEPER:  Okay.  Will do.

We've obviously cited and referenced in our brief extensive public record, a public reporting regarding the nature of the public discussion about the way in which these voting records -- or the rationale for why these voter records are being requested, and you can simply line that up against what is -- how this request or this demand was made or the pretextual purpose of it.

The public discussion of the rationale for collecting and vacuuming up private voter data across the country does not relate to basic compliance with the

administrative requirements of HAVA.  If that were the case, you wouldn't need this type of sensitive voter data.

And you can see that both in the reporting, but also in the actions of the DOJ itself with respect to the proposed memorandum of understanding that it has offered to various other states which include provisions by which the federal government, in adjusting this information or receiving this information as a condition of that, would effectively be granted a right to challenge whether voters are proper or not.

And we also cannot just accept the government's assurances at face value that they will effectively protect this data or use it solely for the purpose of establishing a HAVA-compliant voting system in Minnesota when we've also cited to executive orders that have been issued by the Trump administration related to -- or really requiring the federal government administration-wide to share data across agencies.  And we've seen how that has occurred time and time again where poor data practices have -- within the federal government, have created instances in which voter -- or excuse me, which private citizen data has been unlawfully shared across agencies.

THE COURT:  Okay.

MR. PIEPER:  And we've highlighted -- with respect specifically to the Privacy Act, Your Honor, I know this is

in the briefing, but the prohibition on compiling individual voter data that -- or excuse me, individual data that reflects a citizen's protected activities under the First Amendment, that is under 5 U.S.C. 552a(e)(7), and that states, "An agency shall not maintain any record of how any individual exercises rights guaranteed by the First Amendment."

There is no statute that authorizes the collection of data into a national federal database, and there is no authorized law enforcement activity that's at issue here as to an individual voter that would allow the government to collect individual data on millions of voters in Minnesota.

So with that, Your Honor, I have nothing further, unless you have any questions for me.

THE COURT:  I don't think so.  Thank you.

MR. PIEPER:  Thank you, Your Honor.

THE COURT:  All right.  Time for Mr. Tucker? Okay, great.

MR. TUCKER:  Yes, Your Honor.

THE COURT:  Any update you want to provide to opposing counsel's sort of rundown of what other cases are percolating with similar issues, the New York, New Mexico, Nevada, Pennsylvania, and the states with hearings coming, any that you think should be on my radar screen besides those?

MR. TUCKER:  There is one, Your Honor, and I don't think I can reveal what the state is yet, but the State contacted us this morning indicating that it's one of the cases we filed, and they are going to negotiate a settlement with the United States and provide the requested statewide voter registration list.  I do believe I'll be able to provide that certainly in the supplemental briefing because I think it will be concluded then, but given the fact that the State has just informed us and we don't have -- we don't have a final agreement, I don't think it would be appropriate for me to identify the state yet.

THE COURT:  And is that going to be similar to the consent decrees in Texas and Georgia?

MR. TUCKER:  I'm not exactly sure.

THE COURT:  I don't mean in content.  I guess I mean more, when you talk about a settlement, do you mean something like that in the consent decree realm or you don't even know that yet?

MR. TUCKER:  I believe it will be along those lines.  I mean, typically what we've been doing is we've been looking at the MOU that other counsel have mentioned.

What I will also mention is that one of the other developments is that in the discussions with the states, many of the states have objected to what they refer to as kind of a poison pill, which is what was referred to, in

terms of requiring that within I believe it's 45 days that they have to take certain action if the United States identifies that there are ineligible voters on the list. The United States and the communications with those states indicated that we're certainly willing to enter into an MOU without that language.

And I will also just add that of the 15 states, so far to date that have already provided us with the data, 13 have provided their statewide voter registration lists with no agreement, two have provided subject to a memorandum of understanding, and then there are three more, plus the additional state that are presently in negotiations to provide that data.  But they've been receptive to it, and we expect that they're going to provide the data.

THE COURT:  So with the 13 that have been provided with no constraint, what is the government doing with those?

MR. TUCKER:  It's a very good question because it certainly goes to the heart of the Privacy Act.  The United States is in full compliance with the Privacy Act and its SORNs.  It is treating these individual data that are coming in.  They are completely separated and kept separate and distinct from the data of any other state.  They are subject to very severe constraints even within the civil rights division.  Even the attorneys within the civil rights division who are working on these cases, such as myself,

it's very constrained in terms of who has access to that. It's only those individuals who have a need to know, again, consistent with the Records Information Management System and, again, the Privacy Act provisions that apply to the United States.

THE COURT:  But I guess my question is:  What are the needs to know?  Are they being reviewed for immigration enforcement?  Are they being reviewed for other purposes?  Are they being disseminated to other agencies that have a need to know?

MR. TUCKER:  So there are two fundamental purposes that they're being used for.  And, again, this really -- this was expressed in the letter.  It's certainly something that's consistent with how we've been managing the data that we've been getting.

The first is section 303(a)(5) of HAVA.  Section 303(a)(5) is the provision of HAVA that requires a state to ask in this order for either a driver's license or state identification number.  If that's not available, the last four of the Social.  If that's not available, to assign a unique identifier for that individual.

THE COURT:  So they're being used to confirm that that information has been gathered?

MR. TUCKER:  Yes, for the individual records.  And the reason, again, is because it goes back to the North

Carolina litigation that the United States brought and resolved last year.  That was a facial violation of Section 303(a)(5).  There the State of North Carolina used a non-HAVA-compliant voter registration form that said, you don't have to provide it.  They made it optional.

THE COURT:  But we don't have that here.

MR. TUCKER:  No, but what we do have is half of -- potentially, we don't know, but it could potentially be half of what we found in North Carolina.  Through the course of state litigation, the statewide voter registration list had been produced through state litigation, and what the State identified was that over 200,000 voter registration records, active registered voters, were lacking the HAVA identifier.  Roughly 103,000 of those were because they were just simply never required to provide it.

THE COURT:  And you're talking still about North Carolina?

MR. TUCKER:  Yes, but --

THE COURT:  So presumably you could get that information with something other than looking at the number yourself.  For instance, an attestation from Secretary Simon that, you know, only -- however many did not provide that information.

MR. TUCKER:  We really can't because it's the other half.  Like North Carolina, slightly more than half of

those records lacking it were voters who had actually filled it out, gave the information, and through clerical mistakes, the data simply not being entered by county clerks, it wasn't in there.  And that was something that we could not get directly from them.  We certainly understand and appreciate that, you know, the State did provide a robust response, but it's a response that really requires the United States to verify that the information is correct.

THE COURT:  Where in HAVA is your authority to verify that the information is correct?

MR. TUCKER:  So obviously, as you know, Your Honor, we did bring the claim -- just general records claim under HAVA.  We've indicated that we can't dispute the fact that HAVA doesn't have a records production requirement like the NVRA does or like the CRA.  And we also found that it was, frankly, just confusing the issues.  The CRA does clearly provide a means for us to get these -- get the statewide voter registration list.

I will add that historically it's not been limited to the purpose that counsel says in terms of just the Fifth Circuit cases and the district court cases from the '60s. The United States obtained a statewide voter registration list from Texas through an MOU in the early 2000s and also obtained one through litigation with the State of Georgia where the State of Georgia entered into a consent decree for

the very same basis and purpose that's been stated here to assure compliance with the list maintenance requirements. And that case was within the NVRA.

THE COURT: And where in the record are citations to the requests made in the Texas and Georgia instances in the early 2000s?

MR. TUCKER: So some of the exhibits that are attached to ECF Document Number 102, which were the supplemental declaration that we submitted.

THE COURT: Thank you. I think I have a couple of additional questions for you.

So tell me what you think -- what's your response to the arguments about the Supreme Court's decision in *Powell*?

MR. TUCKER: So the issue with *Powell*, and this is where *Benson* got it right looking at it, *Powell* does not necessarily stand for the proposition that it's been cited for. It does say it in footnote 18, that there the -- you know, the Court said that it was appropriate to apply -- you know, to apply the Federal Rules of Civil Procedure to what was functionally an administrative summons, and it was also appropriate under those circumstances to look at the specific reasons that were given.

THE COURT: You've got to slow down a little, too.

MR. TUCKER: Yes. But what ended up -- what is

omitted from the discussion, and it's certainly been omitted in the briefing, is that *Powell* goes much further to explain why that was required there. And specifically the Supreme Court pointed out that Section 7605(b) of the Internal Revenue Code required that the Internal Revenue Service not engage in any kind of investigatory procedure that was harassing or unnecessary vis-à-vis a particular taxpayer. And for those reasons, it's completely dissimilar because we don't have any similar limitation of the Civil Rights Act.

THE COURT: Does the Court expressly in *Powell* invoke that basis to justify the footnote, so to speak?

MR. TUCKER: It does through the text of the discussion.

And I think the other key quote that comes directly from *Powell,* and this is where the Supreme Court was quoting another Supreme Court decision, the *Morton Salt* decision, which was at 338 U.S. at 642 through 43. The Court in *Powell* says that "These sorts of requests" -- and again, this was under the Internal Revenue Code -- "does not depend on a case or controversy for power to get evidence but can investigate merely on assumption that the law is being violated" -- and this is the key language -- "or even because it wants assurance that it is not."

That is exactly what is happening here. The United States is conducting -- to use counsel's words, it is

unprecedented in one respect.  HAVA enforcement has occurred by the Department of Justice previously, but it's been limited to three areas.  Initially when HAVA was passed, the very early HAVA cases focused solely on --

COURT REPORTER:  I'm sorry.  I need you to repeat. I have "the very early HAVA cases focused solely on."

MR. TUCKER:  Whether states and local jurisdictions, but in particular states, had created a computerized statewide voter registration list as the statute required.  In addition, there were some cases early on that were enforcing the provisional ballot requirements that some states simply weren't complying with it.

The third area was focused on the accessibility provisions of HAVA.  Never before has there been an effort, certainly individually or on a national scale, to look at whether or not states are doing what they are required to do under Section 303(a)(5), which is that they've gotten the HAVA identifiers and that they are using those appropriately, that they ensure that clerks are entering the data so that everyone has a unique identifier.

THE COURT:  But if this is a purpose of HAVA, what am I supposed to do with the reality that Congress did not vest the United States with the power it's now using a statute that was passed 60 years before HAVA for a totally different purpose to achieve that goal?  If Congress wanted

the DOJ to be able to make sure that each state was applying the correct HAVA identifiers, requiring or creating the correct HAVA identifiers, they could have said so.

MR. TUCKER:  Well, Congress did in two ways. First, Congress gave the Attorney General the exclusive authority under Section 401 of HAVA, which is at 52 U.S.C. 21111, to enforce provisions -- four provisions, including Section 303.

THE COURT:  But they could have said, in order to fulfill this enforcement requirement or this enforcement power, we also give the federal government the right to do what you're doing here, which is demand this specific information.  You've been very candid, they didn't do anything like that.

MR. TUCKER:  They didn't need to, Your Honor, because of the Civil Rights Act.  And specifically, the reason why --

THE COURT:  Does anybody anywhere in the HAVA legislative history or discussions about HAVA or the text of HAVA or any regulations implementing HAVA talk about that idea, that they didn't need to do that because the Civil Rights Act gave that power?

MR. TUCKER:  What they do talk -- not directly. Indirectly, they do.  And, again, it's in a footnote that question cite.  It's footnote 7 at page 10 of our brief at

ECF 102.  And, again, we were quoting language from the House Report.

And this gets to the point that counsel has made suggesting that HAVA -- somehow this provision of HAVA is not about protecting individual voting rights.  It absolutely is.  And what that House Report was referring to is it was quoting language from the Ford-Carter Commission report that was issued a year before HAVA was passed in 2001.  And there they were specifically talking about the problem that happened during the 2000 presidential election where voters were showing up to vote, the jurisdiction -- the clerk had purged voters, had removed voters through list maintenance procedures, but had removed the wrong Joseph Smith.

And so part of what Congress was doing when it passed HAVA was, this is a violation of the fundamental right of that individual voter to cast a ballot --

THE COURT:  So this is your argument, that the reference to purging a wrong voter constitutes an implicit awareness that the Civil Rights Act gives information-gathering power to the federal government?

MR. TUCKER:  No, Your Honor.  I'm just simply trying to tie it into the fact that this is tied directly into the -- you know, consistent with why the Civil Rights Act Title III was passed to begin with, which is protecting

the individual right to vote.  HAVA is part of that, just as the NVRA is part of that.

THE COURT:  Okay.  Aside from the arguable convergence of HAVA protecting voting rights, is there anything in the legislative history of HAVA that suggests that its authors did not believe that enforcement -- or that information-gathering power needed to be given to the executive because that was already covered by the Civil Rights Act?

MR. TUCKER:  The only thing that's in HAVA that talks about that is specifically explaining why there was no public disclosure requirement, and the reason is simple. It's because there's no private right of action under HAVA. And that's the difference.  That's why you have in Section 8(i) of the National Voter Registration Act, there is a public disclosure provision because individuals or private organizations can also enforce, you know, the requirements, particularly with respect to voters under Section 5 of the NVRA who are registering to vote.

THE COURT:  So there is no mention in the legislative history of HAVA that suggests that the authors understood that they didn't need to provide information-gathering authority to the executive because that was covered by the Civil Rights Act?

MR. TUCKER:  I'm unaware of any, but I will also

say -- I think this is one of the really important points that I do need to make in terms of just focusing on what role legislative history plays here.  This is where the Eighth Circuit's relatively recent decision in the Arkansas branch of *NAACP vs. Arkansas Board of Apportionment*, which is the 2023 decision that focussed on the private right of action --

THE COURT:  I'm aware of the Eighth Circuit's general thoughts about legislative history.  I'm trying to understand what your position is that the Civil Rights Act from a very long time before HAVA was -- and I could pull up my realtime -- was that they didn't say anything in HAVA specifically because it was covered by the Civil Rights Act. I think you suggested that, so I was looking for any support anywhere for the idea that that is true.

MR. TUCKER:  I can certainly fess up that I have not read the comprehensive history of HAVA, but to my knowledge, I'm unaware of any that would do that.

THE COURT:  Okay.  So you're just surmising that that's what they all had in mind.

MR. TUCKER:  Yes, Your Honor, again consistent with the text that they adopted and also comparing, obviously, the differences in the text with the National Voter Registration Act.

THE COURT:  Okay.  Why does the Department of

Justice need the HAVA-specific identifiers, as opposed to needing information of whether those identifiers were collected, even down to a voter-by-voter list?

MR. TUCKER:  So it's for the very same reason that we talk about in our briefing, and that is it's the reason why certain states, including Minnesota, subscribe or participate in ERIC, which is basically the collective with 25 -- between 25 states and the District of Columbia to basically compare notes, basically compare voter registration files to see whether or not there's been appropriate list maintenance.

Now, what we're talking about, because contrary to what counsel from Common Cause is --

THE COURT:  Wait, wait, wait.  I'm sorry.

MR. TUCKER:  Yes.

THE COURT:  You say that you need to have the specific identifiers so that you can compare state to state to make sure that HAVA-compliant lists are being gathered by Minnesota?

MR. TUCKER:  No, Your Honor.  I need to correct that.  I was just simply saying that that's what ERIC does.

THE COURT:  Okay.  I understand.  Why does the Department of Justice need the list with the specific numbers to ensure compliance with HAVA as opposed to a list that indicates whether those numbers were collected and if

so, which of the satisfying numbers it is?

MR. TUCKER:  So one of the reasons, for example, is that one of the things the United States will do in assessing this -- and again, this is not for the United States -- for purposes of the United States doing list maintenance itself but simply to identify whether or not the State of Minnesota is engaged in reasonable list maintenance practices.  The United States will enter into a use agreement with the Social Security Administration to basically run those numbers, the Social Security numbers, the last four, based upon the addressing information against the Social Security's death index.  That's a way to determine if, for example, there are individuals who are deceased who should not be on the rolls who are still on the rolls.  That's the purpose.

THE COURT:  And HAVA requires list maintenance by each state.  Does HAVA specify that the federal government has this role in ensuring compliance with individual voter comparisons to death rolls?

MR. TUCKER:  It does.  And our complaint actually quotes much of the language, and there are approximately five paragraphs in our complaint that talk about how HAVA tried to do it within the structure of federalism, to recognize that, as the State correctly points out, the primary role for doing this and responsibility for doing

this is the state, but Congress also said the federal government has a role to play, too, again, under the Elections Clause of the Constitution.

And that is, again, consistent with what I had said earlier, it's trust but verify.  We trust the states to do it, but it's necessary and the role of the Attorney General through Section 401 of HAVA is to verify that they're, in fact, doing it and to make a determination at that point whether or not it's appropriate to enter -- to have an enforcement action.  In some cases, it's not.  If it's a minor infraction, if there are things that, you know, perhaps may be a little sloppy, the Department of Justice in the past, and certainly going forward, works with the states to identify that, allows the states to correct it.

But in other cases we're finding, again, North Carolina is one, there are a couple of additional states where we've also already found that there are issues and, again, we have to assess whether or not it's appropriate under those circumstances to bring an enforcement action, as Congress charged the Attorney General to do.

THE COURT:  Is the information that's been gathered from other states being used for immigration enforcement?

MR. TUCKER:  Not to my knowledge.  Now, no.  No, Your Honor.  And, again --

THE COURT:  Is the information that's being gathered -- that's been gathered from other states going to be used for immigration enforcement?

MR. TUCKER:  So I need to break this down into two responses to that because it's really important to draw the distinction.  Some of the briefing talks about data that has been transmitted for purposes of the SAVE Act, which is still pending legislation, and there's a reference to 47 million records being transmitted.  The distinction I want to draw is that those were actions by the states themselves to work with Homeland Security to go through their rolls and determine whether or not there were individuals who are noncitizens on their list.  And that's a decision, again, that the states themselves have made because the SAVE Act is not yet law.

The United States right now, again, we are focused solely on the two purposes that we have stated, which is to look at Section 303(a)(5), compliance, and also to look at list maintenance compliance under Section 303(b)(4) of HAVA.

I would also add, again, consistent with the discussion that counsel had said in terms of what the Court's inherent authority is, that the Court, of course, can craft a protective order to ensure that it is used only for that purpose and, of course, the United States would comply with that.

THE COURT:  You mentioned that you're focused right now on HAVA compliance with the data that you've already received.  Is there an intention to use this data to conduct immigration enforcement?

MR. TUCKER:  Not to my knowledge, no, Your Honor, not with the data that we are getting.  Now, again, there are some instances in which you have local U.S. Attorney's Offices at the state level that are working with Homeland Security.  Some of the discussion -- you know, the references to allegedly building a national database that have been reported in the national media are reporting -- they're conflating all of these different purposes.  All these different things that are happening by the U.S. Attorney's Offices is conflating with what we're doing, conflating with what Homeland Security is doing.  We are completely --

THE COURT:  But I'm mindful that it's not just you personally and the civil rights division of the Department of Justice that will have access to this information.  You described a need to know.  Presumably Attorney General Bondi, for example, could say that she has a need to know and could access the lists that have already been provided and use them for some other purpose, correct?

MR. TUCKER:  I don't believe -- I don't know that that's correct in terms of the Privacy Act.  Again, the

Privacy Act is very constraining.  We have very well laid out procedures on that.

THE COURT:  But the Privacy Act has exceptions for law enforcement.  So, for instance, if Attorney General Bondi said, I'd like to use these records to look at every person who has voted in the country and see whether they did so legally, that would be allowed?

MR. TUCKER:  Your Honor, I can honestly say I do not know the answer to that.  And it was on this particular point that what I would suggest is, again, if, as we believe, the United States has demonstrated that it is entitled to the motion to compel, to the extent that the Court has further questions like that, it would actually be appropriate I think under the circumstances for the privacy officer at the civil rights division, who's in a much better position than me, to be able to answer those.  I simply can't because it's outside of the purview of what we even do in the voting section, but we do have a privacy office that does specifically focus on these questions.  And they're fair questions and they should be answered, especially in terms of what the request is.

THE COURT:  Okay.  Let me see if I have any additional questions for you.

In response to the motion to dismiss, you focus primarily on the Civil Rights Act as your vehicle for

obtaining this information.  You do not invoke HAVA as a basis for obtaining this information.  You reference HAVA as one of the -- as the primary purpose of getting this information.  You've described two different ways that you intend to confirm HAVA compliance, both sort of granularly and process-wise.

Are you relying on HAVA specifically at your HAVA claim from the complaint to resist the motion to dismiss?

MR. TUCKER:  Your Honor, I'm not in a position to say anything in that respect other than the United States believes a dismissal without prejudice would be appropriate if the Court finds that that claim is moot because the records that we're seeking can be and should be produced pursuant to the Civil Rights Act.

THE COURT:  What do you mean you're not in a position to say anything?

MR. TUCKER:  Just in terms of the United States does not want to dismiss that claim, but the United States also recognizes it's duplicative of what we've already asked for under the Civil Rights Act and it would be -- you know, it would be mooted out, effectively, if we end up getting the relief that we've requested under the Civil Rights Act.

THE COURT:  Okay.  So you're not pointing -- you're not raising any argument through the HAVA claim to defend against the motion to dismiss, and you're not

invoking the HAVA claim in support of your motion to compel, but you're not conceding that it should go away.

MR. TUCKER:  That's correct, Your Honor.  But obviously the United States would concede, as counsel pointed out, that HAVA does not have a records production provision.

THE COURT:  Okay.

MR. TUCKER:  And so for that reason, again, the statute -- we've obviously taken a very strict textualist approach to this, and the text of HAVA is clear, there is no records production requirement, like there is for the NVRA or the CRA.

THE COURT:  Which segues to my next question.  The NVRA doesn't apply to the State of Minnesota.  Aside from the ways that you've kind of compared and contrasted what HAVA provides from what the NVRA provides in terms of record gathering and dissemination, do you think that that has any -- what other work does the NVRA do in this case for my decisions?

MR. TUCKER:  It doesn't have any bearing other than that HAVA basically incorporates some of the provisions, a very limited set of provisions from the NVRA into it.  And what I would just -- I can provide the Court with a citation to a First Circuit case that talks about that where it involved Puerto Rico, the Commonwealth of

Puerto Rico, which is also, like Minnesota, is NVRA exempt. And the name of the case is *Colon-Marrero vs. Velez*, and it's at 813 F.3d 1, and the key cites are right around pages 13 to 14, and it's a First Circuit 2016.

THE COURT:  Thank you.  I think those are my questions for you.  Anything else you need to share?

MR. TUCKER:  I think just really a couple of points, because I know we've had quite a lengthy discussion on this, and I appreciate that, Your Honor.

Just in terms of, again, focusing on the text and structure, the CRA, all of the discussion about looking at legislative history is concordant with what the Eighth Circuit encountered in the Arkansas apportionment case, where the Court specifically noted that advocacy groups are urging us to look elsewhere, and the Court said that that was wrong.  And that's at 86 F.4th at 1211.

Here, the way that they're doing it is manyfold. They're ignoring Section 304 of the Civil Rights Act altogether, which is the privacy provision.  And the reason why that matters here is because they're suggesting that the United States is only entitled to a redacted version of the list.  If that were true, Congress wouldn't have found that it was appropriate to include privacy provision if it intended that the data that -- it was only going to be public data that the United States would get.

THE COURT:  But isn't the information that was collected at the time of the Civil Rights Act and presumably that informs the meaning that we attach to the act, what the adopters intended at the time it was adopted, the information was so much less comprehensive and intrusive, it didn't have the last four of Social Security number, it didn't have even a driver's license number, it certainly didn't have a HAVA identifier.  I'm not even sure if they had dates of birth, but maybe they did.  They probably had names and addresses.  The privacy protections contained in the Civil Rights Act were going to something very, very different from the scope of information that you're seeking that is required to be collected by HAVA.

MR. TUCKER:  But the information, Your Honor, is talked about, again -- I think that's largely correct.  I believe from the records we've seen, it did include dates of birth.  But that information was highly -- it's what we would call personally identifiable information today, and it was highly dangerous to -- you know, for that to be made in the public, because one of the things that was happening in the 1960s is you would have individuals or in some cases you would even have election officials, that would publish in newspapers the names and addresses of all those black voters who had registered to vote specifically so they would be targeted.  They would lose their jobs.  They would suffer

economic retaliation.  They would suffer physical retaliation and intimidation.

So there was a reason.  And Congress, again, had very good reason to believe that that information -- even though today we would consider that readily available because you can go on the Internet and get all of that information, that was not true at the time that the CRA was passed.

And so there is an analogy, again, a direct analogy tied in with the information that's being sought today.  And, again, I think it's consistent with what the *Benson* Court said where the *Benson* Court indicated there's no temporal limitation on statutory construction that somehow a statute that's passed a long time ago has to take into consideration every statute that follows, and I think that's true here as well.

THE COURT:  Okay.  Thank you.  Thank you very much.

MR. TUCKER:  Thank you, Your Honor.

THE COURT:  Okay.  I promised intervenors that they could -- if there was something that I missed, but I think we kind of covered that.

MR. PIEPER:  Yes, Your Honor.  Nothing further from us.

MR. GOLAN-VILELLA:  Yeah, nothing further.

THE COURT:  Okay.  I think we're done for the day. Thank you, all, very much for being here.  I really appreciate the argument.

We will get some guidance to you about additional briefing that we're seeking, and we'll turn to this as soon as we can.

Thank you, all, very much.  We're in recess.

(Court adjourned at 10:40 a.m.)

*       *       *

I, Paula K. Richter, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


Certified by:  *s/ Paula K. Richter*

Paula K. Richter, RMR-CRR-CRC

# EXHIBIT D

App. 182

## Schedule A

## PREFATORY STATEMENT AND STIPULATIONS

The Plaintiffs agree that Defendants' compliance with Paragraph E fulfills their obligations under the Court's May 20 and May 27 Orders subject to the following provisions: Plaintiffs reserve their right to request additional information, including information listed in Paragraph D of Schedule A if circumstances warrant. Defendants reserve their right to object to any such request. Plaintiffs and Defendants agree to the production of all information in paragraph B except: Defendants object to the production of birth dates, places of birth, telephone numbers, email addresses, and registration dates because they represent nonpublic voter information and for the reasons stated in their discovery response objections and in their oral and written opposition to Plaintiffs' Motion to Compel. Notwithstanding, Defendants recognize that the production of these categories has been ordered by the Court and yield to their inclusion in this Schedule A.

Additionally: the Parties stipulate:

- The Defendants will not argue that any analysis is incomplete or incorrect based on the exclusion from any data of confidential voters.

- The Defendants will not rely on any arguments related to data from DMV or DOC in this litigation unless that data is produced.

- The Defendants will not argue that any analysis is incomplete or incorrect based on any Statewide Voter Registration System ("SVRS") data, data field information, or structural aspects of the SVRS that are not previously produced to Plaintiffs as part of this agreement.

- Given the live nature of the SVRS and the static nature of the contemplated production of .csv files, the Defendants experts will not rely on discrepancies between the data

App. 183

provided to Plaintiffs and subsequent changes to the SVRS to argue that any analysis is incomplete or incorrect.

- The Plaintiffs acknowledge that the Defendants will not be conducting a search for responsive material in the SVRS.  Defendants will be producing data maintained in the SVRS according to data field tables as summarized in paragraph B below.

New Hampshire's SVRS is a comprehensive election management system, the disclosure of which has been ordered by the Court over the Defendants' objections.  Endorsed Order (May 20, 2025); Mem. Order ECF No. 75 (May 27, 2025) (the "SVRS Orders").  Protective Order Schedule A hereby modifies the SVRS Orders as follows:

A.  Data derived from the SVRS system, as described below, shall be designated HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER – ATTORNEYS, EXPERTS, & AUTHORIZED EYES ONLY.

B.  Defendants must produce all voter registration information (for all voters in the database who had not been removed from the database prior to January 1, 2016) from January 1, 2016 to present which, at a minimum, will include the following information:

- name
- unique voter ID number
- date of birth
- place of birth
- naturalization information (name of court, city/town, state, date naturalized)
- mailing addresses
- domicile addresses
- voter histories (status changes/reasons, name changes)
- voter out-of-state driver's license two-letter state abbreviation in the election history file
- election history (which shows each election in which a voter voted, absentee ballot voting, election dates, election names, election categories, ballot types, party affiliations, and whether voter has a CVA on file with local authorities)
- QVA use for age, identity, or citizenship after 4/29/24 and QVA use for identity and citizenship before 4/29/24
- telephone numbers
- e-mail addresses
- registration date

App. 184

- 30-day letters and 10-year verifications if not reflected in voter or election histories as provided above
- type of document used to prove identity or citizenship when registering
- prior histories such as previous names, addresses, and party affiliation
- information regarding data maintenance and management (i.e., absentees, changes, voter audits, etc.)

C. Defendants will produce the following upon Plaintiffs' request for specific individual voters:

- absentee mailing address
- voter documents (if assigned to a voter)

D. The following SVRS information is excluded from the Court's SVRS Orders:

- voter Social Security Numbers
- confidential voter information (voters registering confidentially due to domestic violence, sexual assault, or stalking)
- absentee management information (deadlines and organization)
- election information not related to individual voters
- UOCAVA information
- local election official reminders
- ballot memos
- election management and procedures (quality control, poll worker information, polling place inventories and logistics) but to the extent any of this information pertain to QVA usage, voter qualifications, CVA use or adjudication, or other relevant information, it must be disclosed
- election result reporting protocols
- ballot specifications
- SVRS data maintenance, management, and auditing information
- geographical database address mapping
- election official/supervisor/registrar meetings
- petitions information
- voting machine information and inventories
- logs, templates, and queries
- report status queues
- draft correspondence
- candidate information
- redistricting information
- inter-agency transmission information
- modules and information managing password-like access management, authentication protocols, and permissions

E. The Defendants must comply with this modified SVRS Order within 10 days of the Court's entry of this Protective Order

App. 185

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM FRANCIS GALVIN, in his Official Capacity as Secretary of State for the Commonwealth of Massachusetts,<br><br>Defendant(s). | Case Number: 1:25-cv-13816-LTS |

## NOTICE OF APPEAL

Plaintiff, UNITED STATES OF AMERICA, by and through the Attorney General, appeals to the United States Court of Appeals for the First Circuit from this Court's Order Denying the United States' Motion to Compel and Granting Defendant's Motion to Dismiss and Intervenors' Motions to Dismiss (Doc. 92) and the District Court's entry of final judgment (Doc. 93 ).  Both Doc. 92 and Doc. 93 were filed on April 9, 2026.

Dated: June 1, 2026

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

JESUS A. OSETE
Principal Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section

ANDREW G. BRANIFF
Acting Chief, Appellate Section

1

App. 186

/s/ Christopher J. Gardner
CHRISTOPHER J. GARDNER
Trial Attorneys, Voting Section
Civil Rights Division
4 Constitution Square
150 M Street, Room 8.141
Washington, D.C. 20002
Christopher.Gardner@usdoj.gov
Tel. (202) 704-5430
Attorneys for the United States

**CERTIFICATE OF SERVICE**

I hereby certify that on June 1, 2026, a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record.

/s/ Christopher J. Gardner
CHRISTOPHER J. GARDNER
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430

2

App. 187

# CERTIFICATE OF SERVICE

I certify that on July 17, 2026, I electronically filed the foregoing Appendix with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

<div align="right">

s/ Joshua R. Zuckerman
JOSHUA R. ZUCKERMAN
 Attorney

</div>

Date: July 17, 2026