**No. 26-1657**

# United States Court of Appeals for the First Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

– v. –

WILLIAM F. GALVIN, in his official capacity as Secretary of the Commonwealth of Massachusetts; MASSACHUSETTS ALLIANCE FOR RETIRED AMERICANS; COMMON CAUSE; JANE DOE INC.; JUAN PABLO JARAMILLO; NEW ENGLAND STATE AREA CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,
*Defendants-Appellees*

ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**BRIEF OF *AMICUS CURIAE* LIBERTY LEGAL FOUNDATION IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL**

Stacey Bucci (No. 1203282)
BUCCI LAW
595 New Loudon Road
Suite 215
Latham, New York 12110
(413)248-7622
berkshirelegal@gmail.com
*Counsel for Amicus Curiae*

## DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), Liberty Legal Foundation states that it is a non-profit legal organization that has issued no shares to the public, and does not have any parent company, subsidiary, or affiliate that has issued shares to the public. Because Liberty Legal Foundation has no stock nor issued any stock, no corporation owns 10% or greater ownership interest.

## TABLE OF CONTENTS

**PAGE**

DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ........................................................ iii

INTEREST OF AMICUS CURIAE ........................................................ 1

INTRODUCTION ........................................................ 2

ARGUMENT

I. THE ORDER SIMPLY IGNORES FACTS AND LAW PROVIDED BY THE USA ........................................................ 3

II. ARTIFICIAL SEPARATION OF "BASIS" AND "PURPOSE" ............ 4

III. RELIANCE ON VERY RECENT DISTRICT COURT DECISIONS....... 7

IV. TREATMENT OF TITLE III AS ORDINARY CIVIL LITIGATION....... 9

V. THE ORDER'S MISCHARACTERIZATION OF THE WRITTEN DEMAND........................................................10

VI. FAILURE TO ENGAGE WITH HAVA/NVRA INTEGRATION ..........11

VII. IGNORING THE ADMINISTRATIVE-SUBPOENA ANALOGY ....... 12

VIII. CONSEQUENCES FOR TITLE III AND PRACTICAL CONCERNS ...13

IX. THE CONSTITUTION AND FEDERAL STATUTES PRESUPPOSE ROBUST FEDERAL ACCESS TO VOTER INFORMATION...............14

A. Constitutional foundation: Elections Clause and limited state role......14

B. The NVRA and HAVA embed federal oversight..........................15

C. Title III expressly envisions federal access................................16

D. State "time, place, and manner" power cannot override federal Supremacy........................................................ 18

E. State authority is administrative, not sovereign, in federal elections.... 21

F. "Time, place, and manner" is not a privacy veto......................... 22

CONCLUSION ........................................................ 25

# TABLE OF AUTHORITIES

**CASES** **PAGE**

*Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960)....…….….. 6, 10

*Coleman v. Campbell*, 208 F. Supp. 199 (S.D. Miss. 1962) ("*Coleman I*") ..… 4, 6

*Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963) ("*Coleman II*")…...….. 4, 5, 6

*Kennedy v. Bruce,* 298 F.2d 860 (5th Cir. 1962) ………………………………… 4

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962)...……………………….. 4, 6, 8, 10

*Public Interest Legal Foundation, Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024).... 19

*United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846 (W.D. La. 1960) ……………………………………………………………... 6

*United States v. Benson*, Case No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789. (W.D. Mich. Feb. 10, 2026)...…………...… 8, 9, 10, 11, 12

*United States v. Bisceglia,* 420 U.S. 141 (1975) ……………………………………….6

*United States v. Galvin,* No. 1:25-cv-13816-LTS (D. Mass. Apr. 9, 2026)… *passim*

*United States v. Georgia*, No. 1:06-cv-2442 (N.D. Ga. Oct. 27, 2006)…………. 23

*United States v. Markwood*, 48 F.3d 969 (6th Cir. 1995)) ……...………...….. 8, 12

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950)…………….……...6, 7, 12, 13

*United States v. Oregon*, Case No. 6:25-cv-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026)………………………….. 7, 8, 9, 12

*United States v. Powell*, 379 U.S. 48 (1964)………………………… 7, 8, 9, 12, 13

**CASES (Cont.)** **PAGE**

*United States v. Weber*, Case No. 2:25-cv-09149-DOC-ADS,
2026 WL 118807 (C.D. Cal. Jan. 15, 2026)……………...………. 7, 8, 9, 12

*Voter Reference Foundation, LLC v. Torrez,* 160 F.4th 1068 (10th Cir. 2025)..…. 20

**UNITED STATES CONSTITUTION**

U.S. Const. art. I, § 4, cl. 1 (“Elections Clause”) …………….……. 14, 19, 25, 26
U.S. Const. art. VI, cl. 2 (“Supremacy Clause”)……………………….. 21, 25, 28

**STATUTES**

Civil Rights Act of 1960
Pub. L. No. 86-449, title III, 74 Stat. 86, 88–89 (codified
at 52 U.S.C. 20701–20706)…………………………………… *passim*
52 U.S.C. 20701 ……………………………………...………….. 11, 17
52 U.S.C. 20703 ………………………………………………….. 2, 17
52 U.S.C. 20705 …………………………………………………….. 18

Help America Vote Act
Pub. L. No. 107-252, 116 Stat. 1666 (codified
at 52 U.S.C. 20901–21145)…………………………...…… *passim*
52 U.S.C. 21083(a)(1)(A) …………………………………….….. 16
52 U.S.C. 21083(a)(2)(A) …………………………….………… 16
52 U.S.C. 21083(a)(2)(B) …………………………...…………… 16
52 U.S.C. 21111 …………………………………………………….. 16

National Voter Registration Act
Pub. L. No. 103-31, 107 Stat. 77 (codified as amended at
52 U.S.C. 20501–20511)……………………………… *passim*
52 U.S.C. 20502(b)(1),(3),(4) ……………………………………. 15
52 U.S.C. 20507(a)(4) …………………………………...………. 15, 16
52 U.S.C. 20507(b)(1)……………………………………………… 16

**STATUTES (Cont.)** **PAGE**

52 U.S.C. 20507(i)(1) …………………………………...………….. 15
52 U.S.C. 20510(a)…………………………………….……………16

**RULE**

Fed. R. Civ. P. 81…………………………………...………………….. 9

**MISCELLANEOUS**

Clinger, Derek. "Explainer: Can the Federal Government Force States to Hand Over Citizens' Voter Information?" Dec. 19, 2025, ("SDRI Explainer"), https://statedemocracy.law.wisc.edu/our-work/can-the-federal-government-force-states-to-hand-over-citizens-voter-information/………………………………... 18, 19

Electronic Registration Information Center, Inc., *BYLAWS,* https://ericstates.org/wp-content/uploads/documents/ERIC-Bylaw-MA-FINAL.pdf …………………..……………………………… 20, 21

"Federal Law Constraints on Post-Election 'Audits'", July 28, 2021, ("DOJ Guidance"), https://www.justice.gov/archives/opa/press-release/file/1417796/dl ………………… 16, 17, 22, 24

*The Federal Prosecution of Election Offenses, Eighth Edition 2017* …..….….. 17

## INTEREST OF *AMICUS CURIAE*

Liberty Legal Foundation ("Liberty Legal") is a Delaware corporation exempt from income tax under 26 U.S.C. 501(c)(3). It is a non-profit public interest organization whose mission is to promote the rule of law, protect due process, and defend equal protection under the Constitution. This case presents legal questions central to the administration of federal election law and to Liberty Legal's ongoing election-related work. Liberty Legal and its Massachusetts supporters are vitally concerned with the outcome because it affects the integrity and security of federal elections in the Commonwealth.[1] Liberty Legal urges this Court to reverse the District Court of Massachusetts[2] ("District Court" and "court") decision so the United States can obtain records necessary to enforce federal election law.

Liberty Legal therefore has a substantial institutional interest in this case and submits this brief solely to aid the Court. As a nonpartisan organization, it does not support or oppose any political party or candidate and participates only to advance its commitment to the rule of law.

---

[1] This brief addresses only the Massachusetts case, *United States v. Galvin,* No. 1:25-cv-13816-LTS (D. Mass. Apr. 9, 2026), in this consolidated appeal. No party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than the amicus curiae, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.

[2] *Id.,* Doc. 92. All references to "Doc" in this brief are to the docket in the district court case.

## INTRODUCTION

The District Court's order (Doc. 92) ("order") rests on a narrow statutory reading of Title III of the Civil Rights Act ("CRA")[3] that is deficient in text, structure, precedent, and factual application. The core holding is that the Attorney General's[4] demand "failed to 'contain a statement of the basis'" under 52 U.S.C. 20703 simply because the August 14 letter[5] did not articulate "the" factual basis for the request, thereby rendering the USA's complaint and motion to compel fatally defective.

By contrast, the USA expressly characterizes the same August 14 letter as stating a basis (Massachusetts's possible non-compliance with the National Voter Registration Act [NVRA][6] and Help America Vote Act [HAVA][7] list-maintenance obligations) and a purpose (ascertaining compliance). The order effectively treats the August 14 letter in isolation and then insists on a hyper-literal "magic words" requirement ("basis" as distinct from "purpose") not demanded by the statutory text or Title III case law, despite the USA's filings tying the July 22 and August 14 letters together as a unified written demand.

---

[3] Pub. L. No. 86-449, title III, 74 Stat. 86, 88–89 (codified at 52 U.S.C. 20701–20706). "Title III" and "CRA" are used interchangeably.
[4] "Attorney General," "AG," "United States," "USA," "Department of Justice," and "DOJ" are used interchangeably throughout this brief.
[5] Doc. 7.3.
[6] Pub. L. No. 103-31, 107 Stat. 77 (codified as amended at 52 U.S.C. 20501–20511).
[7] Pub. L. No. 107-252, 116 Stat. 1666 (codified at 52 U.S.C. 20901–21145).

The order leans heavily on dictionaries from circa 1960 to construe "the basis" as "the foundation or chief supporting factor" and then insists that the AG must state expressly "why" the records are being sought, as a factual matter, in the written demand itself. It then concludes that no basis was stated at all because the August 14 letter only recited legal authority and purpose and allegedly "nowhere" used the term "basis" or equivalent.

The order is flawed due to an unduly formalistic and ahistorical reading of "basis"; an over-expansion of judicial review; selective reliance on adverse district court decisions while discounting contrary authority; and a practical effect that frustrates enforcement of HAVA and the NVRA through Title III's investigatory mechanism.

## ARGUMENT

### I. THE ORDER SIMPLY IGNORES FACTS AND LAW PROVIDED BY THE USA.

The USA squarely argues in its pleadings that the August 14 letter "explain[ed] the basis of the demand as Massachusetts' possible lack of compliance with the voter registration list requirements enumerated in the [] July 22 Letter," and that the purpose was to determine compliance with NVRA and HAVA list maintenance. Doc 7. Even under the court's own dictionary definitions, describing an ongoing investigation into possible non-compliance with federal list-maintenance statutes is a statement of the "foundation" for the demand.

The opposition brief similarly states that the letter's basis was Title III authority "codified at 52 U.S.C. 20701, et seq., and the purpose was to 'ascertain [] compliance with the list maintenance requirements of the NVRA and HAVA.'" Doc. 72 at 4. The order's refusal even to treat "possible lack of compliance" as a stated basis effectively reads "basis" to require an allegation of specific anomalies or a quasi-probable-cause showing -- well beyond the statute's language.

Early Fifth Circuit authority[8] approves a written demand that states only that the demand is "based upon information in the possession of the Attorney General tending to show" discrimination, and the court in *Coleman II* explicitly held that "a sufficient statement would be the assertion that the demand was made for the purpose of investigating possible violations of a Federal statute." *Kennedy v. Bruce*, 298 F.2d 860, 861, 863 & n.2 (5th Cir. 1962); *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*").

The order acknowledges these cases but then treats them as prescribing a model that the DOJ failed to meet, without grappling with the fact that the DOJ here

[8] Fifth Circuit Title III decisions and related district court opinions cases arose in Mississippi/Alabama/Louisiana became the main body of federal appellate case law interpreting Title III's "basis and purpose" requirement and "special statutory proceeding" structure. *See Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), cert. denied, 371 U.S. 952 (1963); *Kennedy v. Bruce* (1962); *Coleman v. Campbell*, 208 F. Supp. 199 (S.D. Miss. 1962) ("*Coleman I*"); *Coleman v. Kennedy* ("*Coleman II*") (1962).

did say it was investigating compliance with federal statutes (the NVRA and HAVA) and sought records to assess that compliance.

The order treats "basis" to require a discrete articulation of concrete evidence or anomalies in the text of the letter and treats an expressly articulated investigative purpose as legally insufficient, even though the Fifth Circuit had accepted a "possible violations" formulation that the DOJ essentially replicated with different statutes. *Id.*

## II. ARTIFICIAL SEPARATION OF "BASIS" AND "PURPOSE"

The order emphasizes Congress's use of "the basis and the purpose" to insist they are "conceptually distinct" and to reject any interpretation under which "basis" collapses into "purpose." It refuses to treat an explanation that the AG is seeking records "to ascertain Massachusetts's compliance with the list maintenance requirements of the NVRA and HAVA"[9] as satisfying "basis," even inferentially.

However, the Fifth Circuit has construed "basis and purpose" functionally, not formalistically. *Coleman II* allows a simple statement that the demand was "made for the purpose of investigating possible violations of a Federal statute," treating that as satisfying the statutory requirement — without considering whether "possible violations" is "basis," "purpose," or both. *Coleman II* at 868.

[9] Doc. 72 at 19, 21 (14, 16 internal) citing the August 14 letter.

The only language that is required in the AG's demand is that it "was made for the purpose of investigating possible violations of a Federal statute." *Id.* (quoting "Senator Keating, one of the principal spokesmen for the bill in the Senate," at 106 Cong. Rec. 7767); *see also Coleman v. Campbell*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) ("*Coleman I"*) (a sufficient purpose to examine federal election records is "to see if any Federal laws were violated.") Possible violation(s) of federal law also serve(s) as a basis.

As provided by the USA in its opposition brief, but appears to have been overlooked in the order:

> The "chief purpose" of Title III "is to facilitate the investigation of the records *before suit is filed*." *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added). "[T]he function sought to be exercised by the Attorney General is … purely investigative," *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), to evaluate "possible violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"). It does not require known violations of federal law. In that manner, Title III enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Lynd*, 306 F.2d at 228. Contrary to what the Defendants argue, no factual allegations of a substantive violation of federal law are required. Instead, "Congress has specifically committed the investigative responsibility to the Attorney General and has equipped [her] with machinery thought suitable for the effective fulfillment of that obligation" through Title III of the CRA.[10] *Id.* at 230. That approach makes sense. Doc 72 at 6.

[10] Title III invests the Attorney General with a power akin to a grand jury which "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Bisceglia*, 420 U.S. 141, 148 (1975). The Supreme Court has recognized that statutes that vested investigative powers in Executive Branch agencies provide such agencies with grand jury-like

The order never reconciles its rigid separation with and deviation from this case precedent.

The USA's filings support the treatment of the CRA as an investigatory tool akin to an administrative subpoena, and that "questions of relevancy or good cause or other like considerations are completely foreign to the summary proceeding." By insisting that a "basis" must be spelled out in factual detail and cannot be inferred from the investigative purpose (ensuring compliance with HAVA/NVRA), the court reintroduces a relevance/good-cause-like screen that the early CRA cases disclaimed.

The District Court relies on a doctrinal flaw: its strict separation of "basis" and "purpose" is not compelled by Title III and conflicts with the way courts have applied the statute in historical practice.

## III. RELIANCE ON VERY RECENT DISTRICT COURT DECISIONS

The order leans heavily on recent decisions in *Oregon* and *Weber*, which treated Title III demands as subject to more searching judicial scrutiny (including a requirement that the DOJ identify specific anomalies). *United States v. Oregon*, Case

---

powers and latitude. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing that the IRS Commissioner has grand jury-like powers); *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (same with respect to the Federal Trade Commission). Investigative powers that the Attorney General derives from Title III fall comfortably within this paradigm. FN3, Doc. 72 at 6.

No. 6:25-cv-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Weber*, Case No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026). The USA's opposition brief criticizes those decisions as misreading *Powell*, relying on IRC-specific "unnecessary examination" language, and mischaracterizing *Lynd's* treatment of Title III as a "special statutory proceeding" outside the ordinary Federal Rules of Civil Procedure ("FRCP") framework.

In *Benson*, the district court explicitly rejected its (Plaintiff-Appellant's) analysis, treated CRA demands as akin to administrative subpoenas, held that "most of the Federal Rules of Civil Procedure are simply inapplicable," and concluded that the statute does not allow courts to "evaluate the substance of the DOJ's purported basis and purpose." *Benson*, 2026 WL 362789, at *7, 8 (quoting *United States v. Markwood*, 48 F.3d 969, 982 (6th Cir. 1995)), Doc 72 at 8, 15. The Massachusetts order cites *Benson*[11] only to distinguish it on the facts and adopts *Oregon/Weber'*s more intrusive reading without squarely addressing *Benson*'s reasoning.

[11] *United States v. Benson*, Case No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789, 819 F. Supp. 3d 753 (W.D. Mich. Feb. 10, 2026). For clarity, all references to *Benson* in this brief are to the district court decision which was on the books when the Massachusetts district court ruled; this brief does not rely on or address the subsequent divided Sixth Circuit panel opinion, issued after the Massachusetts decision, which is currently the subject of a petition for rehearing en banc.

The USA also emphasized that *Powell*'s application of the FRCP to Internal Revenue Service summonses turned on the absence of a specified procedure in the IRC and the presence of a statutory limitation against "unnecessary" investigations, constraints that Title III lacks. The order nevertheless imports *Powell*'s "inquire into underlying reasons" language into a statutory context where Congress did not include similar limiting language.

The order is aligned with *Oregon/Weber* and in tension with *Benson* and the Fifth Circuit's early CRA jurisprudence, and it treats *Powell* as if it were a general template for all investigatory statutes despite significant textual differences.

## IV. TREATMENT OF TITLE III AS ORDINARY CIVIL LITIGATION

The USA's pleadings describe Title III as creating a "special statutory proceeding"[12] where the court's role is "severely limited" to confirming (1) that a written demand was made to an officer of election; (2) that the demand contained a statement of basis and purpose; (3) that the custodian refused to comply; and (4) that the AG filed a simple statement to that effect. They argue that "there is no place for any other procedural device or maneuver"[13] (including motions to dismiss) to test the sufficiency of the AG's basis and purpose. Doc 72 at 7, 11.

---

[12] "Since it is a special statutory proceeding, it does not require pleadings which satisfy usual notions under the federal rules of civil procedure." *Lynd* at 225-226.
[13] *Lynd* at 226; *see also* Fed. R. Civ. P. 81 (summarizing other federal claims to which the Federal Rules of Civil Procedure do not apply).

The order nonetheless:

- treats the case as an ordinary civil action, entertains multiple motions to dismiss, and uses Rule-type pleading sufficiency analysis (e.g., asking whether the letters themselves "contain a statement" of basis in a way that would survive a 12(b)(6) motion); and

- uses that framing to dismiss the complaint instead of entering an order to compel and leaving any disputes about particular records to later proceedings, contrary to *Lynd*'s admonition that questions of relevancy or good cause are "completely foreign" to CRA summary proceedings and that the Attorney General need not "show [she] could win without" the requested records.

This is a structural flaw: the court has effectively converted a summary Title III enforcement mechanism into a plenary civil case governed by the FRCP, despite the DOJ's valid arguments based on *Lynd, Gallion,* and *Benson* for the opposite proposition.

## V. THE ORDER'S MISCHARACTERIZATION OF THE WRITTEN DEMAND

On the facts, the order repeatedly asserts that the letters failed to contain a statement of the basis and "nowhere" used the word "basis" or an equivalent like "based upon." Doc 92 at 9. That characterization is strained when read against the record the USA puts before the court.

The July 22 letter requested information "regarding the Commonwealth's procedures for complying with" the NVRA, sought a current electronic copy of the Statewide Voter Registration List ("SVRL" and "VRL"), and cited NVRA and HAVA provisions on list maintenance. Doc. 7.1. The August 14 letter expressly states

that the DOJ "requested Massachusetts's VRL to assess your compliance with the list maintenance provisions of the NVRA," cites the NVRA and HAVA sections, then says "[p]ursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of Massachusetts's complete and current VRL," and "[t]he purpose of this request is to ascertain Massachusetts's compliance with the list maintenance requirements of the NVRA and HAVA." Doc. 7.3.

Even if the statute does not require recitation of specific anomalies, an express statement that the DOJ is investigating whether Massachusetts is complying with federal list-maintenance law is "possible violations" language that CRA cases have endorsed. The order's insistence that this states "no basis" — as though the DOJ had said only "because we feel like it" — indicating that the court misread the letters and elevated form over substance.

## VI. FAILURE TO ENGAGE WITH HAVA/NVRA INTEGRATION

The USA's briefing makes a sustained argument that Title III is not limited to enforcing contemporaneous 1960 statutes or race-based violations but rather functions as a general investigatory tool for "federal election laws" including later-enacted NVRA and HAVA provisions, and that nothing in Title III's text prevents its use to obtain records needed to enforce those statutes.

The order assumes, without deciding, that an electronic SVRL is covered by 52 U.S.C. § 20701, but then avoids the broader structural question of how Title III

interacts with NVRA/HAVA by disposing of the case on the basis-statement issue. The order does not respond to the USA's reliance on *Benson*'s holding that "there is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes," and that the CRA "aids the Attorney General in assessing states' compliance with federal election law" beyond race-based claims. Doc. 72 at 18-19 (13-14 internal). The court sidesteps the statutory-interaction argument and instead uses a procedural defect theory to avoid grappling with Congress's broader regulatory scheme for federal elections.

## VII. IGNORING THE ADMINISTRATIVE-SUBPOENA ANALOGY

The United States explicitly analogizes Title III demands to administrative subpoenas, invoking *Morton Salt*, *Powell, Markwood*, and *Benson* to argue for a limited judicial role: confirm the facial prerequisites, then enforce unless the demand is plainly outside statutory bounds. *United States v. Morton Salt Co.*, 338 U.S. 632 (1950); *United States v. Markwood*, 48 F.3d 969 (6th Cir. 1995)). Conversely, the order relies on *Weber* and *Oregon* but never explains why Title III demands should be treated as if they were ordinary civil discovery rather than agency subpoenas.

The DOJ points out that, under *Morton Salt* and *Powell*, agencies can seek information "merely on suspicion that the law is being violated, or even just because [they] want assurance that it is not," and that courts may not impose a heightened evidentiary threshold on the investigative phase. Doc 72 at 9. By requiring an

explicit, particularized "basis" in the demand letter and dismissing the case when the DOJ did not identify anomalies in Massachusetts's data, the court imposes precisely the kind of threshold limitation that *Morton Salt* and *Powell* reject for investigatory tools.

This mismatch between the administrative-subpoena paradigm and the court's approach demonstrates that the court mischaracterized the nature of the proceeding and exceeded the appropriate scope of judicial review.

## VIII. CONSEQUENCES FOR TITLE III AND PRACTICAL CONCERNS

The order's reading undermines Title III's role as a practical investigative tool. The United States' filings emphasize that the DOJ cannot "effectively enforce federal election laws such as HAVA and the NVRA if the Attorney General is required to allege facts from federal election records that state officers of election have denied to her." Doc. 72 at 7. Title III was designed precisely to allow the DOJ to obtain the records needed to assess whether violations exist, not to force the DOJ to prove violations before it can inspect the records.

The order's requirement that the DOJ articulate a "basis" beyond an express investigative purpose — without access to the very data it seeks — creates a Catch-22: The DOJ must identify anomalies or concrete suspicions before requesting records, yet those anomalies are only detectable through the very SVRL the court refuses to compel.

The USA demonstrated that unredacted SVRL data (including driver's license numbers and SSN last-four) is necessary to evaluate list maintenance, identify duplicate registrations, and ensure compliance with HAVA's verification requirements. The order acknowledges none of those practical enforcement needs, instead treating the demand defect as purely formal.

If states may satisfy federal law by providing only redacted, curated, and non-verifiable datasets, then federal enforcement becomes impossible. Such a rule would allow states to control the scope of federal oversight and shield underlying system operations from review. This is incompatible with the structure and purpose of federal election law. The order essentially hamstrings the DOJ's investigatory mechanism which is discussed in detail below.

## IX. THE CONSTITUTION AND FEDERAL STATUTES PRESUPPOSE ROBUST FEDERAL ACCESS TO VOTER INFORMATION.

### A. Constitutional foundation: Elections Clause and limited state role

The Elections Clause assigns primary responsibility for regulating the "Times, Places and Manner" of federal elections to the states but gives Congress power to "make or alter" those regulations. U.S. Const. art. I, § 4, cl. 1. Once Congress enacts federal-election rules, state authority is derivative and may not be used to frustrate or nullify those commands, including as to voter registration and recordkeeping.

This means state authority is derivative and subject to displacement whenever Congress legislates on federal-election administration, including voter registration

and recordkeeping. Once Congress has enacted national rules, states may not invoke their residual time, place, and manner power to frustrate or nullify those federal commands.

Voter-registration systems and voter rolls are themselves part of the "Manner" of holding federal elections. Congress has chosen to regulate this domain through statutes like the NVRA, HAVA, and the CRA, and those federal enactments necessarily carry with them authority to obtain the information needed to enforce them. State laws cannot redefine "manner" so narrowly — e.g., as polling hours or physical polling locations — that they exclude recordkeeping and disclosure; that would contradict both modern practice and the federal statutory framework.

**B. The NVRA and HAVA embed federal oversight.**

The NVRA was passed to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal Office;" "protect the integrity of the electoral process;" and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. 20502(b)(1),(3),(4). The NVRA requires every state to conduct "a general program that makes a reasonable effort" to remove ineligible registrants. 52 U.S.C. 20507(a)(4). The statute mandates, in detailed instruction, that they keep records of list-maintenance activities and "make such records available for public inspection." 52 U.S.C. 20507(i)(1). Programs to

maintain accurate and current VRLs must be uniform and nondiscriminatory. 52 U.S.C. 20507(b)(1).

Congress further authorized the AG to sue states to enforce these obligations, which presupposes access to underlying registration data sufficient to assess compliance. 52 U.S.C. 20510(a) provides, "The Attorney General may bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary to carry out this chapter." It is difficult, even nonsensical, to argue that Congress empowered the DOJ to police list maintenance yet simultaneously barred it from seeing the full lists and records necessary to evaluate whether states have made "reasonable" efforts that their programs "remove the names of ineligible voters from the official lists of eligible voters..." 52 U.S.C. 20507(a)(4).

HAVA requires states, in detailed instruction, to maintain a computerized statewide voter registration list and to implement a list-maintenance system that removes ineligible voters while protecting eligible voters from erroneous removal. 52 U.S.C. 21083(a)(1)(A) and (a)(2)(A)–(B). This statute also gives the AG enforcement authority, which is meaningless if federal officials can be blocked from obtaining the very database whose compliance they must evaluate. 52 U.S.C. 21111. DOJ guidance on federal election law underscores that enforcement of voting-rights and election-crimes provisions "often depend[s] on documentation generated during

the voter registration, voting, tabulation, and election certification processes."[14] DOJ Guidance at 2.

Because the NVRA and HAVA regulate the "manner" of federal elections and authorize federal enforcement, they should be read to carry the authority to obtain complete, unredacted records where necessary to discharge those enforcement responsibilities. State privacy regimes cannot strip federal authorities of information Congress has effectively required them to obtain in enforcing federal law.

### C. Title III expressly envisions federal access.

Title III requires election officials to "retain and preserve all records and papers which come into their possession relating to any application, registration, payment of poll tax, or other act requisite to voting" in federal elections for 22 months. 52 U.S.C. 20701. DOJ Guidance notes that these obligations extend to electronic records and that their purpose is to ensure federal investigators can access records needed to enforce voting-rights and election-crime statutes.

Title III also authorizes the AG, upon written demand, to inspect, reproduce, and copy those records. 52 U.S.C. 20703. The statute provides a mechanism to compel disclosure in federal court: "The United States district court for the district

[14] "Federal Law Constraints on Post-Election 'Audits'" published July 28, 2021 ("DOJ Guidance") https://www.justice.gov/archives/opa/press-release/file/1417796/dl (last accessed June 21, 2026) citing *The Federal Prosecution of Election Offenses, Eighth Edition 2017* at 75.

in which a demand is made…, or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. 20705. The DOJ invokes this statute to demand voter registration lists, emphasizing that those lists "fall within Title III's preservation and disclosure requirements." SDRI Explainer at 15. The statute contains no carve-out for particular data; it speaks broadly in terms of "all records and papers" relating to acts requisite to voting, which naturally encompasses unredacted registration files used by states to determine eligibility.[15]

Title III is a direct federal regulation of election records for federal contests. States may regulate time, place, and manner in the first instance, but Congress has already "made or altered" those regulations by specifying retention, preservation, and federal inspection rights. A state cannot redefine its own role or privacy law to override an express federal authorization for DOJ inspection.

### D. State "time, place, and manner" power cannot override federal supremacy.

Federal courts have held that states must disclose list-maintenance records even when state privacy statutes point the other way, reasoning that the NVRA's

[15] Without access to underlying records, it is impossible to determine whether such anomalies reflect lawful processes, system limitations, or compliance failures.

disclosure provision supersedes conflicting state law.[16] Courts have consistently allowed redaction of especially sensitive fields for public requests[17], but the key Elections Clause point is that once Congress requires disclosure, states cannot invoke their own laws to bar it outright. If state privacy laws cannot block disclosure to private NVRA plaintiffs, they *a fortiori* cannot block disclosure to the federal sovereign charged with enforcing the statute.

This honorable Court addressed similar preemption questions in *Public Interest Legal Foundation, Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024). In *Bellows*, this Court held that the SVRL is within the NVRA, "all records" and "concerning the implementation of" list maintenance activities are read broadly, and state restrictions on disclosure are preempted under the Elections Clause. The First Circuit held in Bellows that the NVRA compels public inspection of the statewide voter file and preempts contrary state privacy law.[18] This Court found Maine's "Use Ban" (including the prohibition on making the voter file accessible to the general public, e.g., via the Internet) preempted because it obstructed the NVRA's purpose of

---

[16] https://statedemocracy.law.wisc.edu/our-work/can-the-federal-government-force-states-to-hand-over-citizens-voter-information/ ("SDRI Explainer") (last accessed June 16, 2026)
[17] e.g. full birthdates, full social security numbers
[18] With proper redaction of particularly sensitive personal information in the context of public disclosure to private organizations, e.g. Public Interest Legal Foundation, Judicial Watch, etc.

enabling public analysis and dissemination of voter file data to detect and correct roll inaccuracies.[19]

Similarly, in *Voter Reference Foundation, LLC v. Torrez*, the Tenth Circuit held that New Mexico's restrictions on use, sharing, and Internet publication of voter registration and history data were preempted by the NVRA because Congress intended "transparency and circulation" of voter data to enable public audits and detection of errors; bans on sharing and publication "obstruct" that purpose. *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068 (10th Cir. 2025).[20]

It follows *a fortiori* that a state may not rely on that same privacy law to refuse the United States access for official, non-public purposes. The opinion stresses Congress's purposes — protecting electoral integrity, ensuring accurate rolls, and enabling both private and public enforcement — and treats public access as instrumental to those goals. A federal agency's request for the same data to monitor nationwide compliance sits at the heart, not the periphery, of those purposes.[21]

At present time, twenty-seven states[22] plus the District of Columbia provide their voter registration and motor vehicle data to the Electronic Registration

[19] https://advancingamericanfreedom.com/the-national-voter-registration-act-mandates-public-access-to-voter-registration-records-and-preempts-all-state-laws-to-the-contrary/ (last accessed June 18, 2026)
[20] *Id.*
[21] "If to everyone, then certainly to the United States," ed.
[22] Including Massachusetts, Maine, and Rhode Island, see www.ericstates.org

Information Center, Inc. ("ERIC"), a nonprofit organization. It is important to note that the information shared to and from ERIC includes: name, address, driver's license or state ID number, last four digits of social security number, date of birth, voting activity dates, current record status, phone number, and email address.[23]

Massachusetts already chooses to share voter data through ERIC, which shows the issue is not a categorical power to withhold data but the specific legal authority governing each recipient and use case. ERIC's own materials say member states submit voter-registration and motor-vehicle data under rules requiring compliance with federal and state law. From a supremacy perspective[24], a state's interest in shielding data from the federal government is at its lowest ebb when Congress has expressly mandated broad public access to that same category of records.

**E. State authority is administrative, not sovereign, in federal elections.**

The "administration of voter registration has primarily been the responsibility of state and local election officials, not the federal government," but only "subject to certain federal requirements."[25] States are essentially administrators

---

[23] https://ericstates.org/wp-content/uploads/documents/ERIC-Bylaw-MA-FINAL.pdf at 31 (last accessed June 16, 2026)
[24] The "Supremacy Clause" of the US Constitution is U.S. Const. art. VI, cl. 2.
[25] https://statedemocracy.law.wisc.edu/our-work/can-the-federal-government-force-states-to-hand-over-citizens-voter-information/ at 5 (last accessed June 16, 2026)

implementing a federalized scheme for federal elections, not sovereigns with plenary control over whether and on what terms to share federal-election records with the federal government.

The CRA's retention requirement places the "retention and safekeeping duties squarely on the shoulders of election officers," and stresses that those duties exist precisely to ensure records remain available "in a form that allows for the Department to investigate and prosecute both civil and criminal elections matters under federal law."[26] Thus, state officials are custodians for a federal oversight purpose; their custodial role does not include the power to withhold the records from the very federal agency Congress expected to review them.

**F. "Time, place, and manner" is not a privacy veto.**

States have been arguing in parallel cases that their traditional control over election administration allows them to condition or deny access to sensitive data. But case precedent shows courts distinguishing between the manner of public disclosure (where redaction is permitted under the NVRA) and the underlying obligation to make list-maintenance records available.[27] In other words, time, place, and manner authority may allow states to set reasonable modalities (e.g., in-person

[26] "Federal Law Constraints on Post-Election 'Audits'" published July 28, 2021 ("DOJ Guidance") https://www.justice.gov/archives/opa/press-release/file/1417796/dl at 3-4 (last accessed June 16, 2026)

[27] https://statedemocracy.law.wisc.edu/our-work/can-the-federal-government-force-states-to-hand-over-citizens-voter-information/ at 6 (last accessed June 16, 2026)

inspection, copy costs), but does not justify categorical refusal to provide federal authorities with records necessary to enforce federal law.

Moreover, the DOJ's own practice acknowledges that federal access can be paired with strict federal data-protection conditions rather than blocked outright. A consent decree resolving a Title III case against Georgia required the state to provide its full statewide voter registration list, "including each registered voter's full name, address, birth date, and all additional voter identification information, including Social Security numbers or driver's license numbers," while the DOJ agreed to limit data sharing and ultimately destroy the data. *See* Consent Judgment and Decree, *United States v. Georgia*, No. 1:06-cv-2442 (N.D. Ga. Oct. 27, 2006).[28] This example demonstrates that, in the DOJ's historical view, federal law supports access to unredacted data, with privacy concerns addressed by federal safeguards rather than by denying the DOJ the information altogether.

Because the NVRA, HAVA, and the CRA contemplate the DOJ as the primary federal enforcer of voting-rights and election-crime statutes, giving the DOJ full, unredacted access under strict federal privacy restrictions provides a channel for enforcing both election integrity and privacy norms. By contrast, allowing states to withhold data wholesale impedes federal oversight while doing nothing to prevent leaks or misuse at the state level.

---

[28] *Id*. at 15 (last accessed June 16, 2026)

DOJ guidance highlights federal statutes prohibiting intimidation of voters and election workers and cites cases where misuse or threatened exposure of personal information contributed to unlawful intimidation.[29] The guidance notes concerns about post-election "audits" that contemplate direct canvassing of individual voters and frames such activities as potentially intimidating. The DOJ requires access to unredacted voter records to monitor and prosecute schemes that weaponize voter data for intimidation or suppression. Where state officials are unwilling or unable to police such misconduct, federal access to detailed records is essential to safeguard the federal right to vote, which again falls well within the DOJ's enforcement powers. State time, place, and manner regulations cannot be interpreted to deprive the federal government of the tools necessary to prevent intimidation and protect the franchise.

The NVRA does not distinguish between federal and private requesters in its text, suggesting that, wherever the statute does mandate disclosure, state privacy rules must yield. The CRA's express inspection authority gives the DOJ an even stronger claim to unredacted access than private plaintiffs enjoy, because Congress has specifically contemplated federal inspection of "all records and papers" relating to voting.[30]

---

[29] https://statedemocracy.law.wisc.edu/our-work/can-the-federal-government-force-states-to-hand-over-citizens-voter-information/ at 6 (last accessed June 16, 2026)
[30] *Id*. at 15 (last accessed June 16, 2026)

## CONCLUSION

The DOJ's case is a justifiable effort to enforce congressionally imposed duties on states under the NVRA, HAVA, and the CRA, within the enforcement authority the Constitution gives the federal government over federal elections.

The Elections Clause authorizes Congress to "make or alter" state regulations for the "Times, Places and Manner" of federal elections; when Congress enacts the NVRA, HAVA, the CRA, and their federal record-retention and anti-intimidation provisions, it is exercising that power. Voter rolls and registration records are part of the "manner" of federal elections.

Congress has exercised its authority to regulate these areas and to empower the DOJ to enforce those regulations through the NVRA, HAVA, and the CRA. Congress has validly legislated in this space and has empowered the Attorney General to enforce those statutes through civil litigation. This is exactly what the NVRA and HAVA do: they authorize the AG to bring actions to secure compliance with federal voter-registration and list-maintenance standards.

Those federal statutes presuppose and, in the case of the CRA, expressly provide the DOJ authority to inspect, copy, and use election records — including unredacted registration data — when necessary for federal election enforcement. Under the Supremacy Clause and the Elections Clause, state "time, place, and manner" regulations and privacy statutes cannot be wielded to bar the federal

government from accessing the very records Congress has required states to preserve for federal use.

The NVRA requires states to conduct a "general program that makes a reasonable effort" to identify and remove ineligible registrants (e.g., movers, deceased voters) and to keep records of these activities and make them available for inspection.

If a state refuses to provide the records the DOJ says it needs to evaluate whether that "reasonable effort" standard is being met—including, in the DOJ's view, the statewide list itself—that refusal is independently actionable as a violation of NVRA's disclosure and record-keeping provisions, and the DOJ is within its statutory rights to sue to compel compliance.

Reviewing the actual rolls, not just policy manuals, is often indispensable to determining whether state programs are reasonable in practice (for example, to see if certain counties never remove movers, or if certain racial groups are disproportionately purged), so seeking the lists is a proportional, statute-tethered investigative step, not an extra-statutory power grab.

The NVRA does not distinguish between federal and private requesters in its text. This suggests that wherever the statute does mandate the CRA's express inspection authority gives the DOJ an even stronger claim to unredacted access than

private plaintiffs enjoy, because Congress has specifically contemplated federal inspection of "all records and papers" relating to voting.

HAVA requires every state to maintain a single, uniform, official, computerized statewide voter registration list and to have a system of file maintenance that makes a reasonable effort to remove ineligible registrants while protecting eligible voters from erroneous removal.

Where the DOJ believes a state's implementation is deficient — e.g., persistent evidence of deceased or moved voters retained on the list, or systemic failures in the matching processes — HAVA authorizes the AG to bring suit for injunctive or declaratory relief.

The DOJ reasonably needs to see the statewide list and related files as evidence; the list is not being demanded as a freestanding "database project," but as the core subject-matter evidence necessary to test whether the state's HAVA obligations are being fulfilled.

Federal law requires states to "retain and preserve all records" relating to any act "requisite to voting" in elections with federal candidates, for twenty-two months, precisely so that the DOJ can investigate and prosecute civil-rights and election-crime violations.

If states refuse to provide access to those records — including voter-registration records — when the DOJ seeks them in the course of an

investigation, that denial obstructs a federally mandated preservation scheme whose purpose is to make those records available for federal enforcement.

This litigation is not a demand for permanent custody or integration of those records into federal systems, but an attempt to vindicate its inspection and investigatory access rights that the retention statute was designed to ensure.

The DOJ has principled counter-arguments to privacy and federalism claims. To the extent state open-records or privacy laws conflict with obligations under NVRA/HAVA or frustrate federal enforcement (for example, by categorically forbidding disclosure of any statewide data needed to evaluate compliance), the DOJ can argue that those state laws must yield under the Supremacy Clause when applied to federally required disclosures.

The DOJ can employ safeguards — use of protective orders, limited redisclosure rules, and secure handling — so that it does not unnecessarily intrude on voter privacy, making the request reasonable even where state law is more protective.

It is enough to say that (1) Congress set substantive and procedural standards for voter registration and records, (2) the DOJ is the designated enforcer, and (3) access to the contested materials is reasonably necessary to vindicate those statutory standards in court.

Congress has set a floor of protections and obligations: states must retain federal election records for twenty-two months, maintain chain of custody, and avoid intimidating voters, and the DOJ may step in to ensure those minimum federal rights are respected. Privacy and anti-intimidation concerns are better addressed by federal conditions on use and security of unredacted data, not by allowing states to veto federal access and thus frustrate the enforcement of federal election law. *Amicus* recognizes that states may impose reasonable disclosure modalities and redactions at the margins but maintains that, at the core, federal law entitles the DOJ to unredacted records for federal election law enforcement and investigatory purposes.

The District Court's order of dismissal should be reversed.

DATED: August 10, 2026

Respectfully submitted,

/s/ Stacey Bucci
STACEY BUCCI (No. 1203282)
595 New Loudon Road, Suite 215
Latham, New York 12110
(413)248-7622
buccilawllc@gmail.com

Counsel for *Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation for an *amicus* under the Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,472 words, excluding the parts exempted by the Federal Rule of Appellate Procedure 32(f).

This brief also complies with the typeface requirements of the Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(2)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in a 14-point Times New Roman font.

Dated: August 10, 2026

/s/ Stacey Bucci
STACEY BUCCI
*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed on August 10, 2026 with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the Court's Electronic Filing System which will send notification of that filing to all counsel of record in this litigation.

/s/ Stacey Bucci
STACEY BUCCI
*Counsel for Amicus Curiae*