**No. 26-1657**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*

v.

WILLIAM F. GALVIN, IN THE OFFICIAL CAPACITY AS SECRETARY OF THE COMMONWEALTH OF MASSACHUSETTS; MASSACHUSETTS ALLIANCE FOR RETIRED AMERICANS; COMMON CAUSE; JANE DOE INC.; JUAN PABLO JARAMILLO; NEW ENGLAND STATE AREA CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,
*Defendants-Appellees.*

---

ON APPEAL FROM THE ORDER OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

---

# BRIEF OF APPELLEES COMMON CAUSE, JANE DOE INC. AND JUAN PABLO JARAMILLO

---

JESSIE J. ROSSMAN
SUZANNE SCHLOSSBERG
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108

ARI J. SAVITZKY
THERESA J. LEE
SOPHIA LIN LAKIN
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

*Counsel for the Common Cause Defendants-Appellees*

## DISCLOSURE STATEMENT

Defendants-Appellees Common Cause and Jane Doe Inc. state pursuant to Federal Rule of Appellate Procedure 26.1 that they do not have any parent corporation and no publicly held corporation owns 10% or more of their stock.

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iv

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 3

STATEMENT OF THE ISSUES ........ 4

STATEMENT OF THE CASE ........ 4

A. Statutory Background: Title III of The Civil Rights Act of 1960 ........ 4

B. Factual Background ........ 8

C. Procedural Background ........ 16

SUMMARY OF ARGUMENT ........ 18

STANDARD OF REVIEW ........ 20

ARGUMENT ........ 21

I. THE CRA DOES NOT ENTITLE DOJ TO THE SVRL BECAUSE THE SVRL IS OUTSIDE THE SCOPE OF TITLE III ........ 21

II. THE CRA DOES NOT ENTITLE DOJ TO THE SVRL BECAUSE DOJ DID NOT COMPLY WITH THE CRA'S "BASIS" AND "PURPOSE" REQUIREMENTS. ........ 27

A. The Federal Rules Apply in this Federal Civil Action. ........ 27

B. The United States Failed to Comply with the Statutory Requirement to Provide "a Statement of the Basis and the Purpose" for Its Demand. ........ 34

III. THE CRA DOES NOT REQUIRE DISCLOSURE OF PRIVATE, SENSITIVE VOTER INFORMATION TO THE FEDERAL GOVERNMENT. ........ 54

CONCLUSION ........ 60

# TABLE OF AUTHORITIES

## Cases

*Alabama v. United States*,
304 F.2d 583 (5th Cir. 1962) .......... 6

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 20

*Bowman Dairy Co. v. United States*,
341 U.S. 214 (1951) .......... 35

*Buckley v. American Constitutional Law Foundation, Inc.*,
525 U.S. 182 (1999) .......... 59

*Butler v. Deutsche Bank Trust Co. Americas*,
748 F.3d 28 (1st Cir. 2014) .......... 41

*Corner Post, Inc. v. Board of Governors of the Federal Reserves System*,
603 U.S. 799 (2024) .......... 37

*Coro, Inc. v. Federal Trade Commission*,
338 F.2d 149 (1st Cir. 1964) .......... 35

*Department of Commerce v. New York*,
588 U.S. 752 (2019) .......... 54

*Donaldson v. United States*,
400 U.S. 517 (1971) .......... 31

*Duncan v. Walker*,
533 U.S. 167 (2001) .......... 39

*Freeman v. Town of Hudson*,
714 F.3d 29 (1st Cir. 2013) .......... 20

*Greidinger v. Davis*,
988 F.2d 1344 (4th Cir. 1993) .......... 55

*Honeycutt v. United States*,
581 U.S. 443 (2017) .......... 22

*In re Administrative Subpoena No. 25-1431-019*,
800 F. Supp. 3d 229 (D. Mass. 2025) .......... 35

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962) .......... 7, 33, 58

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) .......... 7, 31, 32, 33, 37, 38, 46, 55, 58

*Lyman v. Baker*,
954 F.3d 351 (1st Cir. 2020) .......... 20

*National Pharmacies, Inc. v. Feliciano-de-Melecio*,
221 F.3d 235 (1st Cir. 2000) .......... 57

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) .......... 37, 54

*PA Fair Elections v. Pennsylvania Department of State*,
337 A.3d 598 (Pa. Commw. Ct. 2025) .......... 13

*Project Vote/Voting for America, Inc. v. Long*,
682 F.3d 331 (4th Cir. 2012) .......... 57, 58

*Public Interest Legal Foundation v. Benson*,
136 F.4th 613 (6th Cir. 2025) .......... 49, 50, 51

*Public Interest Legal Foundation, Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) .......... 56, 58

*Public Interest Legal Foundation, Inc. v.*
*North Carolina State Board of Elections*,
996 F.3d 257 (4th Cir. 2021) .......... 57

*Rutan v. Republican Party of Illinois*,
497 U.S. 62 (1990) .......... 59

*Schatz v. Republican State Leadership Committee*,
669 F.3d 50 (1st Cir. 2012) .......... 20, 21

*Smith v. Spizzirri*,
601 U.S. 472 (2024) .......... 36

*State v. Trump*,
No. 26-cv-11581, 2026 WL 1826490
(D. Mass. June 25, 2026) .......... 16

*Sugarloaf Funding, LLC v. U.S. Department of Treasury*,
584 F.3d 340 (1st Cir. 2009) .......... 31

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) .......... 21

*United States v. Adams*,
No. 26-cv-00019, 2026 WL 2123871
(E.D. Ky. July 23, 2026) .......... 17, 21, 28

*United States v. Aguilar*,
No. 25-cv-00728, 2026 WL 2364502
(D. Nev. Aug. 14, 2026) .......... 16

*United States v. Amore*,
831 F. Supp. 3d 149 (D.R.I. 2026) .......... 16, 28, 38, 40, 47, 48

*United States v. Bellows*,
No. 25-cv-468, 2026 WL 1430481
(D. Me. May 21, 2026) .......... 17, 21, 28, 46, 47, 50

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026) .... 16, 21, 22, 25, 26, 27, 28, 36, 37, 42, 47

*United States v. Benson*,
819 F. Supp. 3d 753 (W.D. Mich. 2026) .......... 16, 25

*United States v. Board of Elections of New York*,
No. 25-cv-1338, 2026 WL 1999921
(N.D.N.Y. July 10, 2026) .......... 17, 21, 28

*United States v. Caldwell*,
No. 26-cv-2025, 2026 WL 2186515 (D.N.J. July 29, 2026) ...... 16, 21, 28

*United States v. Cartwright*,
230 F. Supp 873 (M.D. Ala. 1964) ........ 6

*United States v. Comley*,
890 F.2d 539 (1st Cir. 1989) ........ 31, 35, 51

*United States v. Commonwealth Energy Systems & Subsidiary Companies*,
235 F.3d 11 (1st Cir. 2000) ........ 26

*United States v. DeMarinis*,
No. SAG-25-3934, 2026 WL 1780586
(D. Md. June 18, 2026) ........ 17, 21, 28

*United States v. Evans*,
No. cv 25-4403, 2026 WL 2267774
(D.D.C. Aug. 6, 2026) ........ 16, 21, 22, 26, 34

*United States v. Fontes*,
No. cv-26-66, 2026 WL 1177244
(D. Ariz. Apr. 28, 2026) ........ 17, 21, 25, 28

*United States v. Galvin*,
830 F. Supp. 3d 122 (D. Mass. 2026) ........ 16

*United States v. Griswold*,
No. 25-cv-3967, 2026 WL 2235374
(D. Colo. Aug. 3, 2026) ........ 16, 21, 28, 42, 47

*United States v. Koski*,
No. 26CV42, 2026 WL 2032532
(E.D. Va. July 14, 2026) ........ 17, 21, 23, 28

*United States v. Matthews*,
No. 25-cv-3398, 2026 WL 2212877
(C.D. Ill. July 31, 2026) ........ 16, 21, 23, 28, 38, 40, 47, 48, 50

*United States v. Mayton*,
335 F.2d 153 (5th Cir. 1964) ........ 5

*United States v. Oliver*,
No. 25-cv-01193, 2026 WL 2031479
(D.N.M. July 14, 2026)........................................................ 17, 28, 34, 42

*United States v. Oregon*,
828 F. Supp. 3d 1092
(D. Or. 2026)........................... 5, 16, 28, 38, 40, 42, 46, 47, 48, 50, 52, 54

*United States v. Powell*,
379 U.S. 48 (1964).................................................................. 28, 29

*United States v. Scanlan*,
No. 25-cv-371, 2026 WL 1864054
(D.N.H. June 29, 2026) ........................................... 17, 21, 23, 28, 38, 40

*United States v. Schmidt*,
No. 25-cv-01481, 2026 WL 1850016
(W.D. Pa. June 27, 2026) ............................................... 17, 21, 47, 52, 54

*United States v. Thomas*,
No. 26-cv-21, 2026 WL 2070437 (D. Conn. July 17, 2026)............ 17, 21

*United States v. Warner*,
No. 26-cv-156, 2026 WL 2018877
(D.W.V. July 13, 2026)..................................... 17, 28, 36, 38, 40, 47, 54

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026).................... 16, 28, 38, 40, 47, 52

*United States v. Wisconsin Elections Commission*,
No. 25-cv-1036, 2026 WL 1430354 (W.D. Wis. May 21, 2026) ...... 17, 21

**Docket Citations**

DOJ Letter, *United States v. Schmidt*,
No. 25-cv-1481 (W.D. Pa. Jan. 12, 2026), Dkt. No. 103-3 .................... 43

DOJ Letter, *United States v. Weber*,
No. 25-cv-9149 (C.D. Cal. Dec. 1, 2025), Dkt. No. 87-3........................ 43

March 26, 2026 Hearing Transcript, *United States v. Amore*,
No. 25-cv-639 (D.R.I. filed Dec. 2, 2025), Dkt. No. 47 .................... 12, 52

Notice of Corrections to the Record,
*American Federation of State, County and Municipal Employees, AFLCIO v. Social Security Administration*,
No. 1:25-cv-596-ELH
(D. Md. Jan. 16, 2026), Dkt. No. 197 .................... 14, 55

Order, *United States v. Simon*,
No. 25-cv-3761, Dkt. No. 210 (D. Minn. Aug. 17, 2026) .................... 16

**Regulatory Authorities**

Executive Order No. 14399,
91 Fed. Reg. 17125 (Mar. 31, 2026) .................... 16, 52

940 Mass. Code Regs. 27.01 .................... 58

**Rules**

Fed. R. Civ. P. 1 .................... 29

Fed. R. Civ. P. 12(b)(6) .................... 20

Fed. R. Civ. P. 16 .................... 33

Fed. R. Civ. P. 56 .................... 33

Fed. R. Civ. P. 81 .................... 30, 31

**Statutory and Constitutional Authorities**

U.S. Constitution Article I, § 4 .................... 3

13 U.S.C. § 214 .................... 23

18 U.S.C. § 1703 .................... 23

18 U.S.C. § 654 .................... 23

26 U.S.C. § 7604 .................... 28

28 U.S.C. § 1291 ........ 3

28 U.S.C. § 1331 ........ 3

28 U.S.C. § 1343 ........ 3

44 U.S.C. § 3501 ........ 56

5 U.S.C. § 552 ........ 56

5 U.S.C. § 552a ........ 56, 59

50 U.S.C. § 217 ........ 23

52 U.S.C. § 20501 ........ 8

52 U.S.C. § 20507 ........ 15, 27, 44, 48, 50, 51, 53, 56, 57, 58

52 U.S.C. § 20701 ........ 1, 2, 4, 5, 18, 22, 25, 57

52 U.S.C. § 20702 ........ 26

52 U.S.C. § 20703 ........ 2, 4, 5, 6, 7, 18, 22, 27, 34, 36, 39, 41, 54, 58

52 U.S.C. § 20705 ........ 6, 28, 29

52 U.S.C. § 20901 ........ 8

52 U.S.C. § 20922 ........ 9

52 U.S.C. § 21083 ........ 49, 50

52 U.S.C. § 21085 ........ 49, 50

Mass. Gen. Laws, ch. 4, § 7(26)(c) ........ 58

Mass. Gen. Laws, ch. 93H ........ 58

Mass. Gen. Laws, ch. 214, § 1B ........ 58

**Other Authorities**

106 Cong. Rec. H5,326 (daily ed. March 11, 1960) ........ 6, 35

106 Cong. Rec. S6,959 (daily ed. March 30, 1960) .................................. 30

Alexandra Berzon & Nick Corasaniti,
*Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*,
N.Y. TIMES, Oct. 22, 2025, https://perma.cc/R8ZU-GGZZ .................... 13

*Basis*, Merriam-Webster,
https://www.merriam-webster.com/dictionary/basis ............................ 38

Devlin Barrett & Nick Corasaniti,
*Trump Administration Quietly Seeks to Build National Voter Roll*,
N.Y. TIMES, Sept. 9, 2025,
https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html .......................................................................... 11

Doug Bock Clark,
*She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*,
PROPUBLICA, Aug. 26, 2025, https://perma.cc/CE7A-6RY6 .................. 13

Emily Bazelon & Rachel Poser,
*The Unraveling of the Justice Department*, N.Y. TIMES MAG.,
Nov. 16, 2025, https://perma.cc/L39A-S5VZ. ....................................... 13

H.R. Rep. No. 86-956 (1959) ................................................................ 5, 24

Jonathan Shorman,
*DOJ is Sharing State Voter Roll Lists with Homeland Security*,
STATELINE, Sept. 12, 2025, https://perma.cc/8HCR-S45F .................... 12

Jude Joffe-Block,
*Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*,
NPR, Dec. 10, 2025, https://perma.cc/6P7X-NZXL ............................... 11

Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry,
*Tracker of Justice Department Requests for Voter Information*,
Brennan Center for Justice (updated August 6, 2026),
https://perma.cc/DFJ2-ERTE ........................................................... 10, 15

Kyle Cheney,
*Trump Administration Concedes DOGE Team May Have Misused Social Security Data*,
POLITICO, Jan. 20, 2026, https://perma.cc/4FTL-F7KQ ........................ 14

Miles Parks & Jude Joffe-Block,
*Trump's DOJ Focuses in on Voter Fraud, with a Murky Assist from DOGE*,
NPR, May 22, 2025, https://perma.cc/6QPB-NLZ8 .............................. 11

Reid Epstein & Nick Corasaniti,
*Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. TIMES, Feb. 2, 2026,
https://perma.cc/E75W-SRZD ................................................................ 16

Sarah Lynch,
*US Justice Dept Considers Handing Over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025,
https://perma.cc/V3JR........................................................................ 12

Sarah N. Lynch,
*Justice Dept. Close to Finalizing Deal to Hand over States' Voter Roll Data to Homeland Security, Sources Say*, CBS NEWS, Mar. 26, 2026,
https://perma.cc/T66C-RYRC ............................................................... 12

Sarah N. Lynch,
*Justice Dept. Close to Finalizing Deal to Hand Over States' Voter Roll Data to Homeland Security, Sources Say*, CBS NEWS, Mar. 26, 2026,
https://perma.cc/T66C-RYRC ............................................................... 52

The Federalist No. 60 (Alexander Hamilton)............................................ 3

U.S. Commission on Civil Rights,
*Report of the U.S. Commission on Civil Rights 1959* (1959),
https://www.usccr.gov/files/historical/1959/59-001-U.pdf..................... 24

U.S. Election Assistance Commission,
*Election Administration and Voting Survey 2024 Comprehensive Report*, https://perma.cc/9M99-STAY .......................................... 8, 9, 44

# INTRODUCTION

The United States, through the Civil Rights Division of its Department of Justice (DOJ), is attempting to seize millions of citizens' sensitive voter data over the objection of their own state governments. In response, a unanimous array of twenty-four different federal courts has held those efforts unlawful, concluding that the Civil Rights Act of 1960 (CRA) does not authorize the Administration to seize private, sensitive voter data or conduct baseless fishing expeditions into state voter rolls. This Court should now join the resounding chorus.

Beginning in the Fall of 2025, the United States began demanding that states turn over complete and unredacted copies of their statewide voter registration lists (SVRLs), which contain the sensitive information of every voter in the state, such as driver's license numbers and partial social security numbers. The United States claims that Title III of the CRA, 52 U.S.C. § 20701 *et seq.*, a 1960s voting rights statute passed to remedy Black voter disenfranchisement in the Jim Crow South, entitles the federal government to seize the personal identifying information of millions of Massachusetts voters today. It does not. This Court can affirm the district court's rejection of the CRA claim on multiple grounds.

*First*, Massachusetts's SVRL does not fall within the "records and papers" contemplated by the CRA's text. The CRA covers only those records that have "come into [the] possession" of state elections officials, like the voter registration applications submitted by Black voters that motivated the statute's passage. 52 U.S.C. § 20701. But the SVRL is a record *created by* Massachusetts in the first place.

*Second*, DOJ failed to provide a written "statement of the basis and the purpose" for its demand for the SVRL as expressly required by Title III. 52 U.S.C. § 20703. As the district court found, "the Attorney General offered no basis—none—and the demand was therefore facially inadequate." Add.8. On appeal, DOJ asserts for the first time that it sufficiently stated that "it was investigating anomalies in Massachusetts's 2024 EAVS response," U.S. Br. 12, but this post-hoc construction of a basis is both waived, and in all events, unsupported by the record. Additionally, DOJ's supposed "purpose" is unsound and an obvious pretext for interfering with elections and creating an unauthorized and illegal national voter database.

*Third*, the relief the United States seeks—forced disclosure of millions of Massachusetts voters' sensitive, protected data—would

impermissibly burden Bay Staters' voting and privacy rights, threatening to chill voter participation and political activity. Because the United States seeks only the unredacted SVRL, and because disclosure of the unredacted SVRL would be unlawful even if the CRA otherwise authorized it, the CRA claim fails on this ground, too.

The Framers vested states, not the federal executive, with responsibility for managing most aspects of federal elections in order to protect our democracy from "tyrants." The Federalist No. 60 (Alexander Hamilton); *see* U.S. Const. art. I, § 4, cl. 1. This Administration's unprecedented and baseless intrusion into the machinery of our elections must be rejected. No federal law entitles the United States to the private voter data it seeks. This Court should affirm the district court's dismissal of the Complaint.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether a state's SVRL, which is a database created by a state's chief election official, is a "record[] . . . which come[s] into [their] possession" within the meaning of Title III of the CRA, 52 U.S.C. § 20701.

2. Whether the United States can obtain a covered record under Title III of the CRA in the absence of a "demand in writing by the Attorney General or his representative . . . contain[ing] a statement of the basis . . . therefor," 52 U.S.C. § 20703.

3. Whether the United States can obtain a covered record under Title III of the CRA where its written "statement of the basis and the purpose therefor," 52 U.S.C. § 20703, is invalid or pretextual.

4. Whether the redaction of sensitive personal information from the Massachusetts SVRL would be required to avoid a constitutional violation or a violation of federal privacy law.

## STATEMENT OF THE CASE

### A. Statutory Background: Title III of The Civil Rights Act of 1960

Congress enacted Title III of the CRA to stop states in the Jim Crow South from denying Black citizens the ability to register to vote. *See, e.g.*,

H.R. Rep. No. 86-956 at 7 (1959). The CRA followed the Civil Rights Act of 1957, Congress's first attempt since Reconstruction to enforce the voting guarantees of the Fourteenth and Fifteenth Amendments. *United States v. Mayton*, 335 F.2d 153, 159 (5th Cir. 1964). With Title III, Congress sought to empower DOJ "to require the production of [election] records during any investigation it conducts as to complaints that qualified persons have been denied the right to vote in violation of Federal law." *United States v. Oregon*, 828 F. Supp. 3d 1092, 1097 (D. Or. 2026). The statute requires that elections officials retain and preserve "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. These records "shall, upon demand in writing by the Attorney General or his representative . . . be made available for inspection, reproduction, and copying at the principal office of [the] custodian." 52 U.S.C. § 20703.

While Congress intended that the Attorney General investigate violations of constitutional rights, some, including Florida Congressman William Cramer, were also concerned about DOJ using Title III powers for "fishing expedition[s]." 106 Cong. Rec. H5,326 (daily ed. March 11,

1960). To address these concerns, Congress adopted Representative Cramer's amendment to Title III, which added a requirement that a demand for records include "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703; *see also* 106 Cong. Rec. H5,326 (daily ed. March 11, 1960). Congress also anticipated judicial review over such statements of basis and purpose, specifying that "[t]he United States district court for the district in which a demand is made pursuant to [S]ection 20703 of this title, . . . shall have jurisdiction by *appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added).

The federal government initially used Title III as intended, to investigate jurisdictions that had effectively denied voter registration to Black Americans. *See, e.g.*, *Alabama v. United States*, 304 F.2d 583, 586–89 (5th Cir. 1962), *aff'd* 371 U.S. 37 (1962) (Title III investigation of registration records showed that discriminatory practices led to less than 10% of Black citizens being registered to vote); *see also United States v. Cartwright*, 230 F. Supp 873, 875 (M.D. Ala. 1964) (Title III investigation revealed registrars engaged in racially discriminatory practices resulting in only 7.5% of Black citizens being registered). And in conducting those

investigations, DOJ adhered to 52 U.S.C. § 20703, by setting forth in writing "the basis and the purpose" for its demands—that is, the factual basis for why DOJ suspected a potential legal violation as well as its investigatory purpose of how the requested records would bear upon that suspicion. *See, e.g.*, *Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

This robust use of Title III was short lived. Only a few years later, Congress passed the Civil Rights Act of 1964, which outlawed racial segregation. Then, in 1965, Congress passed the Voting Rights Act, which established broad new voter protections, eliminated literacy tests, and led to the enfranchisement of millions of Black citizens. Because Congress enacted more effective voting rights laws, federal court assessment of Title III has largely been silent since 1965. Until the past year, all jurisprudence analyzing Title III arose during the 1960s in the former Confederate states and pertained to investigations into state and local officials unlawfully denying Black citizens the right to register to vote.

### B. Factual Background

#### *1. The United States Seeks to Force the Disclosure of Massachusetts Voters' Sensitive Voter Data*

Half a century later, on July 22, 2025, DOJ sent a letter to the Secretary for the Commonwealth of Massachusetts, William F. Galvin (Secretary Galvin), demanding, pursuant to the National Voter Registration Act (NVRA), 52 U.S.C. § 20501 *et seq.*, an electronic copy of Massachusetts's entire SVRL. App.21, 47–48. DOJ requested that the voter file be produced with "all fields" included. *Id.*

The July 22 letter did not mention the CRA at all. App.21, 47–49. It did not claim or suggest any deficiencies in Massachusetts's voter list maintenance practices or inconsistencies with the NVRA or the Help America Vote Act (HAVA), 52 U.S.C. § 20901 *et seq*. *Id*. Rather, in addition to requesting the SVRL, the July 22 letter propounded three questions regarding a few of Massachusetts's responses to the Election Administration and Voting Survey 2024 Comprehensive Report (2024 EAVS Report). App.48. The 2024 EAVS Report is a biennial report published by the U.S. Election Assistance Commission (EAC),[1] which

---

[1] The EAC was established by HAVA to be an independent federal agency charged with, among other functions, serving as a national clearinghouse and resource for the

broadly reports survey data about federal elections management from all fifty states and U.S. territories. It is an aggregation of public data submitted by the states that provides an overview of America's decentralized electoral system.[2] The report makes clear that state voter registration practices and methods differ considerably, and—due to governing federal law—SVRLs inevitably include some voters who are no longer qualified to vote.[3]

On August 7, 2025, Secretary Galvin's office responded that sixty additional days would be required for a response to the July 22 letter. App.21, 51.

On August 14, DOJ sent another letter demanding an earlier response and again demanding the full electronic voter file. App.22, 53–55. DOJ reiterated that the production "must contain *all fields*, including the registrant's full name, date of birth, residential address, his or her

---

compilation of information and review of procedures regarding the administration of federal elections. *See* 52 U.S.C. § 20922.

[2] *See* 2024 EAVS Report at i–ii, https://perma.cc/9M99-STAY.

[3] The Report, referencing requirements of the NVRA, states that voter "registration removal can take up to two federal general election cycles to complete for some registration records," and "it is inevitable that voter lists will contain some number of voter records for individuals who are no longer eligible to vote." 2024 EAVS Report at 150.

state driver's license number or the last four digits of the registrant's social security number." App.53. DOJ's August 14 letter for the first time cited Title III of the CRA as authority for its request. App.53–55. It stated that "[t]he purpose of this request is to ascertain Massachusetts's compliance with the list maintenance requirements of the NVRA and HAVA," but did not elaborate further or reference any specific compliance deficiencies with respect to those statutes' voter list maintenance requirements. App.22; *see id.*53–55.

When Massachusetts did not produce the SVRL, the United States filed a single-count federal civil action under the CRA, App.17–24—one of thirty-one nearly identical actions DOJ has initiated against states and election officials across the country—seeking to compel the production of sensitive Massachusetts voter data.[4] The Complaint did not include any counts under the NVRA or HAVA or allege any violations thereof.

[4] *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated August 6, 2026), https://perma.cc/DFJ2-ERTE.

### 2. *The United States Seeks to Unlawfully Construct a National Voter Database and Use It to Disenfranchise Voters.*

DOJ's requests for private, sensitive voter data from Massachusetts and other states appear to be in connection with novel efforts to construct a national voter database, and to otherwise use untested forms of database analysis to challenge voters' eligibility.

DOJ officials "have been clear that they are interested in a central, federal database of voter information."[5] Within months of the new Administration's taking office, DOJ officials asked staffers from the new "Department of Governmental Efficiency" (DOGE) to identify supposed noncitizens in state voter rolls by matching voter data with data from the Social Security Administration (SSA), efforts which have incorrectly flagged numerous U.S. citizens as ineligible to vote.[6] DOJ has also been coordinating in these unprecedented efforts with the federal Department

---

[5] Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.

[6] *E.g.*, Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR, Dec. 10, 2025, https://perma.cc/6P7X-NZXL; Miles Parks & Jude Joffe-Block, *Trump's DOJ Focuses in on Voter Fraud, with a Murky Assist from DOGE*, NPR, May 22, 2025, https://perma.cc/6QPB-NLZ8.

of Homeland Security (DHS), according to reported statements from both agencies and DOJ's admissions in open court.[7]

Around the time that DOJ first began filing these lawsuits, one article extensively quoted a recently-departed lawyer from DOJ's Civil Rights Division, describing DOJ's aims in these cases regarding the collection and aggregation of voter data:

> We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data . . . I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division.

[7] *See* Mar. 26, 2026 Hr'g Tr. at 50:21–23, 65:1–66:18, *United States v. Amore*, No. 25-cv-639 (D.R.I. filed Dec. 2, 2025), Dkt. No. 47 (admitting planned provision of voter data to DHS); *see also, e.g.*, Sarah N. Lynch, *Justice Dept. Close to Finalizing Deal to Hand over States' Voter Roll Data to Homeland Security, Sources Say*, CBS NEWS, Mar. 26, 2026, https://perma.cc/T66C-RYRC; Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://perma.cc/8HCR-S45F; Sarah Lynch, *US Justice Dept Considers Handing Over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025, https://perma.cc/V3JR.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAG., Nov. 16, 2025, https://perma.cc/L39A-S5VZ.[8]

Administration officials have also been working with outside "election integrity" advocates, apparently mishandling sensitive personal data in the process. For example, as detailed in a federal court filing on behalf of the SSA:

> [I]n March 2025, a political advocacy group contacted two members of SSA's DOGE Team with a request to analyze state voter rolls that the advocacy group had acquired. The advocacy group's stated aim was to find evidence of voter fraud and to overturn election results in certain States. In connection with these communications, one of the DOGE team members signed a "Voter Data Agreement," in his capacity as an SSA employee, with the advocacy group. He

[8] DOJ's efforts to obtain massive amounts of private voter data are being undertaken in coordination with self-proclaimed "election integrity" advocates who have previously sought to mass-challenge voters and overturn elections. For example, Heather Honey, who is currently serving as DHS's "deputy assistant secretary for election integrity," was involved in efforts to overturn the 2020 election, to compel states to engage in aggressive purges of registered voters, and to abuse voter data to make flawed mass challenges to disenfranchise thousands. *See, e.g.*, *PA Fair Elections v. Pa. Dep't of State*, 337 A.3d 598, 599 n.1 (Pa. Commw. Ct. 2025) (dismissing complaint brought by group affiliated with Honey challenging Pennsylvania's voter roll maintenance practices pursuant to HAVA); *see also, e.g.*, Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, N.Y. TIMES, Oct. 22, 2025, https://perma.cc/R8ZU-GGZZ; Doug Bock Clark, *She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025, https://perma.cc/CE7A-6RY6.

> sent the executed agreement to the advocacy group on March 24, 2025.

Notice of Corrections to the R. at 5, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 1:25-cv-596-ELH, (D. Md. Jan. 16, 2026), Dkt. No. 197.[9] The filing, which does not specify the terms of the "Voter Data Agreement" or the activities these DOGE actors or others undertook pursuant to it, also indicates that, around the same period, DOGE actors shared unknown amounts of Social Security data on an unapproved third-party server, in a "manner [that] is outside SSA's security protocols." *Id.* at 6

Additional government documents suggest that the United States ultimately plans to use voters' sensitive personal data to assert control over voting eligibility in the states, to order the disenfranchisement of voters, and potentially to contest the results of state-run elections.

In particular, the United States has asked states to execute a memorandum of understanding (MOU) in connection with its requests for states' voter data. *See* App.75–83.[10] The MOU purports to vest the

---

[9] *See also* Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO, Jan. 20, 2026, https://perma.cc/4FTL-F7KQ.

[10] In addition to the Colorado and Texas versions of the MOU included in the Appendix, the copies provided to many other states are aggregated and posted in

United States with substantial new authority to identify supposedly ineligible voters on state voter rolls and to compel states to remove these voters from the rolls, depriving them of the franchise. App.76, 79. Specifically, under the MOU's terms, federal officials may take custody of the voter rolls, identify supposed "ineligible voters," and compel states to "remov[e]" these voters "within forty-five (45) days" and to resubmit their voter lists for additional analysis. App.79. These removals are purportedly required by the MOU despite the procedural protections afforded by the NVRA, which requires voters to be notified prior to removal and bars systematic removal programs within 90 days of an election, 52 U.S.C. § 20507. The MOU would thereby turn states' own voter rolls into a tool for unlawfully and improperly mass-challenging voters and interfering with the democratic process in the states.

The actions of the President and other officials also highlight the Administration's impermissible aims. For example, earlier this year, President Trump announced his desire to "take over the voting" and "nationalize" elections in certain states. Reid Epstein & Nick Corasaniti,

---

Martinez-Ochoa, O'Connor, & Berry, *Tracker of Justice Department Requests*, *supra* n.1.

*Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. TIMES, Feb. 2, 2026, https://perma.cc/E75W-SRZD. The next month, the President issued an executive order, in part directing DHS, in coordination with SSA, to compile lists of citizens eligible to vote in each state, *see* Exec. Order No. 14399 § 2(a), 91 Fed. Reg. 17125 (Mar. 31, 2026), which was subsequently held unlawful. *See State v. Trump*, No. 26-cv-11581, 2026 WL 1826490, at *14 (D. Mass. June 25, 2026).

### C. Procedural Background

As noted, the United States has now filed more than thirty lawsuits seeking to obtain state SVRLs under the purported authority of Title III of the CRA. Every court that has passed upon the validity of these actions—now twenty-four courts in all, including the Sixth Circuit—has held that DOJ's demand is unenforceable and dismissed the United States's claims.[11]

---

[11] *See United States v. Benson*, 179 F.4th 470 (6th Cir. 2026); *United States v. Amore*, 831 F. Supp. 3d 149 (D.R.I. 2026); *United States v. Galvin*, 830 F. Supp. 3d 122 (D. Mass. 2026) (Add.1–13); *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026); *Oregon*, 828 F. Supp. 3d 1092; *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026); Order, *United States v. Simon*, No. 25-cv-3761, Dkt. No. 210 (D. Minn. Aug. 17, 2026); *United States v. Aguilar*, No. 25-cv-00728, 2026 WL 2364502, at *1 (D. Nev. Aug. 14, 2026); *United States v. Evans*, No. cv 25-4403, 2026 WL 2267774, at *1 (D.D.C. Aug. 6, 2026); *United States v. Griswold*, No. 25-cv-3967, 2026 WL 2235374 (D. Colo. Aug. 3, 2026); *United States v. Matthews*, No. 25-cv-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026); *United States v. Caldwell*, No. 26-cv-2025, 2026 WL 2186515 (D.N.J. July 29, 2026); *United States v. Adams*, No. 26-

The district court here is one of them. Add.1–13. On April 9, 2026, following full briefing on the United States's motion to compel, App.26–29, and Rule 12 motions from Defendant Galvin, Intervenor-Defendants Common Cause, Jane Doe Inc., and Massachusetts voter Juan Pablo Jaramillo (the Common Cause Intervenors), and Intervenor-Defendant New England State Area Conference of the NAACP, the district court held that DOJ's demand for Massachusetts's SVRL was "facially deficient" because it did not comply with Title III's requirement to provide a written statement of "the basis" for the demand. Add.5–12. It did not reach any of the other arguments in favor of dismissal. Add.16.

Fifty-three days later, on June 1, the United States noticed this appeal. App.186–187.

---

cv-00019, 2026 WL 2123871 (E.D. Ky. July 23, 2026); *United States v. Thomas*, No. 26-cv-21, 2026 WL 2070437 (D. Conn. July 17, 2026); *United States v. Oliver*, No. 25-cv-01193, 2026 WL 2031479 (D.N.M. July 14, 2026); *United States v. Koski*, No. 26CV42, 2026 WL 2032532 (E.D. Va. July 14, 2026); *United States v. Warner*, No. 26-cv-156, 2026 WL 2018877 (D.W.V. July 13, 2026); *United States v. Bd. of Elections of N.Y.*, No. 25-cv-1338, 2026 WL 1999921 (N.D.N.Y. July 10, 2026); *United States v. Scanlan*, No. 25-cv-371, 2026 WL 1864054 (D.N.H. June 29, 2026); *United States v. Schmidt*, No. 25-cv-01481, 2026 WL 1850016 (W.D. Pa. June 27, 2026); *United States v. DeMarinis*, No. SAG-25-3934, 2026 WL 1780586 (D. Md. June 18, 2026); *United States v. Wis. Elections Comm'n*, No. 25-cv-1036, 2026 WL 1430354 (W.D. Wis. May 21, 2026); *United States v. Bellows*, No. 25-cv-468, 2026 WL 1430481 (D. Me. May 21, 2026); *United States v. Fontes*, No. cv-26-66, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026).

## SUMMARY OF ARGUMENT

The United States's CRA claim is legally deficient many times over, and there are multiple independent bases on which this Court can affirm.

*First*, Title III does not reach the records the United States seeks. Title III covers only documents that "come into [the] possession" of election officials. 52 U.S.C. § 20701. The SVRL is a record Secretary Galvin's office *created*, not one obtained from some external source, and thus did not "come into [his] possession" as a matter of plain text. This reading interprets Title III harmoniously with the NVRA and HAVA, which requires states to create and maintain their own SVRLs.

*Second*, the United States has neither pleaded nor provided a valid statement of "the basis and the purpose" for its demand for Massachusetts's unredacted SVRL, as Title III requires. 52 U.S.C. § 20703.

As to basis, DOJ pleaded that its CRA demand was contained in the August 14 letter. But the August 14 letter contained no factual basis for its demand. Reflecting this reality, DOJ did not point to any factual basis for its demand before the district court. DOJ's attempt to backfill a factual basis for its demand for the first time on appeal, by citing to the

July 22 letter's reference to the Massachusetts' EAVS responses, is both waived and in any event meritless because neither letter provided any articulable reason for any concern with any aspect of Massachusetts's voter roll maintenance.

DOJ has neither pleaded nor provided a valid "purpose," either. The generalized purpose DOJ points to (namely, ascertaining Massachusetts's compliance with the NVRA and HAVA) simply does not match the records demanded; a single point-in-time SVRL provides no insight into Massachusetts's list maintenance process or procedures. And even if this supposed purpose were otherwise valid, it is invalidated here because the United States's own statements and other public records demonstrate that it is pretextual. The failure to provide the basis and failure to provide the valid purpose are each—independently and together—fatal to the United States's CRA claim.

*Finally*, the relief sought—disclosure of a complete SVRL without redactions to protect the privacy of millions of Massachusetts voters—cannot be granted without trammeling constitutional and privacy rights, and thus cannot be granted at all. This Court can affirm the district court's dismissal order on that ground as well.

## STANDARD OF REVIEW

This Court reviews the grant of a motion to dismiss *de novo*. *Lyman v. Baker*, 954 F.3d 351, 359 (1st Cir. 2020).[12] It is "free to affirm an order of dismissal on any basis made apparent from the record." *Freeman v. Town of Hudson*, 714 F.3d 29, 35 (1st Cir. 2013).

Dismissal is proper if, accepting all well-pleaded factual allegations as true, the complaint does not plausibly "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In analyzing a motion to dismiss, a court must "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements," and then "take the complaint's well-pled (*i.e.*, non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). Courts can also "consider (a) implications from documents attached to or fairly incorporated into the complaint, (b) facts susceptible to judicial notice,

[12] While the district court's Order did not specify the rule under which it was dismissing the Complaint, the United States acknowledges in its opening brief that the district court dismissed the complaint pursuant to Rule 12(b)(6). *See* U.S. Br. 14.

and (c) concessions in plaintiff's response to the motion to dismiss." *Id.* at 55–56 (cleaned up). *Cf. Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").

## ARGUMENT

### I. THE CRA DOES NOT ENTITLE DOJ TO THE SVRL BECAUSE THE SVRL IS OUTSIDE THE SCOPE OF TITLE III.

This Court can affirm because the United States seeks records that are not covered by Title III in the first place.[13]

Title III requires elections officials to "retain and preserve, for a period of twenty-two months from the date of any" federal election, "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to

[13] The district court assumed without deciding the SVRL is within Title III's scope. Add.9 n.9. Sixteen courts have held that SVRLs are not covered under Title III, *see Benson*, 179 F.4th at 480–81; *Evans*, 2026 WL 2267774, at *5, *11; *Griswold*, 2026 WL 2235374, at *4–5; *Matthews*, 2026 WL 2212877, at *3–4; *Caldwell*, 2026 WL 2186515, at *6–8; *Adams*, 2026 WL 2123871, at *4–5; *Thomas*, 2026 WL 2070437, at *7; *Koski*, 2026 WL 2032532, at *6; *Bd. of Elections of N.Y.*, 2026 WL 1999921, at *11; *Scanlan*, 2026 WL 1864054, at *6; *Schmidt*, 2026 WL 1850016, at *2; *DeMarinis*, 2026 WL 1780586, at *5; *Wis. Elections Comm'n*, 2026 WL 1430354; *Bellows*, 2026 WL 1430481, at *7; *Fontes*, 2026 WL 1177244, at *5.

voting in such election." 52 U.S.C. § 20701. The statute then obligates officials to turn over "[a]ny record or paper required by [S]ection 20701 . . . to be retained and preserved," *id.* § 20703. While "all records and papers ... relating to any application, registration, . . . or other act requisite to voting" is indeed sweeping language, *see* U.S. Br. 35–37, Title III also provides an immediate textual limitation to those otherwise broad parameters: Only those records or papers that have "come into [the custodian's] possession" must be retained and provided in response to a valid Title III demand. *Id.* § 20701.

The SVRL falls outside the ambit of this text. The phrase "come into . . . possession" in the CRA refers to records that elections officials *obtain* or *receive*, rather than those they *create*. *See United States v. Benson*, 179 F.4th 470, 480 (6th Cir. 2026) ("Around the time that Congress enacted Title III, the phrase 'come into . . . possession,' meant to 'acquire,' 'obtain,' or 'receive,'" rather than something a state "created . . . themselves"); *see also Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to get or acquire" and "to come into possession of" in interpreting terms of the Comprehensive Forfeiture Act) (internal quotation marks omitted); *accord, e.g.*, *United States v. Evans*,

No. cv 25-4403, 2026 WL 2267774, at *6 (D.D.C. Aug. 6, 2026); *United States v. Matthews*, No. 25-cv-3398, 2026 WL 2212877, at *3 (C.D. Ill. July 31, 2026); *United States v. Kosk*i, No. 26-cv-00042, 2026 WL 2032532, at *5 (E.D. Va. July 14, 2026).

Indeed, Congress regularly uses the language "comes into possession" to refer to something that the subject obtains or acquires, rather than creates. *See, e.g.*, 13 U.S.C. § 214 (prohibiting census staff from disclosing "any information . . . which comes into [their] possession"); 18 U.S.C. § 654 (prohibiting embezzlement of money or property that "comes into [one's] possession"); 18 U.S.C. § 1703(a) (prohibiting postal employees from delaying or destroying mail that "come into [their] possession"); 50 U.S.C. § 217 (requiring military members to report whenever abandoned property "comes into [their] possession"); *see also United States v. Scanlan*, No. 25-cv-371, 2026 WL 1864054, at *5 (D.N.H. June 29, 2026) ("Congress has consistently employed the phrase 'comes into possession' to describe the process by which a person receives something from an external source").

Because the SVRL is a continuously updated document created by state officials, it is not a record that "come[s] into [their] possession," and falls outside of the CRA's reach.

This reading is consistent with Title III's aims. The statute was part of an effort to force Southern registrars to accept the voter registration forms submitted by Black voters, rather than destroying or otherwise rejecting them. *See, e.g.*, U.S. Comm'n on Civil Rights, *Report of the U.S. Commission on Civil Rights 1959* at 93 (1959), https://www.usccr.gov/files/historical/1959/59-001-U.pdf ("Rejected applications were destroyed approximately 30 days after being rejected, which fact made accurate statistical review of the records impossible"); H.R. Rep. 86-956 at 7 (describing viewing of submitted registration materials as "an essential step in the process of enforcing and protecting the right to vote"). Title III is at its heart a retention provision to prevent the destruction of materials submitted by would-be voters so that federal enforcers can determine whether they were being denied registration on the basis of race. These aims are reflected not just in the statute's "comes into possession" language, but in Title III's subsequent language specifying that the records and papers at issue are those "relating to any

application, registration, payment of poll tax, or other act requisite to voting," 52 U.S.C. § 20701—all of which "'refer[] to something that the voter submits or does as part of the registration process' and thus refers to 'records that election officials receive, rather than create.'" *United States v. Fontes*, No. cv-26-66, 2026 WL 1177244, at *4 (D. Ariz. Apr. 28, 2026) (quoting *United States v. Benson*, 819 F. Supp. 3d 753, 769 (W.D. Mich. 2026)).

DOJ fails to address the "come into . . . [their] possession" limitation on Title III's scope in its brief, *see generally* U.S. Br. 34–39. As in related matters, DOJ may argue that the SVRL is in part based on an aggregation of materials submitted by voters, but that is of no moment. DOJ "has not requested the records or papers that [Massachusetts] obtained in creating the qualified voter file—[DOJ] has requested the qualified voter file itself," which Massachusetts itself created. *Benson*, 179 F.4th at 480–81. Further, the SVRL "contains information from diverse sources, many of which have nothing to do with 'act[s] requisite to voting.'" *Id.* at 481 (quoting 52 U.S.C. § 20701).

Nor can DOJ claim that Title III applies to *any* documents or records that an elections official *possesses*, including those the official

creates, because that reading would improperly read language out of the statute, replacing "all records and papers *which come into [their] possession*" with "all records and papers which *they possess*." But "a statute should be construed so that each part is given effect and no part is rendered inoperative or superfluous." *United States v. Commonw. Energy Sys. & Subsidiary Companies*, 235 F.3d 11, 15 (1st Cir. 2000).

Such a reading would also violate normal rules of usage and plain common sense. "An ordinary English speaker would not say that she has come into possession of something that she created, established, and maintained." *Benson*, 179 F.4th at 479. Or as another court explained: "As a matter of common usage, one might say, for example, that the Mona Lisa 'came into the possession' of the Louvre around 1797; one would not say that the painting 'came into the possession' of Leonardo da Vinci when he completed it around 1517." *Evans*, 2026 WL 2267774, at *6.

Finally, reading Title III to cover the SVRL would produce bizarre results that Congress could not have intended. Under the CRA, it is a criminal violation for anyone to "willfully steal[], destroy[], conceal[], mutilate[], or alter[] any record or paper required by [Title III] to be retained and preserved." 52 U.S.C. § 20702. Yet the NVRA and HAVA

affirmatively "*require* [state] election officials to alter the qualified voter file routinely as part of their 'reasonable effort[s]' to ensure accuracy." *Benson*, 179 F.4th at 479 (citing 52 U.S.C. § 20507(a)(4)). Accordingly, "construing [Title III] in a manner that subjects the qualified voter file to Title III would place Title III on a collision course with the NVRA and HAVA," an unharmonious and absurd result. *Benson*, 179 F.4th at 480. The better reading is that the SVRL simply is not covered by Title III.

## II. THE CRA DOES NOT ENTITLE DOJ TO THE SVRL BECAUSE DOJ DID NOT COMPLY WITH THE CRA'S "BASIS" AND "PURPOSE" REQUIREMENTS.

Even if the SVRL was covered under Title III—and it is not—DOJ failed to comply with Title III's requirement to set forth a "demand in writing" that "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. DOJ's failure to fulfill these statutory requirements provides multiple additional bases to affirm.

### A. The Federal Rules Apply in this Federal Civil Action.

The United States claims that enforcing a Title III demand constitutes "a special statutory proceeding," such that the Federal Rules do not apply, and courts may conduct no inquiry whatsoever into DOJ's

compliance with Title III's "basis and purpose" requirements. U.S. Br. 17–21. This is wrong, as over a dozen federal courts have now held.[14]

To begin with the text, Title III provides: "The United States District Court for the district in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located, shall have jurisdiction *by appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). And the process that is "appropriate," particularly where the United States has filed a civil action, is the Federal Rules of Civil Procedure.

Binding precedent so holds. In *United States v. Powell*, 379 U.S. 48 (1964), the Supreme Court held that proceedings to enforce a federal records statute—one whose jurisdictional provision is materially identical to the CRA, with the same "by appropriate process" language—are governed by the Federal Rules, *id.* at 52, 57–58 & n.18 (citing 26 U.S.C. § 7604(a)); *compare* 26 U.S.C. § 7604(a) ("[T]he United States

[14] *See Benson*, 179 F.4th at 483 n.2; *Amore*, 831 F. Supp. 3d at 155; *Oregon*, 828 F. Supp. 3d at 1102–03; *Weber*, 816 F. Supp. 3d at 1182; *Griswold*, 2026 WL 2235374, at *3; *Matthews*, 2026 WL 2212877, at *2; *Caldwell*, 2026 WL 2186515, at *5; *Adams*, 2026 WL 2123871, at *3–4; *Oliver*, 2026 WL 2031479, at *7; *Koski*, 2026 WL 2032532, at *1 n.2; *Warner*, 2026 WL 2018877, at *2; *Bd. of Elections of N.Y.*, 2026 WL 1999921, at *6–7; *Scanlan*, 2026 WL 1864054, at *1 n.2; *DeMarinis*, 2026 WL 1780586, at *3; *Bellows*, 2026 WL 1430481, at *5; *Fontes*, 2026 WL 1177244, at *1 & n.1.

district court for the district in which such person resides or is found *shall have jurisdiction by appropriate process* to compel such attendance, testimony, or production of books, papers, records, or other data" (emphasis added)), *with* 52 U.S.C. § 20705 ("The United States district court for the district in which a demand is made . . . or in which a record or paper so demanded is located, *shall have jurisdiction by appropriate process* to compel the production of such record or paper" (emphasis added)).

The *Powell* Court was clear: Because the jurisdictional provision of the records statute there provided that records requests would be judicially enforced "by appropriate process," and because no alternative process was specified, "the Federal Rules of Civil Procedure apply." *Powell*, 379 U.S. at 57–58 & n.18. Where the federal government demands the production of documents in those circumstances, the demand may be contested as the Rules allow, on "any appropriate ground." *Id*. at 58.

The Federal Rules themselves are also explicit on this point. They "govern the procedure in *all* civil actions and proceedings in the United States district courts." Fed. R. Civ. P. 1 (emphasis added). The Rules

contain limited and narrow carveouts to their own application, none of which include a claim under Title III. *See also* Fed. R. Civ. P. 81(a)(5) (expressly providing that the Rules "apply to proceedings to compel testimony or the production of documents"). Here, the United States filed a federal civil action seeking a court order to compel production of documents; it cannot avoid the implications of its own decisions.

The legislative history of Title III, while unnecessary to interpret its plain meaning, is consistent. As Senator Hruska explained: "[Section 305] is merely a restatement of court powers which now exist. . . . A formal court application, and any order which might flow from the court, would still remain unimpaired and without diminution." 106 Cong. Rec. S6,959 (daily ed. March 30, 1960). The CRA's "appropriate process" language was meant to confirm courts' unimpaired judicial oversight—not stymie it.

Applying the Rules here is consistent with the independent judicial function that they are designed to serve. The Supreme Court and this Court have repeatedly reaffirmed that it is a court's responsibility to independently determine—prior to compelling disclosure—whether a government agency has followed procedural requirements, and whether

the evidence sought is relevant and material to its investigation. *See, e.g.*, *Donaldson v. United States*, 400 U.S. 517, 528 (1971) ("The Civil Rules, of course, do have an application to a summons proceeding." (citing Fed. R. Civ. P. 81)); *Sugarloaf Funding, LLC v. U.S. Dep't of Treasury*, 584 F.3d 340, 347–50 (1st Cir. 2009); *United States v. Comley*, 890 F.2d 539, 541–42 (1st Cir. 1989). This independent judicial obligation is as important now as ever.

The United States never supports its contrary assertion that this civil action is actually a "special statutory proceeding" that exists outside of the Federal Rules, with "no room for judicial inquiry as to whether the basis and purpose are factually accurate" or "the sufficiency or sincerity of the Attorney General's statement" of basis and purpose. U.S. Br. 17, 20–21. It points to no statutory text that provides for any such "special" process—because none exists. Rather, the United States's assertion of this "special" process is based solely on the Fifth Circuit's 1962 opinion in *Lynd*, 306 F.2d 222. But that non-binding decision was issued before *Powell*, and addressed wholly dissimilar circumstances.

*Lynd* was a response to the situation that prevailed in the Jim Crow South in the early 1960s. Title III's purpose was to protect the right to

vote by facilitating discrimination suits against counties that refused to process the registrations of Black voters and stymied every effort to enforce federal law. The Fifth Circuit painted a clear picture of this recalcitrance: By the time *Lynd* was decided, the registrar defendants in that case had spent 18 months filing "a series of motions, motions to dismiss, opposing substitution motions for more definite statement and briefs and repeated extended oral arguments thereon," all "with no clear-cut ruling, no indication that this interminable proceeding would ever come to an end, and certainly never an order for production." *Lynd*, 306 F.2d at 227. This was all despite the fact that "the factual foundation for" the Attorney General's Title III requests was utterly self-evident—massive racial disparities in registration that evidenced discriminatory refusal to register Black voters—and DOJ had in fact clearly stated the factual basis and purpose of its requests to local registrars. *See id*. at 226–28 & n.6. Against that backdrop, the Fifth Circuit emphasized that, after months of dilatory action, a new round of plenary "judicial review or ascertainment" of facts was not warranted; at that point, the statutory goal of protecting the franchise could only be met with summary resolution. *See id*. at 226–28.

Moreover, *Lynd* was decided before sensitive personal identifying information such as Social Security numbers or driver's license numbers was required as part of a person's voter registration record, and before federal laws like the Privacy Act were passed to protect and constrain access to personal information. *Lynd* and contemporaneous cases required production of *public* records; as the court explained: "[W]e are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection." *Id.* at 231. And even in that very different context, federal courts applying Title III recognized there would be "exception[s]" to "[t]he right of free examination of official records" due to improper purpose. *In re Coleman*, 208 F. Supp. at 201.

*Lynd* is thus inapposite, and in any event, the United States goes far beyond *Lynd* here. It did not seek expedited summary judgment following months of litigation over a facially valid Title III demand—something that the Federal Rules would allow under appropriate circumstances, *see* Fed. R. Civ. P. 16(b), 56. It instead argues that Title III prevents federal courts from *any* inquiry into whether a DOJ demand for millions of voters' personal identifying information is legally valid,

even where DOJ has invoked the court's jurisdiction by filing a civil action. No wonder so many courts have rejected this claim: Title III's text, binding cases like *Powell*, the Rules themselves, and basic notions of due process and judicial independence are all to the contrary.

### B. The United States Failed to Comply with the Statutory Requirement to Provide "a Statement of the Basis and the Purpose" for Its Demand.

Whatever particular form of inquiry applies, Title III's statutory requirements must be met; otherwise the demand is fatally flawed and cannot be enforced.[15] That is the case here.

#### *1. Title III requires DOJ to specifically articulate the basis and the purpose of its demand.*

A Title III demand requires a written "statement of the basis and the purpose" for the records the Attorney General is seeking. 52 U.S.C. § 20703. Title III's "basis" and "purpose" requirements are critical safeguards created precisely to prevent the statute from becoming a vehicle for DOJ to conduct baseless fishing expeditions and to provide proper notice to election officials of the nature of the federal inquiry. *See*

---

[15] *See* Add.8 n.8 (noting that "even under the United States' proposed standard, it concedes that the Court may inquire whether 'the Attorney General ma[d]e a written demand for election records stating the basis and purpose.'"); *accord Evans*, 2026 WL 2267774, at *5 n.3; *see also Oliver*, 2026 WL 2031479, at *7 n.17.

106 Cong. Rec. H5,326 (statutory language introduced to prevent "fishing expedition[s]"). Those safeguards are consistent with the application of other federal statutes allowing federal agencies to obtain records in service of investigations, which are enforceable if, among other things, the underlying investigation has a proper purpose and there is an actual nexus between that purpose and the specific information sought. *Compare Comley*, 890 F.2d at 542 (upholding subpoena based on government affidavits specifying proper purpose and detailing evidentiary basis for requested information) *with In re Admin. Subpoena No. 25-1431-019,* 800 F. Supp. 3d 229, 236–37 (D. Mass. 2025) (quashing administrative subpoena against hospital where asserted basis and purpose was an internal DOJ memo directing officials "to undertake appropriate investigations"), *appeal filed*, No. 25-2092 (1st Cir.).[16]

There are at least three notable aspects of Title III's text with respect to the "basis" and "purpose" requirements. First, and as the district court noted, Title III's use of the words "*shall* contain"

[16] *See also, e.g.*, *Coro, Inc. v. F.T.C.*, 338 F.2d 149, 153 (1st Cir. 1964) ("[S]ubpoenas are not issued on bare suspicion. They are not licenses for extended fishing expeditions in waters of unknown productivity in the vague hope of 'catching the odd one.'" (quoting *Bowman Dairy Co. v. United States*, 341 U.S. 214, 221 (1951)).

demonstrates that "the requirement that the Attorney General state 'the basis'" and "the purpose" "is mandatory, not a mere formality with which the federal government or this Court is free to dispense." Add.6; *see also, e.g.*, *Benson*, 179 F.4th at 483; *United States v. Warner*, No. 2:26-cv-156, 2026 WL 2018877, at *5 (D.W.V. July 13, 2026). Such mandatory commands are "impervious to judicial discretion" and must be followed to comply with the statute. *See, e.g.*, *Smith v. Spizzirri*, 601 U.S. 472, 476 (2024).

Second, the requisite statement containing "the basis and the purpose" must be made "in writing," meaning that the basis and the purpose "must be made express." Add.7. In this way, "[t]he statute . . . directs the Court to the Attorney General's written demand—rather than the United States's subsequent court filings—to determine whether that demand" satisfies the basis and purpose requirements. *Id.*

Third, and again as the district court recognized, the statute's language, providing that the demand "contain a statement of *the* basis and *the* purpose therefor," confirms that "basis" and "purpose" are two "conceptually distinct" and independent requirements. Add.7–8 (emphasis added); *see* 52 U.S.C. § 20703; *see also Benson*, 179 F.4th at

483. And by twice using the definite article, the statute requires not just *a* conceivable or possible basis or a purpose, but *the* complete basis and *the* complete purpose underlying the request. *See Niz-Chavez v. Garland*, 593 U.S. 155, 165–66 (2021) (noting that the inclusion of a definite article with a singular noun implies that each noun is "a discrete thing"); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024).

The "basis" is the factual grounds for why the Attorney General believes there may be a violation of federal civil rights law in the first place, whereas the "purpose" explains how the requested records would help the Attorney General determine if there is, in fact, a violation. In *Lynd*, for example, the Attorney General's stated basis was "information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within [the] jurisdiction." 306 F.2d at 229 n.6. The stated purpose was "to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred," i.e., to investigate and establish

a discriminatory "pattern or practice" in the jurisdiction's voting registration processes. *Id.*; *see also id.* at 228 n.4.

Here, the United States's failure to provide *either* the basis *or* the sufficient purpose for its request for Massachusetts's unredacted SVRL invalidates its CRA claim. This Court can affirm in light of either of these fatal defects of statutory compliance.

#### *2. The United States failed to state the basis for its CRA demand.*

The "basis" for a CRA demand is a statement of why the United States believes there may be some relevant violation of law—the facts on which the demand is "based." *Lynd*, 306 F.2d at 229 n.6; *see also Basis*, Merriam-Webster, https://www.merriam-webster.com/dictionary/basis (last visited Aug. 17, 2026) ("something on which something else is established or based"). Recent federal court decisions have thus consistently held that "the 'basis' contemplated by Title III is a factual, not legal basis." *Warner*, 2026 WL 2018877, at *5; *see also, e.g.*, Add.10–12; *United States v. Amore*, 831 F. Supp. 3d 149, 156–57 (D.R.I. 2026); *Oregon*, 828 F. Supp. 3d at 1103; *United States v. Weber*, 816 F. Supp. 3d 1168, 1184 (C.D. Cal. 2026); *Matthews*, 2026 WL 2212877, at *5; *Scanlan*, 2026 WL 1864054, at *7.

The United States's contrary claim, that stating the *legal* basis for the demand is sufficient, is indefensible. U.S. Br. 21–22. Merely referring to Title III cannot be sufficient, because *every* Title III request is, by definition, legally based on Title III. If DOJ could tautologically cite Title III as "the basis" for its request under Title III, the statutory obligation to provide "a statement of the basis" for the request in writing, 52 U.S.C. § 20703, would be rendered "wholly superfluous," *e.g.*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001), and the statutory aim of giving election officials proper notice would be disserved.

As for a factual basis, DOJ's demand letter simply did not contain one. In the only count of the Complaint, DOJ pleaded that the Attorney General sent Secretary Galvin a "written demand" containing "a statement of the basis and the purpose therefor" on August 14, 2025. App.23. But, as the district court rightly noted, the August 14 letter "contain[ed] nothing that could fairly be characterized as the factual basis for the demand." Add.9. The letter "states only that the Attorney General had authority to demand the voter registration list or bring enforcement actions and concludes, 'Pursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an

electronic copy of Massachusetts's complete and current VRL.'" Add.9 (quoting August 14 letter, App.54). That is not a factual basis.

Even now, DOJ does not attempt to claim that the August 14 letter—the only place where it made a CRA demand—contained a factual basis for its CRA demand. The total omission of any factual basis for the demand is fatal, as the district court (and numerous others) correctly concluded. Add.8–12; *accord Amore*, 831 F. Supp. 3d at 157; *Oregon*, 828 F. Supp. 3d at 1103; *Weber*, 816 F. Supp. 3d at 1184; *Warner*, 2026 WL 2018877, at *5; *see also, e.g.*, *Matthews*, 2026 WL 2212877, at *5; *Scanlan*, 2026 WL 1864054, at *7.

To evade this conclusion, DOJ for the first time on appeal relies on the July 22 letter, claiming that the factual basis for its CRA demand may be found there, even though that letter nowhere mentions the CRA. U.S. Br. 24–25. Specifically, DOJ points to that letter's references to Massachusetts's responses on the 2024 EAVS survey. *See* App.47–49. This argument fails for several reasons.

*First*, it is waived. DOJ included no allegations in its Complaint that the EAVS responses discussed in the July 22 letter were actually its "basis" for the CRA demand, and made no such arguments before the

district court in either its briefing on the motion to compel or its opposition to the motions to dismiss for failure to state a "basis" for the demand. *See* App.21–22. Instead, DOJ argued below that the provision of a *legal* basis for the demand (*i.e.*, citing the CRA) was enough, *see* U.S. Opp. to MTD at 4, Dkt. No. 72 ("As stated in the letter, the basis for the demand was Title III of the CRA . . . ."). Having completely failed to identify, plead, or argue a factual basis before the district court, the United States may not do so now for the first time on appeal. *E.g.*, *Butler v. Deutsche Bank Tr. Co. Americas*, 748 F.3d 28, 36 (1st Cir. 2014) ("[W]e routinely deem waived arguments not timely presented before the district court.").

*Second*, the July 22 letter itself is not a "demand in writing" for purposes of the CRA. 52 U.S.C. § 20703. It neither mentions the CRA nor is it pleaded in the Complaint as the demand. Title III says that there must be a "demand in writing" that "shall contain a statement of the basis and the purpose therefor." *Id.* The July 22 letter does not fulfill these requirements. And the July 22 letter cannot be combined with the August 14 letter to create a valid demand under the CRA. As a matter of statutory text, a CRA demand "must contain *both*" a statement of the

basis along with the purpose. *Benson*, 179 F.4th at 483 (emphasis added). The July 22 letter does not mention the CRA, and the August 14 letter propounding DOJ's written CRA demand purports to state a "purpose" for the demand but includes no statement of any basis and no reference to the 2024 EAVS Report whatsoever. App.53–55. DOJ's post-hoc, piecemeal approach is statutorily insufficient. *See Benson*, 179 F.4th at 483 (noting that none of the three letters the government sent to Michigan officials contained "both a statement of the basis along with the purpose"); *accord Oregon*, 828 F. Supp. 3d at 1104; *United States v. Griswold*, No. 25-cv-3967, 2026 WL 2235374, at *4 (D. Colo. Aug. 3, 2026); *United States v. Oliver*, No. 25-cv-01193, 2026 WL 2031479, at *9 (D.N.M. July 14, 2026).

*Third*, even if the July 22 letter could be considered as part of the relevant CRA demand, that would not salvage the United States's position, because that letter still contains no statement of the basis for the demand. DOJ claims that the July 22 letter refers to "potential anomalies in Massachusetts's EAVS responses." U.S. Br. 16; *see also* U.S. Br. 22–23. But neither the pleadings nor the July 22 letter itself describe or refer to any "anomalies" or suggest that any of Massachusetts's

responses to the 2024 EAVS Survey are anomalous. *See* App.47–48; *see also* App.21. Rather, the letter asks three anodyne questions about the responses Massachusetts reported on certain questions in the EAVS survey. For example, the letter notes that Massachusetts reported that it sent 580,433 confirmation notices to voters but did not provide data in response to the EAVS survey categorizing the responses to the confirmation notices, and asks Massachusetts to provide that data if possible. App.48.

That is not a basis for DOJ's SVRL demand. The July 22 letter never suggests any factual basis to think that Massachusetts's list maintenance procedures might fail to comply with the NVRA or HAVA. *See* App.47–48. It does not say that Massachusetts's decision not to provide the EAVS survey with more granular data about voter responses to confirmation notices is abnormal.[17] It does not say that this survey

[17] Notably, multiple federal courts have held that there was an insufficient factual basis for a CRA demand even when DOJ made more specific allegations about states' purported inconsistencies and/or errors in their compliance with list maintenance requirements under federal law. *See* DOJ Letter, *United States v. Weber*, No. 25-cv-9149 (C.D. Cal. Dec. 1, 2025), Dkt. No. 87-3 at 2 (claiming California's reported removal percentage for dead voters "was well below the national average"); DOJ Letter, *United States v. Schmidt*, No. 25-cv-1481 (W.D. Pa. Jan. 12, 2026), Dkt. No. 103-3 at 2 (claiming Pennsylvania's reported percentage of duplicates was "nearly three times below the nationwide average").

response is even *potentially* indicative of any improper practice under the NVRA or HAVA. Indeed, neither the July 22 letter nor the Complaint alleges *any* evidence of *anything* inconsistent with reasonable list maintenance efforts based on the Massachusetts EAVS responses.[18]

Nor does DOJ fill in the missing pieces now. Rather, DOJ simply speculates, without further detail or explanation, that the EAVS survey responses somehow indicate that "Massachusetts might have improperly removed or failed to remove voters from its SVRL following confirmation notices." U.S. Br. 23. Such sheer surmise is beyond baseless. And indeed, the July 22 letter affirmatively undercuts the United States's newfound theory. In the letter, DOJ acknowledges that Massachusetts EAVS responses reported "that it removed 120,203 voters for failure to respond to a sent confirmation notice and not voting in the two most recent federal elections," thereby confirming that Massachusetts *was* taking appropriate action in using the confirmation notice process to maintain its SVRL. App.48; *see* 52 U.S.C. § 20507.

[18] To the contrary, the 2024 EAVS Report acknowledges that differences are to be expected between the states, and even within states, with respect to list maintenance policies and practices. *See* 2024 EAVS Report at 2 ("Broad legal and procedural authority [over elections] rests with the states . . . . As a result, wide variation exists in the policies and practices for conducting elections across and sometimes within states, and these policies and practices are constantly changing").

The United States appears to acknowledge that one function of the CRA's "basis" requirement is to provide "notice" to election officials, U.S. Br. 25. But it never explains how DOJ's obscure technical question about the categorization of voter responses to confirmation notices in Massachusetts's 2024 EAVS survey submission in the July 22 letter could have provided even a hint of notice to the Secretary that there might be some federal concern over Massachusetts's voter removal practices under the NVRA or HAVA—let alone that such concern was the basis for DOJ's later CRA demand for the state's SVRL.

The United States finally asserts that the district court erroneously required it to use "magic words" or to make some kind of premature evidentiary "showing" to satisfy the statutory basis requirement. U.S. Br. 25–27. That is incorrect. The district court rightly concluded that DOJ was required to assert a factual basis to think some specific wrongdoing was occurring in Massachusetts with respect to the SVRL, and that it failed to do so. Add.7–12. That conclusion is in line with DOJ's chief authority, *Lynd*, *e.g.*, U.S. Br. 24–25, which demonstrates the straightforward way the federal government can comply with the statute. The Attorney General's written demand to the Southern registrars in

that case was short—"information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction"—but, especially in context, made clear "the basis" to think there might be some violation of law occurring with respect to the treatment of would-be Black voters, and thereby provided the notice that was due. 306 F.2d at 229 n.6. Title III's "basis" requirement mandates no more but also no less. DOJ failed to clear that hurdle here.

#### ***3. The United States failed to state a valid purpose for its CRA demand.***

The statutorily required "purpose" is an explanation of how the requested records would help determine if there is a legal violation. *See, e.g.*, *Lynd*, 306 F.2d at 229 n.6. Title III requires an "assessment of the sufficiency of . . . the purpose asserted," *United States v. Bellows*, No. 25-cv-468, 2026 WL 1430481, at *7 (D. Me. May 21, 2026); otherwise, "[i]f *any* purpose . . . would suffice, then the requirement of stating the demand's purpose would serve no function," *Oregon*, 828 F. Supp. 3d at 1104.

Here, DOJ's August 14 letter invoking the CRA stated that "[t]he purpose of the request is to ascertain Massachusetts's compliance with

the list maintenance requirements of the NVRA and HAVA." App.22, 54. At least eight federal courts have held that this or a substantially similar purpose did not satisfy Title III in a request for a state's SVRLs. *See Amore*, 831 F. Supp. 3d at 157–58; *Oregon*, 828 F. Supp. 3d at 1104–05; *Weber*, 816 F. Supp. 3d at 1183–84; *Griswold*, 2026 WL 2235374, at *4; *Matthews*, 2026 WL 2212877, at *5–6; *Warner*, 2026 WL 2018877, at *6–8; *Bellows*, 2026 WL 1430481, at *7–9; *United States v. Schmidt*, No. 25-cv-01481, 2026 WL 1850016, at *2 (W.D. Pa. June 27, 2026). Here too, for multiple reasons, DOJ's stated purpose is invalid.[19]

*First*, DOJ's stated purpose is outside the scope of Title III. The CRA and Title III were not designed "to investigate list maintenance procedures" but rather "violations of individuals' voting rights." *Oregon*, 828 F. Supp. 3d at 1105; *see also Amore*, 831 F. Supp. 3d at 157–58; *Weber*, 816 F. Supp. 3d at 1183. Its purpose was to "help end voting discrimination." *Benson*, 179 F.4th at 474. Accordingly, the purpose of a Title III demand must involve "an investigation into potential violations of an individual's right to vote." *Warner*, 2026 WL 2018877, at *7; *see also*

[19] Because the district court concluded that DOJ failed to state a basis for its demand, it did not reach whether DOJ had sufficiently stated the statutorily required purpose. *See* Add.5–6.

*Amore*, 831 F. Supp. 3d at 157–58; *Oregon*, 828 F. Supp. 3d at 1105; *Matthews*, 2026 WL 2212877, at *5. To be sure, it is theoretically possible for list maintenance procedures to implicate individuals' right to vote—for example, in the case of improper removal of voters close to an election, or without proper safeguards, in violation of the NVRA, *see, e.g.*, *See* 52 U.S.C. § 20507(d). But the generic statement in DOJ's August 14 letter does not indicate any such purpose. Because DOJ's stated purpose "lack[s] any reference or relation to the purposes for which Title III was enacted," it is deficient. *Oregon*, 828 F. Supp. 3d at 1105.

*Second*, DOJ's stated purpose does not comport with the records it demands. Neither the August 14 letter nor the Complaint articulate how the unredacted SVRL, which is a static snapshot of Massachusetts's voter file, is relevant to ascertaining Massachusetts's compliance with the NVRA or HAVA. App.20–22, 53–55. In fact, it is not.

The NVRA requires states to "conduct a general program that makes a reasonable effort" to remove ineligible voters from the official lists of eligible voters. 52 U.S.C. § 20507(a)(4)(A)–(B). Perfect or error-free voter rolls are not the standard, nor are they feasible in practice. *See, e.g.*, 2024 EAVS Report at 150 (noting it is "inevitable" that voter lists

will contain some records for individuals who are no longer eligible to vote); *see also, e.g.*, *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–26 (6th Cir. 2025) (describing a "reasonable effort" as "a serious attempt that is rational and sensible" and rejecting any "quantifiable, objective standard" in this context). In fact, the NVRA explicitly *prohibits* removal of the names of some potentially ineligible registrants from the official list of eligible voters until steps are taken to provide notice and ensure they are not removed prematurely or unfairly.[20]

Meanwhile, HAVA, which requires the collection and use of personal identifying information and numerical identifiers in the state's SVRL, makes clear that it is *states*—not the federal government—who are principally tasked with "perform[ing] list maintenance." 52 U.S.C. § 21083(a)(2)(A). That statute expressly provides that "[t]he specific choices on the methods of complying with" such requirements "shall be left to the discretion of the State." *Id.* § 21085.

[20] Section 8(d) of the NVRA sets out a specific set of rules and requirements for removals from the voter rolls based on changes of residence, whereby states "shall not remove" voters on these grounds unless these voters directly confirm their change of residence in writing, or unless states first provide notice and then wait a multi-year statutory period. 52 U.S.C. § 20507(d).

Accordingly, it is a state's *overall procedures* for voter list maintenance and how they are carried out that establish its compliance with the NVRA and HAVA, *see* 52 U.S.C. §§ 20507(a)(4), (c)(1), 21083(a)(2)(A), 21085; *see also Benson*, 136 F.4th at 624–26; *Oregon*, 828 F. Supp. 3d at 1097; *Matthews*, 2026 WL 2212877, at *1; *Bellows*, 2026 WL 1430481, at *7, *9. A snapshot of the unredacted voter file from one particular moment in time does not provide information relevant to determine if the state is making a "reasonable effort" to remove ineligible voters or is otherwise in compliance with the NVRA or HAVA. And the highly sensitive personal identifiers like driver's license numbers and partial Social Security numbers contained in such unredacted files is especially unnecessary for such an inquiry.

In response, DOJ argues that the SVRL will allow it to assess whether there are "duplicate registrations" on the SVRL, or whether unique identifiers are being used. U.S. Br. 33–34. But this does not make sense. Voter list maintenance involves constant updates to the SVRL, and removals are subject to important procedural safeguards. Because states are constantly reviewing the SVRL for duplicates, the presence of a duplicate registration on the list in any particular snapshot cannot

speak to whether the list maintenance *procedures* that the state is employing amount to a "reasonable effort." 52 U.S.C. § 20507(a)(4); *see also Benson*, 136 F.4th at 624–26. And as for the use of unique identifiers, there is no basis to suggest that Massachusetts is not using them, and no explanation for why the entire unredacted SVRL is necessary to determine that point. The mismatch between the records requested and the purpose stated is an independent reason to affirm the district court.

*Third*, DOJ's stated purpose is contradicted by the United States's own public statements, which provide "firm evidence" of pretextual motives and an improper purpose, an independent basis to affirm. *E.g.*, *Comely*, 890 F.2d at 542.

The United States has filed over thirty nearly identical lawsuits demanding states' complete unredacted SVRLs, including sensitive personally identifiable information. *See supra* pp. 10–13 & nn.4–8. Consistent with extensive public reporting, DOJ has now admitted in open court that it will use and share the gathered information with agencies such as DHS, thus potentially facilitating immigration investigations. Mar. 26, 2026 Hr'g Tr. at 50:21–23 65:1–66:18, *United*

*States v. Amore*, No. 25-cv-639 (D.R.I. filed Dec. 2, 2025), Dkt. No. 47.[21] Immigration enforcement is nowhere mentioned in DOJ's written CRA demand. App.53–55. The Administration has also made plain its desire for a national voter registration list, and earlier this year issued an executive order directing DHS to create citizenship lists for each state.[22] Those efforts are not mentioned in the CRA demand, either.

Although the United States has repeatedly invoked only voter list maintenance as the stated purpose for its nationwide effort to seize states' voter rolls, the statements and documents in the public record suggest the Administration's underlying intentions: "[T]o create a nationwide voter-database, for potential weaponization in future elections; as a 'fishing expedition,' hoped to advance unsubstantiated claims of non-citizen voting; and as a tool for immigration enforcement." *Schmidt*, 2026 WL 1850016, at *2; *see also Weber*, 816 F. Supp. 3d at 1184; *Oregon*, 828 F. Supp. 3d at 1106, 1108.

---

[21] *See* Sarah N. Lynch, *Justice Dept. Close to Finalizing Deal to Hand Over States' Voter Roll Data to Homeland Security, Sources Say*, CBS NEWS, Mar. 26, 2026, https://perma.cc/T66C-RYRC; *see also supra* nn.6–8 and accompanying text.

[22] 91 Fed. Reg. 17125.

The concern that DOJ has not disclosed the true and complete purpose or purposes of its demands for state voter roll data as required by Title III is particularly acute in light of the MOU that the United States has asked states to sign in connection with its SVRL requests. *See* App.75–83. Far from indicating a purpose of ensuring compliance with the NVRA and HAVA, the MOU runs directly afoul of those statutes. For example, the MOU purports to allow DOJ to compel states to remove supposedly ineligible voters "within forty-five (45) days," App.79, in a manner that would violate multiple protections of the NVRA, including the requirement to provide voters with notice prior to their removal from the rolls, and the bar against systematic voter removals close to an election. *See generally* 52 U.S.C. § 20507. The MOU further suggests that DOJ's actual purpose for seeking the sensitive personal information of millions of Massachusetts voters involves not ascertaining compliance with the NVRA and HAVA, but defying those same statutes to unlawfully centralize control over state voter rolls in the hands of the federal executive.

The Court need not ignore public information demonstrating DOJ's failure to provide a statement of the actual purpose for its demand. It is

not "required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce v. New York*, 588 U.S. 752, 756 (2019). It "is not obliged to accept a contrived statement and purpose" in place of an accurate one. *Weber*, 816 F. Supp. 3d at 1184, 1186; *accord Oregon*, 828 F. Supp. 3d at 1106–08; *Schmidt*, 2026 WL 1850016, at *2; *Warner*, 2026 WL 2018877, at *8 n.9. DOJ was required to state, in writing, "*the* purpose" for its demand. 52 U.S.C. § 20703; *see Niz-Chavez*, 593 U.S. at 165–66. The pleadings and public record show that it did not. The Court can affirm on that basis as well.

## III. THE CRA DOES NOT REQUIRE DISCLOSURE OF PRIVATE, SENSITIVE VOTER INFORMATION TO THE FEDERAL GOVERNMENT.

Even if the United States had provided the basis and the purpose in support of its demand for records covered by Title III—which it did not—any sensitive personal voter information would still be subject to redaction. Constitutional and privacy concerns prohibit disclosure of the sensitive information that the United States seeks.

Requiring voters to disclose to the federal government their uniquely sensitive information, like driver's license numbers and other unique identifier numbers, as a prerequisite to voting creates an

unnecessary, impermissible burden on their fundamental right to vote. *See Greidinger v. Davis*, 988 F.2d 1344, 1355 (4th Cir. 1993) (holding that making disclosure of sensitive data "a condition of [the] right to vote . . . creates an intolerable burden on that right"). Voters would be discouraged from registering and exercising their right to vote if the sensitive information they submitted for registration could be seized by the federal executive without an opportunity to object. And this risk of chilling voters' rights is especially serious here. The United States has admitted to sharing sensitive personal information from the SSA with outside "election integrity" groups and storing such data on unsecured, non-government servers that did not conform with agency security protocols. *See* Notice of Corr. to the Rec. at 5–6, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 25-cv-596 (D. Md. Jan. 16, 2026), Dkt. No. 197.

In *Lynd*, the Fifth Circuit noted that "of great importance" to its reasoning was that it was "not discussing confidential, private papers and effects" but "rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection . . . ." 306 F.2d at 231. But in this case, the United States seeks sensitive private

information like Social Security information, not just public records. Federal laws enacted since *Lynd* was decided acknowledge the sensitivity of such personal data in multiple ways. *See, e.g.*, 5 U.S.C. § 552(b)(6) (exempting private records from FOIA disclosure); 5 U.S.C. § 552a(b) (establishing protections for personal information held by the federal government); 44 U.S.C. § 3501 note (purpose of law is to "ensure sufficient protections for the privacy of personal information . . . ."). And today, unlike when *Lynd* was decided, there are new threats to this sensitive information: Voter data can be electronically transferred, compounded, hacked, or run through dubious, DOGE-run AI programs.

Courts' treatment of requests for state voter rolls under the NVRA is instructive here. The 1993 NVRA includes a records provision allowing for disclosure of records specifically related to list maintenance. *See* 52 U.S.C. § 20507(i)(1). And, as this Court and others have recognized in NVRA cases, "appropriate redaction" of voters' sensitive personal data is permitted and may even be affirmatively required to protect the fundamental right to vote as well as voter privacy. *See Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *see also, e.g.*, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334, 339 (4th Cir.

2012); *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 264 (4th Cir. 2021). Interpreting the NVRA to allow for such redactions thus helps prevent any conflict between the NVRA's disclosure provisions and voters' constitutional rights and thereby "avoid[s] constitutional difficulties." *Cf. Nat'l Pharmacies, Inc. v. Feliciano-de-Melecio*, 221 F.3d 235, 241 (1st Cir. 2000).

Title III should be interpreted consistently with the later-enacted NVRA to allow and even require redactions to protect privacy and the right to vote. Both statutes use the same "all records" language. *Compare* 52 U.S.C. § 20507(i) ("Each State shall maintain for at least 2 years and shall make available for public inspection . . . *all records* concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters") (emphasis added), *with* 52 U.S.C. § 20701 ("Every officer of election shall retain and preserve, for a period of twenty-two months . . . *all records* and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election . . . .") (emphasis added). And both statutes are silent as to how

sensitive personal information should be treated during disclosure. *Compare* 52 U.S.C. § 20703 *with* 52 U.S.C. § 20507(i)(1).

Resisting this straightforward approach, DOJ argues that the NVRA's disclosure provisions are available to all, whereas the CRA applies only to the federal government. U.S. Br. 40–41. But invasions of privacy by the federal government are no less chilling than those wrought by private actors—indeed, some would find federal intrusions *more* problematic. Moreover, the limited case law considering records requests under the CRA from around the time of the statute's passage expressly acknowledged that courts retain the "power and duty to issue protective orders," *Lynd*, 306 F.2d at 230; *accord In re Coleman*, 208 F. Supp. at 200, recognizing that, even in the CRA context, courts can and must protect sensitive voter information from disclosure where privacy and constitutional concerns arise. *See, e.g.*, *Bellows*, 92 F.4th at 56; *accord Project Vote/Voting for Am., Inc.*, 682 F.3d at 339.[23]

---

[23] Massachusetts voters have a strong interest in the privacy of their personal identifying information, as evidenced by the numerous state law protections for such information. *See, e.g.,* M.G.L. ch. 214, § 1B (Massachusetts residents "shall have a right against unreasonable, substantial or serious interference with his privacy"); M.G.L. ch. 93H (driver's license and Social Security numbers are personal information subject to protection); 940 Mass. Code. Regs. 27.01 (regulations implementing ch. 93 H, including prohibiting "use of such information that could result in substantial harm or inconvenience to any resident of the commonwealth"); M.G.L. ch. 4, § 7(26)(c) (exempting from public disclosure "materials or data relating

And in addition to these constitutional constraints, DOJ's efforts also run afoul of the federal Privacy Act, which requires it to publish a System of Records Notice (SORN) detailing the use and storage of the SVRLs before collecting them, 5 U.S.C. § 552a(e)(4), and which bans the creation or maintenance of any database "describing how any individual exercises rights guaranteed by the First Amendment," such as the right to vote, *id.* § 552a(e)(7); *see Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999); *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 69, 75–76 (1990).

DOJ's response is that it may bypass these constraints by relying on old, outdated SORNs from many years ago, and an "authorized law enforcement activity" exception to the ban on First Amendment Rights databases. U.S. Br. 42–44. The breathtaking reasoning behind that response is that, in DOJ's view, *every registered voter in America is a subject of a federal criminal investigation into voter fraud* and also somehow simultaneously a victim of the fraud being investigated. *See*

---

to a specifically named individual, the disclosure of which may constitute an unwarranted invasion of personal privacy."). These state laws are relevant not because the Common Cause Intervenors are arguing that they somehow trump federal law, as DOJ wrongly suggests, U.S. Br. 51–53, but because they help define the strong privacy interest of Massachusetts voters.

U.S. Br. 45 ("Persons who appear in [an SVRL] are '[s]ubjects of investigations,' 68 Fed. Reg. at 47,611," and also "potential 'victims' of NVRA and HAVA noncompliance, 68 Fed. Reg. at 47,611."). That DOJ needs to characterize every registered voter in the country as a subject and/or victim of a criminal investigation to get around the requirement to publish a new SORN is telling. Under DOJ's interpretation, it can compile and maintain a nationwide voter database that has never been authorized by Congress as part of its "routine" enforcement of the NVRA, HAVA, and the CRA. *See* U.S. Br. 44. This would render the Privacy Act's protections meaningless.

Even if the United States had properly pleaded some entitlement to Massachusetts's SVRL under Title III, voters' sensitive personal information would still need to be protected. Because DOJ demands only an unredacted SVRL containing sensitive personal identifying information that cannot be disclosed without violating the Constitution and the Privacy Act, its demand is defective and the Court can affirm on that basis as well.

## CONCLUSION

The decision below should be affirmed.

Dated: August 17, 2026

Respectfully submitted,

/s/ Ari Savitzky
ARI J. SAVITZKY
THERESA J. LEE
SOPHIA LIN LAKIN
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

JESSIE J. ROSSMAN
SUZANNE SCHLOSSBERG
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108

*Counsel for Defendants-Appellees Common Cause, Jane Doe Inc., and Juan Pablo Jaramillo*

## CERTIFICATE OF COMPLIANCE

I certify this motion complies with the length limits set forth in Fed. R. App. P. 27(d)(2) because this brief contains 12,997 words excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: August 17, 2026

*/s/ Ari Savitzky*
Ari Savitzky

*Counsel for Defendants-Appellees Common Cause, Jane Doe Inc., and Juan Pablo Jaramillo*

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2026, I electronically filed the foregoing brief by using the ECF system.

I certify that the participants in the case are registered ECF users and that service will be accomplished by the ECF system.

Dated: August 17, 2026

*/s/ Ari Savitzky*__________
Ari Savitzky

*Counsel for Defendants-Appellees Common Cause, Jane Doe Inc., and Juan Pablo Jaramillo*