**No. 26-1657**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,
v.

WILLIAM F. GALVIN, in his official capacity as Secretary of the Commonwealth of Massachusetts,
*Defendant-Appellee*.

MASSACHUSETTS ALLIANCE FOR RETIRED AMERICANS; COMMON CAUSE, JANE DOE INC., JUAN PABLO JARAMILLO, and NEW ENGLAND STATE AREA CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,
*Intervenors-Defendants-Appellees*.

On Appeal from the United States District Court for the District of Massachusetts
No. 1:25-cv-13816
Hon. Leo T. Sorokin

---

# BRIEF OF *AMICI CURIAE* FORMER EMPLOYEES OF THE U.S. DEPARTMENT OF JUSTICE IN SUPPORT OF APPELLEES

---


NOAH B. BOKAT-LINDELL
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
(202) 383-5300
nbokat-lindell@omm.com

JONATHAN ROSENBERG
O'MELVENY & MYERS LLP
1301 Avenue of the Americas, 17th Fl.
New York, NY 10019
(212) 326-2000
jrosenberg@omm.com

*Counsel for* Amici Curiae

# TABLE OF CONTENTS

**Page**


INTEREST OF *AMICI* .......... 1

SUMMARY OF ARGUMENT .......... 1

ARGUMENT .......... 3

I. DOJ'S REQUEST FOR SENSITIVE VOTER DATA REQUIRES MORE THAN A "SUMMARY PROCEEDING," AND ITS BASIS AND PURPOSE ARE JUDICIALLY REVIEWABLE .......... 3

II. THE 1960 CRA DOES NOT JUSTIFY THE DEPARTMENT OF JUSTICE'S REQUESTS IN THIS CASE .......... 8

A. DOJ's Justification For Seeking Full Voter Files From Massachusetts Is Inadequate Under the CRA .......... 9

1. DOJ has provided no "basis" for needing records from Massachusetts, as the CRA requires .......... 10

2. DOJ cannot seek voter records for the purposes of conducting its own list maintenance and identifying noncitizens .......... 14

B. CRT Has Previously Used The CRA To Seek Targeted Information Based On Reasonable Law-Enforcement Concerns .......... 20

CONCLUSION .......... 27

APPENDIX A – List of *Amici Curiae* .......... 1a

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*,
267 F.3d 30 (1st Cir. 2001)....9

*California v. Trump*, 2026 WL 1826535 (D. Mass. June 24, 2026) 2017)....15

*CFPB v. Accrediting Council for Indep. Colls. & Schs.*,
854 F.3d 683 (D.C. Cir. 2017)....11

*Consumer Data Indus. Ass'n v. Frey*,
26 F.4th 1 (1st Cir. 2022)....9

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)....14, 18, 19

*Donaldson v. United States*,
400 U.S. 517 (1971)....5

*Guerrero-Lasprilla v. Barr*,
589 U.S. 221 (2020)....6

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*,
313 F.2d 867 (5th Cir. 1963)....10

*In re Colonial Mortg. Bankers Corp.*,
324 F.3d 12 (1st Cir. 2003)....19

*Kennedy v. Bruce*,
298 F.2d 860 (5th Cir. 1962)....21, 22

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962)....*passim*

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*,
606 U.S. 146 (2025)....6

*Mi Familia Vota v. Fontes*,
719 F. Supp. 3d 929 (D. Ariz. 2024), *aff'd in part, vacated in part*, 129
F.4th 691 (9th Cir. 2025), *cert. granted*, 2026 WL 1855101 (U.S. June
29, 2026)....26

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021)....................18

*Pub. Int. Legal Found. v. Benson*,
136 F.4th 613 (6th Cir. 2025), *cert. denied*, 146 S. Ct. 1772 (U.S. Mar. 2, 2026)....................13

*Reisman v. Caplin*,
375 U.S. 440 (1964)....................4, 5

*United States v. Benson*,
__ F.4th __, 2026 WL 2364306 (6th Cir. Aug. 14, 2026)....................2

*United States v. Clarke*,
573 U.S. 248 (2014)....................5

*United States v. Comley*,
890 F.2d 539 (1st Cir. 1989)....................7, 10

*United States v. Lynd*,
301 F.2d 818 (5th Cir. 1962)....................21

*United States v. Powell*,
379 U.S. 48 (1964)....................5, 6, 10, 19

*Veasey v. Perry*,
71 F. Supp. 3d 627 (S.D. Tex. 2014), *aff'd in part, vacated in part sub nom. Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015), *aff'd in part, vacated in part, rev'd in part*, 830 F.3d 216 (5th Cir. 2016)....................26

**Statutes**

5 U.S.C. § 552a(e)....................14

5 U.S.C. § 552a(e)(1)....................14

5 U.S.C. § 552a(e)(4)....................14

52 U.S.C. § 10101(a)(2)(B)....................26

52 U.S.C. § 20507(a)(4)....................12, 19

52 U.S.C. § 20507(c)(2)....................19, 24

52 U.S.C. § 20510(a)....................12, 20

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

52 U.S.C. § 20701 ... 8

52 U.S.C. § 20703 ... *passim*

52 U.S.C. § 20704 ... 26

52 U.S.C. § 20705 ... 4

52 U.S.C. § 21083(a)(1)(A) ... 20

52 U.S.C. § 21083(a)(4) ... 12, 20

52 U.S.C. § 21085 ... 13, 20

52 U.S.C. § 21111 ... 12, 20

**Regulations**

Exec. Order No. 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025) ... 16

Exec. Order No. 14,399, 91 Fed. Reg. 17125 (Mar. 31, 2026) ... 18

**Rules**

Fed. R. Civ. P. 34 ... 25

Fed. R. Civ. P. 45 ... 25

Fed. R. Civ. P. 81(a)(5) ... 5, 7

**Other Authorities**

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025), https://perma.cc/9PM4-2A6R ... 15

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. Times (Nov. 16, 2025), https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html ... 16-17

Glenn Thrush et al., *Administration Targets Noncitizen Voting, Despite Finding It Rare*, N.Y. Times (Feb. 18, 2026), https://www.nytimes.com/2026/02/18/us/politics/voting-trump-immigrants-midterms.html ... 17

H.R. Rep. No. 86-956 (1959) ... 22

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Jen Fifield and Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes.*, ProPublica (Feb. 13, 2026), https://perma.cc/BB2L-SAG9 ....................15

Letter from Pamela Bondi, U.S. Att'y Gen., to Tim Walz, Gov. of Minnesota (Jan. 24, 2026), https://perma.cc/34U4-3SK3 ....................17

*Memorandum of Understanding*, U.S. Dep't of Just. (May 13, 2008), https://perma.cc/U73L-FRX6 ....................25

*Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (last updated Aug. 19, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information ....................16

## INTEREST OF *AMICI*[1]

*Amici curiae* are former attorneys who worked on voting enforcement in the Civil Rights Division (CRT) of the U.S. Department of Justice (DOJ). Some worked at DOJ decades ago; others worked there until last year. Some were line attorneys; others were managers. Most worked in CRT's Voting Section, directly enforcing federal voting rights law; others worked alongside them as Appellate Section attorneys or political appointees. Many *amici* have made, reviewed, or approved information requests to States and localities under Title III of the Civil Rights Act of 1960 (CRA), or have litigated under the CRA, the National Voter Registration Act (NVRA), and the Help America Vote Act (HAVA) on behalf of the United States. *Amici* file this brief to explain that, even though DOJ retains significant authority to investigate potential violations of federal election law, DOJ's request to Massachusetts for its full unredacted voter file is inconsistent with prior DOJ practice and cannot be justified by the authorities it invokes.

A list of *amici* is provided in Appendix A.

## SUMMARY OF ARGUMENT

Title III of the 1960 CRA is a vital tool that helps the Attorney General make "preliminary investigations of registration practices," determine whether to file

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no person other than *amici* or their counsel has made any monetary contributions intended to fund its preparation or submission.

voting lawsuits, and obtain evidence for those suits. *Kennedy v. Lynd*, 306 F.2d 222, 225 (5th Cir. 1962). Though "[w]ide scope must be accorded the Attorney General in the facilities for adequate investigation," *id*. at 228, that scope is not unlimited. Title III requires DOJ to provide "a statement of the basis and the purpose" of its information requests. 52 U.S.C. § 20703. Here, DOJ has overstepped its bounds by requesting "all fields" of the registration list for every voter in Massachusetts—including registration method, partial Social Security Numbers (SSNs), and driver's license numbers—without sufficient basis and in furtherance of an improper purpose.

The district court rightly dismissed DOJ's complaint. *Amici* agree with DOJ (Br. 35 n.4) that state voter rolls are subject to Title III because they, "by definition, comprise[] records that have separately come into [officials'] possession." *United States v. Benson*, __ F.4th __, 2026 WL 2364306, at *13 (6th Cir. Aug. 14, 2026) (Thapar, J., dissenting from denial of rehearing en banc). And *amici* agree that some of the information voter rolls contain may be important to legitimate DOJ enforcement efforts. But examined as it must be under traditional procedural and substantive standards—rather than under the outdated and artificially narrow standards DOJ advocates—DOJ's request is plainly invalid. DOJ has not provided any *basis* for requesting all Massachusetts voters' most private identifying information. And while DOJ has provided a *purpose* for its requests—enforcing the

NVRA and HAVA—DOJ has all but admitted that this is a stalking horse for its true purpose: to enable the federal government to conduct its own list maintenance, to find supposed noncitizens who are registered to vote. That purpose cannot justify the request for sensitive data here. The NVRA and HAVA place *States*, not the federal government, in charge of developing and maintaining voter registration lists. DOJ's sweeping request, made without adequate investigative rationale, is a radical departure from the sorts of targeted, justified requests that *amici* and others in CRT have previously made under Title III.

## ARGUMENT

### I. DOJ'S REQUEST FOR SENSITIVE VOTER DATA REQUIRES MORE THAN A "SUMMARY PROCEEDING," AND ITS BASIS AND PURPOSE ARE JUDICIALLY REVIEWABLE

DOJ first seeks to limit courts' role in evaluating its Title III requests. Appellant's Br. 17-21. But those requests are subject to ordinary judicial review.

DOJ may use the 1960 CRA to seek some information that cannot be disclosed under the NVRA. But in exchange, Title III restricts DOJ's ability to obtain and use this material. Most notably for purposes of this case, DOJ must make a "demand in writing" for the requested records. 52 U.S.C. § 20703. That demand "shall contain a statement of the basis and the purpose" for seeking the information. *Id.* The statute then grants courts "jurisdiction *by appropriate process* to compel the production" of

records. 52 U.S.C. § 20705 (emphasis added). DOJ is bound by these restrictions, which courts must police.

Relying on certain early cases, DOJ argues that the "process to compel the production of" records, 52 U.S.C. § 20705, should be treated as merely "a summary proceeding" not subject to regular rules of procedure, *Lynd*, 306 F.2d at 226. These early cases' restrictions on Title III proceedings were eminently understandable, decided as they were in the midst of a concerted effort to frustrate federal investigations of racial discrimination in voter registration in the Jim Crow South. But they are unpersuasive today in light of text and subsequent precedent.

*Lynd* declared with little reasoning that because Title III requests are "investigative," courts could throw out the Federal Rules of Civil Procedure and treat any Title III case as "a special statutory proceeding." 306 F.2d at 225-26. Title III's text, however, requires "*appropriate* process." 52 U.S.C. § 20705 (emphasis added). And just two years after *Lynd*, the Supreme Court clarified that such language demands far more judicial oversight than *Lynd* allowed. In *Reisman v. Caplin*, 375 U.S. 440 (1964), the Court examined a tax statute that used nearly identical language to Title III, granting jurisdiction "by appropriate process to compel" document production, *id.* at 445-46. The Court held that courts considering production requests under that statute must provide "an adversary proceeding affording a judicial determination of the challenges to the summons and giving complete

protection to the" request's subject. *Id.* at 446. The subject must be able to "challenge the summons on any appropriate ground," including on grounds "that the material is sought for [an] improper purpose" or is privileged. *Id.* at 449.

Likewise, the Federal Rules of Civil Procedure apply to Title III proceedings. Where (as here) a statute "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964). And the Rules expressly apply to proceedings seeking "production of documents" in the analogous context of a subpoena issued under any federal statute, unless the statute clearly states otherwise. Fed. R. Civ. P. 81(a)(5). While courts may apply the Rules flexibly in such proceedings if needed, *see Donaldson v. United States*, 400 U.S. 517, 528-29 (1971), "the rights of the party summoned" must be protected, *id.* at 529. The target "may present argument and evidence on all matters bearing on a summons's validity." *United States v. Clarke*, 573 U.S. 248, 253-54 (2014).

DOJ also relies (Br. 19) on *Lynd*'s statement that "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand, § [20703], is not open to judicial review or ascertainment." 306 F.2d at 226. That assertion in *Lynd* must be considered in the context of what was a particularized and amply supported investigation into racial discrimination in 1961 Forrest County, Mississippi, and in four rural parishes in

northwest Louisiana, and not a dragnet of unprecedented national scope. Regardless, the Supreme Court has since held that notice requirements similar to Title III's create judicially reviewable standards for examining the notice's legitimacy. In *United States v. Powell*, for instance, the Court held that a statute requiring the Treasury Secretary to "notif[y] the taxpayer in writing that an additional inspection is necessary" allows courts to "inquire into the underlying reasons for the examination." 379 U.S. at 53, 58. "It is the court's process which is invoked to enforce the administrative summons," the Court noted, "and a court may not permit its process to be abused." *Id.* at 58. Courts therefore must be able to look behind DOJ's stated basis and purpose, and determine whether the request is being made "for an improper purpose" or there is otherwise reason to doubt "the good faith of the particular investigation." *Id.*

The Court also has long applied a strong presumption favoring judicial review of the government's actions. *See, e.g.*, *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020). And the Administrative Procedure Act "articulates the default principle that parties in enforcement proceedings can challenge an agency's interpretation of a statute." *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 156 (2025). Thus, defendants can challenge DOJ's data request specifically, and its interpretation of Title III's basis-and-purpose language more generally.

But even if the more limited set of procedures applicable to administrative subpoena enforcement also were to apply here, the court's role would be far more robust than DOJ envisions. The Federal Rules of Civil Procedure, again, would apply except where the court deems them irrelevant and orders them set aside. *See* Fed. R. Civ. P. 81(a)(5). And the request would be subject to meaningful judicial review. The court still would have to ensure that "[1] it is for a proper purpose authorized by Congress, the information sought is [2] relevant to that purpose and [3] adequately described, and [4] statutory procedures are followed in the subpoena's issuance." *United States v. Comley*, 890 F.2d 539, 541 (1st Cir. 1989). The "statutory procedures," *id.*, of course include compliance with Tile III's "basis" and "purpose" requirements, 52 U.S.C. § 20703, further indicating that DOJ's statements of basis and purpose are judicially reviewable. As discussed below, *see infra* Part II.A, DOJ cannot meet its burden of showing that there is a *basis* relevant to a legitimate investigatory *purpose* for seeking every Massachusetts voter's sensitive voter data. Even if DOJ could make these showings, though, the request would still be invalid if made for an "improper purpose," issued in "bad faith," or seeking information not "relevant" to "a proper purpose authorized by Congress." *Comley*, 890 F.2d at 541, 543. DOJ's request triggers each of these defenses. *See infra* Part II.A.2.

## II. THE 1960 CRA DOES NOT JUSTIFY THE DEPARTMENT OF JUSTICE'S REQUESTS IN THIS CASE

Title III of the 1960 CRA gave election officials a new duty to preserve, and granted DOJ a new power to request, certain election-related documents. It gives DOJ broad investigative authority to seek at least some of the information at issue in this case—but subject to important guardrails. Under Title III, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for" federal office "are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. DOJ may then seek "inspection, reproduction, and copying" of "[a]ny record or paper required by [Title III] to be retained and preserved." 52 U.S.C. § 20703. But the government must provide its targets with both a "purpose" for conducting an inquiry and a "basis" for thinking there may be a legal violation to which the requested records would be relevant. *Id.*

DOJ has failed to meet that basic standard here: it (1) fails to provide a "basis" for suspecting that Massachusetts is not fulfilling its NVRA and HAVA obligations, and (2) appears to be obscuring its true "purpose" in seeking not only Massachusetts's voter rolls, but the rolls of every State in the country. When DOJ has used the 1960 CRA, it has rarely sought a State's entire voter database, and it certainly has not done so to enable a fishing expedition.

### A. DOJ's Justification For Seeking Full Voter Files From Massachusetts Is Inadequate Under the CRA

This case directly implicates the 1960 CRA's written demand requirement. Under Title III, any demand for records "shall contain a statement of *the basis and the purpose* therefor." 52 U.S.C. § 20703 (emphasis added). Like any statute, this provision must be construed so "that 'no clause, sentence, or word shall be superfluous, void, or insignificant.'" *Consumer Data Indus. Ass'n v. Frey*, 26 F.4th 1, 7 (1st Cir. 2022). That is particularly so here, since the statute uses the word "and" to connect "basis" with "purpose"—and ordinarily "and" is used "in its conjunctive sense." *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 35 (1st Cir. 2001).

Thus, the purpose and basis must be read as independent requirements, *both of which* must be satisfied. The *purpose* of a records request is the rationale for the investigation—*e.g.*, determining whether a State is complying with the NVRA or the Voting Rights Act (VRA). The *basis* is the statement indicating why DOJ believes, or what evidence suggests, that it should investigate this particular State or locality, or what other suspected violation the records are needed to investigate. Combined, the basis-and-purpose requirement makes explicit what is implicitly true for many other coercive, investigative information requests: the agency seeking information must have both a legitimate *purpose* within its enforcement ambit for pursuing an investigation and a sufficient *basis* for suspecting a potential violation to which the

requested records would be relevant. *See Powell*, 379 U.S. at 58 (noting administrative summons must have proper purpose "reflecting on the good faith of the particular investigation"); *accord Comley*, 890 F.2d at 543.

DOJ's investigative actions in Title III's early years confirm the difference between these two necessary procedural elements, both of which were provided in its requests under Section 20703. In *Lynd*, for instance, DOJ said that its purpose in requesting records was "to ascertain whether or not violations of Federal law in regard to registration and voting"—*i.e.*, the Civil Rights Act of 1957—"have occurred." 306 F.2d at 229 n.6. And it stated that the basis for the request was "information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction." *Id.* DOJ made similar statements of basis and purpose in *In re Coleman*, 208 F. Supp. 199, 199-200 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

DOJ cannot seek Massachusetts's unredacted voter file here, when it has satisfied neither Title III's "basis" nor its "purpose" requirement.

**1. DOJ has provided no "basis" for needing records from Massachusetts, as the CRA requires.**

DOJ has not provided an adequate basis for the broad requests it has made in this case. Although Title III does not impose a high standard for the basis of a records demand, the provision is not so deferential as to allow DOJ to engage in

fishing expeditions. *See CFPB v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683, 689 (D.C. Cir. 2017) ("Agencies are also not afforded 'unfettered authority to cast about for potential wrongdoing.'"). Rather, the statutory requirement that the Attorney General articulate in writing the "basis" for a Title III demand means that DOJ must know of specific, articulable facts suggesting that a violation of federal law may have occurred. *See, e.g.*, *Lynd*, 306 F.2d at 229 n.6.

Here, the district court rightly found that DOJ has provided no basis at all for demanding sensitive data about every Massachusetts voter, much less a basis that would indicate that Massachusetts possibly violated federal law. Add. 6-12. DOJ's supposed *purpose* is "to ascertain Massachusetts's compliance with the list maintenance requirements of the NVRA and HAVA." App. 54; *but see infra* Part II.A.2. But DOJ has provided no *basis* for thinking that Massachusetts might be violating the NVRA or HAVA in a manner that would justify its request for the Commonwealth's full, unredacted voter rolls. DOJ's initial letter simply requested "a description of the steps that you have taken, and when those steps were taken, to ensure that the Commonwealth's list maintenance program has been properly carried out in full compliance with the NVRA" and asked for "all fields" in Massachusetts's statewide voter registration list. App. 47-48. (It also initially requested the information under the NVRA's disclosure provision, not the CRA's. App. 47.) DOJ's follow-up letter articulated its NVRA/HAVA-enforcement purpose, but it

apparently treated this statement as satisfying the entirety of Title III's basis-and-purpose requirement, despite the lack of any stated *basis* for the investigation. App. 54.

DOJ relies (Br. 22-27) on purported "anomalies" in answers Massachusetts provided on a government election-administration survey to declare the basis requirement satisfied. But this does not explain why DOJ needed to request every Massachusetts voter's private data, rather than simply seeking answers to its questions about those supposed anomalies, perhaps along with a redacted voter list. *See, e.g.*, Galvin Appellee Br. 29-32. DOJ provides no basis for using the proverbial sledgehammer to crack a nut.

DOJ's basis is especially lacking given the questionable fit between DOJ's demand and its ostensible purpose. DOJ now asserts that SSNs and driver's license numbers are needed for it to identify individual ineligible voters on the rolls. *E.g.*, Appellant's Br. 23, 34, 54-55. But it is not DOJ's role under the NVRA or HAVA to conduct list maintenance for the States. It may only ensure that States are complying with the statutes' requirements. 52 U.S.C. §§ 20510(a), 21111.

And States' list-maintenance requirements under the NVRA and HAVA are procedural. States need only conduct a "general program" of list maintenance that makes a "reasonable effort" to remove ineligible or deceased or relocated voters from the rolls. 52 U.S.C. § 20507(a)(4); 52 U.S.C. § 21083(a)(4)(A) (requiring a

"system of file maintenance"). As the Sixth Circuit noted in affirming Michigan's compliance with this requirement just two months before DOJ sent its first letter to Massachusetts, "the attempt need not be perfect, or even optimal, so long as it remains within the bounds of rationality." *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025), *cert. denied*, 146 S. Ct. 1772 (U.S. Mar. 2, 2026). A snapshot of a State's voter file at one point in time is unlikely to convey whether a State is engaging in that reasonable effort through a continuing program. *See, e.g.*, *id.* at 626 (rejecting identification of "27,000 'potentially deceased' voters on Michigan's registration rolls" as evidence of an NVRA violation); *contra* Appellants' Br. 25. Indeed, HAVA provides that "[t]he specific choices on the methods of complying with [the list maintenance mandate] shall be left to the discretion of the State." 52 U.S.C. § 21085.

The potential for government misuse of the information sought—including partial SSNs and driver's license numbers—outweighs any reason yet provided for needing that information to investigate an ostensible HAVA or NVRA violation. DOJ has admitted that Department of Government Efficiency (DOGE) staffers agreed to help an outside advocacy group—whose aim was "to find evidence of voter fraud and to overturn election results in certain States"—match Social Security Administration data against States' voter rolls. Notice of Corrections to the Record 5 & n.1, *Am. Fed'n of State and Mun. Emps. v. Soc. Sec. Admin.*, No. 1:25-cv-00596

(D. Md. Jan. 16, 2026), Dkt. No. 197, https://storage.courtlistener.com/recap/gov.uscourts.mdd.577321/gov.uscourts.mdd.577321.197.0.pdf. These revelations highlight the concerns raised by the mass requests for voters' SSNs here—requests that are unnecessary for law-enforcement purposes.[2] DOJ therefore cannot derive from the NVRA's and HAVA's mandates a "basis" for seeking Massachusetts's full, unredacted voter files. 52 U.S.C. § 20703.

### 2. DOJ cannot seek voter records for the purposes of conducting its own list maintenance and identifying noncitizens.

DOJ fails the purpose prong of Title III's basis-and-purpose requirement because (1) its true purpose is not articulated in the records request and (2) the true purpose exceeds DOJ's enforcement authority under the cited statutes.

Although courts' "review" of an information request's purpose is deferential, courts "are 'not required to exhibit a naiveté from which ordinary citizens are free.'" *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). News reports and the

[2] The Privacy Act also requires certain procedural steps before the government can lawfully collect information on individuals indexed to each individual's identity. 5 U.S.C. § 552a(e). The agency must publish a notice in the Federal Register before developing a new system of records, *id.* § 552a(e)(4)—something DOJ has not done here. This alone renders DOJ's request unlawful. Agencies also may "maintain in [their] records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute." *Id.* § 552a(e)(1). But individual list-maintenance checks are not "a purpose of" DOJ "required to be accomplished by" the NVRA or HAVA, and DOJ has not shown retention of SSNs and driver's license numbers is "necessary" to accomplish its law-enforcement function. *Id.*

Administration's public statements have revealed that DOJ's true purpose in seeking these voter files is not what DOJ stated in its information requests—*i.e.*, to monitor Massachusetts's compliance with the NVRA's and HAVA's list-maintenance requirements. Rather, that proffered purpose is a pretext for other aims that include collecting all States' voter data and then sharing that information with the Department of Homeland Security (DHS) as part of a broader effort to discover what DOJ thinks are undocumented immigrants who are unlawfully voting.

DOJ is currently "compiling the largest set of national voter roll data it has ever collected" in an attempt "to prove long-running, unsubstantiated claims that droves of undocumented immigrants have voted illegally." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025), https://perma.cc/9PM4-2A6R. As part of that scheme, DOJ plans to compare States' "voter data to a different database, maintained by" DHS, "to see how many registered voters on the state lists match up with noncitizens listed by immigration agents." *Id.* This database, called SAVE, is notoriously inaccurate. *E.g.*, Jen Fifield and Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes.*, ProPublica (Feb. 13, 2026), https://perma.cc/BB2L-SAG9. An executive order, swaths of which have been enjoined by three federal courts, *see California v. Trump*, 2026 WL 1826535, at *6, 25-26 (D. Mass. June 24, 2026), required DHS and DOGE to crosscheck DHS's

citizenship list with state voter rolls, *see* Exec. Order No. 14,248, § 2(b)(iii), 90 Fed. Reg. 14005, 14006-07 (Mar. 25, 2025).

To accomplish these goals, DOJ has requested voter-roll data from at least 48 States and so far has sued 30 of them and the District of Columbia. *See Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (last updated Aug. 19, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information. And the Acting Chief of DOJ's Voting Section, Eric Neff, confirmed in a court hearing that DOJ has now "enter[ed] a use agreement with" DHS and "intend[s] to" send States' voter lists through DHS's SAVE database. Mar. 26, 2026 Hr'g Tr. 65:6-10, 65:23-24, *United States v. Amore*, No. 25-CV-639 (D.R.I.), Dkt. No. 47.

There are also indications that federal agencies may use voters' data to engage in broader immigration enforcement. An attorney in the Housing Section of CRT, who was "detailed to work in the Voting Section enforcing the [NVRA]" and participated in making the requests for States' voter rolls, told the *New York Times* last November that DOJ leadership "said they had a DOGE person who could go through all the data and compare it to the [DHS] data and Social Security data," ostensibly "to identify undocumented immigrants that have registered to vote." Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. Times (Nov. 16, 2025), https://www.nytimes.com/interactive/2025/11/16/

magazine/trump-justice-department-staff-attorneys.html. The attorney "had a concern that the data would be used not for purging voter rolls of people who aren't eligible to vote but for broader immigration enforcement." *Id.*

Then, in response to intense outrage in January over a sustained Immigration and Customs Enforcement (ICE) operation in Minneapolis—including two fatal attacks by ICE officers on citizens—Attorney General Pam Bondi sent a letter to Minnesota Governor Tim Walz outlining three "common sense solutions" to "restore the rule of law, support ICE officers, and bring an end to the chaos in Minnesota." Letter from Pamela Bondi, U.S. Att'y Gen., to Tim Walz, Gov. of Minnesota 2 (Jan. 24, 2026), https://perma.cc/34U4-3SK3. One of the solutions was to "allow the Civil Rights Division of the Department of Justice to access voter rolls to confirm that Minnesota's voter registration practices comply with federal law." *Id.* at 3. And "Homeland Security Investigations, an arm of Immigration and Customs Enforcement [(ICE)], recently issued a two-page memo," citing the blocked March 2025 executive order, "requiring its employees to 'review all open and closed voter fraud cases' involving immigrants who registered to vote, or actually voted, before they became naturalized U.S. citizens." Glenn Thrush et al., *Administration Targets Noncitizen Voting, Despite Finding It Rare*, N.Y. Times (Feb. 18, 2026), https://www.nytimes.com/2026/02/18/us/politics/voting-trump-immigrants-midterms.html.

The Administration since has reiterated the connection between voter-roll collection and immigration enforcement. When asked by a judge whether voter data could be used "for ICE going to people's homes and arresting them," Mr. Neff responded: "Good question, your Honor, because the Civil Rights Division cannot promise what any other agency will or will not do." Mar. 26, 2026 Hr'g Tr. 66:8-9, 66:12-14, *Amore*, *supra*. And President Trump has issued a new executive order requiring DHS to create federal citizenship lists and threatening loss of federal funds for noncompliance and prosecution of election officials who send ballots to those the federal government deems ineligible. Exec. Order No. 14,399, §§ 2(a)-(b), 5, 91 Fed. Reg. 17125, 17125-27 (Mar. 31, 2026).

The government's use of the CRA for this purpose—*i.e.*, to maintain its own voter lists and then use those lists to falsely claim widespread voter fraud by noncitizens and further immigration enforcement—is improper twice over.

First, it is not the "purpose" that DOJ set forth in its "statement" to Massachusetts. 52 U.S.C. § 20703. "If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." *Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021). An agency's action thus cannot be sustained when there is "a significant mismatch between the decision [an agency] made and the rationale [it] provided." *Dep't of Com.*, 588 U.S. at 783. This principle is especially important in the context

of a proceeding to enforce administrative process, since it would be an abuse of the court's *own* process to invoke it when there are doubts about "the good faith of the particular investigation." *Powell*, 379 U.S. at 58.[3] The district court did not address this "mismatch between" DOJ's request "and the rationale [it] provided," *Dep't of Com.*, 588 U.S. at 783, deciding the case on other grounds, Add. 5-6. But "matters of public record" and other judicially noticeable documents "are fair game" on motions to dismiss, *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 19 (1st Cir. 2003), so this Court can consider that DOJ's own public statements depart from its proffered purpose.

Second, even if DOJ had been transparent about its purpose for seeking voter data, that purpose would have been improper, as the very statutes that DOJ invokes establish that the *States*, not the federal government, are in charge of maintaining voter rolls. The NVRA provides that "each *State* shall . . . conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(a)(4) (emphasis added). HAVA is likewise clear that *States* are required to define, maintain, and administer voter

---

[3] DOJ's slow pace of litigation until seeking expedition in this Court likewise suggests that it is not actually concerned with assessing NVRA compliance before the midterm elections. The NVRA's Quiet-Period Provision prohibits any systematic voter removals within 90 days of federal primary or general elections. 52 U.S.C. § 20507(c)(2)(A). Given the date of the federal general election, no systematic purges could occur after August 4—a date that has already passed.

rolls. For example, HAVA requires "each State" to "implement" "a single, uniform, official, centralized, interactive computerized statewide voter registration list *defined, maintained, and administered at the State level*." 52 U.S.C. § 21083(a)(1)(A) (emphasis added). It is this "list" that serves "as the official voter registration list for the conduct of all elections for Federal office in the State." *Id.* HAVA similarly requires each State to provide for a "[m]inimum standard for accuracy of State voter registration records," 52 U.S.C. § 21083(a)(4), but leaves the means of implementation to the States, 52 U.S.C. § 21085. While DOJ has authority to enforce these provisions, 52 U.S.C. §§ 20510(a), 21111, it does *not* have authority to conduct list maintenance itself and then force States to remove certain voters from their rolls. Yet that is precisely what a Memorandum of Understanding that DOJ offered to several States proposed to do. App. 69.

Simply put, there is nothing in the CRA, the NVRA, or HAVA that authorizes the federal government to use highly sensitive, personal data in state voter rolls to conduct a nationwide search for individual registrants that it suspects may not be eligible to vote.

### B. CRT Has Previously Used The CRA To Seek Targeted Information Based On Reasonable Law-Enforcement Concerns

DOJ's demand for Massachusetts's full voter roll is also out of step with the way CRT historically has used Title III's records-inspection authority: as a focused

investigative tool tethered to concrete, articulable concerns about unlawful registration or voting laws or practices.

The earliest Title III cases from the 1960s arose against a backdrop of blatant, widely documented racial exclusion from voter registration. *See United States v. Lynd*, 301 F.2d 818, 818-19 (5th Cir. 1962) (describing the government's clear showing of voting rights discrimination against Black voters). Those decisions reflect two relevant features of Title III practice.

First, DOJ's demands were directed at "records and papers" connected to the mechanics of registration and voting—materials that would allow federal investigators to evaluate whether discriminatory administration was occurring. They were not generalized requests for personal identifiers untethered to a defined investigative need. For example, in *Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962), DOJ sought inspection of "all records and papers . . . relating to any application, registration, payment of poll tax, or other act requisite to voting" for federal elections, and provided both a basis (*i.e.*, reason to believe "distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction") and a purpose (*i.e.*, "to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred").

Second, those cases underscore that Title III's inspection mechanism was conceived as an investigative instrument keyed to identifiable concerns about discriminatory voting practices in discrete locations, not a freestanding entitlement to assemble voter datasets to try to find a "problem" in the first place. In *Bruce*, the Fifth Circuit noted that the record reflected extraordinary racial disparities in access to registration in Wilcox County, Alabama, that made an inspection plainly appropriate. 298 F.2d at 863-64. And in *Lynd*, the Fifth Circuit emphasized with respect to five southern counties that a Title III application is intended to "enable the Attorney General to determine whether . . . suit[s] . . . should be instituted" and "to enable him to obtain evidence for use in such [suits] if and when filed." 306 F.2d at 228. These requests fulfilled Title III's principal purpose: serving as a "necessary supplement" to, and helping to "implement federal enforcement" of, the 1957 Civil Rights Act's prohibitions against racial discrimination in voting. H.R. Rep. No. 86-956, at 26 (1959). It is unthinkable that the Department of Justice in 1960 could have invoked the authority of the new CRA, designed to further investigations of particularized wrongdoing, to instead demand millions of voter registration cards held by the thousands of voter registration authorities across the country to assemble a central federal voter file.

Modern practice reinforces the same point. When CRT has invoked Title III more recently, it has typically done so to obtain discrete categories of records keyed

to a specific, preexisting, and articulated enforcement concern. Several examples illustrate how CRT has traditionally wielded its Title III investigative authority:

- When necessary to investigate potential violations of Section 2 of the VRA, the Voting Section has sent Title III requests to specific jurisdictions under investigation based on definite, articulable discriminatory practices, seeking, for example, a voter registration list to conduct racial bloc voting analysis of elections held within the jurisdiction. DOJ has not generally needed, and has rarely made, Title III requests for SSNs or driver's license numbers to conduct any such analyses.
- In 2021, the United States challenged several provisions of Georgia's new omnibus voting law, SB202, as having been adopted with a discriminatory purpose. *See* Compl. ¶ 161, *United States v. Georgia*, No. 1:21-cv-2575 (N.D. Ga. June 25, 2021), Dkt. No. 1. Counties with records relevant to the case were not parties to the lawsuit, and the district court froze discovery while deciding the defendants' motions to dismiss. *See* Min. Order of Aug. 6, 2021, *Georgia*, *supra*. DOJ used its authority under Title III to request county records that were relevant to the allegations that DOJ had already made in its lawsuit: (1) the Numbered Lists of Provisional Voters from each polling place in a county—paper lists of provisional voters, with voters' names and their reasons for casting a provisional ballot—which were relevant to DOJ's

challenge to SB202's "prohibition on counting most out-of-precinct provisional ballots," Compl. ¶ 161(g); and (2) Drop Box Ballot Transfer Forms—paper records of how many ballots a county picked up from each mail-in ballot drop box on each day—which were relevant to DOJ's challenge to SB202's "cutback in the number of drop boxes permitted" and limitations on their dates and times of use, *see id.* ¶ 161(e). *See, e.g.*, Decl. of Dr. Barry C. Burden, 35, 51, *In re Georgia Senate Bill 202*, No. 1:21-mi-55555 (N.D. Ga. May 30, 2023), Dkt. No. 566-42.

- In 2024, DOJ sued Alabama for systematically removing several thousand people from its voter rolls within 90 days of a federal election, which would violate the NVRA's Quiet-Period Provision, 52 U.S.C. § 20507(c)(2). *See* Compl. ¶¶ 2-4, *United States v. Alabama*, No. 2:24-cv-1329 (N.D. Ala. Sept. 27, 2024), Dkt. No. 1. DOJ sent a letter to state election officials explaining that DOJ had "reviewed reports" (which it cited) suggesting that the State was implementing within 90 days of the 2024 federal election a "program" to identify and remove registrants identified as noncitizens, in violation of the Quiet-Period Provision. Letter, *Alabama*, *supra*, Dkt. No. 11-7, at 2. DOJ then requested a defined set of materials tailored to that asserted concern, including (i) a list of the voters removed under the State's new processes; (ii) a list of any additional voters sent notices of intent to cancel on similar grounds;

and (iii) a "complete description" of the methodology used, including contacts with or requests to federal agencies. Letter, *Alabama*, *supra*, at 2-3. The letter did not explicitly invoke Title III. *Id.* But in later conversations, DOJ did "assert[]" that authority, and the State "produced" the requested records "in compliance with Title III." Letter, *Alabama*, *supra*, Dkt. No. 11-9, at 1. DOJ did not request SSN or driver's license data, but the State did provide it for those registrants who were ensnared in its program.

Thus, in the rare instances when DOJ has requested or received sensitive information like SSNs and driver's license numbers, it was because this information was vital to investigating or proving a potential legal violation in a particular jurisdiction, and there was already an articulable reason to believe that a violation might have occurred. DOJ does not usually request such data under Title III.[4]

To the extent DOJ has need of sensitive voter data, it has instead tended to obtain it through traditional civil litigation tools. *See, e.g.*, Fed. R. Civ. P. 34 (discovery of documents); Fed. R. Civ. P. 45 (issuance of subpoenas to nonparties). For instance, DOJ may need a State's entire voter file (including SSNs and driver's

---

[4] In 2006 and 2008, DOJ sent Title III requests to Georgia and Texas, seeking the States' voter files with SSNs and/or driver's licenses to ensure compliance with the NVRA. *See* Compl. ¶¶ 9-10, *United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006), Dkt. No. 1; *Memorandum of Understanding*, U.S. Dep't of Just. (May 13, 2008), https://perma.cc/U73L-FRX6. As DOJ acknowledges (Br. 39 n.5), neither request was litigated to a court decision.

license numbers) to analyze whether a voter ID law violates the VRA, because having this information allows DOJ to compare the voter file to other state and federal databases to determine (i) how many people registered in a State do not have driver's licenses or the other forms of ID allowed under the voter ID law and (ii) whether there are significant racial disparities in possession of those IDs. *See, e.g.*, *Veasey v. Perry*, 71 F. Supp. 3d 627, 659 (S.D. Tex. 2014), *aff'd in part, vacated in part sub nom. Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015), *aff'd in part, vacated in part, rev'd in part*, 830 F.3d 216 (5th Cir. 2016) (en banc). Likewise, it may need such information to determine whether a required field on a voter-registration form is "not material in determining whether" an applicant "is qualified under State law to vote" and so violates the Civil Rights Act of 1964. 52 U.S.C. § 10101(a)(2)(B); *see, e.g.*, *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 962 (D. Ariz. 2024), *aff'd in part, vacated in part*, 129 F.4th 691 (9th Cir. 2025), *cert. granted*, 2026 WL 1855101 (U.S. June 29, 2026).

Although the United States has gotten such information in discovery, it has submitted to strict court supervision and detailed protective orders that prescribe procedures for exchanging, handling, storing, protecting, and deleting this sensitive data. *See, e.g.*, Protective Order, *Mi Familia Vota*, *supra* (No. 22-cv-509), Dkt. No. 353. Title III does not offer these kinds of safeguards. *See* 52 U.S.C. § 20704.

Against the backdrop of past practice, DOJ's approach in this litigation stands out for both overbreadth and lack of justification.

## CONCLUSION

For these reasons, this Court should affirm the district court's judgment.

Dated: August 24, 2026
Washington, DC

O'MELVENY & MYERS LLP

By: /s/ Jonathan Rosenberg

NOAH B. BOKAT-LINDELL
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
(202) 383-5300
nbokat-lindell@omm.com

JONATHAN ROSENBERG
O'MELVENY & MYERS LLP
1301 Avenue of the Americas, 17th Fl.
New York, NY 10019
(212) 326-2000
jrosenberg@omm.com

*Counsel for* Amici Curiae

## APPENDIX A

### *Alphabetical List of* Amici Curiae*

**David Becker**
U.S. Department of Justice (1998-2005): *Trial Attorney*, Voting Section (1998-2005)

**Gregory Friel**
U.S. Department of Justice (1989-2022): *Attorney*, Appellate Section (1992-2006); *Special Litigation Counsel*, Appellate Section (2006-2011); *Senior Counsel*, Office of the Assistant Attorney General (2011); *Deputy Assistant Attorney General* (2012-2022)

**Bradley Heard**
U.S. Department of Justice (2010-2022): *Trial Attorney*, Voting Section (2010-2022)

**Brian Heffernan**
U.S. Department of Justice (1978-2011): *Trial Attorney*, Voting Section (2000-2009); *Special Litigation Counsel*, Voting Section (2009-2011)

**Robert Kengle**
U.S. Department of Justice (1984-2005): *Trial Attorney*, Voting Section (1984-1996); *Special Counsel*, Voting Section (1996-1999); *Deputy Chief*, Voting Section (1999-2005)

**Timothy Lambert**
U.S. Department of Justice (2001-2004): *Trial Attorney*, Voting Section (2001-2004)

**Justin Levitt**
U.S. Department of Justice (2015-2017): *Deputy Assistant Attorney General*, Civil Rights Division (2015-2017)

**Steven Mulroy**
U.S. Department of Justice (1991-2000): *Trial Attorney*, Voting Section (1991-1995)

---

* *Amici* submit this brief in their personal capacities. *Amici*'s institutional affiliations are for identification purposes only.

**Stephen B. Pershing**
U.S. Department of Justice (1996-2005): *Trial Attorney*, Voting Section (1996-2005)

**John Powers**
U.S. Department of Justice (2007-2015, 2021-2024): *Civil Rights Analyst & Senior Civil Rights Analyst*, Voting Section (2007-2015); *Counsel*, Office of the Assistant Attorney General (2021-2024)

**Joseph Rich**
U.S. Department of Justice (1968-2005): *Trial Attorney*, Southern Section (1968); *Chief*, Voting Section (1999-2005)

**Bob Rush**
U.S. Department of Justice (1970-1973): *Trial Attorney*, Voting Section (1970-1973)

**Elizabeth Ryan**
U.S. Department of Justice (2012-2025): *Trial Attorney*, Voting Section (2012-2025)

**Bryan Sells**
U.S. Department of Justice (2010-2015): *Special Litigation Counsel*, Voting Section (2010-2015)

**Avner Shapiro**
U.S. Department of Justice (2000-2007, 2013-2016): *Trial Attorney*, Voting Section (2000-2007, 2013-2016)

**Thomas Sheran**
U.S. Department of Justice (1971-1977): *Trial Attorney*, Voting & Public Accommodations Section (1971-1977)

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(b)(4) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 6,407 words. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft 365 in Times New Roman font, type 14 point.

Dated: August 24, 2026

/s/ Jonathan Rosenberg
Jonathan Rosenberg

## CERTIFICATE OF SERVICE

I certify that on August 24, 2026, this document was served on all parties or their counsel of record through the CM/ECF system.

Dated: August 24, 2026

/s/ Jonathan Rosenberg
Jonathan Rosenberg