No. 26-1657

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

UNITED STATES OF AMERICA
*Plaintiff-Appellant,*

v.

WILLIAM F. GALVIN, in his official capacity as Secretary of the Commonwealth of Massachusetts, MASSACHUSETTS ALLIANCE FOR RETIRED AMERICANS; COMMON CAUSE; JANE DOE INC.; JUAN PABLO JARAMILLO; NEW ENGLAND STATE AREA CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,
*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Massachusetts
No. 1:25-cv-13816
Hon. Leo T. Sorokin

# BRIEF OF *AMICI CURIAE* LOCAL GOVERNMENTS AND LOCAL ELECTION OFFICIALS IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

Karianne Jones
Grace Leeper
EVERGREEN LEGAL STRATEGIES LLP
1763 Columbia Road NW, Suite 100
Washington, DC 20009
Telephone: (202) 430-6568
karianne@evergreenlegalstrategies.com

Jonathan Miller, 1st Cir.
Christine Bass
PUBLIC RIGHTS PROJECT
490 43rd Street, #115
Oakland, CA 94609
Telephone: (510) 738-6788
jon@publicrightsproject.org

Counsel for *Amici Curiae*

## TABLE OF CONTENTS

STATEMENT OF INTEREST ............................................... 1

SUMMARY OF ARGUMENT ................................................ 2

ARGUMENT ........................................................................ 3

I. Local Election Officials Have a Unique Institutional Perspective on Requests for Statewide Voter Registration Data ............................................................ 3

II. If Courts Do Not Evaluate Whether a Title III Demand Contains the CRA's Required Statement of Basis and Purpose, the Administrative Burden on Local Election Officials Could Increase ............................ 7

III. EAVS Data Cannot Provide a Sufficient Basis for Questioning Voter Roll Maintenance Practices ............. 11

CONCLUSION ................................................................... 18

APPENDIX A – List of *Amicus Curiae* ................................ 19

## TABLE OF AUTHORITIES

**CASES**

*Boston Globe Media Partners, LLC v. Dep't of Pub. Health*,
124 N.E.3d 127 (Mass. 2019) ............................................ 7

*Duncan v. Walker*,
533 U.S. 167 (2001) ........................................................ 2

*García-Navarro v. Universal Ins. Co.*, 173 F.4th 1 (1st Cir. 2026)........................................................................ 12

*Pub. Int. Legal Found., Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) ................................................ 4

*United States v. Aguilar*,
No. 25-cv-00728-ART-CLB, 2026 WL 2364502 (D. Nev. Aug. 14, 2026)................................................................ 9

*United States v. Bellows*,
No. 25-cv-00468-LEW, 2026 WL 1430481 (D. Me. May 21, 2026)...................................................................... 9

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026)............................................. 9

*United States v. Benson*,
819 F. Supp. 3d 753 (W.D. Mich. 2026) .............................. 9

*United States v. Caldwell*,
No. 26-cv-2025, 2026 WL 2186515 (D.N.J. July 29, 2026) ................................................................................ 9

*United States v. DeMarinis*,
No. SAG-25-3934, 2026 WL 1780586 (D. Md. June 18, 2026) ........................................................................... 9

*United States v. Fontes*,
No. cv-26-00066-PHX-SMB, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026) .......... 9

*United States v. Oregon*,
No. 2828 F. Supp. 3d 1092 (D. Or. 2026) .......... 9

*United States v. Scanlan*,
No. 25-cv-371-JL, 2026 WL 1864054 (D.N.H. June 29, 2026) .......... 9

*United States v. Schmidt*,
No. 25-cv-01481-CB, 2026 WL 1850016 (W.D. Pa. June 27, 2026) .......... 10

*United States v. Simon*,
No. 25-cv-3761, 2026 WL 2389778 (D. Minn. Aug. 17, 2026) .......... 9

*United States v. Warner*,
No. 26-cv-00156, 2026 WL 2018877 (S.D.W. Va. July 13, 2026) .......... 9

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) .......... 9

*United States v. Wis. Elections Comm'n*,
No. 25-cv-1036-JDP, 2026 WL 1430354 (W.D. Wis. May 21, 2026) .......... 10

**STATUTES**

52 U.S.C. § 20501(a)(2) .......... 1

52 U.S.C. § 20507(a)(4) .......... 15

52 U.S.C. § 20507(c)(2) .......... 16

52 U.S.C. § 20507(d)(1) .......... 16

52 U.S.C. § 20703 .......... 2, 8

52 U.S.C. § 20705 ........ 8

52 U.S.C. § 20922 ........ 12

Mass. Gen. Laws ch. 51, § 3 ........ 1

Mass. Gen. Laws ch. 51, § 4 ........ 1

Mass. Gen. Laws ch. 51, § 42H ........ 1, 7

Mass. Gen. Laws ch. 51, § 47C ........ 4, 7

Mass. Gen. Laws ch. 66, § 10 ........ 4

**OTHER AUTHORITIES**

Charles Stewart III, *Is the EAVS a Reliable Guide to Voter List Maintenance?* MIT Pol. Sci. Dep't, Research Paper No. 2018-20 (Aug. 25, 2018) ........ 15

Jack Williams, MIT Election Data & Sci. Lab, *The Election Administration and Voting Survey*, Elections Performance Index (Aug. 16, 2021) ........ 14

Jane C. Timm, *Amateur fraud hunters bury election officials in public records requests*, NBC News (Mar. 26, 2023) ........ 6

Jess Bidgood, *America's Election Workers Are Leaving in Droves*, Boston Globe (Oct. 23, 2022) ........ 4

Jim Saksa, *In 23rd Loss for DOJ, federal judge rejects its demand for Minnesota voter rolls*, Democracy Docket (Aug. 17, 2026) ........ 2

Karen L. Shanton, Cong. Rsch. Serv., *The Election Administration and Voting Survey (EAVS): Overview and 2024 Findings* (July 8, 2025) ........ 14

Kyle Yoder & Alice Tan, Ctr. for Election Innovation & Rsch., *Focus Brief: Election Officials & the Misuse of Public Records Requests* (June 14, 2024) ........ 6

MIT Election Data & Sci. Lab, *About*, .................................. 14

Paul Gronke & Paul Manson, Elections & Voting Info. Ctr., *Findings From the 2023 LEO Survey* (Nov. 16, 2023) ........................................................................ 5

Paul Gronke et al., Elections & Voting Info. Ctr., *Findings from the 2024 LEO Survey* 20 (Feb. 2025) ...................... 5, 6

Ruby Edlin & Lawrence Norden, *Survey Finds Election Officials Want More Support Amid Federal Cutbacks and Ongoing Threats*, Brennan Ctr for Just. (July 10, 2025) ........................................................................ 4

Samantha J. Gross, *"I have no idea what any of these even mean": Massachusetts clerks are getting bombarded with conspiracy-fueled records requests about the 2020 election*, Boston Globe (Sept. 18, 2022) ............................... 6

U.S. Election Assistance Comm'n, *Best Practices: Public Records Requests* 1 (Mar. 2023) ........................................... 5

U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* (June 2025) .......................................... 13, 15, 16, 17

## STATEMENT OF INTEREST

The *amici* listed in Appendix A offer this brief in support of Defendant-Appellee Massachusetts Secretary of the Commonwealth William Galvin and affirmance.[1] *Amici* are local election officials and local governments from states that have received letters from the federal government demanding sensitive voter roll data, including Massachusetts. In Massachusetts and other states that are subject to the National Voter Registration Act ("NVRA"), local government officials are duty-bound to promote the exercise of the right to vote. 52 U.S.C. § 20501(a)(2). Local election officials like *amici* administer local, state, and federal elections in their respective jurisdictions, and many count voter registration and list maintenance among their duties. *See, e.g.*, Mass. Gen. Laws ch. 51, §§ 3, 4, 42H (assigning Massachusetts city and town clerks responsibility for some voter registration and list maintenance activities).

---

[1] *Amici curiae* submit this brief under Federal Rule of Appellate Procedure 29(a). Undersigned counsel for *amici curiae* certify that this brief was not authored in whole or in part by counsel for any of the parties; no party or party's counsel contributed money for the brief; and no one other than *amici* or their counsel has contributed money toward the preparation or submission of this brief. Pursuant to Fed. R. App. P. 29(a)(2), all parties have consented to the filing of this brief.

*Amici* support the Appellees' arguments for affirmance but write separately to offer their experience and expertise in election administration, specifically with respect to election-related records requests, voter roll maintenance, and data security practices.

## SUMMARY OF ARGUMENT

DOJ's unprecedented and unsubstantiated demands for sensitive voter information under the Civil Rights Act of 1960 ("CRA") have now been rejected by twenty-three courts and counting.[2] The CRA authorizes the Attorney General to seek certain state election records but contains specific statutory guardrails: the demand must be "in writing," and "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. That requirement may not be onerous, but read in light of the "duty to give effect, if possible, to every clause and word of a statute," *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (internal citation and quotation marks omitted), it must have some meaning. Courts can provide that meaning and must enforce appropriate safeguards to prevent a burdensome drain on the limited resources of local election

[2] Jim Saksa, *In 23rd Loss for DOJ, federal judge rejects its demand for Minnesota voter rolls*, Democracy Docket (Aug. 17, 2026), https://perma.cc/XC9K-WNNW.

officials caused by overbroad requests. For the reasons set forth below, and in Secretary Galvin's brief, this Court should affirm.

## ARGUMENT

### I. Local Election Officials Have a Unique Institutional Perspective on Requests for Statewide Voter Registration Data.

Election administration in the United States is intensely local and thinly resourced. In Massachusetts, for example, elections are administered by individual city and town clerks with small offices. Yet these offices carry enormous responsibilities for ensuring the free, fair, and efficient administration of all federal, state, and local elections. They lead on voter communications; manage voter registrations and maintain voter rolls; print and distribute ballots; recruit and train poll workers; run early, absentee, and Election Day voting; and manage post-election procedures, like counts, recounts, and certification. And in the weeks and months leading up to an election, all of this work is performed under rigid statutory calendars dictating tight and unforgiving deadlines. These

conditions—chronic resource constraints paired with intense job stress—drive high turnover rates nationwide;[3] Massachusetts is no exception.[4]

Amidst this work, local election officials like *amici* also regularly field public records requests under state law, *see, e.g.,* Mass. Gen. Laws ch. 66, § 10, and routinely coordinate and share information with local, state, and federal law enforcement.[5] They thus appreciate the importance of transparency in the electoral process, but understand equally that it must be balanced against voter privacy. Indeed, states often impose strict parameters around personally identifying voter information that local election officials must comply with in responding to data requests. In Massachusetts, for example, the names and addresses of voters maintained in the state's central voter registration database are expressly not public records. *See* Mass. Gen. Laws ch. 51, § 47C; *see also Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024)

---

[3] Jess Bidgood, *America's Election Workers Are Leaving in Droves*, Boston Globe (Oct. 23, 2022), https://perma.cc/R8NN-D4N9.

[4] *Id.*

[5] Eighty percent of local election officials reported coordinating with law enforcement in the lead-up to the 2024 election. Ruby Edlin & Lawrence Norden, *Survey Finds Election Officials Want More Support Amid Federal Cutbacks and Ongoing Threats*, Brennan Ctr for Just. (July 10, 2025), https://perma.cc/JM5U-AY3G.

(noting that the National Voter Registration Act of 1993 "does not require the disclosure of sensitive information that implicates special privacy concerns" (citation omitted)). To that end, local election officials have developed real expertise in managing records requests—disclosing what the public is entitled to while safeguarding what the law protects.

That expertise has been put to the test in recent years, as public records requests have surged, unduly burdening the offices of local election officials and threatening their ability to conduct elections.[6] In response to national surveys by the Elections & Voting Information Center ("EVIC"), a non-partisan academic research center focused on election administration, a vast majority of election officials have reported spending an increased amount of time on records requests.[7] That is likely due not only to the increased volume of requests, but also to the more

[6] *See* U.S. Election Assistance Comm'n, *Best Practices: Public Records Requests,* at 1 (Mar. 2023), https://perma.cc/A346-P8JU.

[7] *See* Paul Gronke & Paul Manson, Elections & Voting Info. Ctr., *Findings From the 2023 LEO Survey,* at 2, 13 (Nov. 16, 2023), https://perma.cc/6XLB-SC4G; Paul Gronke et al., Elections & Voting Info. Ctr., *Findings from the 2024 LEO Survey* 20 (Feb. 2025), https://perma.cc/9TNQ-BE7M.

complicated and sweeping nature of the requests.[8] *Amici* have seen this first-hand, as requests have increasingly sought a broad range of records not traditionally requested and covering long periods of time, with many seemingly grounded in misinformation about election administration.[9] The staff time necessary to respond to these types of requests has forced local election officials to shift staff responsibilities.[10]

Moreover, wholesale demands for voter rolls like the one at issue here inevitably burden local election officials because in most states,

[8] In its 2024 survey, EVIC included a new question regarding record requests. *See* Gronke et al., *Findings from the 2024 LEO Survey*, *supra* note 7, at 20. In response, 72 percent of election officials surveyed reported that a smaller subset of requests disproportionately consume their time. *Id.* Over 60 percent reported that records requests are unduly burdensome and impede the ability of local election officials to perform their duties. *Id.*

[9] Samantha J. Gross, *"I have no idea what any of these even mean": Massachusetts clerks are getting bombarded with conspiracy-fueled records requests about the 2020 election*, Boston Globe (Sept. 18, 2022), https://perma.cc/7242-GS9H; Kyle Yoder & Alice Tan, Ctr. for Election Innovation & Rsch., *Focus Brief: Election Officials & the Misuse of Public Records Requests,* at 2 (June 14, 2024), https://perma.cc/3XVG-3AJN.

[10] Jane C. Timm, *Amateur fraud hunters bury election officials in public records requests*, NBC News (Mar. 26, 2023), https://perma.cc/CKZ9-SBN5.

including Massachusetts,[11] the sensitive data that DOJ seeks exists in its original form only in the files held by local officials. Redacting or producing that data cannot be done from the state's central registry alone; it requires hands-on work by the very local offices that are already short-staffed. Local election officials shoulder that burden willingly when a legitimate, particularized law enforcement purpose justifies it. But DOJ's demand here is different in kind: untethered from any concrete law-enforcement needs and imposing real costs on local offices in service of no specific investigation at all.

## II. If Courts Do Not Evaluate Whether a Title III Demand Contains the CRA's Required Statement of Basis and Purpose, the Administrative Burden on Local Election Officials Could Increase.

Amidst the growing burden on local election officials, courts serve an important backstop—policing the line between lawful and unlawful information requests and ensuring that voters' sensitive information is not released unless it is truly necessary. *See, e.g.*, *Boston Globe Media Partners, LLC v. Dep't of Pub. Health*, 124 N.E.3d 127, 147 (Mass. 2019)

---

[11] *See* Mass. Gen. Laws ch. 51, § 47C (central registry populated with data "provided by the registrars"); *id.* § 66 (requiring registrars to provide data to the state secretary for maintenance of voter lists); *id.* § 42H (receipt of registration affidavits by local registrars).

(explaining that when a requester is relying on an asserted public interest as a reason to get access to data that would otherwise raise privacy concerns, the requester must do more than proffer the public interest in general terms).

Nothing in the CRA precludes courts from performing this vital function in reviewing records requests made by the Attorney General, and in fact, *amici* and other local election officials rely on courts to evaluate less-routine requests and identify the limits of production obligations. *See* 52 U.S.C. § 20705. The CRA requires the Attorney General to include in any record request "a statement of the basis and the purpose" for the request, 52 U.S.C. § 20703, and gives federal courts "jurisdiction *by appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). The statutory phrase "appropriate process" means that courts have the authority to inquire into the basis and purpose for the CRA demand.

DOJ's arguments to the contrary are incorrect. DOJ has filed lawsuits against thirty states and the District of Columbia seeking to compel election officials to provide sensitive voter data. It argues across these cases that courts have no meaningful role in reviewing CRA

demands by the Attorney General for election-related records. *See* Appellant's Br. at 17–21. Time and again, that argument has failed. In fact, nearly every court to have considered DOJ's argument has rejected it—some courts expressly,[12] others by performing exactly the threshold

[12] *See United States v. Simon*, No. 25-cv-3761, 2026 WL 2389778, at *7–8 (D. Minn. Aug. 17, 2026); *United States v. Aguilar*, No. 25-cv-00728-ART-CLB, 2026 WL 2364502, at *2–3 (D. Nev. Aug. 14, 2026); *United States v. Caldwell*, No. 26-cv-2025, 2026 WL 2186515, at *6 (D.N.J. July 29, 2026); *United States v. Benson*, 179 F.4th 470, 483 n.2 (6th Cir. 2026); *United States v. Weber*, 816 F. Supp. 3d 1168, 1182 (C.D. Cal. 2026); *United States v. Warner*, No. 26-cv-00156, 2026 WL 2018877, at *2 (S.D.W. Va. July 13, 2026); *United States v. Scanlan*, No. 25-cv-371-JL, 2026 WL 1864054, at *3 n.2 (D.N.H. June 29, 2026); *United States v. DeMarinis*, No. SAG-25-3934, 2026 WL 1780586, at *3 (D. Md. June 18, 2026); *United States v. Bellows*, No. 25-cv-00468-LEW, 2026 WL 1430481, at *5 & n.8 (D. Me. May 21, 2026); *United States v. Fontes*, No. cv-26-00066-PHX-SMB, 2026 WL 1177244, at *1 n.1 (D. Ariz. Apr. 28, 2026); *United States v. Oregon*, No. 2828 F. Supp. 3d 1092, 1102–03 (D. Or. 2026).

The district court in *United States v. Benson*, 819 F. Supp. 3d 753, 767 (W.D. Mich. 2026) stated in dicta that courts may not evaluate the "substance" of a demand's stated basis—a suggestion the district court did not need to reach, since its dismissal rested on the independent ground that a voter registration list is not a covered "record," *id.* at 768, and one the Sixth Circuit effectively superseded, *see Benson*, 179 F.4th at 483 n.2 (holding that "binding precedent … carves out a role for the courts in reviewing civil investigative demands like the government's").

review DOJ claims is forbidden, even where they did not specify which procedural rule required it.[13]

Recognizing the authority of federal courts to conduct this review makes practical sense, too. Local election officials who already grapple with the difficulty of responding to increased election records productions from the public are now faced with the specter of a flood of burdensome records requests from the federal government. If courts did not serve as arbiters of the validity of novel elections-related records requests, local election officials would be hard-pressed to find time to fulfil their day-to-day election administration responsibilities while also responding to every single request. *Amici* appreciate the importance of local government transparency and its power to build trust in elections, but limitless requests can do the opposite while also burdening election administration.

Under DOJ's implausible interpretation of the CRA, there would be no meaningful check on DOJ's power to issue sweeping records demands

---

[13] *See United States v. Schmidt*, No. 25-cv-01481-CB, 2026 WL 1850016, at *2 (W.D. Pa. June 27, 2026); Add. to Appellant Br. at 8 n.8.; *United States v. Wis. Elections Comm'n*, No. 25-cv-1036-JDP, 2026 WL 1430354, at *2 (W.D. Wis. May 21, 2026).

unsupported by any sufficient basis. The record indicates local election officials themselves could be the next target of such demands: DOJ's letters to Massachusetts included a request for "a list of election officials responsible for implementing Massachusetts's list maintenance program." Add. to Appellant Br. at 3 n.4. This Court should join the numerous others that have held that courts may test the adequacy of the basis and purpose stated in a CRA demand.

## III. EAVS Data Cannot Provide a Sufficient Basis for Questioning Voter Roll Maintenance Practices.

For the first time on appeal, DOJ contends that it stated a basis for its demands by requesting information concerning three responses to the Election Assistance Commission's ("EAC") 2024 EAVS Comprehensive Report. *See* Appellant's Br. at 22–23. First of all, DOJ failed to make this argument before the district court. *See generally* Pl.'s Consolidated Mem. Opp'n Mots. to Dismiss, Dist. Ct. Dkt. No. 72. In fact, DOJ never asserted that its July 22 letter, which outlined the purported concerns about Massachusetts's EAVS data, constituted the CRA "written demand." Instead, it attributed its "written demand" to the August 14 letter, which contains no such reference to EAVS data. *See* Compl. ¶¶ 22-24, Dist. Ct. Dkt. No. 1. As this Court has "repeatedly warned," and as the Secretary

correctly notes, Br. of State Appellee Sec'y William F. Galvin. at 25–28, "arguments that were not raised below are forfeited" on appeal. *García-Navarro v. Universal Ins. Co.*, 173 F.4th 1, 7 (1st Cir. 2026). But even if DOJ had made the argument, it falls flat: merely asking for explanation concerning three answers on the EAVS, without suggesting that the original answers raised any concern about compliance with federal requirements, is not a "factual basis" under any reasonable understanding of that term.

*Amici* join the Secretary in his arguments as to why DOJ's demand fails to comport with the CRA's factual basis requirement, and write separately to put the EAVS data in context and explain why a handful of cherry-picked figures do not constitute a "basis" for Massachusetts's unredacted voter registration list.

The EAVS is a biennial survey of state and local election officials conducted by the EAC. Its use dates to passage of the Help America Vote Act ("HAVA"), which created the EAC to serve "as a national clearinghouse and resource for the compilation of information and review of procedures with respect to the administration of Federal elections." 52 U.S.C. § 20922. The EAC relies on EAVS data to carry out that mandate.

Local election officials like *amici* are often responsible for providing data in response to EAVS and have significant familiarity with its data.

The survey is divided into six sections—voter registration, overseas and military voting, domestic absentee voting, election administration, provisional ballots, and Election Day activities—each posing standardized questions.[14] To answer them, state officials draw on data from local officials and state level databases. Each state's chief election official submits and certifies the state's response. The EAC then reports its findings to Congress and releases them publicly the year after each election.

That design makes the EAVS useful for identifying general trends but ill-suited to specific findings about individual jurisdictions. Elections in the United States are administered locally, and jurisdictions employ

[14] *See* U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report,* at 231–33 (June 2025), https://perma.cc/TMQ7-MSSD.

widely varying election practices that change over time.[15] Those differences do not translate neatly into the survey's standardized response categories. The data can offer initial insights into voting patterns and procedures, but it is neither as detailed or comprehensive as the records the states themselves maintain.[16] In fact, the 2024 EAVS report states that its purpose is "produc[ing] a general understanding of core aspects of the election process and the management challenges faced by election officials," helping the EAC determine how to better support election officials and voters, and informing lawmakers and the public

---

[15] *See* Karen L. Shanton, Cong. Rsch. Serv., *The Election Administration and Voting Survey (EAVS): Overview and 2024 Findings,* at 3 (July 8, 2025), https://perma.cc/A746-9A35 ("[S]ome data may not be straightforwardly comparable across years, states, or localities. Changes in the EAVS survey instrument from one year to another and changes or differences in data collection practices or election laws, procedures, or definitions complicate comparisons.").

[16] The MIT Election Lab aims to support advances in election science by collecting, analyzing, and sharing election data and findings. *See* MIT Election Data & Sci. Lab, *About*, https://perma.cc/4DFW-Z5ZH. It identifies itself as a "[p]ower user[]" of the EAVS data. Jack Williams, MIT Election Data & Sci. Lab, *The Election Administration and Voting Survey*, Elections Performance Index (Aug. 16, 2021), https://perma.cc/L3JG-LELE. The MIT Election Lab notes the need to strike a balance between "valuing what the survey can bring to the table with cautions about scrutinizing the data before using it." *Id*. It notes that the EAVS data may differ from administrative data maintained by the states "for many reasons that are justified." *Id*.

about the impact of voting laws.[17] As one researcher aptly described it, EAVS data is "close enough for social science, but not close enough for the court house."[18]

DOJ has seized on selected EAVS figures to suggest that Massachusetts is falling behind other states in maintaining its voter rolls—a strategy it has employed in many of the cases where it is trying, and failing, to obtain state voter roll data. But a survey measuring so many variables will always yield some categories in which a state runs above or below the national average. In fact, other EAVS data suggests that Massachusetts is actually *exceeding* its peers in maintaining its voter registration. The NVRA requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(a)(4). Indeed, the efforts of state and local election officials in Massachusetts meet the list maintenance requirements of the NVRA and HAVA. The EAC's own report on its 2024 survey data shows that Massachusetts

---

[17] U.S. Election Assistance Comm'n, *supra* note 14, at i.

[18] Charles Stewart III, *Is the EAVS a Reliable Guide to Voter List Maintenance?*, at 3 MIT Pol. Sci. Dep't, Research Paper No. 2018-20 (Aug. 25, 2018), https://perma.cc/9MXY-DWK5.

removed 14.4 percent of registered voters from its rolls due to relocation, death, or failure to return registration confirmation[19]—placing the Commonwealth among the top five percent of states nationwide and reflecting diligent voter roll maintenance, as required by the NVRA.

Another reason that EAVS data cannot support a basis for the CRA demand is that the timing of the nationwide survey may not align with the timing of election administration. For example, while DOJ asked states about low rates of removals from voter rolls, the NVRA *requires* a waiting period of two federal elections after it appears that a registered voter may have moved before their registration may be cancelled, a delay of at least four years. 52 U.S.C. § 20507(d)(1). Further, the NVRA prohibits systematic removal of registrants during the 90-day period before an election, which can add months to the prohibition on removal, especially if a jurisdiction has a special election scheduled between primaries and general elections. *Id.* § 20507(c)(2). DOJ should at least be aware of this potential for delay, because the 2024 EAVS Report that DOJ used to identify its EAVS "anomalies" flags this issue specifically:

> [D]ata on registered and eligible voters as reported in the EAVS should be used with caution, as these totals can include

---

[19] *See* U.S. Election Assistance Comm'n, *supra* note 14, at 185.

> registrants who are no longer eligible to vote in that state but who have not been removed from the voter lists because the removal process laid out by the NVRA can take up to two election cycles to be completed.[20]

EAVS data is not useless. Election administrators and state policymakers can and do review the data to identify general trends and areas for improvement, and local election officials regularly work with the EAC to improve the quality of the collected data. However, it is not useful as a basis for an investigation into sensitive voter information. DOJ's identification of data points and interpretation of variances across states as "anomalies," without seeming to review information provided by the states, does not suggest a valid basis for an investigation into list maintenance, even if such an investigation was a purpose authorized by the CRA.

DOJ's position that a state's list maintenance procedures can be called into question if *any* of the data in *any* of the categories related to registrations or removals differs from the national average is unsupportable, and ignores the fact that our elections are administered at the state and local level.

---

[20] U.S. Election Assistance Comm'n, *supra* note 14, at 131.

## CONCLUSION

Congress meant what it said when it passed the CRA: a written demand for a state's election records must state its basis and purpose. Courts are entrusted to enforce that requirement, particularly where sweeping demands burden local election officials and seek sensitive voter information. Here, DOJ's reliance on cherry-picked EAVS data does not provide the factual basis the CRA requires. This Court should affirm.

Respectfully submitted,

*/s/ Jonathan B. Miller*

Jonathan Miller
PUBLIC RIGHTS PROJECT
490 43rd Street, #115
Oakland, CA 94609
Telephone: (510) 214-6960
jon@publicrightsproject.org

Counsel for *Amici Curiae*

Dated: August 24, 2026

## APPENDIX A – List of *Amicus Curiae*

### Local Governments

*City of Boston, Massachusetts*

*County of Mendocino, California*

*City of Minneapolis, Minnesota*

### Local Government Officials

Lisa Brown
*Clerk/Register of Deeds, Oakland County, Michigan*

Bill Burgess
*Clerk, Marion County, Oregon*

Barb Byrum
*Clerk, Ingham County, Michigan*

Katharine Clark
*Clerk, Santa Fe County, New Mexico*

Rich Coglianese
*Board of Elections Member, Union County, Ohio*

Cynthia Cornejo
*Interim Registrar of Voters, County of Alameda, California*

Daryl Daugs
*Former Chief Deputy Auditor, Kitsap County, Washington*

Lisa Deeley
*Commissioner, City of Philadelphia, Pennsylvania*

Jilline Dobratz
*Clerk, City of West Bend, Wisconsin*

Justin Douglas
*Commissioner, Dauphin County, Pennsylvania*

Lynn Goya Clark
*Clerk, Clark County, Nevada*

William George Kingston
*Supervisor of the Checklist, Town of New Castle, New Hampshire*

Nicholas J. Lima
*Registrar/Director of Elections, City of Cranston, Rhode Island*

Jo Ellen Litz
*Commissioner, Lebanon County, Pennsylvania*

Daniel Loomis
*Clerk, Douglas County, Oregon*

Dele Lowman
*Voter Registration & Elections Board Member, Dekalb County, Georgia*

Robin Major
*Elections Administrator, Monmouth County, New Jersey*

Kirk McDonough
*Board of Canvassers Chair, City of Cranston, Rhode Island*

Jimmy Sabatino
*Council Chair, Luzerne County, Pennsylvania*

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* certify that they are governmental entities and individuals for whom no corporate disclosure is required pursuant to Federal Rule of Appellate Procedure 26.1.

## CERTIFICATE OF COMPLIANCE

I, Jonathan Miller, hereby certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 3,650 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook size 14.

*/s/ Jonathan B. Miller*
Jonathan Miller
Public Rights Project

Dated: August 24, 2026

## CERTIFICATE OF SERVICE

I, JONATHAN MILLER, hereby certify that I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on August 24, 2026.

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

*/s/ Jonathan B. Miller*
Jonathan B. Miller